**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE FIVE BELOW, INC. SECURITIES LITIGATION | Case No. 2:24-cv-03638-GAM<br><br>CLASS ACTION<br><br><br>JURY TRIAL DEMANDED |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................ 1

    I.    FACTUAL BACKGROUND ............................................................................. 4

        A.    Five Below's History And Business ............................................................ 4

        B.    Defendants Repeatedly Emphasized Five Below's Trend-Right Strategy While The Strategy Was Failing ................................................................ 4

        C.    Defendants Blame Poor Performance On Shrink ...................................... 5

        D.    Defendants Tout The Triple-Double Plan And Omit Its Drawbacks ..................... 7

        E.    Five Below's Previously Concealed Execution Failures Are Revealed And Its Stock Price Plummets ........................................................................ 8

ARGUMENT ..................................................................................................................... 9

    II.    EXTRINSIC DOCUMENTS CANNOT BE USED TO REBUT THE COMPLAINT'S WELL-PLED ALLEGATIONS ........................................... 9

    III.    LEGAL STANDARD ...................................................................................... 11

    IV.    DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING ............................................................................................... 12

        A.    Plaintiffs Allege Multiple Categories Of False And Misleading Statements ....... 12

            1.    Defendants' Statements Regarding The Company's "Trend-Right" Strategy Were False And Misleading. ........................................... 12

            2.    Defendants Made False And Misleading Statements Regarding Shrink. ..... 18

            3.    Defendants Made False and Misleading Statements Concerning The Triple-Double Plan. ........................................................... 22

        B.    Plaintiffs Support Their Claims With Credible Former Employee Accounts ....... 23

        C.    Defendants' Statements Are Not Puffery ............................................... 30

        D.    Defendants' Statements Are Not Protected By The Safe Harbor for Forward-Looking Statements ................................................................ 34

V.  THE COMPLAINT PROPERLY ALLEGES SCIENTER ......................................... 37

    A.  The Officer Defendants Acted With Knowledge Or Reckless Disregard For The Falsity Of Their Statements ...................................................... 38

        1.  The Officer Defendants Admitted To Contemporaneous Knowledge. ....... 38

        2.  Defendants' Knowledge Is Reflected In Former Employee Statements. .... 40

        3.  Defendants' Repeated Public Statements Support A Finding Of Scienter.. 41

        4.  Defendants Had Control And Access To Relevant Information. ................ 42

        5.  The False And Misleading Statements Concerned Five Below's Core Operations. .......................................................................................... 43

        6.  The Temporal Proximity Between False Statements And The Revelation Of The Fraud Supports Scienter............................................................. 44

        7.  The Executive Shake-Up At The End Of The Class Period Supports Scienter. ............................................................................................... 45

        8.  Defendants' Incentive Compensation Offered A Motive For Fraud. .......... 46

        9.  Defendants' Stock Sales Further Support An Inference of Scienter............ 48

    B.  The Complaint Properly Pleads Scienter Against Five Below ............................ 50

    C.  A Holistic Analysis Supports A Finding Of Scienter ......................................... 51

VI.  PLAINTIFFS HAVE SUFFICIENTLY PLED LOSS CAUSATION .......................... 52

    A.  Corrective Disclosures Corrected Defendants' Misrepresentations ..................... 52

    B.  Defendants' Loss Causation Arguments Are Unavailing.................................... 56

VII.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SECTION 20(a) CLAIMS ......... 57

VIII.  CONCLUSION.................................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Klein*,
  2021 WL 4439658 (D. Del. Sept. 28, 2021) ............................................................................ 52

*Alberici v. Recro Pharma, Inc.*,
  2021 WL 798299 (E.D. Pa. Mar. 1, 2021) .............................................................................. 22

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) ............................................................................... passim

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
  744 F. Supp. 3d 350 (E.D. Pa. 2024) .................................................................... 37, 38, 42

*Alsaidi v. City of Paterson*,
  2024 WL 4053085 (D.N.J. Sept. 5, 2024) .............................................................................. 11

*Arazie v. Mullane*,
  2 F.3d 1456 (7th Cir. 1993) .................................................................................................... 45

*Baer v. Shift4 Payments, Inc.*,
  2025 WL 269715 (E.D. Pa. Jan. 22, 2025) ............................................................................ 44

*Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*,
  435 F.3d 396 (3d Cir. 2006) ................................................................................................... 11

*Brendon v. Allegiant Travel Co.*,
  412 F. Supp. 3d 1244 (D. Nev. 2019) .................................................................................... 49

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012) .................................................................................... 20

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .............................................................................................. 25, 26

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
  2019 WL 3451523 (D.N.J. July 31, 2019) ........................................................................ 34, 35

*Chan v. UBS AG*,
  2019 WL 6825747 (C.D. Cal. Aug. 5, 2019) ......................................................................... 11

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018) ....................................................................... 17, 40

iii

*Devon Drive Lionville, LP v. Parke Bancorp, Inc.*,
    2016 WL 7475816 (E.D. Pa. Dec. 29, 2016) ................................................................. 10

*Doe v. Princeton Univ.*,
    30 F.4th 335 (3d Cir. 2022) ......................................................................................... 10

*Elam v. Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ....................................................................................... 45

*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v.  Conduent Inc.*,
    2020 WL 3026536 (D.N.J. June 5, 2020) .................................................................... 29

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (D.S.C. 2016)............................................................................... 56

*Evanston Police Pension Fund v. McKesson Corp.,*
    411 F.Supp.3d 580 (N.D. Cal. 2019) ........................................................................... 47

*Fain v. USA Techs., Inc.*,
    707 F. App'x 91 (3d Cir. 2017) .................................................................................... 43

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020)........................................................................... 29

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................... 50

*Galati v. Commerce Bancorp, Inc.*,
    220 F. App'x 97 (3d Cir. 2007) .................................................................................... 32

*Gammel v. Hewlett-Packard Co.*,
    905 F. Supp. 2d 1052 (C.D. Cal. 2012) ....................................................................... 27

*Gold v. Ford Motor Co.*,
    577 F. App'x 120 (3d Cir. 2014) .................................................................................. 37

*Hall v. Johnson & Johnson,*
    2019 WL 7207491 (D.N.J. Dec. 27, 2019)............................................................. 15, 20

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entertainment Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)........................................................................... 36

*Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) ....................................................................................... 52

*Howard v. Arconic Inc.*,
    2021 WL 2561895 (W.D. Pa. June 23, 2021)........................................................ 55, 56

iv

*Hoxworth v. Blinder, Robinson, & Co. Inc.*,
   903 F.2d 186 (3d Cir. 1990) ................................................................. 30

*Hull v. Global Digital Solutions, Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017) ............................................ 46

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F.3d 267 (3d Cir. 2004) ................................................................. 30

*In re Advance Auto Parts, Inc., Sec. Litig.*,
   2020 WL 599543 (D. Del. Feb. 7, 2020) ........................................... 25, 29

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ................................................................. 32

*In re Aetna, Inc. Sec. Litig.*,
   617 F.3d 272 (3d Cir. 2010) ............................................................. 32, 35

*In re Aetna, Inc. Sec. Litig.*,
   34 F. Supp. 2d 935 (E.D. Pa. 1999) ................................................. 36, 45

*In re Amarin Corp. PLC*,
   2015 WL 3954190 (D.N.J. June 29, 2015) ............................................ 48

*In re Adolor Corp. Sec. Litig.*,
   616 F. Supp. 2d 551 (E.D. Pa. 2009) .................................................... 50

*In re AppHarvest Sec. Litig.*,
   684 F. Supp. 3d 201 (S.D.N.Y. 2023) .................................................. 34

*In re Bally Total Fitness Sec. Litig.*,
   2006 WL 3714708 (N.D. Ill. July 12, 2006) ......................................... 48

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) .................................................. 50

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ............................................................... 33

*In re Cambrex Corp. Sec. Litig.*,
   2005 WL 2840336 (D.N.J. Oct. 27, 2005) ............................................ 38

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
   403 F. Supp. 3d 712 (D. Minn. 2019) ................................................... 46

*In re Champion Enter., Inc., Sec. Litig.*,
   144 F. Supp. 2d 848 (E.D. Mich. 2001) ............................................... 35

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................................... 17

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018) ......................................................... 15, 20

*In re Coinbase Glob., Inc. Secs. Litig.*,
  2024 WL 4053009 (D.N.J. Sept. 5, 2024) ......................................................... 47, 49

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................. 15

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. 2023) .................................................................... 31

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.,*
  7 F.3d 357 (3d Cir. 1993).......................................................................................... 18

*In re DVI, Inc. Sec. Litig.*,
  2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) .......................................................... 53

*In re EQT Corp. Sec. Litig.*,
  504 F. Supp. 3d 474 (W.D. Pa. 2020)...................................................................... 31

*In re Fannie Mae 2008 Sec. Litig.*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012)...................................................................... 17

*In re Fibrogen, Inc., Sec. Litig.,*
  2022 WL 2793032 (N.D. Cal. July 15, 2022)......................................................... 47

*In re Honeywell Int'l, Inc. Sec. Litig.*,
  182 F. Supp. 2d 414 (D.N.J. 2002) .......................................................................... 49

*In re Hutchinson Tech. Inc. Sec. Litig.*,
  502 F. Supp. 2d 884 (D. Minn. 2007)...................................................................... 27

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)..................................................... 12, 51

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) .......................................................................... 29

*In re Medtronic Inc., Sec. Litig.*,
  618 F. Supp. 2d 1016 (D. Minn. 2009)..................................................................... 49

*In re Merck Co., Inc., Sec., Derivative & "ERISA" Litig.*,
  2006 WL 8460903 (D.N.J. Jan. 20, 2006)............................................................... 11

*In re Mindbody, Inc. Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020) .................................................................. 29

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 3539371 (W.D. Pa. May 18, 2023) ........................................ 23, 24, 25

*In re Neustar Sec. Litig.*,
  83 F. Supp. 3d 671 (E.D. Va. 2015) ...................................................................... 27

*In re Newell Brands, Inc. Sec. Litig.*,
  837 F. App'x 869 (3d Cir. 2020) ........................................................................... 17

*In re Novo Nordisk Sec. Litig.*,
  2018 WL 3913912 (D.N.J. Aug. 16, 2018) ............................................................ 45

*In re NVE Corp. Sec. Litig.*,
  551 F. Supp. 2d 871 (D. Minn. 2007) .................................................................... 33

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) .................................................................... 56

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ........................................................ 45

*In re PayPal Holdings Inc. Sec. Litig.*,
  2025 WL 325603 (D.N.J. Jan. 29, 2025) ............................................................... 32

*In re Penn Treaty Am. Corp. Sec. Litig.*,
  202 F. Supp. 2d 383 (E.D. Pa. 2002) .................................................................... 33

*In re Providian Fin. Corp. Sec. Litig.*,
  152 F. Supp. 2d 814 (E.D. Pa. 2001) .................................................................... 31

*In re RenovaCare, Inc. Sec. Litig.*,
  2024 WL 2815034 (D.N.J. June 3, 2024) .............................................................. 20

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010) .................................................................... 25

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ............................................................................. 48, 49

*In re Synchronoss Techs., Inc. Sec. Litig.*,
  2019 WL 2849933 (D.N.J. July 2, 2019) ............................................................... 26

*In re Toronto-Dominion Bank Sec. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018) .......................................................... 27, 28

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022) ............................................................ 35

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................... passim

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ................................................ 35

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) ............................................................ 27

*In re Wilmington Tr. Sec. Litig.*,
  29 F. Supp. 3d 432 (D. Del. 2014) ................................................................. 33

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. 2022) .................................................... 23, 24, 28

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  2021 WL 4191467 (D.N.J. Sept. 15, 2021) .................................................... 43

*Inst. Inv'rs Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) .................................................................... passim

*J/H Real Estate Inc. v. Abramson*,
  901 F. Supp. 952 (E.D. Pa. 1995) .................................................................. 36

*Kanefsky v. Honeywell Int'l Inc.*,
  2020 WL 2520669 (D.N.J. May 18, 2020) ..................................................... 39

*Kasilingam v. Tilray, Inc.*,
  2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ............................................... 43

*Kurtzman v. Compaq Comp. Corp.*,
  2002 WL 32442832 (S.D. Tex. Mar. 30, 2002) ............................................. 46

*Laasko v. Endo Int'l, PLC*,
  2022 WL 3444038 (D.N.J. Aug. 17, 2022) .................................................... 47

*Loc. 307, I.B. of Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  2011 WL 12855820 (N.D. Ala. June 7, 2011) ............................................... 47

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019) ............................................................... 25

*Lupin Atlantis Holdings v. Ranbaxy Lab'ys, Ltd.*,
  2011 WL 1540199 n.8 (E.D. Pa. Apr. 21, 2011) ........................................... 10

*Marsden v. Select Med. Corp.*,
2006 WL 891445 (E.D. Pa. Apr. 6, 2006),
*vacated in part on other grounds*, 2007 WL 518556 (E.D. Pa. Feb. 12, 2007)........................ 48

*Mart v. Tactile Sys. Tech., Inc.*,
595 F. Supp. 3d 788 (D. Minn. 2022)..................................................................................... 49

*McDermid v. Inovio Pharms., Inc.*,
520 F. Supp. 3d 652 (E.D. Pa. 2021) ..................................................................................... 48

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016)................................................................................................... 35

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)............................................................................................................... 30

*Ortiz v. Canopy Growth Corp.*,
537 F. Supp. 3d 621 (D.N.J. 2021) ........................................................................................ 31

*Paxton v. Provention Bio, Inc.*,
2022 WL 3098236 (D.N.J. Aug. 4, 2022) .............................................................................. 43

*Pelletier v. Endo Int'l PLC*,
439 F. Supp. 3d 450 (E.D. Pa. 2020) ..................................................................................... 24

*Perez v. Target Corp.*,
2024 WL 4804656 (D. Minn. Nov. 15, 2024) ............................................................. 27, 28, 31

*Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
690 F. Supp. 3d 862 (N.D. Ill. 2023) ............................................................................... 26, 41

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
645 F. Supp. 2d 210 (S.D.N.Y. 2009)..................................................................................... 56

*Pound v. Stereotaxis, Inc.*,
8 F. Supp. 3d 1157 (E.D. Mo. 2014)....................................................................................... 28

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ................................................................................................. 56

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013)............................................................................................. 27, 46

*Ray v. StoneCo Ltd.*,
2024 WL 4308130 (S.D.N.Y. Sept. 25, 2024).......................................................................... 20

*Rensin, Tr. of Rensin Joint Tr. v. United States Cellular Corp.*,
755 F. Supp. 3d 1048 (N.D. Ill. 2024) .................................................................................... 22

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)...................................................................... 26

*Roofer's Pension Fund v. Papa*,
687 F. Supp. 3d 604 (D.N.J. 2023) ............................................................................... 49

*Sanders v. Realreal, Inc.*,
2021 WL 1222625 (N.D. Cal. Mar. 31, 2021)............................................................. 11

*SEC v. Airborne Wireless Network*,
2023 WL 5938527 (S.D.N.Y. Sept. 12, 2023).............................................................. 50

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000)................................................................................... 36, 53

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992)......................................................................................... 40

*Strougo v. Lannett Co., Inc.*,
2019 WL 1172992 (E.D. Pa. Mar. 13, 2019)............................................................... 12

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
2022 WL 17740482 (D.N.J. Dec. 16, 2022)................................................................. 37

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)........................................................................................... 11, 12, 37

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ....................................................................... 40

*Tomaszewski v. Trevena, Inc.*,
482 F. Supp. 3d 317 (E.D. Pa. 2020) ........................................................................... 10

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
176 F. Supp. 3d 387 (D. Del. 2016).............................................................................. 44

*Victaulic Co. v. Tieman*,
499 F.3d 227 (3d Cir. 2007).......................................................................................... 10

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2015 WL 3755218 (E.D. Pa. June 16, 2015)................................................................ 17

*Washington State Inv. Bd. v. Odebrecht S.A.,*
461 F. Supp. 3d 46 (S.D.N.Y. 2020)............................................................................. 33

*Waswick v. Torrid Holdings, Inc.*,
2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) ............................................................... 32

x

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ....................................................................... 57

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)....................................................................................... 36

*Wu v. GSX Techedu Inc.*,
    738 F. Supp. 3d 527 (D.N.J. 2024) ...................................................................... 24, 29

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................................................... 46

**Statute**

15 U.S.C. § 78u-5 ............................................................................................................ 34

Lead Plaintiffs Arkansas Teacher Retirement System and Arkansas Public Employees' Retirement System (collectively "Plaintiffs") respectfully provide the below arguments in opposition to Defendants' motion to dismiss ("MTD") (ECF No. 42).[1]

## PRELIMINARY STATEMENT

Throughout the Class Period of December 1, 2022 through July 16, 2024, Defendants falsely pitched Five Below to investors as a company that differentiated itself through its expertise in quickly and effectively capitalizing on consumer demand through its trend-right strategy, which the Company repeatedly referred to as its "key differentiator." As Five Below faced decreasing sales and profit margins early in the Class Period, Defendants deflected attention from their inability to execute their trend-right strategy by blaming retail theft or "shrink." Defendants further sought to falsely reinforce that shrink was the real problem by insisting that Five Below was dedicating resources to mitigating theft. Defendants also continued to insist that their ambitious Triple-Double expansion plans were proceeding apace and would be accretive to sales and profits. Defendants' statements on all three of these subjects—trend-right, shrink, and the expansion plans—were knowingly false and misleading. Tellingly, Defendant Joel Anderson continued promoting the Company's trend-right strategy and expansion plans through June of 2024, just weeks before Five Below's performance collapsed and he resigned as CEO, alongside concessions that Five Below had "lost its way" in identifying in-trend products and that its expansion plans were "too aggressive."

---

[1] Capitalized terms not otherwise defined have the same meaning as set forth in the Consolidated Amended Complaint ("Complaint"). ECF No. 40. Citations to "¶" are to the corresponding paragraphs in the Complaint. Unless otherwise noted, all emphasis in both bold and italics is added. Internal citations and quotes are omitted.

Five Below executives would make further concessions, revealing that "[o]ver the past few years"—the entire Class Period—the Company had "lost some of [its] sharp focus on [its] core customers." Management also acknowledged that the Company's issues were "self-inflicted," that its expansion plan "put too much pressure on the organization," causing management to lose focus on the trend-right strategy, and that Five Below needed to "regain [its] speed and intensity in identifying and bringing in key trend items into [its] stores." Eight of Five Below's former employees ("FEs") who served in various capacities confirmed that the Company had lost its way, failing to identify the right products, lacking any real capability to track and allocate inventory, making no meaningful effort to fight shrink, and engaging in an expansion effort that cannibalized sales from existing stores. The FEs' accounts corroborate that Defendants knowingly or recklessly misled investors. As noted above, in the midst of these revelations, Defendant Anderson abandoned ship by unexpectedly resigning at the end of the Class Period. As the true state of Five Below's business emerged in three corrective disclosures between March 2024 and July 2024, investors' shock was reflected in the Company's plunging stock price, which saw a 64% decline from Class Period highs, wiping out $7.7 billion in shareholder value.

This case is not about a mere business downturn, it is about misrepresentations and omissions to cover up the true causes of the downturn. Defendants are not liable for enacting strategies that failed, they are liable for touting strategies that they knew were already failing.

Defendants raise the typical securities fraud defendant laundry-list of arguments in support of dismissal. *First*, with respect to falsity, Defendants assert that the challenged statements were not materially false or misleading despite established law holding that knowingly emphasizing the strength of deficient business operations constitutes securities fraud. Defendants also accuse Plaintiffs of "hindsight" pleading despite allegations that the statements were false when made

2

based on then-existing facts. Defendants then argue that the FE accounts are not credible because the employees were lower level, even though the Complaint alleges that certain of these employees interacted directly with the Officer Defendants or other senior executives. The FEs' accounts are also consistent with and corroborated by the statements Five Below executives made at the end of or following the Class Period. Defendants also categorize certain of their false statements as puffery and forward-looking, but in reality these are statements of verifiable fact that were repeated multiple times, including following direct analyst inquiry, and purported to describe the present state of affairs at Five Below at the time the statements were made.

*Second*, Defendants impugn the Complaint's scienter allegations. But scienter is equally plain. Plaintiffs have alleged, based on the Officer Defendants' own statements and FE reports, that Defendants Anderson and Kenneth Bull had knowledge of facts and access to information contradicting their public statements. The FEs attended meetings with the Officer Defendants, accessed the same inventory dashboard, and discussed their knowledge with the Officer Defendants' direct reports. Despite the collective facts supporting scienter, Defendants posit that Five Below's top executives were not aware of the key facets of the Company's business, which they spoke about in detail and often. Defendants attempt to defeat the inference of scienter by weakly poking holes in particular allegations. But scienter allegations must be considered holistically and the extensive direct and circumstantial facts easily demonstrate Defendants' scienter.

*Finally*, on loss causation, Defendants disregard the well pled Complaint and assert self-serving explanations for Five Below's stock price decline while ignoring well-established authority that corrective disclosures need not precisely mirror the earlier misrepresentations.

Plaintiffs' allegations more than satisfy Rule 8's requirements by pleading how each corrective disclosure revealed the truth that Defendants' earlier statements misrepresented.

## I.    FACTUAL BACKGROUND

### A.    Five Below's History And Business

Five Below is an operator of low-cost retail stores, known for selling products at prices of $5 or less. ¶¶26, 37. A key aspect of Five Below's business model is its purported ability to predict and capture sales from consumer trends. Five Below claimed it "monitored" trends in its target youth demographic as well as "historical sales trends of current and prior products and the success of new product launches to **ensure** that our merchandise is relevant for our customers." ¶28. The Company called this its "trend-right" strategy and emphasized it was "highly planned." ¶¶3, 28.

Due to declining margins in recent years, the Company set out to increase its overall net income by increasing sales volumes. ¶37. Successful implementation of the trend-right strategy was a critical component of those efforts. *Id.* Five Below also announced an ambitious "Triple-Double" plan on March 30, 2022, whereby the Company planned to triple its stores by 2030 and double its sales and EPS by 2025. ¶¶33-34. In March 2023 Defendant Bull was promoted to COO in order to "focus on important building blocks of our Triple Double [plan]." ¶36.

### B.    Defendants Repeatedly Emphasized Five Below's Trend-Right Strategy While The Strategy Was Failing

Throughout the Class Period, Defendants consistently and prominently trumpeted the Company's trend-right strategy in their communications to investors. ¶¶43-49, 208-23; *see* Appendix A. For example, Five Below's SEC filings said the trend-right strategy was the "principal basis upon which we compete." ¶208; *accord* ¶215(d) and § IV.A.1, *infra* (detailing Defendants' trend-right statements). These statements sought to convey that Five Below had unique expertise and resources to pick out trending products that would be in high demand.

4

Reality was far different from Defendants' assertions. Multiple FEs reported that the Company lacked the ability to consistently execute its trend-right strategy. Two common themes run through their accounts. First, Five Below lost its ability to effectively identify new trends. ¶¶65, 78, 89-90, 95. Second, Five Below lacked adequate inventory controls, meaning the Company could not properly identify its current inventory levels of trend-right merchandise, allocate needed in-trend merchandise to particular stores, or keep track of which incoming inventory was being directed to which stores. ¶¶8, 68, 78, 82, 95. As a result, Five Below stores were chronically burdened by too little in-demand inventory, causing foot traffic and sales to decline. ¶¶53, 60.

Following the Class Period, on August 28, 2024, the Company admitted that it had been straying from its trend-right strategy. Defendant Bull acknowledged that Five Below "got away from . . . the core part of our business around . . . trend product," going so far as to say the Company "lost our way." ¶¶55, 195. He also admitted that Five Below "overexpanded our assortments . . . without the strict editing process of past years and without the key item focus that screamed value and differentiation." *Id.* When asked by an analyst, Bull admitted that Five Below's disappointing results were a "culmination of things over a period of years." ¶199. The Company's Executive Chairman and co-founder Thomas Vellios ("Vellios") admitted that the Company "need[ed] to regain our speed and intensity in identifying and bringing in key trend items into our stores," acknowledging that the loss of focus was not new but had in fact occurred "[o]ver the past few years." ¶¶54, 194.

**C.     Defendants Blame Poor Performance On Shrink**

Beginning on March 15, 2023, Defendants began attributing the Company's performance struggles largely to shrink., thereby shifting the blame from their own mismanagement to a so-called "societal problem" of theft. ¶¶7, 99-103, 228-36. On August 30, 2023, Defendant Anderson

said the decline in margin guidance from the prior quarter "pretty much is all based on the changes we're making with the assumption of shrink." ¶¶99, 230. The next day, Anderson went on Fox Business to discuss the Company's financial results with Maria Bartiromo. He discussed the issue of shrink, which he said was "impacting all retailers," and he put the onus on the public to solve the issue. ¶102. On March 20, 2024, the Company announced lower-than-expected EPS and Anderson claimed the disappointing results "can be *fully attributed* to higher-than-planned shrink." ¶¶7, 103, 235.

Behind the scenes, once again the reality was much different. FEs revealed that shrink was *not* the central issue impacting the Company's financial results. ¶¶9, 118. FE 1 said shrink was a minor part of the Company's struggles, and the real problem was its inability to stock trend-right merchandise. ¶119. FE 3 said shrink posed less of an issue than other problems such as inventory control. ¶123. FE 4 revealed that Five Below disguised its inventory control problems *as* shrink; he explained that his District Manager instructed employees to attribute any gap between the number of items Five Below was supposed to have and what it actually had to theft, even when the real reason was poor inventory control, lost inventory, or items the store never received. ¶84.[2]

Defendants coupled their statements blaming shrink with misleading claims that they were taking meaningful steps to "mitigate" shrink and that those efforts were bearing fruit, calming investors' concerns about the purported impact of shrink. ¶¶7, 110-14, 241, 245-46. But the Company's mitigation efforts were largely non-existent. ¶¶9, 118, 120-29, 248. Multiple FEs reported that shrink mitigation would require additional payroll, which the Company refused to

---

[2] Defendants' tactic of scapegoating shrink was consistent with efforts by other retailers to use shrink as an excuse for their financial struggles. ¶¶104-08. Articles in August and September 2023 explained that "[r]etailers . . . could be overstating crime's impact to cover up internal flaws or self-inflicted problems" and that "[e]xperts have said some companies could be using crime as an excuse to distract from other operational challenges . . . such as poor inventory management." ¶¶105-06.

meaningfully invest in, and the main step Five Below took to combat shrink was assigning employees to monitor self-checkout registers. ¶¶118, 120, 123-25, 128. FEs noted that store employees were not trained on strategies to prevent theft and were not allowed to intervene if they observed theft. ¶¶122-23.

### D.    Defendants Tout The Triple-Double Plan And Omit Its Drawbacks

Defendants repeatedly touted the progress of Five Below's ambitious Triple-Double plan throughout the Class Period. ¶¶6, 130-38. Absent from the disclosures was any indication of the toll the Triple-Double plan was taking on the Company or the struggles Five Below was encountering in implementing it.

Following the Class Period, on an August 28, 2024 earnings call, the Company announced it was scaling back the Triple-Double plan. ¶289. This was less than three months after Anderson emphatically said the Company's focus on the plan was "unwavering" and the plan was "solidly intact." ¶¶137-38. On the August 28, 2024 call, Bull stated: "[T]he timeline for these [Triple-Double] goals was **too aggressive and put a tremendous amount of pressure on the organization**." ¶198. He said the Company was "moderating our store growth for 2025" to "**focus on execution in the [other] key areas**," including "amplifying value and **trend**." ¶198. He explained that the reduction was to "make sure we weren't taxing the organization with a number because, as I said before, **we really need focus across the company**." *Id.* He added that these issues were a "**culmination of things over a period of years**" and did not emerge overnight ¶¶199, 271.

Analysts took note that the Triple-Double plan distracted management from other business priorities. An August 29, 2024 analyst report noted that the strategy "became a distraction from core operations as management pushed to reach targets while straying from core values." ¶205. Another analyst stated: "[M]anagement believes much of its problem is self-inflicted. The pitch [by management] is that the company lost its way over the years; issues were cited in . . . the

negative implications of chasing overly aggressive triple-double targets." ¶205. Multiple FEs confirmed that the admissions made in August 2024 reflected facts known internally at Five Below during the Class Period. ¶¶142-48. For example, FE 7 said it was known throughout the Company that the expansion plan was far too aggressive, and employees started expressing concerns in 2021. ¶144. Other FEs said the expansion strategy was unrealistic because the new stores were severely understaffed, and when new Five Below stores opened the sales in its nearby stores immediately dropped. ¶¶143, 145.

> **E.    Five Below's Previously Concealed Execution Failures Are Revealed And Its Stock Price Plummets**

The truth about the Company's concealed execution problems and business deterioration was revealed through a series of corrective disclosures beginning on March 20, 2024, when Five Below issued its year-end financial results, reflecting poor performance. ¶151. The Company's earnings per share (EPS) were materially lower than analysts' expectations, with one analyst describing them as "among the biggest misses in the decade-plus the company has been public." ¶¶151, 158. The results revealed that the Company's new stores were performing worse than new Five Below locations had in the past, exposing issues with its expansion plans. ¶¶155, 159. The poor performance reflected a deterioration in Five Below's business due to the failure of its trend-right strategy, its inventory control issues, and the adverse impact of the Triple-Double expansion. ¶¶10, 151. On this news, the stock price declined by over 15% in one day. ¶¶162, 317.

On June 5, 2024, the Company released its first quarter financial results, which an analyst characterized as "painful." ¶163. Comparable sales, operating income, and net income all materially decreased from the prior period. ¶164. Defendants admitted that difficulties executing the trend-right strategy contributed to the poor results. ¶¶165-66. On the earnings call that day, a Goldman Sachs analyst voiced concerns about Five Below's expansion strategy, spotlighting the

issue of "cannibalization" in stores. ¶169. Truist reported that Five Below's management admitted it was a "fair assumption" that "there just isn't a lot of 'new' 'exciting product' right now in [Five Below] stores." ¶172. Analysts also questioned whether the cause of the poor performance truly was a "societal" problem, with Truist pointing out that "a lot of companies that tend to co-locate with Five Below, like the off-price retailers, are performing very well." ¶173. Wells Fargo and UBS also expressed market skepticism of Five Below's "macro" explanations. ¶¶175-76. On the news, the Company's stock price declined by over 10% in one day. ¶¶178, 319.

Then, on July 16, 2024, the last day of the Class Period, Five Below announced the sudden, unexpected resignation of Defendant Anderson (¶179), a little over a month after he touted the Company's ability to execute its trend-right strategy and claimed its focus on the Triple-Double plan was "unwavering," and that the plan was "solidly intact." ¶¶137-38, 223. The July 16 press release also revealed that comparable store sales and net income continued to decline and were expected to decline further by quarter-end. ¶180. Analyst reports, citing discussions with management, attributed the poor results to lack of execution of the trend-right strategy. ¶¶182-83, 187-88. In downgrading the Company, William Blair expected that Five Below would pare back its expansion strategy (as later occurred in August) and said "[m]anagement highlighted that many of the recent demand pressures are self-inflicted, suggesting the headwinds are more structural in nature, and the company plans to return to its roots by driving demand through trend-right product." ¶187. On this news, the stock price immediately declined by over 25%. ¶¶189, 321.

## ARGUMENT

**II.    EXTRINSIC DOCUMENTS CANNOT BE USED TO REBUT THE COMPLAINT'S WELL-PLED ALLEGATIONS**

As a threshold matter, Defendants improperly seek to introduce for their truth certain documents that are extrinsic to the Complaint. This is in conflict with authority indicating that

taking judicial notice should be done "sparingly" at the pleadings stage and applied "only in the clearest of cases." *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007); *see also Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, 2016 WL 7475816, at *5 (E.D. Pa. Dec. 29, 2016) (applying *Victaulic,* and declining to take judicial notice of proffered documents). Defendants ask the Court to take judicial notice of 22 exhibits falling into two broad categories.

**First**, Defendants claim their submitted exhibits are "incorporated into the complaint by reference." MTD at 2 n.3. But it is well-established in the Third Circuit that it is "improper to [utilize the incorporation by reference doctrine] only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Doe v. Princeton Univ.*, 30 F.4th 335, 343 n.8 (3d Cir. 2022). While the Court may consider those documents, "the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 329 (E.D. Pa. 2020). However, Defendants have submitted these documents not to note their existence, but to raise factual disputes concerning Plaintiffs' allegations. For example, Defendants cite their Exhibit A to assert that the "reason Mr. Anderson resigned was to 'pursue other interests,'" MTD at 35 (quoting July 16, 2024 Press Release), effectively asking the Court to reject Plaintiffs' allegations connecting Anderson's resignation to the fraud because Five Below said there was another reason. Plaintiffs should have the opportunity for discovery to test whether this "version of the facts" is correct. *Trevena, Inc.*, 482 F. Supp. 3d at 329.

**Second**, Defendants ask the Court to take judicial notice of documents (Exhibits L, M, and P) not relied on in the Complaint. As none of these documents are incorporated by reference, if considered at all, they may only be used to "establish the truth of their existence, **not** the truth of their contents." *Lupin Atlantis Holdings v. Ranbaxy Lab'ys, Ltd.*, 2011 WL 1540199, at *3 n.8 (E.D. Pa. Apr. 21, 2011). Defendants far exceed this permissible use. They cite Exhibit M, a Wall

10

Street Journal article, for the "truth" that theft was rising in the retail industry in August 2023. MTD at 6 n.6, Ex. M.[3] But Courts are clear that news articles cannot be subject to judicial notice to determine "whether the contents of those articles were in fact true." *Chan v. UBS AG*, 2019 WL 6825747, at *3 (C.D. Cal. Aug. 5, 2019); *see also Alsaidi v. City of Paterson*, 2024 WL 4053085, at *7 (D.N.J. Sept. 5, 2024) ("[t]he Court . . . is not required to judicially notice facts stated in news articles").[4] In addition, Defendants offer a press release not relied on in the Complaint for the "truth" that Anderson left Five Below "to pursue other interests." MTD at 35. This exhibit cannot be offered to prove the truth of its contents. *Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *4 (N.D. Cal. Mar. 31, 2021) (declining to consider statements contained in press release issued by company for their truth).

## III.    LEGAL STANDARD

To state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff must allege that defendants made a misstatement or omission of material fact with scienter in connection with the purchase or the sale of a security upon which the plaintiff reasonably relied, and that plaintiff's reliance was the proximate cause of his or her injury. *Inst. Inv'rs Group v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009). A court considering a motion to dismiss should assess the complaint "in its entirety" and "holistically," accept all factual allegations as true, and construe the allegations in the light most favorable to plaintiffs. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-26 (2007); *see also Allegheny Cnty. Employees' Ret. Sys. v. Energy*

---

[3] This article does not address Five Below or other low-price retailers like Five Below.

[4] By contrast, in the cases Defendants rely on, the courts took judicial notice of the articles "only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *In re Merck Co., Inc., Sec., Derivative & "ERISA" Litig.*, 2006 WL 8460903, at *5 (D.N.J. Jan. 20, 2006); *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (same).

*Transfer LP*, 532 F. Supp. 3d 189, 204 (E.D. Pa. 2021) ("like all complaints at the motion to dismiss stage, the allegations in [the] Complaint must be assumed to be true") (McHugh, J.).

## IV.    DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING

Plaintiffs adequately plead falsity where, as here, they "specify each allegedly misleading statement and the reasons why the statement is misleading." *Avaya*, 564 F.3d at 252 (citing *Tellabs*, 551 U.S. at 321). A statement is false or misleading if it is "factually inaccurate, or additional information is required to clarify it." *Strougo v. Lannett Co., Inc.*, 2019 WL 1172992, at *8 (E.D. Pa. Mar. 13, 2019). "An omission is misleading if a plaintiff alleges some fact, known to defendants at the time of the statements, the disclosure of which would have made the statement clearer or more correct." *Id.* And "[o]nce a company has chosen to speak on an issue . . . it cannot omit material facts related to that issue so as to make its disclosure misleading." *Energy Transfer*, 532 F. Supp. 3d at 222. As this District has explained, "[s]ome statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors," and so "the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *15 (E.D. Pa. Mar. 25, 2020).

To aid the Court in evaluating Defendants' often sweeping falsity arguments, the accompanying Appendix A sets forth the false and misleading statements alleged in the Complaint, Defendants' arguments addressing the actionability of those statements, and Plaintiffs' responses.

### A.    Plaintiffs Allege Multiple Categories Of False And Misleading Statements

#### 1.    Defendants' Statements Regarding The Company's "Trend-Right" Strategy Were False And Misleading.

From the start of the Class Period until its end, Defendants repeatedly emphasized Five Below's ability to effectively identify consumer trends and efficiently supply in-demand

12

merchandise to its stores. ¶43. Defendants' statements emphasized that this was a key differentiator that Five Below had over competitors. For example, on the December 1, 2022 earnings call, Anderson told investors that Five Below "continue[d] to move quickly to adjust to changing customer preferences" and the Company was "set up to deliver products to our growing store base even more efficiently." ¶¶44-45. This continued throughout the Class Period, with Anderson in January 2023 characterizing responding to trends as "part of the *secret sauce* of Five Below" and insisting that "[w]hen we identify something, we *move really quick to get that in the store*." ¶46. Announcing the Company's fourth quarter of 2023 results, Anderson again insisted that Five Below "*[s]tay[ed] on top of hot trends* and swiftly move[ed] to capitalize on them," and that the Five Below model was "*unique* and enables *swift recognition and introduction of trend-right and relevant products.*" ¶47. As late as March 2024, Anderson told investors the "flexibility of our model . . . enables our teams to *quickly introduce trend-right relevant products to our customers*." ¶49. Securities analysts credited these statements, attributing increased guidance on November 30, 2023 in part to Five Below's "trend-right and value-focused product newness." ¶51.

As admissions by Five Below executives and FE accounts reveal, Defendants' statements above were false and misleading because Five Below failed to identify and stock its stores with trend-right items. Just over a month after the Class Period, Vellios admitted that "over the past *few years*" Five Below actually "lost some of [its] sharp focus on our core customers," and Defendant Bull admitted that the Company "overexpanded our assortments across our worlds without the strict editing process of past years and without the key item focus that screamed value and differentiation," echoing that what Five Below "*got away from was the core part of our business* around . . . *trend product*." ¶¶54-55, 194; *see* § I.B, *supra.*

13

FEs confirmed that these issues recurred, and were discussed, throughout the Class Period. For example, FE 1, a District Manager who oversaw 12-16 stores during his tenure, reported that Five Below stores rarely stocked enough trending merchandise to meet customer demand. ¶59. Other former employees corroborate these issues. FE 2, a District Manager, attended regional conference calls in which managers and senior executives discussed the lack of control and intention behind product selection and inventory. ¶¶63-64. FE 2 reported that Five Below had great difficulty identifying and stocking trending items that were in high demand, as the Company lacked the ability to track specific products or items and how they were selling. ¶¶65-66. FE 2 further explained that even though certain products were in high demand and selling, the stores often did not receive those products and were shipped "dumb junk" instead. ¶68. FE 2 reported that he had trouble consistently obtaining high-selling items, instead receiving items that did not sell. ¶¶67-69. FE 3, another District Manager who managed up to 25 stores at a time, confirmed that Five Below had no strategy to stay on top of hot trends and the Company struggled to stock in-demand products. ¶¶77-78. FE 6, an Operations Manager of Fulfillment responsible for Five Below's e-commerce department, spoke of Five Below's "underwhelming" ability to stay on top of trends. During regular Monday calls with other retail and e-commerce managers, FE 6 learned that all of Five Below's distribution centers were struggling to find a solution to their overstock of unwanted goods. ¶¶89-90. FE 7, an Associate Director of Fulfillment Center Operations, reported that his warehouse was constantly overstocked with unwanted goods and had to ship items to sell at a loss or donate the extra inventory to a liquidator to get rid of them. ¶¶91-94.

One cause of Five Below's problems stocking in-trend items in proper quantities was that its inventory tracking capabilities were so insufficient that Regional and District Managers never knew if they actually received the inventory they were supposed to receive. ¶¶70, 72. FE 2

14

explained that Five Below did not have a true inventory system and instead employees counted each section manually, which led to inaccuracies. ¶71. Moreover, FE 2 reported that because Five Below lacked the ability to track inventory, product was often considered lost in transit. ¶¶74-76. FE 3 confirmed that Five Below did not carefully select the inventory going to each store, and FE 4, a Merchandise Manager, reported that his store had no "choice in what products it received," instead Five Below sent pallets of inventory and directed the employees to "just sell it." ¶¶77, 79, 81-82. Management knew about these issues. FE 5, a Director at Five Below who oversaw various aspects of its marketing, reported that Five Below's Chief Marketing Officer, among others, received weekly information about inventory, and Defendant Anderson was involved in those discussions. ¶¶85-88. FE 5 reported that "everything ran through Anderson," and Anderson knew, for example, that the Company was promoting products without adequate inventory to meet demand. ¶88.

Courts have consistently held that "statements emphasizing the strength of a particular business operation may be actionable as securities fraud[] where those operations are in reality deficient." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019); *see also In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *20 (D.N.J. Aug. 8, 2018) ("[i]mplicit in Cognizant touting . . . its training program was an assurance that the training program could actually be effective at the ground level"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008) (finding statements touting "high quality" underwriting actionable where complaint alleged underwriting practices were deficient). By repeatedly emphasizing Five Below's ability to "quickly introduce trend-right relevant products to our customers" (¶49) at a time when, as Five Below executives would later admit, the Company

15

had actually lost its focus on trend-right (¶54), Defendants emphasized the strength of a business operation that they knew was floundering.

In response to these allegations, Defendants first discount the Complaint's allegations, arguing that Plaintiffs fail to allege facts showing that Five Below "had issues identifying, sourcing, or stocking trend-right products." MTD at 21-22. That argument completely ignores the Complaint's ample allegations, which include concessions from Five Below executives. At the end of the Class Period, multiple analysts reported that Five Below management admitted the Company's issues were "self-inflicted," with one reporting that the Company needed to "return to its roots by driving demand through trend-right product" and another quoting management as blaming Five Below's "less-than-exciting product assortment." ¶¶187-88. Shortly after the Class Period, Five Below executives made these statements publicly, with Vellios admitting that Five Below "need[ed] to regain our speed and intensity in *identifying and bringing in key trend items*[.]" ¶194. Defendant Bull acknowledged that Five Below "*overexpanded our assortments* . . . without the strict editing process of past years and *without the key item focus* that screamed value and differentiation." ¶195. He continued that Five Below had "lost [its] way." *Id.*

These admissions are corroborated by multiple FEs. ¶¶58-94. The common theme running through the FE statements was that Five Below lacked an ability to effectively identify trends and ensure its stores received the goods its customers actually wanted. The Company's stores lacked in-trend inventory while being overwhelmed with untracked, unwanted and unsaleable products. Five Below lacked adequate inventory monitoring systems to reliably track how much inventory was in its stores and how much inventory should and would be sent to stores. These issues were widespread throughout the Company, persisted throughout the Class Period, and were corroborated by multiple FEs. ¶95.

16

Defendants also ask the Court to draw inferences in their favor, for example crediting Anderson's statement to an FE that action to resolve the employee's concerns about obtaining better inventory was "in the pipeline," despite the fact that no action was ever taken and the problems were never remediated. ¶¶61-62; *see* MTD at 21-22. Defendants' counterfactual argument conflicts with the bedrock principle that "[f]or the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff." *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *12 (D.N.J. Dec. 31, 2018). The Complaint alleges that Anderson was aware of the problem and sought to mollify the employee's concern in the moment, but never did anything to fix it. This supports a finding of fraud.

Finally, Defendants claim that Plaintiffs are simply taking aim at strategies that "did not deliver the results the Company had hoped." MTD at 22-23. Courts in this District and elsewhere have rejected such fraud-by-hindsight arguments where, as here, plaintiffs allege "[c]ontemporaneous facts" showing the statements were not true when made. *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *14 (E.D. Pa. June 16, 2015); *see also In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 (S.D.N.Y. 2012) ("[t]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made"). In addition to contemporaneous FE accounts, Defendants admitted that the Company lost focus on its trend-right strategy "over the past few years." Plaintiffs are not attacking a strategy that eventually did not work out, they are holding Defendants to account for trumpeting a strategy that was ***already failing***.[5]

---

[5] Defendants' cases, therefore, are readily distinguishable. MTD at 22. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (fraud-by-hindsight is not a "viable basis upon which to challenge management practices); *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 876 (3d Cir.

2.      Defendants Made False And Misleading Statements Regarding Shrink.

Throughout the Class Period, Defendants adopted a two-fold strategy to address disappointing financial results, first blaming a "societal" problem of theft rather than their own mismanagement, and subsequently by falsely claiming they were taking active steps to "mitigate" shrink. Beginning on June 1, 2023, Anderson claimed that shrink had an "impact on our fourth quarter" and, as a result, the Company was "accruing [reserves] at the higher rates this year and doing things on our part to mitigate shrink." ¶98. On August 30, 2023, Anderson claimed that a 20-basis point decline in operating margin was "pretty much . . . all based on the changes we're making with the assumption of shrink." ¶99. On March 20, 2024, Defendants claimed that lower-than-expected EPS was "fully attributed to higher-than-planned shrink." ¶103. Defendants also sought to deflect blame for their own poor execution by suggesting the Company's problems were wholly or largely the result of lax prosecution.[6] This was consistent with public reporting at the time indicating that blaming shrink was a growing tactic among retailers. *See* ¶¶104-08. Tellingly, Five Below never disclosed or quantified the actual impact of shrink-related losses. ¶109. In addition, in the Company's disclosures after March 2024, Defendants largely abandoned their efforts to blame poor performance on shrink, tacitly acknowledging that the real issues were "Company-specific" and related to both trend-right execution and expansion problems. ¶¶116-17, 165.

---

2020) (plaintiffs only challenged a decision that "did not pan out"); *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 376 (3d Cir. 1993) (potentially unwise business decision not actionable).

[6] For example, in response to an analyst question on August 30, 2023, Bull pointed to "recent media and videos" showing "increased levels of shrink and related crime incidents," and Anderson complained about cities that "simply aren't prosecuting below the $500 level." ¶100. Anderson reiterated that theme on November 30, 2023 when he went on Fox Business and pointed out that theft was "impacting all retailers" and was a "real societal problem." ¶102.

18

Even as they blamed shrink, Defendants doubled-down on their shrink-smokescreen by insisting they were on top of the problem, claiming as early as June 1, 2023 that Five Below was, in Anderson's words, "doing things on our part to mitigate shrink." ¶110. On August 30, 2023, Bull claimed the Company had "dedicated a team to look at all different areas to help with mitigation efforts," including through "enhanced technology, merchandise presentation . . . register formats, policies and procedures." ¶111. On November 29, 2023, Anderson claimed "we obviously think our mitigation efforts are working." ¶113.

Defendants' strategy of blaming shrink worked, at least for a time. In its August 30, 2023 analyst report, Credit Suisse explained that Five Below joined the "long list of retailers embedding significant margin headwinds from shrink in their forward outlooks." ¶115. UBS reported that the Company lowered its EPS outlook "due in large part to a rise in shrink," even as it reported that Five Below was "taking steps to mitigate the shrink." ¶115. Bank of America Securities similarly reported on November 29, 2023 that Five Below had "taken initiatives to mitigate shrink." *Id.*

As would later become clear, however, Defendants' statements blaming shrink were misleading. In calls with analysts in July 2024, management admitted that, rather than being caused by theft, a "significant part of this year's top-line challenges is self-inflicted from less-than-exciting product assortment." ¶188.

FEs corroborate that Five Below's issues were "self-inflicted." FE 1 explained that, through November 2023, shrink was a lesser contributor to earnings declines than the Company's inability to stock trend-right merchandise, and even as it claimed to be working on the problem, Five Below expanded the self-checkout registers that were major purported contributors to shrink. ¶123. FE 3 reported that inventory control issues were a more significant contributor to financial issues than shrink, further explaining that the remedial measures the Company took were

19

inadequate as they did not address the inventory issues. ¶123. FEs further indicated that the claims about efforts to mitigate shrink were illusory. *See* ¶¶111, 129; § I.C, *supra.*

The shrink-related statements were materially misleading. Once Defendants spoke about the issues by blaming shrink, they "assumed an obligation to provide complete and accurate information to investors by including other material reasons known to them." *Ray v. StoneCo Ltd.*, 2024 WL 4308130, at *11 (S.D.N.Y. Sept. 25, 2024) (statements "blaming rising credit delinquencies on Brazil's new registry system and COVID-19 were misleading because Defendants were under an obligation to also discuss the loosened credit standards and the collectability issues as factors"); *see also In re RenovaCare, Inc. Sec. Litig.*, 2024 WL 2815034, at *21 (D.N.J. June 3, 2024) (once defendant "opened the door and began to make disclosures . . ., he was required to tell the whole truth"). Similarly, by putting Five Below's shrink mitigation efforts "in play," Defendants were obliged to discuss how those mitigation programs were "deficient" and not serious. *Johnson & Johnson*, 2019 WL 7207491, at *16; *see also Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) (representations that company conducted "extensive training and safety programs" were misleading where those programs were alleged to fall short of legal requirements).

Defendants' arguments regarding these statements are unavailing. They first argue the Complaint relies on "general opinions of a few operators and managers at a handful" of stores. MTD at 24. This argument fails. The Complaint refers to eight FEs that covered seventy stores throughout the country, not a "handful" of stores as Defendants claim. Regardless, there is no such requirement related to the number of FEs and the operations that they oversaw. *See Cognizant*, 2018 WL 3772675, at *20 (finding falsity based on the statements of two employees out of thousands, reasoning that it "would be quite harsh to on the one hand impose upon securities

20

plaintiffs a heightened requirement of specificity, and on the other disregard their allegations as overly idiosyncratic.").

Defendants also falsely accuse Plaintiffs of "mischaracterization," claiming that Plaintiffs allege there was an "admission by Defendants" on the March 20, 2024 earnings call that the shrink-related statements were "false and misleading." MTD at 24. But no such mischaracterization occurred. Indeed, Plaintiffs quote the same language as Defendants *several times* in the Complaint (¶¶7, 103, 117, 153, 235). And that language *supports* Plaintiffs' position. On the call, Anderson admitted that shrink was "higher-than-planned" and that the Company's "prior expectations assumed that our mitigation efforts would result in a reduction of the shrink rate." Defs.' Ex. H at 4. But implicit in the fact that its "prior expectations" were incorrect is the reality that the (illusory) mitigation efforts did *not* "result in a reduction of the shrink rate." In other words, the mitigation efforts, as Plaintiffs allege, had "largely failed" because they were never really undertaken—the shrink mitigation statements were part of Defendants' efforts to misdirect attention from their undisclosed execution failures (trend-right and expansion) to the "societal" problem of theft. ¶247. The mitigation statements were fake salve for a false wound, aimed at making it seem like Defendants were really trying to stem losses from shrink, but there was never a serious effort. Moreover, as discussed above, Five Below would later admit that its performance declines were driven by its failure to source and efficiently stock trend-right products, making clear that blaming shrink and claiming to mitigate it was merely an excuse for those undisclosed business failures. These admissions of failure should be read in conjunction with the other shrink-related allegations (summarized above) in order to make such a reasonable inference.

21

3.    Defendants Made False and Misleading Statements Concerning The Triple-
      Double Plan.

Finally, throughout the Class Period, Defendants claimed that the Triple-Double initiative was an unqualified benefit to the Company. On November 30, 2022, the first day of the Class Period, Anderson represented that the Company was "still on track for the long-term Triple Double goals," and the plan was "gaining momentum." ¶131. Bull claimed on August 30, 2023 that "[we] feel extremely confident around the triple-double vision," and on January 8, 2024, Anderson claimed that with respect to the goal of tripling Five Below's stores by 2030 "nothing has changed." ¶135. Critically, as late as June 2024, shortly before his exit, Anderson highlighted the plan, claiming that "our focus on executing our store growth plans with excellence is *unwavering*," and stating on June 12, 2024 that the plan was "*solidly intact*." ¶¶137-38.

As noted above in § I.D, at the end of and after the Class Period, Defendants admitted that the expansion plan was "too aggressive" and actually constrained overall growth. Former employees corroborated this and confirmed that it was known during the Class Period that the expansion strategy *hindered* Five Below's success. FE 8, a District Manager during the Class Period, explained that "when new stores opened, sales in comparable stores immediately dropped," but Five Below did not adjust sales targets for the comparable stores. ¶143. FE 3 explained that understaffing hurt the new locations. ¶¶123, 145. FEs 1 and 2 added that new locations did not have enough inventory, leading to sections remaining empty for months at a time; FE 1 reported that in some cases it took Five Below *over a year* to supply Five Beyond inventory. ¶147.

Defendants' statements regarding the Triple-Double initiative were false and misleading. Courts have found statements touting a business initiative's expansion to be misleading where defendants "fail [] to mention . . . significant concerns" about the initiative. *Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at *8 (E.D. Pa. Mar. 1, 2021); *see also Rensin, Tr. of Rensin Joint*

22

*Tr. v. United States Cellular Corp.*, 755 F. Supp. 3d 1048, 1064 (N.D. Ill. 2024) (statements touting strategy the company planned to abandon were false and misleading).

As with the trend-right statements, Defendants argue "fraud-by-hindsight," citing ***their own*** claims that the problems with the Triple-Double plan were only evident "with the benefit of hindsight." MTD at 25. But as detailed above, the FE allegations support the claims that the statements were ***false when made***, which is sufficient to defeat a fraud-by-hindsight argument. There is no reason for the Court to credit Defendants' self-serving claim that they did not know about the problems with the growth initiative, especially at the motion to dismiss stage.

### B.    Plaintiffs Support Their Claims With Credible Former Employee Accounts

In order to determine whether plaintiffs have met the pleading standard for falsity based in part on factual allegations sourced from former employees, courts evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263. The crucial aspect is whether the FEs "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *4 (W.D. Pa. May 18, 2023). Courts have looked to FEs' "job title and functions" to determine if they "support the plausibility that they would have the information alleged." *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 187 (D.N.J. 2022).

In this case, Plaintiffs support their allegations through the accounts of eight FEs who served in a variety of roles at Five Below, and the Complaint provides ample information about the employees' roles and functions. *See Mylan*, 2023 WL 3539371, at *5 (crediting allegations that provided former employees' tenure, job title, and description of "job responsibilities"). For

23

each of the employees, Plaintiffs provide their job title, responsibilities, and tenure at the Company. *See*, *e.g.*, ¶¶58, 63, 77, 81, 85, 89, 91, 142. Having provided that detail, Plaintiffs explain how those positions allowed the FEs to gain the information they relayed about Five Below's operations and related matters. *See generally*, ¶¶58-94, 119-24, 142-48. Taking the allegations as true, Plaintiffs have "satisfactorily alleged how the FEs had access" to the information provided in the Complaint. *Becton*, 620 F. Supp. 3d at 187.

In addition to the information provided, the reliability of the FE accounts is buttressed by their consistency and the fact that they are corroborated by other sources. Plaintiffs allege a common theme throughout the FE statements that Five Below lacked an ability to effectively identify trends and ensure that its stores received the goods its customers actually wanted. ¶95. Plaintiffs also include accounts from four FEs who all spoke of minimal shrink mitigation efforts at the Company, ¶¶118-24, and five FEs who spoke of the pitfalls of Five Below's expansion strategy. ¶¶142-48. "That these accounts tell the same coherent story enhances the plausibility of that story." *Mylan*, 2023 WL 3539371, at *6; *see also Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 468 n.8 (E.D. Pa. 2020) (taking into account that employee accounts were "mutually consistent"); *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 544 (D.N.J. 2024) (crediting that former employee's account "dovetail[ed] closely" with that of other FEs). In addition to being internally consistent, the FE reports are consistent with Defendants' admissions (discussed above), such as Vellios's admission that "[o]ver the past few years, we lost some of that sharp focus on our core customers" and Bull's admission that Five Below "got away from . . . the core part of our business around . . . trend product." ¶¶194-95. These reports echo former employee reports that, for example, stores shipped "dumb junk" instead of items customers actually wanted (¶68), that Five Below failed to identify trends to the extent that it launched multiple versions of the

24

Squishmallow, which eventually stopped selling (¶90), and that Five Below had no reliable strategy for sourcing and selling in-demand products, resulting in excess inventory that employees were forced to sell at a loss (¶94). These corroborating accounts support the reliability of the FEs' statements. *Myan*, 2023 WL 3539371, at *6 (corroboration supported reliability).

Defendants offer a number of purported reasons to disregard the FE statements, none of which are persuasive. *First*, Defendants argue that the FEs held "low-level" positions and thus should not be credited. MTD at 17-18. But it is well-established that where the employee is "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," then "[c]ourts will not disregard a confidential witness' allegations simply because he or she was a low-level employee." *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *3 (D. Del. Feb. 7, 2020); *see also In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555 n.5 (S.D.N.Y. 2010) (crediting former call center employees who were "positioned, albeit at low levels, to have knowledge" about how defendant implemented its policies); *Mylan*, 2023 WL 3539371, at *4 (rejecting defendants' argument that the court should disregard statements from "low-level former employees" and instead crediting the allegations); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019) (rejecting argument that former employee accounts should be rejected because they were "low-level," reasoning that "other courts have not discounted a [former employee's] allegations just because those characteristics were present").

Defendants' cited case, *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004), is factually distinguishable. MTD at 17. In that case, the court found that the former employees "may possess the information alleged," but the complaint omitted key details present here, including "when those sources were employed" and "whether their supposed

knowledge is first or second hand." *Id.* at 149-50. Moreover, the court in *Chubb* found the allegations from the former employees was "not inconsistent with" the alleged false or misleading statements, and thus did not substantively support liability. *Id.*

*Second*, Defendants claim that the FEs lacked "first-hand knowledge" that the Officer Defendants knew about the alleged issues. MTD at 18-19. As an initial matter, this argument conflates scienter and falsity. But even so, their argument is inconsistent with the Complaint's actual allegations: (i) FE 1 reported attending "bi-monthly and quarterly meetings" attended by Anderson in which "inventory concerns for hot items" were consistently discussed (¶62); (ii) FE 1 reported that Anderson personally visited stores and observed issues with trend-right items (¶61); (iii) FE 5 reported that members of Five Below's marketing team kept Anderson up-to-date with inventory issues, for example reporting that senior marketing executives including the Chief Marketing Officer discussed inventory weekly and that these individuals reported they had "talked to Joel [Anderson]" about the inventory issues (¶¶87-88); *see Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 891 (N.D. Ill. 2023) (crediting FE account that senior HR executives would have likely informed the CEO and CFO defendants of undisclosed attrition problems); and (4) FEs reported that Anderson and Bull had access to a dashboard showing real-time inventory information. ¶¶91-94. This is more than enough, especially since courts have sustained claims where there was "no indication of direct contact" between the former employees and "any of the individual defendants." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *23 (D.N.J. July 27, 2018).[7]

---

[7] Defendants' cases are inapposite. Unlike here, in which the FEs provide first-hand observations, the reports in the portion of *In re Synchronoss Techs., Inc. Sec. Litig.* that Defendants quote "amount[ed] to nothing more than second-hand retelling and generalized rumor." 2019 WL 2849933, at *10 (D.N.J. July 2, 2019). Further, contrary to Defendants' implication that *In re Neustar Sec. Litig.* concerned confidential witnesses (MTD at 19), that case dealt with "anonymous sources quoted" in a news article, and the article

*Third*, Defendants relatedly claim the FEs are not credible because they lacked "company-wide" information. MTD at 19. But, as courts have explained, Plaintiffs need not produce a "source with nationwide knowledge," but can support their allegations through "markedly consistent allegations" from "low-level" employees. *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *7 (D.N.J. Dec. 6, 2018) (finding the "consistency of the statements between different levels of employees at different locations across time" to be "particularly persuasive").

Defendants' cases are again readily distinguishable. For example, in *Rahman v. Kid Brands, Inc.*, the former employees had no "way of knowing what was discussed" in the meetings (736 F.3d 237, 245 (3d Cir. 2013)); here the FEs attended calls with Anderson and saw him observe the issues first-hand, while others worked with Anderson's direct reports and were told what was said to or by Anderson. ¶88. In *In re Wachovia Equity Sec. Litig.*, the court found it was "all but impossible" to determine the time period of the FE's knowledge as compared to the false statements (753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011)); here Plaintiffs identify the FEs' tenure at the Company, placing it within the Class Period during the time of the false statements for all eight FEs. The court in *In re Hutchinson Tech. Inc. Sec. Litig.* held that a single employee who worked in a single plant could not discuss the "company-wide return rate" (502 F. Supp. 2d 884, 895 (D. Minn. 2007)), whereas here Plaintiffs rely on eight consistent accounts of FEs at different levels in different parts of the country to draw inferences about the company as a whole. In *Perez v. Target Corp.*, the court's ruling stemmed in part from the fact that the former employees' observations were "consistent with Target's public statements," 2024 WL 4804656, at *10 (D.

---

provided no information about "whether the sources have personal knowledge of the events described, and whether the sources were in a position to learn of such events personally." 83 F. Supp. 3d 671, 686 (E.D. Va. 2015). In *Gammel v. Hewlett-Packard Co.*, the court acknowledged that "reliance on hearsay does not automatically render confidential witness statements unreliable," and ruled for Defendants not solely because the report was hearsay but because the former employee's information concerned a time period not overlapping with the misstatement at issue. 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012).

27

Minn. Nov. 15, 2024), whereas here the FEs' statements conflict with Defendants' disclosures. Similarly, the former employees in *Pound v. Stereotaxis, Inc.* based their observations on nothing other than "anecdotal information regarding individual customer complaints." 8 F. Supp. 3d 1157, 1166 (E.D. Mo. 2014).[8] By contrast, in this case, the FEs explain how Five Below's issues manifested at their own level of the Company's operations, and they also detail the discussions they had, meetings they attended, and reports they received evincing these issues on a larger scale. ¶¶58, 62, 64, 80, 82, 87-88, 91-94.

*Fourth*, Defendants claim that the information is "overly generalized, vague, and devoid of particularity," apparently because the FEs do not offer the specific "date and place" of the conversations and events reported. MTD at 20. This argument is belied by the facts—the FEs' tenures, positions and context for "how" they know what they reported are alleged. But, even so, courts do not impose such an onerous burden on securities plaintiffs, specifically rejecting the proposition that FE statements are conclusory "merely because they state something happened 'regularly,' 'often,' or 'usually.'" *Toronto-Dominion Bank*, 2018 WL 6381882, at *5 ("It seems Defendants would only find these statements "particular" if all the alleged bad actors stepped forward and provided statements concerning the specific date, location, and product that was improperly sold to a specific customer. That is not required."). Plaintiffs' identification of the FEs' tenures is sufficient to delineate the "time period" in which the FEs obtained the relevant

---

[8] Notably, *Hutchinson*, *Target*, and *Stereotaxis* are from the Eighth Circuit (and two are from the District of Minnesota), where courts seem to have applied a uniquely high standard for former employee reports, which is in conflict with the Third Circuit and other circuits' standards. *See Target*, 2024 WL 4804656, at 9 (citing in-circuit law for proposition that courts view former employee reports "with skepticism"). Indeed, *Target* found that former employee reports are "distinct" from the types of allegations "which courts must accept as true on a motion to dismiss" (*id.*), whereas in the Third Circuit former employee reports, like all well-pled factual allegations, must be treated as true. *See Becton*, 620 F.Supp.3d at 187 ("Accepting these allegations as true, **as the Court must**, Plaintiff has satisfactorily alleged how the FEs had access to such information.").

information. *See*, *e.g.*, *Advance Auto Parts*, 2020 WL 599543, at *3 (witness's credibility supported by the "time period during which he occupied [his] position"). Moreover, the Complaint, where appropriate, provides insight as to the frequency of meetings or reports where the former employees learned relevant information. *See*, *e.g.*, ¶¶58, 64 (describing regular Monday calls among District Managers and "regular regional conference calls"); ¶¶86-87 (FE 5 describing how he was involved with "multiple discussions about inventory each week" with Anderson's direct reports); ¶90 (FE 6 reporting "regular Monday calls with other managers, including both retail and e-commerce"); ¶92 (FE 7 reporting that "each day, he checked a dashboard, which depicted how many orders were projected to come out of each of the Company's three distribution facilities"). Courts credit FE accounts that provide such specificity. *See*, *e.g.*, *Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *8 (D.N.J. June 5, 2020) (crediting former employee account of "monthly meetings"); *GSX Techedu*, 738 F. Supp. 3d at 540-41 (finding allegations that referenced plans circulated every quarter, and reviewed every day, were sufficiently detailed).[9]

---

[9] Defendants' cited authorities on this point are again inapposite. In *In re Mindbody, Inc. Sec. Litig.*, one of the former employees was a regional sales manager who the court found did not have a company-wide view of how an integration project was going; for example, in his role he had no "direct knowledge of the technical challenges" at issue in the complaint, and another left the company before the events at issue. 489 F. Supp. 3d 188, 205 (S.D.N.Y. 2020). Here, Defendants have not explained why employees who managed up to dozens of stores or were involved in fulfillment center operations would not have visibility into issues with inventory. Moreover, unlike in *Mindbody*, Plaintiffs report consistent accounts from eight FEs. In Defendants' other cited case, *Francisco v. Abengoa, S.A.*, the court did not credit the allegations from a former employee where the complaint did not provide tenure, what entity within the defendant the employee worked for, or their title, but actually **credited** the allegations of another former employee where the complaint provided the employee's title, details of employment, and "general responsibilities," as here. 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020). Finally, in *In re Intelligroup Sec. Litig.*, the court discredited an employee account that amounted to a "bald declaration . . . void of any factual basi[s]"; here, the FEs specifically connect their assessments to their personal experiences with inventory management and other issues. 527 F. Supp. 2d 262, 290 (D.N.J. 2007).

Given the descriptions of the FEs that Plaintiffs provide, their accounts should be credited by the Court at the pleading stage.

## C.    Defendants' Statements Are Not Puffery

Defendants make the broad argument that the trend-right and Triple-Double statements (¶¶208, 211-13, 253, 256, 263, 298) are immaterial puffery. MTD at 10-12.[10] This argument should be rejected. To start, as the Third Circuit has explained, "[t]o say that a statement is mere 'puffing' is, in essence, to say that it is immaterial, either because it is so exaggerated . . . or so vague . . . that a reasonable investor would not rely on it in considering the total mix of [available] information." *Hoxworth v. Blinder, Robinson, & Co. Inc.*, 903 F.2d 186, 100-01 (3d Cir. 1990). Courts have held that "[g]enerally, materiality is an issue of fact to be decided by the trier of fact." *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 650-51 (E.D. Pa. 2015). Therefore, dismissal is appropriate "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004).

In this case, none of the alleged misstatements constitute immaterial puffery as a matter of law. The law is clear: a determinate, verifiable statement of fact is not puffery. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). Here, the trend-right statements are not puffery. Five Below itself made clear that the "***principal basis upon which we compete*** is by offering a dynamic, edited assortment of trend-right products." ¶284. These statements are assertions of present, material facts which, as discussed above in § IV.A.1, are directly contradicted by the accounts of FEs and Defendants' own admissions. *See* Appendix A;

---

[10] Notably, Defendants' argument does not engage with the language or content of the particular statements. *See* Appendix A.

30

*see also e.g.*, ¶211 ("Our stores *are stocked and ready* with an amazing assortment of value products"); ¶213 ("When *we identify something, we move really quick to get that in the store, test it and then push it out to the stores* . . ."); ¶215 ("We have a *highly planned merchandise strategy* focused on trend-right and everyday products…."). That certain of the trend-right statements are "surrounded by statements of puffery" does not change their nature. *See In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 493 (W.D. Pa. 2020).

The trend-right statements are similar to those found actionable in this District and elsewhere despite arguments like those made by Defendants here. *See, e.g.*, *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 823-24 (E.D. Pa. 2001) (statements concerning "customer-focused approach" actionable when company suggested approach was significant factor in its success); *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 649 (D.N.J. 2021) (statement that "we feel very good that we're balanced" on inventory actionable because "those statements of optimism were connected to factual assertions regarding sales prospects and inventory" and a reasonable investor could have relied on them); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255 (E.D.N.Y. 2023) (statements that "go-to-market" strategy would drive growth actionable when there was an undisclosed glut of inventory that would adversely impact sales). These cases are on point and distinguish *Perez v. Target Corp.*—an out-of-circuit, outlier case—that Defendants heavily rely on in support of their argument that the trend-right statements are not actionable. MTD at 11-12; *see* fn. 8 *supra*. To start, the court did not dismiss as puffery the statement (cited by Defendants at MTD 12 and contained in a risk disclosure) that a large part of the business was dependent on its "ability to make trend-right decisions and effectively manage [] inventory." 2024 WL 4804656, at *13. Rather, the court dismissed that statement because the complaint "contain[ed] no allegations that [it was] false or inaccurate." *Id.* To be sure, the *Target*

31

court did dismiss as puffery other statements concerning the company's inventory practices and customer demand, including statements referring to the company's "continuous evaluation of its guests' mindset." *Id.* at *11-13. Even so, in characterizing such statements as "quintessential examples of nonactionable corporate puffery" (*Id.* at *12), without analyzing them in context, the *Target* court is at odds with courts in multiple circuits, including this one, holding that similar statements are not puffery in contexts like the one here.[11] Likewise, the Triple-Double statements are not "hyperbolic, vague" descriptors of expansion plans as Defendants assert. MTD at 12. Rather, those statements have a factual basis, namely the timing of execution and nature of progress toward the Triple-Double goal. The Company's inability to successfully execute on the Triple-Double plan renders those statements materially misleading. *See* Appendix A; *see also*, *e.g.*, ¶258 ("As it relates to tripling our stores by 2030, I repeat, nothing has changed. We still . . . expect to triple our stores by 2030."); ¶255 ("We now expect to reach a milestone of over 200 new stores this year, while building our pipeline for next year and beyond."); ¶254 ("[T]he process -- we streamlined it in several different ways to be able to execute more leases in a faster time line more

---

[11] Defendants' other cases are similarly inapplicable. In *In re Aetna, Inc. Sec. Litig.,* the court found that plaintiffs omitted language surrounding the challenged statements that explained the "complexity" of the business, among other factors, and found the challenged statements were not actionable in that "context." 617 F.3d 272, 283 (3d Cir. 2010). Similarly, in *Waswick v. Torrid Holdings, Inc.*, the court found that the statement regarding "effective in-season inventory management" was puffery in the context of the fact that the company "continuously disclosed the data needed to assess how successfully or not the company was minimizing inventory risk." 2023 WL 9197563, at *4 (C.D. Cal. Dec. 1, 2023). In *Galati v. Commerce Bancorp, Inc.*, plaintiffs claimed that certain statements touting "dramatic deposit growth," "strong performance," and a "unique business model" were misleading in light of an "illegal bid-rigging and kick-back scheme," but the court found that "none of the statements recited by plaintiffs put into play the integrity of Commerce Bank's practices with respect to government deposits." 220 F. App'x 97, 102 (3d Cir. 2007). The puffery statements in *In re Advanta Corp. Sec. Litig.* concerned "expressions of optimism for the future," 180 F.3d 525, 539 (3d Cir. 1999), whereas here Defendants spoke about the present progress of the Company's trend-right strategy and expansion plans. In *In re PayPal Holdings Inc. Sec. Litig.*, which addressed whether the statements were actionable opinions, the Court held that "[w]hen Defendants made the statements, Defendants genuinely believed them to be true based on the earnings that the Company was reporting." 2025 WL 325603, at *20 (D.N.J. Jan. 29, 2025). Here, Defendants knew that reality did not match their statements.

per month."); ¶260 (similar). For this reason, as discussed above in § IV.A.3, courts have sustained securities fraud claims arising from such misstatements.

Even if the trend-right and Triple-Double statements were not statements of verifiable fact, and they are, they are actionable in their context. They were not one-off statements, rather they were repeated in SEC filings, press releases, investor calls, and analyst conferences throughout the Class Period. ¶¶208-23, 253-64. As this Court has explained, "when a company repeatedly addresses a certain subject, the company 'declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.'" *Energy Transfer LP*, 532 F. Supp. 3d at 217; *see also In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 447 (D. Del. 2014) ("[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder").[12] A number of the statements were also made in direct response to analyst questions about Five Below's "ability to capitalize on new trends" or "whether the Company was able to avoid making mistakes opening so many stores in a short amount of time." ¶¶213, 260. Statements that are made to reassure investors as to specific risks are not puffery. *In re Penn Treaty Am. Corp. Sec. Litig.*, 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002) (statement that company was "not in trouble" in response to analyst's question regarding financial problems at company not puffery because, read in context, it was neither vague nor generally optimistic); *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020).

In sum, Defendants' false and misleading statements do not constitute puffery.

---

[12] By contrast, several cases relied on by Defendants consist of a single statement made on a single occasion. *See*, *e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997) (single statement); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 895 (D. Minn. 2007) (single press release).

**D.    Defendants' Statements Are Not Protected By The Safe Harbor for Forward-Looking Statements**

Defendants argue that "a number of the allegations in the Complaint concern forward-looking statements" and are thus subject to the PSLRA's "safe harbor," MTD at 13, which protects purely forward-looking statements that are either accompanied by meaningful cautionary language or made without actual knowledge of their propensity to mislead. 15 U.S.C. § 78u-5. This argument fails. *First*, Defendants do not identify which statements they claim are forward-looking and instead only make sweeping arguments across all categories of statements. *See* Appendix A. This is fatal to the argument, since virtually all of the statements are plainly not forward-looking.

*Second*, the safe harbor does not apply at all to statements of present or historical facts, or to a "mixed present/future statement . . . with respect to the part of the statement that refers to the present." *Avaya*, 564 F.3d at 255; *Energy Transfer*, 532 F.Supp.3d at 206. Moreover, statements "cannot constitute forward-looking statements for safe harbor purposes [if] they ***omit existing facts***." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *11 (D.N.J. July 31, 2019). As explained above in § IV.A, Defendants' statements concern present facts: Five Below's present ability to execute its trend-right strategy and the impact thereof on its financial results; the impact of shrink on Five Below's present and past earnings; Five Below's present efforts to mitigate shrink; and the benefits and success of Five Below's Triple-Double plan. Accordingly, the overwhelming majority of Defendants' statements are not forward-looking. *See* Appendix A; *Urban Outfitters*, 103 F. Supp. 3d at 650 (statement that "sales trends continue to be strong" and there is "no reason to believe that we couldn't see a continued decrease in markdowns" not forward-looking because they refer to current sales and markdown activity); *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 253 (S.D.N.Y. 2023) (statements that company had a "fast start to the

34

year," "encouraging operating and financial performance," and was able to "scale the business" not forward-looking).[13]

*Third*, even if the statements could somehow be characterized as forward-looking (they cannot), they are not protected by the safe harbor because they were not accompanied by meaningful cautionary language. To start, several of Defendants' oral statements (identified in ¶¶212-13, 234, 243, 264) were not "accompanied" by any cautionary language at all and therefore do not qualify for protection. "[T]he PSLRA safe harbor require[s] that the forward-looking statements be 'accompanied by' the cautionary language" within the same document. *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *25 (S.D.N.Y. Mar. 23, 2017); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 227 (S.D.N.Y. 2022) (finding statements actionable where Defendants failed to proffer evidence that statements were accompanied by cautionary language).[14] Even if the cautionary language did accompany the challenged statements (which it did not), Defendants' argument that statements contained in Five Below's SEC filings or on investor calls are inactionable due to cautionary language in those filings or stated on those calls is unavailing. As courts have held, there must be "some attempt" to connect the statements to the cautionary language, and courts have rejected application of the safe harbor to statements that were "too attenuated" from the cautionary language. *Perrigo*, 2019 WL 3451523, at *12.[15] Boilerplate

---

[13] By contrast, in the case Defendants principally rely on (MTD at 13), the court found that the statements truly constituted projections or expectations of future events. *Aetna*, 617 F.3d at 281 ("Thus, to the extent that disciplined pricing said anything about the current price of premiums, it did so in the form of a projection.").

[14] Contrary to Defendants' assertion (MTD at 13), failure to contemporaneously read the disclaimer is not excused by a bald reference to another communication. *See In re Champion Enter., Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 865 (E.D. Mich. 2001), *aff'd sub nom. Miller v. Champion Enter. Inc.*, 346 F.3d 660 (6th Cir. 2003) (no safe harbor where speaker "failed to state that factors discussed in the document to which she refers could cause actual results to materially").

[15] For example, in *OFI Asset Mgmt. v. Cooper Tire & Rubber*, the court found that the challenged statements were "[s]urrounded by cautionary language." 834 F.3d 481, 500 (3d Cir. 2016).

cautionary language does not meet the "extensive [and] specific" requirement for language to trigger the safe harbor. *See*, *e.g.*, *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000).

Defendants argue that the risk disclosures in Five Below's SEC filings warning that the Company's ability to "accurately predict customer trends . . . [could] adversely impact" its financial results are "spot on." MTD at 14-15. Not so. Courts regularly find that similar generic risk disclosures are insufficient to trigger the safe harbor. *See*, *e.g.*, *J/H Real Estate Inc. v. Abramson*, 901 F. Supp. 952, 956-57 (E.D. Pa. 1995) (cautionary language in quarterly and annual SEC filings insufficient when it only "broadly observe[d]" a "number of factors" that may affect the company's expenses). The same is true for the risk warnings related to the Triple-Double statements. *See*, *e.g.*, *In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 946 (E.D. Pa. 1999) (warning that "synergies, if any, may vary materially from those shown" insufficient where "present fact" indicated merger was not "on track"); *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entertainment Holdings, Inc.*, 422 F. Supp. 3d 821, 847 (S.D.N.Y. 2019) (warnings in SEC filings about execution risks related to acquisitions too general to constitute meaningful cautionary statements). In any event, these risk disclosures cannot inoculate Defendants from liability for their false and misleading statements, because the risks had already materialized and were thus no longer contingent. *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("[A] company may be liable under Section 10(b) for misleading investors when it describes as hypothetical a risk that has already come to fruition.").

*Finally*, any statements that would otherwise be covered by the safe harbor were made with contemporaneous knowledge of falsity, as detailed in § V.A., below, and are actionable.

The safe harbor affords no protection for Defendants' false and misleading statements.

## V.    THE COMPLAINT PROPERLY ALLEGES SCIENTER

"Under the PSLRA, a plaintiff properly pleads scienter by alleging facts that constitute circumstantial evidence of either reckless or conscious behavior." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014). "To establish reckless or conscious misbehavior, a plaintiff must show that defendants either: (1) egregious[ly] refused to see the obvious, or [failed] to investigate the doubtful, *or* (2) had knowledge of facts or access to information contradicting their public statements such that defendants knew or should have known that they were misrepresenting material facts . . . ." *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 744 F. Supp. 3d 350, 390-91 (E.D. Pa. 2024) (McHugh, J.) (alterations in original).

As this Court explained, "the Supreme Court and the Third Circuit have been clear that scienter relies on a 'totality of the circumstances test' in which the Court must ask 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter.'" *Energy Transfer*, 532 F. Supp. 3d at 233-34. It is not appropriate to "divid[e] [plaintiff's] allegations into discrete parts and argu[e] that each part fails to give rise to sufficient scienter." *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *9 (D.N.J. Dec. 16, 2022); *accord Avaya*, 564 F.3d at 272-73 ("it is the composite picture, not the isolated components, that judges must evaluate"). The inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. The Court's scienter analysis will "'rest . . . on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least likely as not that defendants acted with scienter.'" *Energy Transfer*, 532 F. Supp. 3d at 227 (quoting *Avaya*, 564 F.3d at 269).

37

**A.    The Officer Defendants Acted With Knowledge Or Reckless Disregard For The Falsity Of Their Statements**

The Complaint contains ample allegations that both of the Officer Defendants "either knew at the time that [their] statements were false or was reckless in disregarding the obvious risk of misleading the public." *Avaya*, 564 F.3d at 272.

**1.    The Officer Defendants Admitted To Contemporaneous Knowledge.**

As an initial matter, shortly after the Class Period, Defendant Bull and Vellios *admitted* that during the Class Period they were aware of facts contrary to their misrepresentations and omissions. ¶¶269-73. Courts have held that "[t]o adequately plead scienter, it is sufficient for plaintiffs to allege that defendants had knowledge of facts or access to information that contradicts their statements." *In re Cambrex Corp. Sec. Litig.*, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005); *see also Energy Transfer,* 744 F. Supp. 3d at 390 (evidence of defendants' "knowledge of facts or access to information contradicting their public statements" satisfies scienter).

Specifically, on earnings calls on August 28 and December 4, 2024, Five Below executives conceded that the Company had longstanding problems concerning its trend-right strategy and Triple-Double plan. On the August 28 call, Defendant Bull conceded that for the previous "*few years*" Five Below had gotten away from the "core part" of its business, meaning trend-right, and that Five Below had "lost our way." ¶¶14, 55, 195, 271. Bull described that the Company experienced "pressures over the *last several years* that significantly impacted our business . . . [including] evolving customer preferences." ¶271. On the same call, an analyst asked "[s]o everything you talked about in terms of the challenges . . . that the business is facing *really should have been true for several quarters*," to which Bull replied "it really was a culmination of things over a *period of years*." ¶271. Similarly, on that same call, Vellios admitted that "[o]ver the *past few years*, we lost some of that sharp focus on our core customers." ¶¶14, 54, 194, 296. Bull also

38

admitted that the Triple-Double initiative was "***too aggressive*** and put a ***tremendous amount of pressure on the organization***" and was being scaled back. ¶198. Further, he explained that the Triple-Double plan led to a loss of "focus" by management, including with respect to its trend-right strategy. ¶¶198, 265. During the Class Period, on June 5, 2024, Anderson admitted that Five Below had "***noticed*** some pressures over the ***last several quarters***" regarding customers being "far more deliberate with their discretionary dollars," despite blaming the Company's poor performance on shrink and making other misleading statements during the "last several quarters." ¶270.

In sum, Defendants themselves publicly stated that they knew the Company was not executing on its trend-right strategy, that the Triple-Double plan was too aggressive and strained management, causing a loss of focus, and that those issues, rather than shrink, were the primary causes of the Company's financial struggles. ¶¶182, 191-205. These admissions by Defendants Anderson and Bull, as well as Vellios, are evidence of Defendants' knowledge at the time of the misrepresentations and omissions. *See Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *6 (D.N.J. May 18, 2020) (admissions by Defendants were "[e]specially relevant" to scienter finding).

Defendants assert that because these are "later in time" statements, they cannot reflect Defendants' Class Period knowledge. MTD at 31-32. But "[p]ost-class-period data . . . [can] be used to confirm what a defendant should have known during the class period." *Avaya*, 564 F.3d at 249 n.13. Defendants' statements directly discuss what they knew during the Class Period, with Anderson specifically describing during the Class Period what they had noticed over "several quarters," and Bull and Vellios acknowledging that the Company, in direct conflict with Defendants' trend-right statements, lost its focus on the trend-right strategy for the past "few years." Defendants' own words should be taken at face value. Inferring that this Company-wide

loss of focus extended to the very executives who made both the false and misleading statements and the admissions is not an "improper inferential leap" (MTD at 30), but the type of inference that must be drawn in Plaintiffs' favor at this stage of the case. *DeVito*, 2018 WL 6891832, at \*12.

Defendants also diminish Plaintiffs' allegations as assertions that "executives may have not optimally managed the company." MTD at 31. As the Third Circuit has held, mismanagement can be the basis of a securities fraud claim where, as here, Defendants place their management practices "in play" through affirmative statements. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992). Defendants' admissions should absolutely weigh in favor of scienter.[16]

## 2.    Defendants' Knowledge Is Reflected In Former Employee Statements.

FEs reported that the Officer Defendants discussed, received, or had access to information about Five Below's inability to align inventory with trends throughout the Class Period. ¶¶62, 88, 274-76. For example, FE 1 attended bi-monthly and quarterly meetings that were also attended by Anderson. FE 1 revealed that concerns about the lack of sufficient hot items in inventory always came up at those meetings. ¶¶62, 274. FE 5 reported that executives spoke to Anderson about inventory issues including trends, and Anderson was aware that the Company was often advertising products that were low on inventory. ¶¶86-88, 274-76. FEs reported that Anderson and Bull, as well as other executives who directly reported to Anderson, had access to information about inventory issues, including a dashboard showing whether inventory was low for a particular product, how inventory was allocated among Five Below stores, sales data in the Company's Salesforce database, and another system for tracking sales data called Tableau. ¶¶91-94, 276.

---

[16] The admissions are particularly compelling coupled with the other allegations of scienter alleged here. *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) ("[I]f there are enough other suggestions of knowledge or recklessness on the part of defendants, an admission of fault by 'management' as a whole may be enough for a court to infer scienter even if the company was unwilling—or unable at the time—to disclose specifically who was responsible.").

Further, multiple FEs described information known by high-level employees who reported directly to the Officer Defendants, contributing to an inference of the Officer Defendants' knowledge. ¶¶86-88, 274, 276. *See ATI Physical Therapy*, 690 F. Supp. 3d at 891 ("it would be exceedingly strange for the COO to know about high attrition while the CEO and CFO remained oblivious").

FEs also reported that Anderson and other executives personally observed, and acknowledged observing, Five Below's inventory issues during visits to Five Below stores. ¶61. On routine visits to stores that FE 1 oversaw, Anderson acknowledged the dearth of trend-right products in the stores' inventory. ¶¶61, 275. Further, FE 7 stated it was widely known throughout the Company that Five Below's Triple-Double plan was far too aggressive, and employees began expressing concerns over the plan in 2021. ¶144. FE 7 attended calls with senior leadership – including Bull – in which concerns were raised about how the expansion plans were adversely affecting the Five Beyond sections. ¶144.

The FEs establish a reasonable inference of Defendants' knowledge.

### 3.      Defendants' Repeated Public Statements Support A Finding Of Scienter.

The Officer Defendants' public statements during the Class Period indicate that each had detailed knowledge of, or access to, the material facts and information misrepresented or concealed, or that they were reckless in failing to investigate the very issues on which they spoke publicly—repeatedly and in detail. ¶¶281-82. Defendants' misrepresentations and omissions pertained to the Company's trend-right strategy and execution, shrink and shrink mitigation efforts, and Triple-Double plan. *Supra* § IV.A. The Officer Defendants' frequent representations about those issues—including in response to direct questions from analysts—further strengthens the inference of scienter. In *Avaya*, the Third Circuit determined that a "strong inference" of scienter had been established in part because "specific" and "focused" questions from market analysts about a major issue were put "directly and repeatedly" to a company executive who

41

answered knowledgably. 564 F.3d at 269-70; *see also Energy Transfer*, 532 F. Supp. 3d at 228 (inferring knowledge in part because defendant "held himself out to investors as knowledgeable about the construction and regulatory difficulties surrounding the pipelines" and "spoke in detail about the pipeline projects" on analyst calls); *Urban Outfitters*, 103 F. Supp. 3d at 653 ("In the context of specific inquiries . . . defendants' omission of actual circumstances that were contrary to their answers presents an obvious risk of misleading investors.").

4.    Defendants Had Control And Access To Relevant Information.

The Officer Defendants' control over the entire Company and access to material nonpublic information supports a strong inference of scienter. ¶¶277-80*; see Urban Outfitters*, 103 F. Supp. 3d at 653 (defendants' "leadership role" in affected operations supported scienter); *Energy Transfer*, 744 F. Supp. 3d at 390 (defendants' "access to information contradicting their public statements" supports scienter). The Officer Defendants oversaw the operations and financial reporting function at Five Below. In their roles, they had access to—and a duty to obtain— information relevant to the Company's operations. *See Energy Transfer*, 532 F. Supp. 3d at 228 ("[P]laintiffs can use circumstantial evidence to allege scienter, including the importance of a particular matter to the business, meetings and conversations the individual was alleged to be part of, and the day-to-day responsibilities of that individual.").

The Officer Defendants had access to material information about the Company's trend-right execution, inventory control and allocation problems, and problematic nature of the Triple-Double expansion plan during the Class Period. ¶278. As detailed above, FEs describe certain relevant information that the Officer Defendants received or had access to. Further evidencing their access to material information, Defendant Anderson signed each Form 10-K and 10-Q issued during the Class Period, while Defendant Bull signed each Form 10-K and 10-Q issued from the beginning of the Class Period to the first quarter of 2023. *Id.* As COO, Bull oversaw the Company's

shrink mitigation efforts and was particularly focused on implementing the Triple-Double plan as shown by his and the Company's public statements that he was "leading the team" focused on shrink mitigation and was promoted to COO in order to "focus on important building blocks of our Triple Double growth vision." ¶¶279-80. *See Energy Transfer*, 532 F. Supp. 3d at 228 (given defendant's "professed knowledge . . . there is a strong inference that he was closely involved with the project, and that his misleading statements were therefore made with scienter").[17]

5.     The False And Misleading Statements Concerned Five Below's Core Operations.

Defendants' misstatements concerned the most significant aspects and initiatives of Five Below's business. ¶¶284-87. Thus, the "core operations" doctrine contributes to an inference of scienter. *See*, *e.g.*, *Energy Transfer*, 532 F. Supp. 3d at 232 ("[M]isstatements and omissions made on core matters of central importance to the company and its high-level executives give rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to the knowledge.").[18]

The misrepresentations and omissions in this case involve matters that were central to the Company's operations. Bull acknowledged that trend-right was part of the Company's core operations, stating "what we got away from was the ***core part*** of our business around . . . delivering an edited assortment trend product." ¶285. Five Below's SEC filings explained that the "***principal***

---

[17] The cases Defendants cite (MTD at 32) stand for the unremarkable proposition that executive positions on their own cannot satisfy scienter. *Kasilingam v. Tilray, Inc.*, 2021 WL 4429788, at *9 (S.D.N.Y. Sept. 27, 2021) (position alone "without any further facts" does not satisfy scienter); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2021 WL 4191467, at *19 (D.N.J. Sept. 15, 2021) (same in substance); *Fain v. USA Techs., Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017) (position "alone, is not enough"); *Paxton v. Provention Bio, Inc.*, 2022 WL 3098236, at *15 (D.N.J. Aug. 4, 2022) (position "on its own" not enough). Here, the Officer Defendants' positions and access to information, in combination with other facts, collectively satisfy scienter.

[18] Defendants' cited cases merely stand for the proposition that the core operations doctrine cannot satisfy scienter on its own. MTD at 33. Those cases are not persuasive here because Plaintiffs allege many other facts collectively establishing Defendants' scienter.

43

**basis upon which we compete** is by offering . . . trend-right products." ¶284. The Triple-Double plan was core to the Company's operations due to the impact of tripling the number of stores. Given the importance of these issues, the Officer Defendants would have closely monitored the issues and their impact on Five Below's business. It is reasonable to infer that the Officer Defendants knew the Company was straying from its trend-right strategy and the Triple-Double plan was straining management and causing a loss of focus on trend-right issues. ¶287.[19]

6.   The Temporal Proximity Between False Statements And The Revelation Of The Fraud Supports Scienter.

The temporal proximity between Defendants' misleading statements and the revelation of the truth concealed by those statements strengthens the inference of scienter. ¶¶294-98. *See Avaya*, 564 F.3d at 271-72 ("proximity" of the rosy statements "to the . . . release of Avaya's disappointing results" "strengthens the inference of scienter"); *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 395-96 (D. Del. 2016) (four months between false statements and corrective disclosure contributed to inference of scienter).

For example, on June 5, 2024, Anderson stated, "our focus on executing our store growth plans with excellence is unwavering," and on June 12, 2024 he said the Company's store growth plans were "solidly intact." ¶298. Also, on the June 5, 2024 earnings call, he said: "[C]hasing trends has always been a strength of ours. And we will continue to quickly identify and capitalize on trends, bringing them in-store quickly." ¶223. A little over a month later, on July 16, 2024, Anderson abruptly resigned and the Company issued interim financial results that revealed the Company's struggles with comparable sales and declining net income. ¶¶179-80. Shortly after the

---

[19] Defendants argue that these matters do not constitute core operations (MTD at 34), but the case they cite is irrelevant. The court merely held that "customer acquisition costs" and "accounting practice recording commission[s]" do not qualify as core operations. *Baer v. Shift4 Payments, Inc.*, 2025 WL 269715, at *9 (E.D. Pa. Jan. 22, 2025). Those matters are dissimilar from the trend-right and Triple Double issues here.

44

Class Period, on August 28, 2024, the Company announced a reduced pace of the Triple-Double plan and Bull explained that Five Below strayed from its trend-right strategy and "lost our way" over the past few years. ¶¶295, 298.

The temporal proximity between the false statements and admissions creates a reasonable inference that Defendants knew, at the time of their misrepresentations, the trend-right strategy was not being executed and the pace of expansion would be slowed. Similarly, Defendants' shift from blaming shrink on March 20, 2024 (¶103) to mostly abandoning that excuse shortly afterward supports an inference of scienter for the March 20, 2024 statements. *See In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 n.10 (E.D. Pa. 1999) ("The timing between the alleged false statements and the . . . revelation that earnings were going to be significantly lower than expected may also support a finding of Defendants' knowledge of the falsity of the statements.").[20]

### 7.    The Executive Shake-Up At The End Of The Class Period Supports Scienter.

The timing and circumstances of Anderson's resignation support an inference of scienter. *See In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at \*8 (D.N.J. Aug. 16, 2018) (officer departures can "contribute to a finding of scienter"); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at \*17 (S.D.N.Y. Aug. 11, 2021) ("The timing of . . . resignations . . . can be a strong inference of scienter.") (collecting cases).

Anderson downplayed the extent and causes of the Company's financial struggles in March and June 2024, then resigned shortly thereafter in July 2024. ¶289. His resignation was announced

---

[20] Defendants' cited cases (MTD at 35-36) do not stand for a rule that temporal proximity cannot support scienter, but merely that temporal proximity was insufficient in those cases. *See Arazie v. Mullane*, 2 F.3d 1456, 1467-68 (7th Cir. 1993) (temporal proximity insufficient because case involved "predictions of future performance" and plaintiffs "failed to allege any specific facts which illustrate that [defendant's] predictions lacked a reasonable basis"); *Elam v. Neidorff*, 544 F.3d 921, 930 (8th Cir. 2008) (proximity failed to satisfy scienter on its own but the "close proximity between defendants' June statements and the mid-July announcement that resulted in the 35 percent decline in stock value *is* relevant to scienter").

in a press release that also revealed poor sales and lowered guidance. ¶290. In discussions with analysts immediately after his departure, management referred to the Company's issues as "self-inflicted."[21] ¶193. Then, a little more than a month after his resignation, the Company announced that it would slow down its Triple-Double plan, while also admitting that the Company strayed from its trend-right strategy and lost its way. ¶289. These admissions, on the heels of Anderson's resignation, suggest that Anderson knew about these issues and left after making false and misleading statements shortly before his resignation. Anderson resigned "effective immediately" and there is no indication that his departure was a planned event. The close temporal proximity between his abrupt departure and the issues revealed following his resignation strengthens the scienter inference. *See In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 730 (D. Minn. 2019) ("in the context of the other evidence and coupled with evidence of timing," executive resignation helped establish scienter).[22]

### 8.    Defendants' Incentive Compensation Offered A Motive For Fraud.

While motive is not required to plead scienter,[23] the Complaint alleges that the Officer Defendants had a motive to artificially inflate the Company's stock price to increase their incentive

---

[21] Five Below's repeated statements that its injuries were self-inflicted help rebut the otherwise "reasonable assumption" that Anderson left simply because the Company had bad news. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009); *Kurtzman v. Compaq Comp. Corp.*, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) (plaintiffs failed to plead that the "resignations were motivated by anything besides a sense of inadequacy for the job in the face of [the company's] troubles").

[22] The Company's Chief Merchandising Officer, Michael Romanko, resigned in September 2024 after more than five years in that role. ¶293. The sudden departure of Romanko closely following Anderson, and immediately on the heels of the issues revealed related to his role as Chief Merchandising Officer, further strengthens the inference of Defendants' scienter.

[23] *See Rahman*, 736 F.3d at 245 ("Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when conducting a holistic review of the evidence."); *Urban Outfitters*, 103 F. Supp. 3d at 655 ("While insider sales can support an inference of scienter, they are not required."); *Hull v. Global Digital Solutions, Inc.*, 2017 WL 6493148, at *19 (D.N.J. Dec. 19, 2017) ("While motive is not a prerequisite to establish scienter, such allegations strengthen the pleadings of scienter.").

compensation that was awarded based on appreciation in Five Below's stock price. ¶300. Specifically, Five Below granted "performance-based restricted stock units" ("PRSUs") to Anderson in March 2021, March 2022, and March 2023 with grant date fair values of $2.2 million, $2.5 million, and $3.5 million, respectively. ¶303. Five Below granted PRSUs to Bull in March 2021, March 2022, and March 2023 with fair values of $387,852, $482,039, and $1,351,573, respectively. ¶303. The PRSUs vested over a three-year period following the grant date, and were designed to increase or decrease in value based on Five Below's stock price performance relative to its peer group. ¶302. The PRSUs were significant relative to Defendants' base salaries. Anderson's PRSU grants in 2021 and 2022 were more than double his base salaries in those years, and his $3.5 million grant in 2023 was almost triple his base salary that year. Bull's 2023 grant was nearly double his base salary that year. ¶306.

Incentive compensation tied to stock price can support an inference of scienter as to the underlying misstatements that artificially inflated the stock price. *See In re Coinbase Glob., Inc. Secs. Litig.*, 2024 WL 4053009, at *16 (D.N.J. Sept. 5, 2024) (motive met where, *e.g.*, defendant was "entitled to . . . stock options if the Company maintained [its] stock prices"); *Loc. 307, I.B. of Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 WL 12855820, at *8 (N.D. Ala. June 7, 2011) ("the fact that defendants had compensation tied to company performance is a . . . motive that may be considered, collectively, with the other allegations of scienter").[24] This is particularly true where, as here Defendants' performance-based compensation "far outstripped their base salaries." *Evanston Police Pension Fund v. McKesson Corp.*, 411 F.Supp.3d 580, 603 (N.D. Cal. 2019); *see also In re Fibrogen, Inc., Sec. Litig.*, 2022 WL 2793032, at *28 (N.D. Cal.

---

[24] Defendants' citation to *Laasko v. Endo Int'l, PLC*, 2022 WL 3444038, at *8 (D.N.J. Aug. 17, 2022), MTD at 27, is unavailing because the court merely held that performance-based bonuses "without more" do not establish scienter. Here, incentive compensation is part of a holistic showing of scienter.

July 15, 2022) (allegations supported motive when defendants' "options and stock awards far outweigh[ed] their salary").[25]

9.    Defendants' Stock Sales Further Support An Inference of Scienter.

Further adding to the inference of scienter is the additional motive allegations based on Anderson and Bull's sales of Five Below stock at artificially inflated prices during the Class Period. Anderson sold shares for proceeds totaling $7.5 million and Bull sold shares for proceeds totaling $1.5 million. ¶308. These sales support Defendants' scienter for several reasons. *First*, Defendants' sales were significant relative to their base salaries. Anderson's sales in 2023 were nearly triple his base salary that year, and his sales in 2022 and 2024 exceeded his base salaries in those years. ¶313. Bull's sales in 2022 were nearly double his base salary that year. ¶314. Courts hold that stock sales exceeding base salaries may contribute to an inference of scienter.[26] *Second*, Defendants' sales during the Class Period dwarfed their sales during the comparable pre-class period (i.e., the nineteen months prior to the Class Period) as neither Anderson nor Bull sold *any* shares during that window. ¶312. During the Class Period, Anderson and Bull sold shares for $7.5 million and $1.5 million, respectively. ¶308. Courts hold that stock sales during the Class Period that substantially exceed comparable pre-class sales may contribute to scienter.[27] *Third*, the timing

---

[25] By contrast, *In re Bally Total Fitness Sec. Litig.*, cited by Defendants (MTD at 27), did not compare bonus compensation to Defendants' ordinary compensation, 2006 WL 3714708, at *9-10 (N.D. Ill. July 12, 2006). And *In re Amarin Corp. PLC* was not actually a case where Plaintiffs alleged a bonus-based motive at all; instead that case just referenced what happened in other cases without any analysis. 2015 WL 3954190, at *11 (D.N.J. June 29, 2015).

[26] *See*, *e.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) ("The sales [defendant] made netted him over four times his annual salary. . . . Plaintiffs have plausibly alleged that the . . . trades were substantial in comparison to [his] overall compensation."); *Marsden v. Select Med. Corp.*, 2006 WL 891445, at *17 (E.D. Pa. Apr. 6, 2006) (finding scienter because, *e.g.*, "stock sales significantly exceeded the annual compensation of each individual defendant"), *vacated in part on other grounds*, 2007 WL 518556 (E.D. Pa. Feb. 12, 2007).

[27] *See McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 654 (E.D. Pa. 2021) (finding scienter because, *e.g.*, "neither Kim nor Kies sold stock in the year-and-a-half leading up to their 2020 sales and . . .

of Defendants' sales was suspicious given the proximity to false statements. On December 2, 2022, two days after Defendants issued false statements at the beginning of the Class Period, Anderson sold shares totaling $1,855,700 and Bull sold shares totaling $1,276,800. ¶309.[28] On April 11, 2023, less than one month after issuing false statements on March 15, 2023, Anderson sold shares totaling $2,989,597. ¶310. On March 21, 2024, the same day Defendants issued various false statements, Anderson sold shares totaling $1,288,799 and Bull sold shares totaling $161,586. ¶311. Contrary to Defendants' assertions otherwise (MTD at 29-30), courts hold that stock sales taking place shortly after false statements may support an inference of scienter.[29]

Defendants' arguments are unpersuasive. Defendants argue that the overall increase in the Officer Defendants' holdings during the Class Period diminishes any inference of scienter. MTD at 28. That argument fails because the increase in holdings was due to stock grants awarded by the Company as opposed to the Officer Defendants purchasing shares on the open market.[30] Increases

---

they sold at a time when Inovio's stock price was artificially inflated"); *In re Suprema Specialties*, 438 F.3d at 277-78 (finding scienter because, *e.g.*, the sales were "suspicious in scope because Cocchiola had sold only 50,000 shares before the 2001 Offering and Venechanos had sold none"); *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 428 (D.N.J. 2002) ("trading is suspicious . . . when it is 'dramatically out of line with prior trading practices'"). By contrast, in *Roofer's Pension Fund v. Papa*, which Defendants cite, the court found defendants' trades during the relevant period were "not unusual" given their trading history. 687 F. Supp. 3d 604, 618 (D.N.J. 2023) (deciding a motion for summary judgment, not a motion to dismiss). In *Brendon v. Allegiant Travel Co.*, plaintiffs failed to allege any details of trades outside the Class Period. 412 F. Supp. 3d 1244, 1262 (D. Nev. 2019).

[28] In *In re Medtronic Inc., Sec. Litig.*, which Defendants rely on, plaintiffs' allegations concerned the suspicious stock sales of one Defendant, and those sales were "largely" explained by the expiration of stock options. 618 F. Supp. 2d 1016, 1038 (D. Minn. 2009).

[29] *See Coinbase*, 2024 WL 4053009, at *16 (sufficient motive where "in the first two days that Coinbase's stock was listed, the Executive Defendants sold over 1.6 million shares"); *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 820 (D. Minn. 2022) ("Courts have viewed stock sales made 'on the heels of false positive financial statements' as 'unusual and suspicious.'").

[30] This fact is shown from SEC Form 4s filed by Anderson and Bull during the Class Period indicating that none of the share acquisitions were from open market purchases. Rather, the acquisitions were stock grants by Five Below. (Anderson also received a small number of shares as transfers from his personal trust and spouse.) Sample Form 4s for certain of Defendants' acquisitions are attached to Defendants' MTD at Exhibits S and U. ECF No. 42-19, 42-21. The stock grants are signified by Transaction Code "A." *See* Form 4 Instructions at www.sec.gov/files/form4data.pdf.

49

in holdings due to stock grants do not detract from scienter.[31] Next, Defendants argue that some of the stock sales by Anderson and Bull were initiated to cover tax obligations and thus should not support scienter. MTD at 29. That argument fails because only a fraction of Defendants' sales were for tax purposes: 35% of Anderson's sales and 17% of Bull's sales were to cover taxes. ¶308 n.19.[32] Regardless, sales proceeds used for tax purposes still benefit the seller and can support scienter.[33] Finally, Defendants point to the gap in time between Defendants' stock sales and the corrective disclosures at the end of the Class Period. MTD at 29-30. But this temporal distance is not dispositive, it is just one factor some courts look to when evaluating stock sales. In any event, Anderson and Bull sold shares on March 7, 2024 and March 9, 2024, just two weeks before the first corrective disclosure on March 20, 2024. ¶308.

### B.      The Complaint Properly Pleads Scienter Against Five Below

An inference of scienter for Five Below can be imputed by statements made by the Officer Defendants through the agency theory. *See Energy Transfer*, 532 F. Supp. 3d at 234; *Avaya*, 564 F.3d at 252 ("a corporation is liable for statements by employees who have apparent authority to make them"). The Officer Defendants and CFO Chipman spoke with authority and their statements can thus be attributed to Five Below. ¶25.

---

[31] *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ("[Defendant] acquired shares at no cost to him, which does not demonstrate lack of scienter."). Defendants' argument relies in part on *In re Adolor Corp. Sec. Litig.*, a case where Defendants' holdings increased in part because they "held onto their shares" during the Class Period. 616 F. Supp. 2d 551, 572 (E.D. Pa. 2009).

[32] By contrast, in *In re Bristol-Myers Squibb Sec. Litig.*, relied on by Defendants, stock sales were "undertaken **primarily** . . . to pay taxes." 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

[33] *See SEC v. Airborne Wireless Network*, 2023 WL 5938527, at *26 (S.D.N.Y. Sept. 12, 2023) ("[S]cienter can be satisfied by showing a defendant 'benefitted in a concrete and personal way from the purported fraud.' . . . [P]roceeds from sales of Airborne shares were . . . used to fund, *inter alia*, their . . . tax liabilities.").

Additionally, the doctrine of corporate scienter "allows a plaintiff 'to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant.'" *Energy Transfer*, 532 F. Supp. 3d at 236. "Applying the concept of corporate scienter is particularly appropriate where the unattributed statements are all statements made *ex cathedra*, on behalf of the corporation, and where there is ample evidence that high-ranking corporate officials were personally engaged in the details of the project, making it highly unlikely that the unattributed statements were rogue pronouncement by employees lacking authority to speak on the corporation's behalf." *Id*. at 237. Thus, the evidence of Five Below's trend-right struggles, inventory control problems, and Triple-Double problems supports an inference of corporate scienter even if not linked directly to the Officer Defendants.

### C.    A Holistic Analysis Supports A Finding Of Scienter

Under well-established Third Circuit law "[s]cienter is judged holistically, based on all the facts presented." *Energy Transfer*, 532 F. Supp. 3d at 227; *accord Avaya*, 564 F.3d at 267-68 ("The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). In evaluating whether Plaintiffs have pled scienter, the court must "consider[] the package." *Innocoll Holdings*, 2020 WL 1479128, at *13. In this case, the "package" is that Defendants represented throughout the Class Period, including in response to analyst questions, that Five Below's trend-right strategy was the "principal basis" upon which it competed, that its Triple-Double plan was a key part of its future growth, that shrink was responsible for the Company coming in below expectations, and that Five Below was at work to combat shrink with a team Defendant Bull led. Defendants themselves recognized how important these subjects were and would be aware of the true state of affairs. Moreover, as former employees explain, Defendants had access to information at regular meetings, from direct reports, and through the Company

51

dashboard.[34] Despite this knowledge, Defendants persisted in the representations until just over a month before the end of the Class Period; it is unreasonable to infer that the state of Five Below's business changed in such a short period of time. And while motive is "not necessary" to prove scienter, here Plaintiffs have pled motive through Defendants' incentive compensation and stock sales. Finally, shortly after the Class Period, Five Below executives admitted that the Company had lost its focus for years. All these facts, taken collectively, establish a strong inference of scienter.[35]

## VI.    PLAINTIFFS HAVE SUFFICIENTLY PLED LOSS CAUSATION

### A.    Corrective Disclosures Corrected Defendants' Misrepresentations

To plead loss causation, Plaintiffs must simply provide the defendants with notice of the relevant economic loss and "what the causal connection might be between that loss and the misrepresentation." *Energy Transfer*, 532 F. Supp. 3d at 239. Plaintiffs need only allege that "the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss," and courts have found that the element is satisfied where the "misrepresentation touches upon the reasons for the investment's decline in value." *Adams v. Klein*, 2021 WL 4439658, at *15 (D. Del. Sept. 28, 2021). There is no heightened pleading standard, and Rule 8 "requires only a short and plain statement of the claim showing that the pleader is entitled

---

[34] To the extent Defendants argue there was no "smoking gun" in which they confessed to fraud, such evidence is unnecessary at this stage. *See Energy Transfer*, 532 F. Supp. 3d at 233; *Avaya*, 564 F.3d at 268-69 ("It is true that Shareholders do not point to any particular document or conversation that would have informed Peterson or McGuire of [fraud]. . . . But the Supreme Court has made clear that plaintiffs' allegations of scienter 'need not be irrefutable, *i.e.*, of the 'smoking-gun' genre.").

[35] Defendants claim that they could not have acted with scienter because they disclosed that Five Below's strategy "*might* prove unsuccessful." MTD at 36. But as discussed at § IV.A.1, the Complaint alleges that Defendants failed to disclose that Five Below's strategy, at the time Defendants made the statements, had **already proven unsuccessful**. These allegations differentiate this case from *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, where the defendants specifically acknowledged the weaknesses they identified "as soon as" they became aware. 580 F.3d 755, 746 (8th Cir. 2009).

to relief." *Id*. at 239. Given the low pleading standard and its fact-intensive nature "the issue of causation is usually reserved for the trier of fact" and is not appropriate for resolution on a motion to dismiss. *Energy Transfer*, 532 F. Supp. 3d at 239; *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015).

Substantively, corrective disclosures "need not precisely mirror the earlier misrepresentation." *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010); *Urb. Outfitters*, 103 F. Supp. 3d at 655. And "the truth may be revealed by a series of partial disclosures through which the truth gradually leaks out." *Energy Transfer*, 532 F. Supp. 3d at 239. Moreover, "[s]o long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery." *Semerenko*, 223 F.3d at 186–87.

Here, Plaintiffs allege three corrective disclosures that revealed the truth and more than meet the Rule 8 standard. ¶¶317-21.

**March 20, 2024.** On March 20, 2024, Defendants disclosed information reflecting that the Company's performance was deteriorating. ¶151. While Defendants misleadingly placed the blame for the deterioration squarely on shrink, larger issues facing the Company were also revealed, including that its new stores were performing poorly. ¶¶152-55. These disclosures partially corrected Defendants' misrepresentations and omissions, including misrepresentations made at the January 8, 2024 ICR Conference where Anderson spoke about the Triple-Double plan and claimed that "[a]s it relates to tripling our stores by 2030, I repeat, nothing has changed." ¶258. Analysts noted that the March 20, 2024 disclosures were a "surprisingly disappointing update given a generally upbeat tone at ICR." ¶160. As the Complaint alleges in detail, the Triple-Double plan was pressuring sales across new stores, as both those stores and existing stores suffered from

53

low inventory, empty Five Beyond sections, and struggles with a poor mix of undesirable products. ¶¶141-50. These problems all became manifest in the Company's poor results announced on March 20, which acknowledged poor performance in new stores, even if Defendants sought to deflect attention from problems with trend-right and expansion, by blaming shrink.[36] ¶¶151-61. On this news, Five Below's stock price suffered a statistically significant decline of over 15% in one day, from $208.97 at market close on March 20, 2024 to $176.79 at close on March 21. ¶¶162, 317.

**June 5, 2024.** On June 5, 2024, Defendants disclosed additional information reflecting a further material decline in performance, with sales results that one analyst characterized as "painful." ¶163. Anderson explained that part of the Company's issues stemmed from "declining sales and older merchandize trends," revealing that Five Below's inability to stock trend-right products and execute the Triple-Double plan were the true reasons underlying the performance decline. ¶165. Anderson even conceded that the Company's trend-right failures were a cause of its deteriorating financial results. ¶166. This partially corrected Defendants' misrepresentations and omissions regarding the Company's ability to execute both its trend-right strategy expansion. ¶¶165-66, 172. However, Anderson again misleadingly shifted the blame to macroeconomic trends, but analysts had their doubts. Truist opined that "***the store is currently more 'stale' than it has been in quite some time***," and UBS was "skeptical" of Defendants' official explanation for a decline blaming the issue in part on macroeconomic trends; UBS specifically claimed that the

---

[36] Despite these reactions, Defendants' attribution of the lowered earnings per share "fully" to shrink, coupled with their insistence the Company was implementing mitigation measures and their characterization of shrink as an industry-wide problem, lessened the impact of the disclosures. ¶161. Still, as discussed above in § IV.A.2, Anderson acknowledged that shrink mitigation efforts had not been effective, an acknowledgment both that shrink was not the real problem at Five Below, and that the statements about trying to mitigate shrink were merely a misdirection—a further effort to mislead investors by suggesting that they would stop theft.

"***lack of newness in the product assortment***" lowered performance. ¶¶165, 170-76. On this news, the Company's stock price suffered another statistically significant decline, falling from its June 5, 2024 closing price of $132.79 per share, to close at $118.72 on June 6, 2024, a one-day decline of 10.6%. ¶¶178, 319.

**July 16, 2024.**  On July 16, 2024, Defendants issued a press release disclosing a further material decline in performance and the resignation of Anderson. ¶179. His sudden resignation after nearly a decade at the helm was shocking to the market. ¶179. The market was also surprised by the revelation of a further pronounced decline in performance, in terms of both sales and profit, from what the Company forecasted just six weeks earlier. ¶181. In discussions with analysts Five Below executives explained the business decline as attributable to having "strayed" from executing on trend-right (¶182), "the need to improve trend-right product in stores," and noting that seasonal product selection had been "stale." ¶183. Analyst reports noted that the problems at Five Below were not based on societal problems or macroeconomic but were "company specific" and "self-inflicted." ¶¶185, 187. The July 16, 2024 disclosures corrected the prior misrepresentations and omissions regarding the Company's ability to stay on trend, and it also showed that Defendants' earlier insistence that macroeconomic trends, including shrink, were to blame were false. ¶¶181-82, 188. Following this press release, the Company's stock price suffered another statistically significant decline, falling from its July 16, 2024 closing price of $102.07 per share, to close at $76.50 on July 17, 2024, a one-day decline of more than 25%. ¶¶189, 321.[37]

---

[37] Each of the corrective disclosures also reflected the materialization of foreseeable risks concealed by Defendants' fraud, including: (i) the Company failing to stock its stores with trend-right inventory; and (ii) the failure of the Company's expansion strategy. ¶322. *See Howard v. Arconic Inc.*, 2021 WL 2561895, at *17 (W.D. Pa. June 23, 2021) ("Plaintiffs can prove loss causation by showing an event that reveals that an earlier statement was false, or in other words, by showing the materialization of a risk that was misrepresented by the Company."). The true nature of these risks had been concealed by Defendants' misstatements and omissions, which concealed information that would have informed investors about these

### B.    Defendants' Loss Causation Arguments Are Unavailing

Defendants' challenges to loss causation fail. Defendants assert that Plaintiffs do not allege how the stock price drops were caused by the disclosure of facts misrepresented or concealed. MTD 38. Defendants are wrong. Plaintiffs' allegations, described above, show that the corrective disclosures are causally connected to the earlier misrepresentations.[38]

Defendants address the July 16, 2024 press release, which included Defendant Anderson's resignation, to claim that courts have held the resignation of an executive does not adequately allege loss causation. MTD 38-39. Not so. Anderson's sudden resignation after being the leader of the Company and overseeing its failed trend-right strategy and growth plan can adequately allege loss causation. ¶¶179-83, 187, 321. *See Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014) (announcements of executive resignations coupled with other revelations adequately plead loss causation); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 675 (D.S.C. 2016) ("[C]ourts have held resignation announcements can be corrective disclosures where they are viewed collectively with other disclosures.").[39] Moreover, Defendants' argument relies on the inference that Anderson's sudden departure is totally unconnected to Five Below's disastrous performance. But Anderson's

---

risks, including information that: (i) Five Below lacked the ability to execute its trend-right strategy; (ii) the Company failed to meaningfully engage in shrink mitigation efforts; and (iii) the Triple-Double plan was too aggressive and distracted management. *Id.*

[38] Defendants take issue with Plaintiffs' allegations that Five Below's stock price "decline was significantly greater than the overall market's performance that day." MTD at 37 (quoting ¶¶ 317, 319, 321). Defendants state, without support, that these allegations are insufficient because Plaintiffs only reference Five Below's stock performance the day after the corrective disclosures. MTD 38. Defendants are making a factual argument. Plaintiffs' allegations are more than sufficient to establish a decline in the share price following corrective information being released. Nothing more is needed at this stage.

[39] Defendants cite *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210 (S.D.N.Y. 2009) and *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008) for the proposition that a resignation of an officer "standing alone" is not a sufficient disclosure (MTD 38-39). Here, as explained above, the disclosure did not stand alone.

departure coinciding with a rapid decline in performance, combined with the admissions of operational failings in executing trend-right, failing to do anything meaningful to mitigate shrink, and the failed expansion plan, make clear that his departure must be considered in light of these problems. Nonetheless, Defendants inexplicably ignore the connection (MTD 38-39) despite the allegations in the Complaint regarding the disclosure of a material decline in performance (¶¶180, 321). Defendants also ignore the analyst reports that concluded the Company "should be performing better," that the lowered performance was "self-inflicted," and that management in private analyst calls admitted the need to improve trend-right product in stores. ¶¶183-88. These reports also connected the poor performance results, Anderson's resignation and the situation at Five Below being far worse than Defendants had previously, recently represented. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 932 (N.D. Cal. 2012) (crediting analyst reports connecting stock price drop to the subject of the misrepresentations). Finally, Defendants do not even contest that the July 16 revelation of a further pronounced decline in performance was corrective independent of Anderson's resignation.

## VII.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SECTION 20(A) CLAIMS

Section 20(a) liability extends to individuals that controlled primary violators of Section 10(b) claims. *Energy Transfer*, 532 F. Supp. 3d at 243. Here, Plaintiffs adequately plead a Section 10(b) claim for the reasons addressed above. Defendants Anderson and Bull are liable as control persons because each controlled the operations of the Company, and took part in the fraud, including by making false statements. ¶¶23-24, 354. They also controlled and approved the Company's disclosures, signing SEC filings. ¶¶278. Plaintiffs plead Defendants Anderson and Bull's culpable participation in Five Below's Section 10(b) violations. Control person liability is

adequately pled.

## VIII.   CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety. In the event the Court grants the motion in whole or in part, Plaintiffs respectfully request leave to amend.


Dated:  May 13, 2025                              */s/ Michael Dell'Angelo*

Michael Dell'Angelo
Andrew D. Abramowitz
Alex B. Heller
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net
aheller@bm.net

Hannah Ross
James A. Harrod
Timothy G. Fleming
Sarah Schmidt
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah.ross@blbglaw.com
jim.harrod@blbglaw.com
timothy.fleming@blbglaw.com
sarah.schmidt@blbglaw.com


*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2025, I authorized the electronic filing of Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint using the Court's CM/ECF system, which will send notification of such filing to all counsel of record in this case.


*/s/ Michael Dell'Angelo*
Michael Dell'Angelo

59

# APPENDIX A

## Chart of False And Misleading Statements[1]

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | **Trend-Right Statements** | |
| 211 | Defendant Anderson: "*Our stores are stocked and ready with an amazing assortment of value products that promises to delight our customers*. . . . [W]e're also excited for *Five Beyond* t*o provide new and extreme value products in different categories*."<br><br>November 30, 2022 Earnings Call | Defendants do not make any arguments specific to this statement.<br><br>Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not puffery: Statement of verifiable fact (stores were "stocked and ready"); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.);<br><br>Not forward-looking: Mixed statement of present fact with forward-looking elements ("our stores *are* stocked and ready") (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and<br><br>Falsity adequately alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |

---

[1] All defined terms have the same means as in Plaintiffs' accompanying Memorandum. "¶," refers to the paragraphs of the Complaint, and references to "§" are to the various sections of Plaintiffs' Memorandum.

1

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| 211 | Defendant Bull: "*Our teams continue to move quickly to adjust to changing customer preferences.*" <br><br> November 30, 2022 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statement of verifiable fact (explains what teams were doing); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: Mixed statement of present fact with forward-looking elements (described what the teams had done and were "continu[ing] to" do at the time of the statement) (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 212 | Defendant Anderson: "[I]t was a very good holiday. **Trends were strong,** Squishmallows, Slime Lickers, Hello Kitty. And I think that's something that – I've been here eight years now, **we've really got a good cadence with those** | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Trend-Right Statements are puffery, forward-looking | Not Puffery: Statement of verifiable fact (claims trends were "strong" and describes specific products that were supposedly doing well, and describing "cadence" of getting into and out of trends); Defendants' repeated emphasis on this issue shows materiality to investors; Statement was directly in response to an analyst question (§ IV.C.); |

2

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | [trends], how to get into them, how to get out of them." <br><br> January 9, 2023 ICR Conference | statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | **Not Forward-Looking:** Statement of present or past facts as opposed to future projections (describes past events – "[t]rends were strong" – and present capability "we've got a good cadence") (§ IV.D.); <br><br> **No Safe Harbor:** Cautionary language absent and not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> **Falsity Adequately Alleged:** Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 213 | Defendant Anderson: "[I]t seems like we're always talking about trends. And I think it all goes back to '17 with that [fidget] spinner year. . . . But from the beginnings of those times to now, it's really – it's kind of **part of the secret sauce of Five Below. And it's kind of in our DNA,** and **it's not only about getting into a trend, but also knowing how to land the plane and get out of it. . . . And we're** | Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. <br><br> Defendants cite this statement as an example | **Not Puffery:** Statement of verifiable fact (describes speed with which a company introduces a product and claims there is an effective vetting process to get trend-right goods into stores); Defendants' repeated emphasis on this issue shows materiality to investors; Statement was directly in response to an analyst question (§ IV.C.); <br><br> **Not Forward-Looking:** Statement of past and present fact (explicitly states that the capabilities described had been "part of the secret sauce" and in Five Below's |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | **pretty nimble and quick.** There's not a lot of bureaucracy at Five Below. **When we identify something, we move really quick to get that in the store, test it and then push it out to the stores.**"<br><br>January 9, 2023 ICR Conference | of puffery and "strategies being pursued by the Company, which ultimately did not deliver the results the Company had hoped." | "DNA" since at least 2017) and describes present-day capabilities and practices (§ IV.D);<br><br>No Safe Harbor: Cautionary language absent and not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 213 | Defendant Bull: "The other thing with the trends too is, again, as Joel mentioned, **we love trends, that's what we're all about. It's really kind of the mindset that we have around those. We deal with this all the time.** The two keys is they do help drive traffic and they also bring in new customers. So we continue to see that. And that's really powerful for the growth of the brand as we continue to do that. **And as some fall off,** although Squishmallows has been out there for a few years, **we** | Defendants do not make any arguments specific to this statement.<br><br>Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statement of verifiable fact (claims that company will replace trend-right products as trends "fall off," specifically mentions Squishmallows); Defendants' repeated emphasis on this issue shows materiality to investors; Statement was directly in response to an analyst question (§ IV.C.);<br><br>Not Forward-Looking: Mixed statement of present fact with forward-looking elements (describes how Five Below had responded to trends in addition to discussing how it would "continue" to respond) (§ IV.D.);<br><br>No Safe Harbor: Cautionary language absent and not sufficiently tied to the statement; statement made with |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | **saw the introduction of new ones come on. And that happens every year. So you're going to see that continuing.**" <br><br> January 9, 2023 ICR Conference | | actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 214 | Defendant Anderson: "[W]e are passionate about sourcing an incredible trend-right assortment for our customers . . . . **We stay on top of hot trends and swiftly move to capitalize on them.** . . . The flexibility of our model . . . is unique and enables **swift recognition and introduction of trend-right and relevant products to our customers, and we honed our expertise and discipline to effectively manage the constant cycling of these trends.**" <br><br> March 15, 2023 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statement of verifiable fact (describes the process by which Defendants are supposedly able to capitalize on trends); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: The statement makes claims about Five Below's current capabilities (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later |

5

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | | admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 215 | Five Below: a) "We **monitor trends** in the ever-changing tween and teen markets and **are able to quickly identify and respond to trends**." <br><br> b) "We deliver **an edited assortment of trend-right** as well as everyday products within each of our category worlds that changes frequently to create a sense of anticipation and freshness . . . ." <br><br> c) "We monitor trends in our target demographic market, historical sales trends of current and prior products and the success of new product launches to ensure that our merchandise is relevant for our customers. **We have a highly planned merchandise strategy focused on trend-right** and everyday products supplemented by selected opportunistic purchases from our vendors **to drive traffic and therefore offer our customers a consistently exciting shopping experience**." | Defendants do not make any arguments specific to these statements. <br><br> Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statements of verifiable fact (discusses the "principal basis" by which the Company competes, and details the Company's strategy, capabilities and methods); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: The statements make claims about Five Below's current capabilities (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statements were false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | d) "The **principal basis upon which we compete is by offering a dynamic, edited assortment of trend-right products** . . . ." March 16, 2023 Form 10-K (for the fiscal year ended January 28, 2023), signed by Defendants Anderson and Bull March 21, 2024 Form 10-K (for the fiscal year ended February 3, 2024), signed by Defendant Anderson | | |
| 216 | Defendant Anderson: "While our customers face multiple macro headwinds, we continue to be there for them, flexing our offering to bring them the Wow products they need and want. **Our broad-based sales performance and transaction trends demonstrate that we are gaining trips and customers through our amazing value, trend-right products and Five Beyond prototype.**" June 1, 2023 Press Release | Defendants do not make any arguments specific to this statement. Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statement of verifiable fact (claims that the success of the strategy led to an increase in Five Below customers); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); Not Forward-Looking: Discussion of past and present fact (makes claims about current and past trends) (§ IV.D.); No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | | corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 217 | Defendant Anderson: "Five Below's merchants **persistently pursue trends [with] newness and value,** both in the United States and across the globe." He also stated, "we can **quickly capitalize on a trend.**"<br><br>August 30, 2023 Earnings Call | Defendants do not make any arguments specific to this statement.<br><br>Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statement of verifiable fact (makes specific claims about Five Below's ability to "capitalize" on trends); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.);<br><br>Not Forward-Looking: The statement makes claims about Five Below's current capabilities (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 218 | Defendant Anderson: "As we look to the second half of the year, **our merchants have sourced a terrific line-up of fresh, trend-right** | Defendants do not make any arguments specific to this statement. | Not Puffery: Statement of verifiable fact (contains claims about products that have already been sourced and providing specific explanation for lowered financial performance); Defendants' repeated emphasis |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | **product** at outstanding value for the holiday season. While we are **adjusting our earnings guidance to reflect an anticipated increase in shrink reserves, our sales outlook remains unchanged.** We will continue to play offense on sourcing amazing product, capitalizing on an improved supply chain, opening a record number of new stores, and **executing on the continued success of our Five Beyond store format**." August 30, 2023 Press Release | Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | on this issue shows materiality to investors; Statement was directly in response to an analyst question (§ IV.C.); Not Forward-Looking: Mixed statement of present fact with forward-looking elements (claims that merchants had already "sourced" the trend-right items in addition to providing "outlook") (§ IV.D.); No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 219 | Defendant Anderson: "Our merchants have sourced . . . fresh and trend-right products at outstanding values." He continued, "in summary, **our teams are focused on delivering incredible value, trend-right products**." | Defendants do not make any arguments specific to this statement. Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the | Not Puffery: Statement of verifiable fact (contains claims about products that have already been sourced); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); Not Forward-Looking: Discusses past and current facts (claims that merchants had already "sourced" in addition to present "focus") (§ IV.D.); |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | November 29, 2023 Earnings Call | PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 220 | Defendant Anderson: "We exceeded our guidance for sales, comparable sales and EPS, as **our value offering resonated with customers and we effectively capitalized on multiple trends** We opened a record 74 new stores in the third quarter and are on track to open over 200 new stores for the year. We have also successfully converted over 400 stores to our new Five Beyond format, ending the third quarter with approximately 50% of our comparable store base in this format. **We entered the all-important holiday quarter ready to Wow our customers with an** | Defendants do not make any arguments specific to this statement.<br><br>Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statement of verifiable fact (contains representations about what Five Below had purportedly accomplished); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.);<br><br>Not Forward-Looking: Discusses past and current facts (claims that the value offering had already "resonated," that Five Below had "capitalized" on trends, and that the Company had already "entered" the quarter ready to supply trend-right items) (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | **outstanding assortment of gifts and stocking stuffers at incredible value**. We are well-positioned to execute this holiday season and deliver on our goals for the year." <br><br> November 29, 2023 Press Release | | deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 221 | CFO Chipman: "Our **merchants continue to innovate** on the assortment not only during the holidays, but are **bringing new and innovative things to [Five Beyond]** . . . . Five Beyond conversions drive traffic, they elevate sales in the overall box and that includes both Five Below and Five Beyond products." <br><br> January 8, 2024 ICR Conference | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statement of verifiable fact (represents the current impact of Five Beyond offerings and how Five Beyond sections attract sales); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: Mixed statement of present fact with forward-looking elements (describes the present impact of Five Beyond offerings, not impact in the future) (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later |

11

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | | admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 222 | Defendant Anderson: The Company's "buyers **scour the globe to bring our customers the value, trends, wow and newness that keep them coming back to Five Below.**" He also stated that the "flexibility of our model with our 8 worlds is unique and enables our teams to **quickly introduce trend-right relevant products to our customers.**" <br><br> March 20, 2024 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Trend-Right Statements are puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. | Not Puffery: Statement of verifiable fact (makes claims about the process by which Five Below stocks trend-right items); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: Discusses current facts (makes claims about Five Below's current process, not what it would do in the future) (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| 223 | Defendant Anderson: "**[C]hasing trends has always been a strength of ours. And we will continue to quickly identify and capitalize on** | Defendants generally claim that the Trend-Right Statements are puffery, forward-looking | Not Puffery: Statement of verifiable fact (claims the ability to quickly respond to trends had "always been a strength" of Five Below); Defendants' repeated |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | trends, bringing them in-store quickly . . . ." "[M]erchants remain passionate and are committed to bringing the best trend-right amazing value products to our customer, while newness are part of our DNA, and I am really pleased with the latest trends they have identified." "[M]erchants are definitely looking at new trends, chasing trends, finding new ways to drive footsteps." <br><br> June 5, 2024 Earnings Call | statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are insufficient. <br><br> Defendants cite this statement as an example of puffery and "strategies being pursued by the Company, which ultimately did not deliver the results the Company had hoped." | emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: Mixed statement of present fact with forward-looking elements (the statement discusses one of Five Below's purported "strengths" in the past as well as its future commitment) (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the trend-right strategy was not being implemented properly and was being hampered by inventory control deficiencies, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made. Plaintiffs allege that the trend-right strategy was failing during the Class Period, as corroborated by FEs, corrective disclosures, and later admissions – partly due to Five Below lacking inventory tracking and controls to allocate in demand merchandise to its stores (§ IV.A.1.). |
| | **Shrink-Related: Statements Blaming Shrink For Deteriorating Financial Results** | | |
| 228 | Defendant Bull: Five Below experienced "higher-than-expected shrink," and "[o]n an annual basis, shrink for 2022 was approximately 30 basis points higher than what we experienced in 2021." | Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor (quoting this statement) | Not Forward-Looking: Discusses past events (describes the previous quarter's results) (§ IV.D.). <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of declining |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | March 15, 2023 Earnings Call | and that the Complaint's allegations of falsity are insufficient. | performance, which facts were known at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures (§ IV.A.2.). |
| 229 | Defendant Anderson: Five Below "trued [up shrink] last year, and it had an impact on our fourth quarter [and] **we are accruing at the higher rates this year and doing things on our part to mitigate shrink**."<br><br>June 1, 2023 Earnings Call | Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor (quoting this statement) and that the Complaint's allegations of falsity are insufficient. | Not Forward-Looking: Describes previous quarter's results and purports to describe current actions by Five Below (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of declining performance, which facts were known at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures  (§ IV.A.2.). |
| 230 | Defendant Anderson: "[W]ith us not changing the top line [i.e., sales], the 20 basis point decline [in operating margin guidance] is really the only change from the last quarter, and **that pretty much is all based on the changes we're making with the** | Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor (citing this statement) | Not Forward Looking: Mixed statement of present fact with forward-looking elements (incorporates shrink's impact to date) (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of declining |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | **assumption of shrink. . . . [w]hile we are adjusting our earnings guidance to reflect an anticipated increase in shrink reserves, our sales outlook remains unchanged**." August 30, 2023 Earnings Call | and that the Complaint's allegations of falsity are insufficient. | performance, which facts were known at the time this statement was made (§ IV.D.); and Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures (§ IV.A.2.). |
| 231 | Defendant Bull: "I think you're all familiar with the recent media and videos that are out there where **retailers across the sector are experiencing increased levels of shrink** and related crime incidents and **we are not immune to this as we're finding out**." August 30, 2023 Earnings Call | Defendants do not make any arguments specific to this statement. Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor and that the Complaint's allegations of falsity are insufficient. | Not Forward-Looking: Discusses events that have purportedly already occurred (§ IV.D.); No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of declining performance, which facts were known at the time this statement was made (§ IV.D.); and Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures (§ IV.A.2.). |
| 232 | Defendant Anderson: "And so, where is it coming from? It's coming on all angles. And you've got several cities now which just simply aren't prosecuting below the $500 level. Sadly, our hometown here in Philly is a city that's seen some of our highest shrink rates. And we | Defendants do not make any arguments specific to this statement. Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the | Not Forward-Looking: Discusses events that have purportedly already occurred (§ IV.D.); No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of declining |

15

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | watched Target and we watched Wawa exit Center City. And so while I don't think we're yet at that extreme of closing Five Below stores there, **these are the type of mitigation strategies that will be included as we consider what to do if we don't see things improve**." <br><br> August 30, 2023 Earnings Call | PSLRA Safe Harbor (quoting this statement) and that the Complaint's allegations of falsity are insufficient. | performance, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures  (§ IV.A.2.). |
| 233 | Chipman: "Gross margin decreased by approximately 190 basis points to 30.3%, as anticipated. This decline was **primarily driven by recording actual shrink results for the stores that completed their physical inventories in August as well as recording the true-up of shrink reserves for the full chain,** which we shared during our last quarter's earnings call." <br><br> November 29, 2023 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor (quoting this statement) and that the Complaint's allegations of falsity are insufficient. | Not Forward-Looking: Describes previous quarter's results (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of declining performance, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures  (§ IV.A.2.). |
| 234 | Defendant Anderson (after being asked about shrink and prompted that what shrink "really means, is theft"): "We talked about theft in our second quarter call. Theft is real, it's impacting all retailers." He later | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Shrink-Related Statements were | Not Forward-Looking: Purports to discuss the current state of affairs regarding theft (§ IV.D.); <br><br> No Safe Harbor: Cautionary language absent and not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of |

16

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | claimed "this is a real societal problem and we've got to lean together with the politicians to figure this out."<br><br>November 30, 2023 Fox Business Interview | forward-looking statements subject to the PSLRA Safe Harbor (quoting this statement) and that the Complaint's allegations of falsity are insufficient. | declining performance, which facts were known at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures  (§ IV.A.2.). |
| 235 | Defendant Anderson: "Despite these strong sales results, earnings per share of $3.65 was at the low end of our internal expectations and **can be fully attributed to higher-than-planned shrink**."<br><br>March 20, 2024 Earnings Call | Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor (quoting this statement) and that the Complaint's allegations of falsity are insufficient. | Not Forward-Looking: Describes previous quarter's results (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of declining performance, which facts were known at the time this statement was made (§ V.D.); and<br><br>Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures  (§ IV.A.2.). |
| 236 | Defendant Anderson: "**Shrink is industry-wide and a societal problem** that accelerated over the last year."<br><br>March 20, 2024 Earnings Call | Defendants do not make any arguments specific to this statement.<br><br>Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the | Not Forward-Looking: The statement purports to discuss the current state of affairs regarding theft (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that shrink was not a main driver of declining |

17

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | PSLRA Safe Harbor and that the Complaint's allegations of falsity are insufficient. | performance, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made because Five Below's issues were not primarily attributable to shrink but as the Company would later admit, "self-inflicted" and rooted in operational and execution failures  (§ IV.A.2.). |
| | **Shrink-Related Statements: Statements Regarding Shrink Mitigation Measures** | | |
| 240 | Defendant Anderson: "[W]e are . . . **doing things on our part to mitigate shrink**." <br><br> June 1, 2023 Earnings Call | Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor (citing this statement) and that the Complaint's allegations of falsity are insufficient. | Not Forward-Looking: The statement claims to describe what efforts were currently underway ("doing things") (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that Five Below was not undertaking any serious effort to mitigate shrink, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made because, as former employees attest, the Company was not undertaking serious efforts to combat shrink (§ IV.A.2.). |
| 240 | Defendant Bull: "[W]e're **focusing on preventative measures around shrink**." <br><br> June 1, 2023 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Shrink-Related Statements were | Not Forward-Looking: The statement claims to describe what efforts were currently underway ("focusing on") (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that Five Below was not undertaking any |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | forward-looking statements subject to the PSLRA Safe Harbor and that the Complaint's allegations of falsity are insufficient. | serious effort to mitigate shrink, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made because, as former employees attest, the Company was not undertaking serious efforts to combat shrink (§ IV.A.2.). |
| 241 | Defendant Bull: "I am also leading a team to focus on operational mitigation efforts to counter the elevated shrink trends." "**[W]e've dedicated a team to look at all different areas to help with mitigation efforts. And that includes enhanced technology, merchandise presentation, . . . register formats, policies and procedures**." <br><br> August 30, 2023 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor and that the Complaint's allegations of falsity are insufficient. | Not Forward-Looking: The statement claims to describe what efforts were currently underway (have "dedicated a team") (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that Five Below was not undertaking any serious effort to mitigate shrink, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made because, as former employees attest, the Company was not undertaking serious efforts to combat shrink (§ IV.A.2.). |
| 242 | Defendant Anderson: "We'd **already mitigated some of the things from the 30 basis [point] increase from last year.** . . . The difference is . . . a year ago, we weren't doing anything about it. . . . So all the mitigation efforts we are putting in just started." "I see | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the | Not Forward-Looking: The statement claims to describe what efforts were currently underway, purports to reference results to date (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that Five Below was not undertaking any serious effort to mitigate shrink, which facts were |

19

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | nothing but upside as we get past this shrink, **put mitigation efforts in for that**." <br><br> August 30, 2023 Earnings Call | PSLRA Safe Harbor and that the Complaint's allegations of falsity are insufficient. | known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made because, as former employees attest, the Company was not undertaking serious efforts to combat shrink (§ IV.A.2.). |
| 243 | Defendant Anderson: "[W]e're making some changes to our business model, we've had to really tighten up our self-checkouts, **we're putting some more labor in the stores**. . . . [W]e will figure out the shrink and theft problem." <br><br><br> November 30, 2023 Fox Business Interview | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the PSLRA Safe Harbor and that the Complaint's allegations of falsity are insufficient. | Not Forward-Looking: The statement claims to describe what efforts were currently underway (§ IV.D.); <br><br> No Safe Harbor: Cautionary language absent and not sufficiently tied to the statement; statement made with actual knowledge that Five Below was not undertaking any serious effort to mitigate shrink, which facts were known at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Statement was false or misleading when made because, as former employees attest, the Company was not undertaking serious efforts to combat shrink (§ IV.A.2.). |
| 244 | Defendant Anderson: "We have **implemented additional shrink mitigation initiatives** based on our 2023 learnings." <br><br> March 20, 2024 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Shrink-Related Statements were forward-looking statements subject to the | Not Forward-Looking: The statement claims to describe what efforts were currently underway (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that Five Below was not undertaking any serious effort to mitigate shrink, which facts were |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | PSLRA Safe Harbor and that the Complaint's allegations of falsity are insufficient. | known at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Statement was false or misleading when made because, as former employees attest, the Company was not undertaking serious efforts to combat shrink (§ IV.A.2.). |
| | **Statements Concerning Expansion and The Triple-Double Plan** | | |
| 253 | Defendant Anderson: "[W]e're still on track for the long-term Triple-Double goals. . . . **We are gaining momentum going into '23 and expect that to continue to grow**."<br><br>November 30, 2022 Earnings Call | Defendants generally claim that the Triple-Double Statements were puffery (citing this statement), forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient. | Not Puffery: Statement of verifiable fact (affirmatively represents momentum of plan); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.);<br><br>Not Forward-Looking: Mixed statement of present fact with forward-looking elements (discusses momentum that was ongoing in addition to expectations) (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made; statement made with actual knowledge that Five Below was not undertaking any serious effort to mitigate shrink, which facts were known at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statements were made, which is directly corroborated by the corrective disclosures and later |

21

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | | admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 254 | Defendant Bull: "We plan to open 200 new stores [in 2023] and expect to end the year with 1,540 stores or unit growth of approximately 15%." <br><br> March 15, 2023 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Triple-Double Statements were puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient. | Not Puffery: Statement of verifiable fact (affirmatively represents number of stores to be opened); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statements were made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 254 | Defendant Anderson: "[T]he process -- we streamlined it in several different ways to be able to execute more leases in a faster time line more per month. We are expanding the types of centers we're going into." <br><br> March 15, 2023 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Triple-Double Statements were immaterial puffery, forward-looking statements subject to the PSLRA Safe Harbor, and | Not Puffery: Statement of verifiable fact (describes steps that the Company had already taken to prepare the Triple-Double plan); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: Mixed statement of present fact with forward-looking elements (describing steps already undertaken—"we streamlined it"—and omitted the fact that the plan was floundering) (§ IV.D.); |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | that the Complaint's allegations of falsity are not sufficient. | No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statements were made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 255 | Defendant Anderson: "We now expect to reach a milestone of over 200 new stores this year, while building our pipeline for next year and beyond."<br><br>June 1, 2023 Earnings Call | Defendants do not make any arguments specific to this statement.<br><br>Defendants generally claim that the Triple-Double Statements were immaterial puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient. | Not Puffery: Statement of verifiable fact (affirmatively represents momentum of plan and number of stores to be opened); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.);<br><br>No Safe Harbor:  Cautionary language not sufficiently tied to the statement, statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statements were made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |

23

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| 256 | Defendant Bull: "**[We] feel extremely confident around the Triple-Double vision**." <br><br> August 30, 2023 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Triple-Double Statements were immaterial puffery (quoting this statement), forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient (citing this statement). | Not Puffery: Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: Mixed statement of present fact with forward-looking elements (expressed confidence in plan while omitting the plan was floundering) (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); <br><br> Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statement was made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 257 | Defendant Anderson: "**We remain on track to achieve the goal of opening over 200 stores** [in 2023]. . . . Our real estate teams have built a strong pipeline of new stores for 2024 and have also started working on 2025 stores." <br><br> November 29, 2023 Earnings Call | Defendants generally claim that the Triple-Double Statements were immaterial puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are | Not Puffery: Statement of verifiable fact (provides update as to the status of the plan, and that it is currently "on track"); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: Mixed statement of present fact with forward-looking elements (includes the progress on the plan to date) (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | not sufficient (citing this statement). | that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statement was made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 258 | Defendant Anderson: "Now I'd like to update you on the Triple-Double strategy. As you recall, we shared the strategy with you back in March of 2022, and it was very simple. We were going to triple our stores by 2030, we're going to double our earnings and sales by 2026 -- 2025. Today I will update you on exactly where that vision stands. . . . **As it relates to tripling our stores by 2030, I repeat, nothing has changed. We still . . . expect to triple our stores by 2030.** We opened 1,000 stores in the last seven years. We're going to open 2,000 stores in the next seven years."<br><br>January 8, 2024 ICR Conference | Defendants do not make any arguments specific to this statement.<br><br>Defendants generally claim that the Triple-Double Statements were immaterial puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient. | Not Puffery: Statement of verifiable fact (provides update as to the status of the plan with specific details of the plan); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.);<br><br>Not Forward-Looking: Mixed statement of present fact with forward-looking elements (includes the progress on the plan to date while omitting issues that the plan was experiencing) (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statement was made, which is directly corroborated by the corrective disclosures and later |

25

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | | admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 260 | Defendant Anderson: "We still expect to open between 225 and 235 new stores [in 2024]." <br><br> March 20, 2024 Earnings Call | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Triple-Double Statements were immaterial puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient. | Not Puffery: Statement of verifiable fact (affirmatively represents momentum of plan and number of stores to be opened); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> No Safe Harbor:  Cautionary language not sufficiently tied to the statement, statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statement was made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 260 | Defendant Anderson (when asked "how do you avoid the mistakes with a more streamlined process when you're opening more stores than you did in the prior years"): "[A:] . . . We've been on the streamlined process for quite some time, everything from – we're using Placer AI now to help us evaluate stores, which allows us to do it quicker. The legal team has streamlined with | Defendants do not make any arguments specific to this statement. <br><br> Defendants generally claim that the Triple-Double Statements were immaterial puffery, forward-looking statements subject to the PSLRA Safe Harbor, and | Not Puffery: Statement of verifiable fact (purports to describe details of how the initiative is executed); Defendants' repeated emphasis on this issue shows materiality to investors; Statement made in direct response to analyst question (§ IV.C.); <br><br> Not Forward-Looking: Mixed statement of present fact with forward-looking elements (describes how the plan had been implemented, and Defendant Anderson explicitly claimed Five Below had been employing the same techniques for "a number of years") (§ IV.D.); |

26

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | some AI advantages, how quickly they're able to approve leases. All those add into -- add up to weeks not days. And so it's less about the approval at the rec committee level and it's more about the individual components that get it to the rec committee and then leases signed after the Rec committee. And this has been going on for a number of years with a[n] extreme focus . . . ." <br><br>March 20, 2024 Earnings Call | that the Complaint's allegations of falsity are not sufficient. | No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and <br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statement was made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 261 | Form 10-K: "[W]e plan to open between 225 and 235 new stores in fiscal 2024." <br><br>Summary of new store openings in fiscal years 2021 through 2023. <br><br>March 21, 2024 10-K for the year ended February 3, 2024, signed by Defendant Anderson. | Defendants do not make any arguments specific to this statement. <br><br>Defendants generally claim that the Triple-Double Statements were immaterial puffery, forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient. | Not Puffery: Statement of verifiable fact (affirmatively represents momentum of plan, number of stores to be opened, and describes the progress of the plan to date); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br>Not Forward-Looking: Statement of present/historical facts (historical store openings and omitted the harm that new stores were doing to existing stores and the difficulties in stacking and staffing stores) (§ IV.D.); <br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and <br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores |

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | | | at the time the statement was made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 263 | Defendant Anderson: "Our first pillar is store expansion. [We have] over 1,600 stores currently and a road map to 3,500 Five Below locations nationwide by the end of 2030. . . . We are confident in our path to achieve approximately 230 new store openings this year and have already built a strong pipeline for 2025." . . . "**[O]ur focus on executing our store growth plans with excellence is unwavering**." <br><br> June 5, 2024 Earnings Call | Defendants generally claim that the Triple-Double Statements were immaterial puffery (quoting this statement), forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient. | Not Puffery: Statement of verifiable fact (provides update as to the status of the plan); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.); <br><br> Not Forward-Looking: Mixed statement of present fact with forward-looking elements (includes the progress on the plan to date, and the Company's then-current "focus" on it, while omitting issues that the plan was experiencing) (§ IV.D.); <br><br> No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and <br><br> Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statement was made, which is directly corroborated by the corrective disclosures and Defendants' later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 264 | Defendant Anderson: "[I]t's also important we don't lose sight of the | Defendants generally claim that the Triple- | Not Puffery: Statement of verifiable fact (describes progress of plan to date and incorporation of Five |

28

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | long term and the Five Below growth story and that remains **solidly intact** and there are several components to it. One, it's all about a **strong new store growth pipeline, which we reiterated several times on our [Q1 2024] call. It's about the Five Beyond expansion continuing** . . . . **[T]he long term growth of Five Below is something I am very excited about and we continue to pursue.**"<br><br>June 12, 2024 Oppenheimer Conference | Double Statements were immaterial puffery (quoting this statement), forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's allegations of falsity are not sufficient. | Beyond sections into new stores); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.);<br><br>Not Forward-Looking: Mixed statement of present fact with forward-looking elements (omitted the harm that new stores were doing to existing stores and the difficulties in stocking and staffing stores) (§ IV.D.);<br><br>No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statement was made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |
| 264 | Defendant Anderson: "While we certainly didn't earn the right to put forth a guide for you that says immediate return to positive comps, there are certainly signs out there that this shouldn't be long term. **We certainly don't think it's structural at all or wouldn't be continuing our growth.**" | Defendants generally claim that the Triple-Double Statements were immaterial puffery (quoting this statement), forward-looking statements subject to the PSLRA Safe Harbor, and that the Complaint's | Not Puffery: Statement of verifiable fact (claims that there are no "structural" issues with the Triple-Double initiative); Defendants' repeated emphasis on this issue shows materiality to investors (§ IV.C.);<br><br>Not Forward-Looking: Mixed statement of present fact with forward-looking elements (omitted the harm that new stores were doing to existing stores and the difficulties in stacking and staffing stores) (§ IV.D.); |

29

| ¶ | Statement/Source | Defendants' Arguments | Plaintiffs' Response |
|---|---|---|---|
| | June 12, 2024 Oppenheimer Conference | allegations of falsity are not sufficient. | No Safe Harbor: Cautionary language not sufficiently tied to the statement; statement made with actual knowledge that it was misleading, based on allegations that the expansion plan was known to be floundering at the time this statement was made (§ IV.D.); and<br><br>Falsity Adequately Alleged: Company's former employees report that the Triple-Double expansion strategy was already failing and hurting existing stores at the time the statement was made, which is directly corroborated by the corrective disclosures and later admissions, including that new stores were performing poorly and the plan was "too aggressive" (§ IV.A.3.). |