# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE FIVE BELOW, INC.** | : | |
| **SECURITIES LITIGATION** | : | **CIVIL ACTION** |
| | : | **No. 24-3638** |
| | : | |

**McHUGH, J.**                                                    **August 25, 2025**

## MEMORANDUM

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................... 3
    A. Defendants ....................................................................................................... 5
    B.  Standard for Former Employee Testimony.................................................... 5
II.   FALSITY AND MATERIALITY OF STATEMENTS ..................................... 6
    A. Statements About Five Below's Trend-Right Strategy ................................ 7
        1.  Factual Background .................................................................................. 7
        2.  Trend-Right Statements Are Not Inactionable Puffery. ......................... 8
        3.  The Safe Harbor Provision and Forward-Looking Statements............................ 12
        4.  Categories of Present Statements .......................................................... 18
        5.  Present Statements Not Plausibly Alleged to be False or Material ..................... 19
        6.  Present Statements Plausibly Alleged to be False ............................... 24
        7.  Materiality .............................................................................................. 27
    B.  Statements About Shrink ............................................................................... 28
        1.  Defining Shrink ...................................................................................... 28
        2.  Factual Background ................................................................................ 30
        3.  The Safe Harbor Provision and Forward-Looking Statements............................ 31
        4.  Statements Representing That Shoplifting Was the Cause of Shrink Were Misleading ............................................................................................. 34
        5.  Shrink Was Not the Sole Cause of Five Below's Weak Performance. ............... 39
        6.  Statements on Shrink Mitigation Are Not Plausibly Alleged to be False............. 40
        7.  Materiality .............................................................................................. 43
    C.  Statements About Five Below's Triple-Double Strategy ............................ 44
        1.  Factual Background ................................................................................ 44
        2.  The Safe Harbor Provision and Forward-Looking Statements............................ 45
        3.  Present Statements Not Plausibly Alleged to be False. ........................ 48
        4.  Defendants' Triple-Double Statements Did Not Create a Duty to Disclose. ....... 50
        5.  Conclusion .............................................................................................. 51
    D.  Conclusion ..................................................................................................... 51
III.  SCIENTER ......................................................................................................... 51
        1.  Individual Defendants ............................................................................ 52
        2.  Corporate Defendant .............................................................................. 61
IV.   LOSS CAUSATION ........................................................................................... 63
        1.  March 20, 2024 Partial Disclosure........................................................ 64
        2.  June 5, 2024 Partial Disclosure............................................................. 65
        3.  July 16, 2024 Partial Disclosure. .......................................................... 66
V.    SECTION 20(a) CLAIM .................................................................................... 69
VI.   CONCLUSION ................................................................................................... 70

## I.    INTRODUCTION

This is a putative class action brought by shareholders of Defendant Five Below.  Lead Plaintiffs are the retirement systems for certain public employees in Arkansas, and the case is brought on behalf of all shareholders who purchased or owned stock in Five Below between December 1, 2022 and July 16, 2024 (the "class period").  Defendants are Five Below, Inc. ("Five Below" or the "Company"), a company that operates a retail store chain, and two Five Below executives (the "Individual Defendants").

In sum, Plaintiffs allege that Defendants issued a series of false or misleading statements during the class period related to (1) Defendants' trend-right strategy and execution, (2) inventory loss that Five Below was experiencing referred to as "shrink," and (3) Five Below's "triple-double" plan to double earnings and triple the number of stores.  Plaintiffs contend that the truth was revealed to investors through several corrective disclosures in 2024, and that the value of Five Below stock fell as a result.  Plaintiffs further assert that Five Below stock was kept at an artificially high price during the class period because of Defendants' false and misleading statements, and bring this securities fraud claim under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a).  Defendants have moved to dismiss.

The Securities Exchange Act of 1934 Section 10(b) and rules promulgated thereunder prohibit fraud in connection with the sale or purchase of securities.  15 U.S.C. § 78j(b).  It is a violation of the Exchange Act and its rules "[t]o make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5 ("Rule 10b-5").  To establish a claim of securities fraud under Rule 10b-5, plaintiffs must show: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred

to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (internal quotations omitted).  Defendants argue that Plaintiffs have not met their burden as to the first, second, and sixth elements.

Federal securities fraud litigation is governed by the Private Securities Litigation Reform Act of 1995 (PSLRA).  Pub. L. No. 104-67, 109 Stat. 737 (1995).  "The PSLRA imposes two exacting and distinct pleading requirements for securities fraud actions." *In re Aetna*, 617 F.3d at 277.  First, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Second, "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see also City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023) ("Under [the PSLRA pleading] standard, the complaint must describe the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity.").

Because of the heightened pleading standard, it has become the norm in securities fraud cases that defendants move to dismiss by microscopically examining each allegation.  This demands rigorous analysis by the court.

Having performed this analysis, I find that Plaintiffs have met their burden on some but not all of the allegedly false or misleading statements. Accordingly, Defendants' Motion to Dismiss is granted in part and denied in part.[1]

## A.    Defendants

Plaintiffs name Five Below as a corporate defendant, as well as two individual company executives. Defendant Joel Anderson was Five Below's President and CEO from 2015 until July 15, 2024. Am. Compl. ¶ 23, ECF 40 (herein "AC"). As CEO, Anderson was the primary Five Below spokesperson on quarterly earnings calls, certified SEC 10-K and 10-Q filings, and directed and supervised Five Below's operations. *Id.* ¶¶ 23, 25. Defendant Kenneth Bull initially served as Chief Financial Officer (CFO) from 2012 until July 2023, and became Five Below's Chief Operating Officer (COO) in March 2023. *Id.* ¶ 24. Mr. Bull became Interim President and CEO upon Anderson's departure. *Id.* Throughout the class period, Bull also spoke regularly at quarterly earnings calls and certified SEC filings. *Id.*

## B.    Standard for Former Employee Testimony

Plaintiffs rely heavily on testimony[2] from former Five Below employees[3] in their Amended Complaint to establish that Defendants' statements were false or misleading and demonstrate scienter. Under the heightened pleading standard, "information provided by confidential witnesses

---

[1] I exercise subject matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

[2] "Testimony" is not used in a formal legal sense, but as a shorthand summary for interviews conducted and statements taken during the course of counsel's investigation.

[3] These former employees are currently anonymous and referred to in the Amended Complaint using "FE" and a number designation. I will use this naming convention, seeing no reason to alter this reasonable abbreviation. *See Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F.Supp.3d 189, 206 (E.D. Pa. 2021) (McHugh, J.) (referring to a former employee as FE-1).

is subject to a steep discount when the source is not credible or reliable." *City of Warren Police & Fire Ret. Sys.*, 70 F.4th at 680. In determining whether to consider confidential former employees reliable or credible as a source of "information and belief" as required by the PSLRA, the Third Circuit has instructed courts to conduct "an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *California Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). Lower-level employees are not to be disregarded merely because of their status, so long as the employee is "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Advance Auto Parts, Inc., Sec. Litig.*, No. 18-212, 2020 WL 599543, at *3 (D. Del. Feb. 7, 2020) (citing *California Pub. Emps' Ret. Sys.*, 394 F.3d at 148). Additional factors courts consider include the job title and functions, consistency between former employee accounts, dates of employment, and whether their knowledge is first- or second-hand.

Plaintiffs' Amended Complaint contains numerous allegations based upon eight separate former employees ("FEs"), with jobs ranging from a merchandise manager at a single store to a corporate marketing director. Whether these allegations are sufficient to satisfy PSLRA's exacting pleading requirements is a context-specific analysis, based on the statements at issue. I will therefore address the reliability of former employee allegations as I assess whether Plaintiffs have adequately pled each claim.

## II.    FALSITY AND MATERIALITY OF STATEMENTS

Plaintiffs allege that Defendants made misrepresentations during the class period concerning three topics: (1) Five Below's "trend-right" strategy of "offering a dynamic, edited

assortment of trend-right products"; (2) the amount and nature of "shrink" – inventory loss – that Five Below was experiencing, and the efforts it was taking to mitigate this inventory loss; and (3) Five Below's "triple-double" initiative, which sought to triple Five Below's stores and double its sales and earnings per share. AC ¶¶ 5-7. I will review each of these categories in turn to determine whether Plaintiffs have adequately alleged falsity and materiality.

### A.     Statements About Five Below's Trend-Right Strategy

#### 1.     *Factual Background*

Five Below is a discount retail chain that primarily sells items for less than five dollars.[4] AC ¶ 26. As a retailer primarily selling low-value items, Five Below must achieve a high volume of sales to turn a profit. *Id.* ¶ 37.

A core aspect of Five Below's strategy and competitive advantage is identifying, marketing, and swiftly stocking "trend-right" items – popular items purchased in reaction to marketplace trends. March 2023 10-K[5] at 5-6, ECF 42-4; AC ¶ 28. Beyond selling well, these trend-right items attract new customers and drive store foot traffic, thereby increasing sales of non-trending items as well. AC ¶¶ 28, 60, 216. Five Below's ability to execute on its trend-right strategy is a key value proposition to investors, and Five Below has repeatedly touted the centrality

---

[4] Many Five Below stores also feature a "Five Beyond" section, where items cost more than five dollars. AC ¶ 30. The expansion and success of Five Beyond sections are referred to occasionally throughout the Amended Complaint. However, these references do not demand a separate category and independent analysis because they fit soundly within the analysis of statements regarding the execution of Five Below's trend-right strategy. It appears that many trend-right products were Five Beyond items. *See id.* ¶ 50 (analyst report noting "trend-right product newness (e.g., Five Beyond items)" as a Five Below strength).

[5] The Court takes judicial notice of the SEC filings, earnings call transcripts, and press releases as documents "integral to or explicitly relied upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[D]ocument[s] integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.").

of this strategy in 10-Ks and in communications to investors. *Id.* ¶¶ 28, 44-49; *see, e.g.*, March 2023 10-K at 13. Numerous analysts responded to these representations, commenting positively on the success and value of this strategy. *See* AC ¶¶ 50-52.

Five Below's success selling certain trend-right products, such as fidget spinners and Squishmallows, undisputably contributed to its significant growth as a company prior to the class period. *See id.* ¶¶ 60, 213. And during the class period, trending items were still being identified and marketed. But according to Plaintiffs, Five Below's overall execution of the trend-right strategy during this time was failing. While it is uncontested that the variety of stocked products had increased substantially since 2020, many of these items were not trending. *Id.* ¶ 204. Numerous Five Below former employees who worked as District Managers testified that, during the class period, Five Below was unable to stock stores with trending items and instead filled stores with unpopular items that clogged shelves and disappointed customers. *Id.* ¶¶ 59, 68, 78. Similarly, an Operations Manager of Fulfillment at a Five Below distribution center had to deal with significant overstock of unwanted items. *Id.* ¶ 90. Despite this alleged reality on the ground, Five Below continued to tout its trend-right strategy as a success to investors.

At issue is whether numerous statements regarding Five Below's trend-right statements made during the class period are false or misleading, and material, under the PSLRA.

### 2.    *Trend-Right Statements Are Not Inactionable Puffery.*

Defendants assert that the trend-right statements are "textbook examples of nonactionable opinions or puffery" that should be dismissed. Mot. to Dismiss at 11, ECF 42. I disagree.

Vague and optimistic statements are often viewed by courts as "puffery" and are generally deemed immaterial as a matter of law. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427-28 (3d Cir. 1997). This is because no reasonable investor would rely on these statements.

*Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019) ("'vague and general statements of optimism' are non-actionable precisely because they are not material – a reasonable investor would not base decisions on such statements") (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (herein "*Tellabs I*"); *see also In re Aetna*, 617 F.3d at 283 (internal citations omitted) ("statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism . . . constitute no more than puffery and are understood by reasonable investors as such."); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (holding that vague statements of progress lack "a standard against which a reasonable investor could expect them to be pegged.").

But, "when a company repeatedly addresses a certain subject, the company 'declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.'" *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP,* 532 F.Supp.3d 189, 217 (E.D. Pa. 2021) (McHugh, J.) (herein "*Energy Transfer*") (citing *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 282 (3d Cir. 1992)).  For example, when energy company executives affirmatively touted their commitment to and prioritization of safety, they "themselves . . . made the subject of safety material." *Id.* at 218.

Here, Plaintiffs adequately plead that Five Below made its trend-right strategy material to investors by repeatedly highlighting it as a core business strength.  First, the trend-right strategy appears predominantly in Five Below's 10-Ks – mandatory annual disclosures that offer a detailed

picture of publicly traded companies, certified as accurate by the CEO and other executives.[6]  At least four of Five Below's recent annual 10-Ks state that "[t]he principal basis upon which we compete is by offering a dynamic, edited assortment of trend-right products."  *See* March 2024 10-K at 14, ECF 42-17; March 2023 10-K at 13, ECF 42-4; March 2022 10-K at 14, ECF 42-9; March 2021 10-K at 14, ECF 42-22; *see also* AC ¶ 215.  Five Below thus told investors that its execution of the trend-right strategy is core to its value as a company.  Similar representations also appear elsewhere in Five Below's Form-10-Ks – the very first substantive page states that "[w]e purchase products in reaction to existing marketplace trends and, hence, refer to our products as 'trend-right,'" and goes on to describe the company as "a leading high-growth value retailer offering trend-right, high-quality products."  March 2023 10-K at 6; March 2024 10-K at 6.  Five Below's 10-Ks also state that its "broad assortment of trend-right, high-quality merchandise" is one of its core "competitive strengths" that "differentiate Five Below from competitors and are the key drivers of our success."  March 2023 10-K at 7; March 2024 10-K at 7 (cleaned up).

Five Below executives also made numerous representations about the importance of the trend-right strategy at conferences, earnings calls, and in press releases.  For example, at a June 2024 earnings call, Defendant CEO Anderson stated "chasing trends has always been a strength of ours. And we will continue to quickly identify and capitalize on trends, bringing them in-store quickly . . ."  AC ¶ 223.

Similarly, at a January 2023 conference on consumer trends, Mr. Anderson acknowledged that:

---

[6] *See* SEC Office of Investor Education and Advocacy, *How to Read a 10-K* (Sept. 2011), available at https://perma.cc/S9W5-9Q9X.

> it seems like we're always talking about trends. And I think it all goes back to '17 with that [fidget] spinner year. . . . But from the beginnings of those times to now, it's really – it's kind of part of the secret sauce of Five Below. And it's kind of in our DNA, and it's not only about getting into a trend, but also knowing how to land the plane and get out of it. . . . And we're pretty nimble and quick. There's not a lot of bureaucracy at Five Below. When we identify something, we move really quick to get that in the store, test it and then push it out to the stores.  AC ¶ 213.

At the same conference, Defendant Bull re-emphasized trends, noting that "[t]he other thing with the trends too is, again, as Joel [Anderson] mentioned, we love trends, that's what we're all about. It's really kind of the mindset that we have around those. We deal with this all the time."  *Id.* Executives thus repeatedly represented to investors that the trend-right strategy was critical to Five Below's success as a company.

The primary reason that vague optimistic statements are considered immaterial as a matter of law is because no reasonable investor would rely on such statements.  *Fan*, 927 F.3d at 716. Here, analyst reactions cited in the Amended Complaint, while not actionable themselves,[7] demonstrate that investors considered Defendants' repeated trend-right representations to be material.  For example, on December 1, 2022 Telsey Advisory Group reported that the Company "exceeded expectations" as a result of "store expansion, innovation of its store format, *trend-right product newness* (e.g., Five Beyond items), enhancements to its supply chain network, and solid execution," while Guggenheim referenced Five Below's "ValueOriented Merchandising Magic" and claimed that "[u]nique, extreme value merchandising lies at the heart of the FIVE brand experience" and that this "strength" would be "apparent heading into Holiday 2022."[8]  AC ¶ 50

---

[7] *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 172 (3d Cir. 2014) ("Defendants cannot be held responsible for statements they did not make.").

[8] I understand this to be a reference to Five Below's unique trend-right items.

(emphasis added).  Defendants' trend-right representations remained material to investors further into the class period, with Telsey Advisory Group attributing the increased guidance in part to "trend-right and value-focused product newness" in November 2023.  *Id*. ¶ 51.

Though many of the "trend-right" statements appear at first glance to be classic examples of puffery, Defendants, through their own representations to investors, made Five Below's ability to identify and execute on its trend-right strategy material.  *Shapiro*, 964, F.2d at 282; *Energy Transfer*, 532 F.Supp.3d at 218.  The trend-right statements therefore cannot be categorically dismissed as immaterial puffery.

### 3.    The Safe Harbor Provision and Forward-Looking Statements

Defendants argue that many of the statements alleged in the Amended Complaint are forward-looking and protected by the PSLRA Safe Harbor Provision.  The Safe Harbor provision in the PSLRA, 15 U.S.C. § 78u-5(c), immunizes from liability any forward-looking statement that is either (1) identified as forward-looking and accompanied by meaningful cautionary language; or (2) is made without actual knowledge of its falsehood.  *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009).  Immaterial forward-looking statements that no reasonable investor would rely on are also inactionable[9] under the Safe Harbor provision.  *Id*.; 15 U.S.C. § 78u-5(c)(1)(A)(ii).  The standards for oral forward-looking statements are similar. 15 U.S.C. § 78u-5(c)(2).

Forward-looking statements include financial projections, statements of plans and objectives of management for future operations, statements of future economic performance, and

---

[9] The term "inactionable" does not appear in any standard dictionary.  It is, however, used frequently by courts when categorizing allegations under federal securities law.  *See, e.g.*, *Avaya*, 564 F.3d at 255; *In re Adams Golf, Inc. Sec. Litig*., 381 F.3d 267, 275 (3d Cir. 2004).

statements relating to assumptions underlying or relating to these projections or plans.  15 U.S.C. § 78u-5(i)(1)(A)-(D).  Many statements are neither fully forward-looking nor present statements, but are mixed statements.  "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."  *Avaya*, 564 F.3d at 255 (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs II*")).  The parts of mixed statements referencing the present may not be actionable if the "assertions of current fact are too vague to be actionable."  *Id*. at 255.  This is a context-specific inquiry.  *See In re Aetna*, 617 F.3d at 279-80.

After review of the trend-right statements in the Amended Complaint, I have identified four that are mixed-statements.  *See* AC ¶¶ 211, 213, 218, 223.[10]  This in turn requires analysis of

---

[10] The forward-looking aspects of these mixed statements are italicized.

- ¶ 211: Defendant Anderson at the November 30, 2022 earnings call: "Our stores are stocked and ready with an amazing assortment of value products that promises to delight our customers. . . . *[W]e're also excited for Five Beyond to provide new and extreme value products in different categories.*"
- ¶ 213: Defendant Bull at the January 2023 ICR Conference: "The other thing with the trends too is, again, as Joel mentioned, we love trends, that's what we're all about. It's really kind of the mindset that we have around those. We deal with this all the time. The two keys is they do help drive traffic and they also bring in new customers. *So we continue to see that.* And that's really powerful for the growth of the brand as we continue to do that. And as some fall off, although Squishmallows has been out there for a few years, we saw the introduction of new ones come on. And that happens every year. *So you're going to see that continuing.*"
- ¶ 218: Defendant Anderson in the August 2023 Press Release: "As we look to the second half of the year, our merchants have sourced a terrific line-up of fresh, trend-right product at outstanding value for the holiday season. *While we are adjusting our earnings guidance to reflect an anticipated increase in shrink reserves, our sales outlook remains unchanged.  We will continue to play offense on sourcing amazing product, capitalizing on an improved supply chain, opening a record number of new stores, and executing on the continued success of our Five Beyond store format.*"
- ¶ 223: Defendant Anderson in the June 2024 earnings call: "[C]hasing trends has always been a strength of ours. *And we will continue to quickly identify and capitalize on trends, bringing them in-store quickly . . . .*"

whether the forward-looking aspects of these statements are covered by the PSLRA Safe Harbor protections.

a)    <u>Cautionary Language</u>

To render a statement inactionable under the Safe Harbor provision, "[c]autionary language must be 'extensive and specific.'"  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).  "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.  To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."  *Id.* (quoting *Semerenko*, 223 F.3d at 182).

Five Below's 10-Ks contained numerous specific warnings about the risks of their trend-right strategy.  They cautioned investors that "[i]f we are unable to continue to select products that are attractive to our customers . . . our sales or profitability could be affected adversely."  March 2022 10-K at 21; March 2023 10-K at 19; March 2024 10-K at 19.  Five Below also warned that it may fail to stock trend-right items, noting that it may not be able to "quickly respond to developing trends," and that "buying decisions [may] not accurately predict customer trends or purchasing actions," leading to lower profits.  March 2022 10-K at 21, 26; March 2023 10-K at 19, 24; March 2024 10-K at 19, 25.  This specific cautionary language clearly warns investors that Five Below may be unable to identify or stock trend-right products in the future, which could lead to reduced profits.

Though these cautionary statements were located within the 10-Ks, they extend to statements made in the earnings calls and press releases.  Cautionary language located in SEC filings "may be incorporated by reference" in company communications.  *See In re Aetna*, 617

F.3d at 282-83 (citing *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n. 11 (3d Cir. 2005)).  And in each earnings call, Five Below informed investors that forward-looking statements are subject to known and unknown risks, and cross-referenced Five Below's SEC filings.  *See, e.g.*, Nov. 2022 earnings call at 4, ECF 42-5; Mar. 2023 earnings call at 4, ECF 42-10; Mar. 2024 earnings call at 4, ECF 42-8; June 2024 earnings call at 4, ECF 42-11; Aug. 2024 earnings call at 4, ECF 42-12. Five Below made similar references in their quarterly press releases.  *See, e.g.*, Mar. 2024 Press Release at 3-4, ECF 42-15 (noting that the press release contains forward-looking statements subject to risks, and noting that for "further details and a discussion of these risks and uncertainties, see the Company's periodic reports, including the annual report on Form 10-K").

These notices successfully incorporate the 10-K cautionary language by reference.  As such, the forward-looking statements in paragraphs 211, 218, and 223 of the Amended Complaint are covered by the Safe Harbor provision, and thus inactionable.

b)  Knowledge of Falsity

Defendants do not contend that forward-looking statements made by Defendant Bull at the 2023 ICR conference[11] were adequately identified as forward-looking and accompanied by meaningful cautionary language.  But they argue that these forward-looking statements are inactionable under the Safe Harbor provision because Plaintiffs have failed to adequately allege knowledge of falsity.  I agree.

To show that a defendant had actual knowledge that their forward-looking statement was false, plaintiffs must "state with particularity facts giving rise to a strong inference that the

---

[11] ICR is a global strategic communications and advisory firm made up of Wall Street analysts, journalists, communications professionals, and lawyers.  AC ¶ 46 n.10.

defendant acted with the required state of mind [scienter]." 15 U.S.C. § 78u-4(b)(2). "[A]n inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs I*, 551 U.S. at 314; *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 245 (3d Cir. 2017) (applying this standard to forward-looking statements).

At the ICR conference, Defendant Bull allegedly stated:

> The other thing with the trends too is, again, as Joel [Anderson] mentioned, we love trends, that's what we're all about. It's really kind of the mindset that we have around those. We deal with this all the time. The two keys is they do help drive traffic and they also bring in new customers. *So we continue to see that.* And that's really powerful for the growth of the brand as we continue to do that. *And as some fall off, although Squishmallows has been out there for a few years, we saw the introduction of new ones come on. And that happens every year. So you're going to see that continuing.* AC ¶ 213.

Thus, Bull asserted that Five Below was going to continue to see trends cycle through into the future, with new trending products growing as other trends faded.

Even accepting all Plaintiffs' allegations as true, they have not shown a strong inference that Mr. Bull's statement about trend cycles was knowingly false when made. The statement's realistic acknowledgement of the cyclical nature of trends is consistent with Five Below's business model. Five Below undisputably *had* previously succeeded in executing their trend-right strategy. Thus, even if Five Below was experiencing some difficulty executing on their trend-right strategy and Bull was aware of these difficulties, it is highly likely that Bull expected that Five Below would capitalize on trends again in the future. Even if this was a negligent or reckless assumption, it was not knowingly false when made. *See Avaya*, 564 F.3d at 274 ("In the case of [] forward-looking statements, however, an inference of recklessness does not avail plaintiffs – that is, it must

be placed on the nonculpable-explanation side of the balance when we weigh competing inferences.").

Plaintiffs therefore fail to allege that Defendant Bull's statement at the ICR conference was made with the requisite knowledge of falsity required for forward-looking statements.

c)      Implied current conditions from forward-looking statements

Because the PSLRA Safe Harbor only renders the forward-looking aspect of mixed statements inactionable, those portions of the statements addressing the present must be analyzed separately.

In certain situations, future-looking language can also imply a current condition. For example, a statement that sales of a product were "still going strong" has been interpreted as a mixed statement expressing both that current sales were strong and that sales would continue to be strong into the future. *See Tellabs II*, 513 F.3d at 705. Conversely, other statements with similar future-looking language implying a current condition, such as "on track" and "position us," have been considered purely future-looking when the associated "assertions of current fact are too vague to be actionable." *Avaya*, 564 F.3d at 255. Thus, whether such language "transform[s] the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor" depends on the context of the statement. *Id.* at 256.

Here, three forward-looking statements use a variation of "continue." Paragraph 218 is a forward-looking statement that Five Below will "*continue to play offense on* sourcing amazing product, capitalizing on an improved supply chain, opening a record number of new stores, and executing on the continued success of our Five Beyond store format." I find that these assertions are too vague to transform the forward-looking statement into one about the present condition – it

17

merely asserts that Five Below is "playing offense" on a variety of strategies.[12]  Conversely, paragraph 223 claims that "we will continue to quickly identify and capitalize on trends, bringing them in-store quickly . . . ."  This more tangibly asserts that Five Below is *currently* identifying trends and able to bring trending items into stores in a quick manner.  Unlike paragraph 218, I find that the present inferences that stem from paragraph 223's forward-looking statement are far more concrete, making it a present statement potentially actionable under the PSLRA.  Finally, paragraph 213's "continuing" language follows present statements and there is therefore no need to infer a present condition when one is stated.  As a result, I will also analyze paragraphs 213 and 223 as present statements not covered by the Safe Harbor Provision.

### 4.    *Categories of Present Statements*

Most statements at issue can be classified as present statements.  Examination of present statements under the PSLRA "begins with a determination of which aspect of the statements are false" or misleading.  *In re Aetna*, 617 F.3d at 281.  Statements not adequately alleged to be false, misleading or material are inactionable under the PSLRA.

The trend-right statements fit into two categories.  On one hand, many of the statements involve Five Below's commitment and efforts to identifying trend-right items.  For the reasons set forth below, I conclude that these statements are not plausibly alleged to be false.  In contrast, other present statements involve representations about Five Below's ability to capitalize on trend-right items by bringing trending inventory into stores and getting out of trends when they were fading.  As to them, the allegations of falsity suffice.

---

[12] Further, Plaintiffs do not dispute that Defendants were opening numerous stores during the class period.  Rather, they argue that Defendants were too aggressive opening new stores, putting excessive pressure on Five Below.  AC ¶ 226.

5.       *Present Statements Not Plausibly Alleged to be False or Material*

Many trend-right statements that Plaintiffs claim are false discuss Five Below's commitment to identifying trend-right products. *See, e.g.*, AC ¶ 215 ("We have a highly planned merchandise strategy focused on trend-right"); *id.* ¶ 219 ("our teams are focused on delivering incredible value, trend-right products"); *id.* ¶ 222 (CEO Anderson stating at the 2024 earnings call that Five Below's "buyers scour the globe to bring our customers the value, trends, wow and newness that keep them coming back to Five Below."); *id.* ¶ 221 (CFO Chipman stating at the 2024 ICR Conference that "[o]ur merchants continue to innovate on the assortment not only during the holidays, but are bringing new and innovative things to [Five Beyond]"). These statements are inactionable and must be dismissed.

a)       Plaintiffs do not adequately allege that Defendants were insufficiently focused on identifying trend-right items.

Plaintiffs assert that Defendants' statements relating to their focus on and commitment to identifying trend-right products were false,[13] relying on former employee testimony. But to the

---

[13] These statements are:

- ¶ 214: Defendant Anderson at the March 2023 earnings call: "[W]e are passionate about sourcing an incredible trend-right assortment for our customers."
- ¶ 215: March 2023 10-K: "We monitor trends in our target demographic market, historical sales trends of current and prior products and the success of new product launches to ensure that our merchandise is relevant for our customers. We have a highly planned merchandise strategy focused on trend-right and everyday products supplemented by selected opportunistic purchases from our vendors to drive traffic and therefore offer our customers a consistently exciting shopping experience."
- ¶ 217: Defendant Anderson at the August 2023 earnings call: "Five Below's merchants persistently pursue trends [with] newness and value, both in the United States and across the globe."
- ¶ 218: Defendant Anderson in the August 2023 press release: "As we look to the second half of the year, our merchants have sourced a terrific line-up of fresh, trend-right product at outstanding value for the holiday season."
- ¶ 219: Defendant Anderson at the November 2023 earnings call: "in summary, our teams are focused on delivering incredible value, trend-right products."
- ¶ 221: CFO Chipman at the 2024 ICR Conference: "Our merchants continue to innovate on the assortment not only during the holidays, but are bringing new and innovative things to [Five Beyond]

extent that various former employee statements can be interpreted as speaking to the focus and efforts of corporate staff in identifying trend-right items, I find them to be unreliable sources. Though the district managers, distribution center workers, or in-store former employees likely had first-hand knowledge about whether in-demand items were being distributed and stocked, none of these employees were positioned to have insight into the merchandise identification and selection process happening at headquarters.  Only one former employee, FE-5, was potentially positioned to have insight into Five Below's effort to identify trend-right merchandise.  *See* AC ¶¶ 85-88, 274.  FE-5 served as a Director involved with marketing from 2019 until February 2024.  *Id.*  But his allegations are focused on corporate structure and inventory reporting, not Five Below's commitment to identifying trend-right items.  *Id.*  Consequently, the former employee statements do not demonstrate the falsity of Defendants' representations that they were focusing on trend-right items.

Plaintiffs also point to the increase in total products to assert that Five Below lost focus on identifying trend-right items.  For example, in the June 2024 earnings call, Defendant Bull commented that Five Below had a "double-digit percentage increase in SKUs[14] versus pre-pandemic.  And that's us becoming over SKU-ed and over-assorted . . . and we're going to get that back. . . . [W]e're going to . . . renew a focus in terms of reducing those SKUs."  AC ¶ 204.  This

---

. . . . Five Beyond conversions drive traffic, they elevate sales in the overall box and that includes both Five Below and Five Beyond products."

- ¶ 222: Defendant Anderson at the March 2024 earnings call: The Company's "buyers scour the globe to bring our customers the value, trends, wow and newness that keep them coming back to Five Below."
- ¶ 223: Defendant Anderson at the June 2024 earnings call: "[M]erchants remain passionate and are committed to bringing the best trend-right amazing value products to our customer, while newness are part of our DNA, and I am really pleased with the latest trends they have identified." "[M]erchants are definitely looking at new trends, chasing trends, finding new ways to drive footsteps."

[14] SKU refers to stock keeping unit – the number of unique items for sale.

statement that Five Below was going to reduce SKUs does not necessarily support an inference that the company had lost its focus on identifying trend-right items during the class period. Defendants never stated that they *only* stocked trend-right items – rather, trend-right items helped drive store foot traffic and purchases of regular merchandise ("i.e., impulse buys"). *Id.* ¶ 60. The fact that Five Below had higher SKUs therefore does not support an inference that Five Below was not committed to identifying trend-right items.

This is particularly true in light of the fact that trending items did exist during the class period. Contrary to Plaintiffs' assertions, former employee testimony verifies that many hot trends existed. FE-1, a Five Below District Manager from January 2019 until November 2023, reported that the stores under his supervision "rarely received enough of those hot trends . . . to satisfy demand." AC ¶ 59. FE-2, another District Manager, noted that "even though certain products were in high demand and selling," the store would receive other, less popular items. *Id.* ¶ 68. And a third District Manager noted that Five Below "created demand but had no supply" for popular, trending items. *Id.* ¶ 78 (citing FE-3, a District Manager from 2016 through March 2023). Thus, the issue wasn't Five Below's ability to identify trending items, but rather "its inability to *stock* trend-right, in-demand merchandise at its stores." *Id.* ¶ 58 (citing FE-1's recollection) (emphasis added).[15]

---

[15] I find these three former employees to be reliable sources of information to show that items were trending. They each managed a significant number of stores in distinct geographical areas, and are reasonably alleged to have firsthand knowledge as to the merchandise trends and ability to stock items in the stores that they oversaw. *See* AC ¶¶ 58-84, 118-124. All three district managers worked at Five Below during part of the class period, and two worked at Five Below more than 4 years each. *See id.* ¶¶ 58, 63, 77. Further, the testimony of the district managers is corroborative. I also find their descriptions of trending items and related stocking issues to be highly plausible. *See California Pub. Emps' Ret. Sys.*, 394 F.3d at 147.

In addition to relying on this weak contemporaneous evidence, Plaintiffs rely heavily on post-class period statements. In Five Below's post-mortem following disappointing financial performance, executives concluded that the Company's triple-double plan was "too aggressive and put a tremendous amount of pressure on the organization." *Id.* ¶ 198. Executive Chairman Vellios commented that "[o]ver the past few years, we lost some of that sharp focus on our core customers." *Id.* ¶ 14. And at a December 2024 earnings call, Defendant Bull commented that they needed to "get back to" focusing on "trend-right product, high-quality, extreme-value, all focused towards and targeting kids." *Id.* ¶ 202.

But a plaintiff cannot "rely on conjecture based on subsequent events." *Williams*, 869 F.3d at 244. "Hindsight [] is not a cause of action." *City of Cambridge Ret. Sys. v. Altisource Asset Management Corp.*, 908 F.3d 872, 883 (3d Cir. 2018). Rather, a statement "must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d. 1314, 1330 (3d Cir. 2002). These post-hoc statements were made after Five Below announced disappointing sales and profit numbers, and Five Below decided to alter course to improve performance. And though Five Below concluded the best course forward was reducing SKUs and putting more focus on trend-right items, this alone does not render prior statements on Five Below's dedication to identifying trend-right items false when made.

b)    Inactionable statements of opinion.

I also conclude that a portion of the statement in paragraph 223 is an inactionable statement of opinion. Statements of opinion are only actionable if "(1) the opinion professed is not actually believed by the speaker or (2) if the opinion contains an 'embedded statement of fact' that is untrue." *Energy Transfer*, 532 F.Supp.3d at 225 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 185 (2015)); *see also City of Warren Police & Fire*

*Ret. Sys.*, 70 F.4th at 685 (holding that *Omnicare's* opinion-falsity framework applies to claims under §10(b)).  At the June 2024 earnings call, Defendant Anderson stated that "I am really pleased with the latest trends [our Merchants] have identified."  AC ¶ 223.  This statement merely indicates that Anderson is excited about new trends that Five Below is hoping to execute upon.  There is no indication that he was actually displeased or knew that these items were not trending, which makes this statement of opinion inactionable.

> c)     <u>Inactionable statements on the importance of Five Below's trend-right strategy.</u>

Finally, multiple statements discuss the importance of the trend-right strategy to Five Below's success.  But Plaintiffs do not appear to assert that these statements are false.  Further, Plaintiffs do not dispute that Five Below's trend-right strategy had been a core aspect of Five Below's growth and success prior to the class period, especially with respect to items such as fidget spinners and squishmallows.  The following statement may have evidentiary significance and confirm the importance of the trend-right strategy for Five Below, but are not themselves actionable:

- ¶ 213: Defendant Anderson at the 2023 ICR Conference: "[I]t seems like we're always talking about trends. And I think it all goes back to '17 with that [fidget] spinner year. . . . But from the beginnings of those times to now, it's really – it's kind of part of the secret sauce of Five Below."
- ¶ 213: Defendant Anderson at the 2023 ICR Conference: "And it's kind of in our DNA, and it's not only about getting into a trend, but also knowing how to land the plane and get out of it."
- ¶ 213: Defendant Bull at the 2023 ICR Conference: "The other thing with the trends too is, again, as Joel mentioned, we love trends, that's what we're all about. It's really kind of the mindset that we have around those. We deal with this all the time. The two keys is they do help drive traffic and they also bring in new customers. So we continue to see that. And that's really powerful for the growth of the brand as we continue to do that. And as some fall off, although Squishmallows has been out there for a few years, we saw the introduction of new ones come on. And that happens every year."

- ¶ 215: March 2023 10-K: "The principal basis upon which we compete is by offering a dynamic, edited assortment of trend-right products . . . ."

        *6.    Present Statements Plausibly Alleged to be False*

Under PSLRA's heightened pleading standard, plaintiffs must "specify each allegedly misleading statement and the reasons why the statement is misleading." *Avaya*, 564 F.3d at 252 (citation omitted).  To show that a statement is false or misleading, Plaintiffs cannot rely on conclusory allegations but must plead "'true facts.'" *Williams*, 869 F.3d at 244.[16]

Many of the trend-right statements that Plaintiffs allege to be false involve Five Below's ability to *execute* upon their trend-right strategy and stock trend-right items in stores.[17]  This is distinct from statements about *identifying* trend-right items, discussed above.

---

[16] The phrase "true facts" can only be taken as a legal convention, like the term "inactionable," because by definition a fact is something that is true.

[17] These statements are:

- ¶ 211: Defendant Anderson at the November 2022 earnings call: "Our stores are stocked and ready with an amazing assortment of value products that promises to delight our customers."
- ¶ 211: Defendant Bull at the November 2022 earnings call: "Our teams continue to move quickly to adjust to changing customer preferences."
- ¶ 212: Defendant Anderson at the 2023 ICR Conference: "[I]t was a very good holiday. Trends were strong, Squishmallows, Slime Lickers, Hello Kitty. And I think that's something that – I've been here eight years now, we've really got a good cadence with those [trends], how to get into them, how to get out of them."
- ¶ 213: Defendant Anderson at the 2023 ICR Conference "And we're pretty nimble and quick. There's not a lot of bureaucracy at Five Below. When we identify something, we move really quick to get that in the store, test it and then push it out to the stores."
- ¶ 214: Defendant Anderson at the March 2023 Earnings Call: "We stay on top of hot trends and swiftly move to capitalize on them. . . . The flexibility of our model . . . is unique and enables swift recognition and introduction of trend-right and relevant products to our customers, and we honed our expertise and discipline to effectively manage the constant cycling of these trends."
- ¶ 215: in the 2023 10-K: "We monitor trends in the ever-changing tween and teen markets and are able to quickly identify and respond to trends."
- ¶ 215: in the 2023 10-K: "We deliver an edited assortment of trend-right as well as everyday products within each of our category worlds that changes frequently to create a sense of anticipation and freshness . . . ."

Plaintiffs plausibly allege that during the class period, Five Below was having serious issues executing on their trend-right strategy and stocking trending items in stores. There is substantial former employee testimony supporting this point.[18] Three district managers, each in a separate geographic region and collectively managing about 40 stores, all experienced significant stocking issues. FE-1 noted that Five Below stores "rarely stocked enough trending merchandise to meet customer demand," despite requesting these items. AC ¶ 59. FE-1 also observed other employees raising these inventory concerns at meetings with George Hill and Defendant Anderson. *Id.* ¶ 62. Similarly, FE-2 reported that "Five Below had great difficulty identifying and stocking trending items that were in high demand." *Id.* ¶ 65. Even though "certain products were in high demand and selling" and he requested in-demand inventory, his stores would only receive "dumb junk" instead of trending products. *Id.* ¶¶ 68, 70. FE-2 said that other district managers also raised identical inventory issues with his regional director. *Id.* ¶ 64. Similarly, FE-3 said that

- ¶ 216: Defendant Anderson in the June 2023 press release: "While our customers face multiple macro headwinds, we continue to be there for them, flexing our offering to bring them the Wow products they need and want. Our broad-based sales performance and transaction trends demonstrate that we are gaining trips and customers through our amazing value, trend-right products and Five Beyond prototype. . ."
- ¶ 217: Defendant Anderson at the August 2023 earnings call: "we can quickly capitalize on a trend."
- ¶ 219: Defendant Anderson at the November 2023 earnings call: "Our merchants have sourced . . . fresh and trend-right products at outstanding values."
- ¶ 220: Defendant Anderson in the November 2023 press release: "We . . . effectively capitalized on multiple trends."
- ¶ 222: "Defendant Anderson at the March 2024 earnings call: the "flexibility of our model with our 8 worlds is unique and enables our teams to quickly introduce trend-right relevant products to our customers."
- ¶ 223: Defendant Anderson at the June 2024 earnings call: "[C]hasing trends has always been a strength of ours. And we will continue to quickly identify and capitalize on trends, bringing them in-store quickly . . . ."

[18] I find this former employee testimony to be a reliable source of information as to the stocking of trend-right items, and therefore give their allegations weight. The former employees cited all worked at Five Below during the class period in positions where they would have a first-hand sense of what products are in-demand and the inventory stores received, and their testimony is consistent.

Five Below struggled to stock in-demand products, and "created demand but had no supply, leaving customers disappointed." *Id.* ¶ 78.

Former employees in other roles also observed similar inventory issues. FE-4, a Merchandise Manager at a single store, said he would continuously get pallets of unwanted inventory, and that the store reached capacity because the inventory they had was not popular. *Id.* ¶ 82. FE-6, an Operations Manager at a distribution center overseeing three supervisors with 40-60 employees underneath them, reported that distribution centers were stuck with a huge overstock of unwanted goods – including items that had previously trended but were falling off. *Id.* ¶¶ 89-90. FE-7, an Associate Director at a fulfillment center, said that his warehouse was constantly overstocked with unwanted inventory. *Id.* ¶ 94.

The theory that Five Below had serious issues executing on their trend-right strategy[19] is plausibly pled. According to former employees, even though there was demand for trending items, stores were not receiving trend-right items despite requesting them, leaving customers disappointed. Instead, Five Below stores and warehouses were overstocked with non-trending items that neither impressed customers nor drove sales. Additionally, Five Below was unable to successfully exit trends, and became stuck with merchandise that was no longer selling. Though these former employees represent only a small fraction of Five Below's stores and distributions centers, I find the consistency of their allegations across geographic regions and stages of the distribution chain sufficiently reliable and compelling at this stage.

---

[19] According to District Manager FE-3, the trend-right inventory issues also impacted Five Beyond sections, often leaving them empty or understocked. *Id.* ¶ 79. FE-1 also noted that Five Beyond stores "were mostly empty" and that it took over a year for Five Beyond items to be delivered to new stores. *Id.* ¶¶ 121, 147, 148. Thus, Five Beyond sections were facing similar pervasive inventory issues as broader trend-right products.

In light of this alleged reality on the ground during the class period, Plaintiffs have adequately pled that these statements were false when made.

### 7. Materiality

Finally, both forward-looking and present statements must be material to be actionable. *See* 15 U.S.C. § 78u-5(c)(1)(A)(ii); 17 C.F.R. § 240.10b-5 (prohibiting "any untrue statement of a material fact").

The materiality requirement of Section 10(b) is satisfied if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976)). "Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004); *see also Weiner v. Quaker Oats Co*., 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings."). Dismissal should be granted on the basis of materiality "[o]nly if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality." *Adams Golf*, 381 F.3d at 275 (emphasis in original) (quoting *Shapiro*, 964 F.2d at 280 n.11).

As detailed above, Five Below made their trend-right strategy material to investors by repeatedly representing that it was central to their business model and the principal basis on which they compete. This is supported by analyst commentary made during the class period, which cited Five Below's trend-right strategy.

Plaintiffs have also plausibly alleged that the related Five Beyond statements were material to investors. Five Below repeatedly represented to investors that Five Beyond would benefit the Company. After a pilot in some stores, Defendant Anderson announced in March 2023 that "our goal is for Five Beyond everywhere." AC ¶ 31. Five Beyond was frequently discussed at earnings calls and mentioned in press releases. *See id.* ¶¶ 211, 216, 218, 220, 221. At the January 2024 IR Conference, CFO Chipman touted Five Beyond to investors, noting that "Five Beyond conversions drive traffic, they elevate sales in the overall box and that includes both Five Below and Five Beyond products." *Id.* ¶ 48. Similarly, at the June 2024 Oppenheimer Conference, CEO Anderson urged investors to not "lose sight of the long term and the Five Below growth story," saying that "the Five Beyond expansion" "remains solidly intact." *Id.* ¶ 138. Analysts took note, frequently commenting optimistically about the Five Beyond initiative. *See id.* ¶¶ 50, 52. Plaintiffs have met their burden as to materiality.

### B.    Statements About Shrink

Plaintiffs allege that many of Defendants' statements regarding "shrink" were false and misleading. These statements fit into two categories: (1) statements discussing the extent and cause of the shrink that Five Below was experiencing; and (2) statements about mitigation measures that Defendants were taking to reduce shrink.

### 1.    Defining Shrink

I will first turn to the definition of "shrink," looking at prior court cases, news reports, and retail industry-focused publications for guidance. At the outset, I observe that the parties frequently use this term imprecisely. In their Amended Complaint, Plaintiffs define shrink as "shoplifting and theft." AC ¶ 4. Similarly, Defendants define shrink as "theft in stores." Mot. to Dismiss at 3. Parties perhaps define shrink this way because Five Below themselves repeatedly

referred to the shoplifting and theft when discussing shrink during the class period.  However, this definition is not consistent with how the term is used both in the industry and in Five Below's own 10-Ks.

Shrink is "the difference between the inventory determined from the perpetual inventory records and the amount of inventory actually on hand."  *Wal-Mart Stores, Inc. & Subsidiaries v. C.I.R.*, 153 F.3d 650, 653 (8th Cir. 1998); *see also* Alex Bitter, *What is retail shrink, and how does it differ from theft?*, Bus. Insider (Nov. 21, 2023), available at https://perma.cc/5ZJD-RYRY[20] (defining shrink as "the difference between the inventory a retailer has according to its balance sheet and what it actually has.").  When Congress focused on the issue from a policy perspective, an economist at a leading trade association provided this definition to a House subcommittee: "Shrink is the term retailers use to describe inventory losses from any cause – everything from shipping and storage mistakes to shoplifting to ringing up the wrong item at the register."  Trevor Wagener, Letter to the U.S. House Judiciary Subcommittee on Crime and Federal Government Surveillance (June 9, 2023), available at https://perma.cc/FR7C-ZLM7.

Thus, while shrink includes losses caused by shoplifting, it also covers inventory losses due to other causes such as operational or administrative errors, damage, waste, and spoilage.  *See* David Johnston, *The reality of retail shrink,* Nat'l Retail Fed'n (Sept. 22, 2023), available at https://perma.cc/6NEC-GRHY (shrink includes losses stemming from "administrative or operational errors, mistakes and other identified inventory loss"); *Famoso v. Marshalls of MA,*

---

[20] I take judicial notice of various articles to understand how the term "shrink" was being used in the public realm with regards to the retail industry.  *See Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (affirming judicial notice of articles to understand what existed in the public realm).

*Inc.*, No. 12-4863, 2015 WL 5793308, at *2 (E.D.N.Y. Sept. 30, 2015) (shrink measures "the lost value of merchandise due to theft, damages, and/or operational errors."). Some retailers even include merchandise markdowns in their shrink numbers. *The art and science of reducing retail shrink*, McKinsey & Co. (Dec. 11, 2023), available at https://perma.cc/EHR3-7DPR.

Five Below's own SEC disclosures also use the term "shrink" broadly. In its 10-Ks, Five Below informs investors that "[w]e also experience inventory shrinkage, and we cannot assure you that incidences of inventory loss *and* theft will stay at acceptable levels or decrease in the future." March 2023 10-K at 24 (emphasis added). Five Below certainly recognized that "inventory shrinkage" encompasses both "theft" and all other forms of "inventory loss."

Investors would reasonably expect statements about "shrink" to be statements about the total inventory loss Five Below was experiencing. But, as discussed more fully below, statements accompanying Five Below's disclosures on shrink deflected attention away from internal operating problems when it emphasized theft as the driving cause of shrink.

### 2. *Factual Background*

During the class period, Five Below began to experience high levels of shrink. In March 2023, Five Below disclosed to investors that shrink for 2022 had increased significantly – it was approximately 30 basis points higher than in 2021. AC ¶ 228. A few months later, Five Below disclosed that high shrink rates were continuing, and that Five Below was taking steps to mitigate shrink. *Id.* ¶ 229. That August, Five Below reduced their earnings guidance by 20 points, blaming continued high levels of shrink. *Id.* ¶ 230. Shrink continued to harm earnings. On the November 2023 earnings call, CFO Chipman disclosed that gross margins had decreased to 30.3 percent, which was "primarily driven by recording actual shrink results for the stores that completed their physical inventories in August as well as recording the true-up of shrink reserves for the full

chain." *Id.* ¶ 233.  In these calls discussing the adjusted earnings guidance, Five Below executives repeatedly connected this shrink to shoplifting, an outside force, and did not discuss any other potential causes inside the company.  *See id.* ¶¶ 231, 232, 234.

With shrink presenting a serious issue, Five Below repeatedly represented to investors that it was taking steps to mitigate shrink.  *See, e.g.*, *id.* ¶ 240 (Defendants representing at the June 2023 earnings call that "we are . . . doing things on our part to mitigate shrink" and "we're focusing on preventative measures around shrink.").  In August 2023, Defendant Bull announced that he was leading a team focused on shrink mitigation.  *Id.* ¶ 241.  At that same call, CEO Anderson claimed that mitigation efforts were already having some impacts and had "just started."  *Id.* ¶ 242.  And in November 2023, CEO Anderson said in an interview with Fox Business that they "will figure out the shrink and theft problem" and were making changes to self-checkout and adding labor.  *Id.* ¶ 243.

Unfortunately, these mitigation efforts did not have the desired effect.  In March 2024, CEO Anderson told investors that earnings were at the low end of expectations, which "can be fully attributed to higher-than-planned shrink."  *Id.* ¶ 103.  Defendants acknowledged that "prior expectations assumed that our mitigation efforts would result in a reduction of the shrink rate," which did not occur.  *Id.* ¶ 117.  But in a press release accompanying the earnings call, Anderson affirmed that "[w]e have implemented additional shrink mitigation initiatives based on our 2023 learnings."  *Id.* ¶ 244.

### 3.    The Safe Harbor Provision and Forward-Looking Statements.

Defendants claim that any forward-looking statements about shrink are inactionable under PSLRA's Safe Harbor provision.  There are four statements that have forward-looking components

31

related to shrink.  *See* AC ¶¶ 230, 232, 241, 243.  For the reasons that follow, none of these statements are actionable.

In an August 2023 earnings call, Defendant Anderson disclosed that Five Below was reducing its operating margin guidance due to shrink, and represented that Five Below's sales outlook remained unchanged.  AC ¶ 230.  These are forward-looking statements involving future projections.  At the beginning of this call, Five Below informed investors that forward-looking statements were subject to known and unknown risks, and cross-referenced Five Below's SEC filings for more details on the risks.  Mar. 2024 earnings call at 4.  Thus, cautionary language in the 10-K covers statements made in this earnings call.  *See In re Aetna*, 617 F.3d at 282-83.

The operative 10-K at the time of this earnings call specifically warned investors that numerous factors – including store traffic, prices, tariffs, distribution network disruptions, and inability to manage inventory shrink were risks that could cause actual financial performance to differ from projections.  March 2023 10-K at 3, 17-29.  Specifically on shrink, the 10-K warned that Five Below's "profitability and cash flows from operations may be negatively affected if we are not successful in managing our inventory balances and inventory shrinkage," and cautioned that Five Below experiences inventory shrinkage and "cannot assure [investors] that incidences of inventory loss and theft will stay at acceptable levels or decrease in the future, or that the measures we are taking will effectively address the problem of inventory shrinkage."  *Id*. at 24 (cleaned up).  I find that this cautionary language is sufficiently "extensive and specific" to render Defendant Anderson's forward-looking financial projections inactionable.

Two other forward-looking shrink statements involve representations about the types of mitigation efforts Five Below planned to consider.[21]  But neither of these statements are plausibly alleged to be false or misleading.  Plaintiffs argue that Five Below failed to implement shrink mitigation measures.  But these specific statements merely represent that Five Below will *consider* a variety of mitigation measures, not that they will *implement* them.  Thus, these statements are inactionable.

The last forward-looking statement is CEO Anderson's aspirational representation that "we will figure out the shrink and theft problem."  *Id.* ¶ 243.  By way of initial observation, this was a rare instance in which Five Bellow acknowledged that shrink included more than theft.  This statement was made in a November 2023 interview with Fox Business, and was not identified by forward-looking or accompanied by cautionary language.  *Id.*  But it is nonetheless protected by the PSLRA Safe Harbor because Plaintiffs do not adequately allege that it was made with "actual knowledge of its falsehood."  *Avaya*, 564 F.3d at 254.  An inference of scienter for forward-looking statements "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs I*, 551 U.S. at 314.  I find it equally if not more probable that Anderson believed that Five Below would – sometime in the future – reduce shrink.  At the time he made the statement, Five Below had recently launched a team headed by Bull to focus on shrink mitigation, and were starting to test out different mitigation

---

[21] *See* AC ¶ 241 ("we've dedicated a team to look at all different areas to help with mitigation efforts. And that includes enhanced technology, merchandise presentation, . . . register formats, policies and procedures."); *id.* ¶ 232 ("And so while I don't think we're yet at that extreme of closing Five Below stores there, these are the type of mitigation strategies that will be included as we consider what to do if we don't see things improve.").  It bears emphasis that these measures by their very nature focus on theft as the operative cause of the problem.

measures. *Id.* ¶ 241. Even if Anderson was aware that the shrink measures currently being implemented were floundering, as Plaintiffs allege, that does not imply that he knew that future mitigation measures would fail. Thus, Plaintiffs do not allege that this statement was knowingly false when made.

The forward-looking statements involving shrink are thus inactionable under the PLSRA's Safe Harbor provision.

> ### 4. Statements Representing That Shoplifting Was the Cause of Shrink Were Misleading.

During the class period, Defendants made numerous representations about the extent and cause of shrink.[22] Plaintiffs claim that these statements were misleading because a significant

---

[22] These statements are:

- ¶ 231: Defendant Bull at the Aug. 2023 earnings call: "I think you're all familiar with the recent media and videos that are out there where retailers across the sector are experiencing increased levels of shrink and related crime incidents and we are not immune to this as we're finding out."
- ¶ 232: Defendant Anderson at the Aug. 2023 earnings call: "And so, where is it coming from? It's coming on all angles. And you've got several cities now which just simply aren't prosecuting below the $500 level. Sadly, our hometown here in Philly is a city that's seen some of our highest shrink rates. And we watched Target and we watched Wawa exit Center City. And so while I don't think we're yet at that extreme of closing Five Below stores there, these are the type of mitigation strategies that will be included as we consider what to do if we don't see things improve."
- ¶ 234: Defendant Anderson at a Nov. 2023 interview with Fox Business: "'We talked about theft in our second quarter call. Theft is real, it's impacting all retailers.' He later claimed 'this is a real societal problem and we've got to lean together with the politicians to figure this out.'"
- ¶ 236: Defendant Anderson at the March 2024 earnings call: "Shrink is industry-wide and a societal problem that accelerated over the last year."
- ¶ 228: Defendant Bull at the March 2023 earnings call: Five Below experienced "higher-than-expected shrink," and "[o]n an annual basis, shrink for 2022 was approximately 30 basis points higher than what we experienced in 2021."
- ¶ 233: CFO Chipman at the Nov. 2023 earnings call: "Gross margin decreased by approximately 190 basis points to 30.3%, as anticipated. This decline was primarily driven by recording actual shrink results for the stores that completed their physical inventories in August as well as recording the true-up of shrink reserves for the full chain, which we shared during our last quarter's earnings call."
- ¶ 235: Defendant Anderson at the March 2024 earnings call: "Despite these strong sales results, earnings per share of $3.65 was at the low end of our internal expectations and can be fully attributed to higher-than planned shrink."

amount of the shrink was caused by inventory management issues rather than shoplifting.  AC ¶ 238.[23]  I agree with Plaintiffs that these statements were misleading because they omitted material facts.

A statement can be actionable under the PSLRA if it is misleading by omission.  A duty to disclose arises "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure."  *Williams*, 869 F.3d at 241 (quoting *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000)).  "Once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading."  *Id*.  These omissions are material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc*., 485 U.S. at 231-32.

During the class period, Five Below repeatedly informed investors that high levels of shrink were harming profits.  For example, in the August 2023 earnings call, Defendant Anderson said that Five Below's 20 basis point decline in operating margin guidance was almost all based on shrink.  AC ¶ 230.  In the November 2023 earnings call, CFO Chipman said that gross margin declined "by approximately 190 basis points . . . as anticipated" and that this was "primarily driven" by recording shrink.  *Id.* ¶ 233.  And in March 2024, Defendant Anderson said that earnings

---

[23] Paragraph 238 reads: "Moreover, 'shrink' was used to be consistent with 'theft' as noted above and repeatedly stated by Defendants to investors. In reality much of what Five Below captured as shrink was not theft, but reflected the Company's inability to track, maintain and sell the inventory it acquired (¶¶72, 74-76, 83-84, 109). Thus, Defendants' efforts to equate the impact of shrink on purely 'macro' or 'societal' factors like theft and the lack of prosecution for stealing, actively mislead investors about the Company's lack of inventory control and inability to sell significant amounts of its inventory."

per share at the low end of expectations "can be fully attributed to higher-than-planned shrink." *Id*. ¶ 235.

Though Defendants never clearly quantified Five Below's total shrink expense or broke down the causes of the shrink, Defendants repeatedly represented that it was caused by shoplifting. In the August 2023 earnings call, when discussing shrink, Defendant Bull remarked that "retailers across the sector are experiencing increased levels of shrink and related crime incidents and we are not immune to this as we're finding out." *Id.* ¶¶ 100, 231. And when asked in the same call about shrink, CEO Anderson commented that "you've got several cities now which just simply aren't prosecuting [shoplifting] below the $ 500 level. Sadly, our hometown here in Philly is a city that's seen some of our highest shrink rates." *Id.* ¶ 232. In November, Defendant Anderson focused on theft in an interview discussing shrink, noting that "[w]e talked about theft in our second quarter call. Theft is real, it's impacting all retailers." *Id.* ¶ 234. Additionally, most of the mitigation efforts disclosed by Five Below to investors focused on shoplifting – implying to a reasonable investor that this was the primary cause of shrink. *See id*. ¶¶ 157, 240, 243. Anderson also told investors that "shrink is industry-wide and a societal problem that accelerated over the last year," implying that shrink was caused by external societal factors, and not from internal factors such as inventory management. *Id.* ¶ 236.

Five Below Defendants thus blamed shrink for the Company's weaker performance during the class period, and framed shoplifting as the underlying cause of the shrink. By choosing to repeatedly speak about one cause of shrink – shoplifting – Five Below created a duty to disclose all other material facts as to the cause of shrink. *Williams*, 869 F.3d at 241. And although Defendants discussed shrink with investors, they never disclosed that other factors were

contributing to shrink or whether Five Below even knew how much shrink was attributable to theft as opposed to other causes.

While Defendants painted shoplifting as the primary cause of shrink, Plaintiffs' Amended Complaint plausibly asserts that internal inventory management issues were also to blame. District Manager FE-2 testified that "Regional and District Managers never knew if they actually received the inventory they were supposed to receive." AC ¶ 72. As a result, FE-2 had "no reliable way to know what the store had for inventory on hand," making it hard to know what shrink was caused by in-store factors such as shoplifting as opposed to upstream causes. *Id.* ¶ 71. FE-2 reported that his colleagues who worked in stores under him "told him that trucks came in, but they only had six pallets of inventory when they were supposed to have received eight" and that "sometimes [the third-party freight companies] just stacked pallets up and left them outside." *Id.* ¶ 75. And FE-4, a Merchandise Manager in a single store, reported that he never received documentation to compare what his store was supposed to have received with what it actually received, and thus "boxes could have been missing and they would not have known." *Id.* ¶ 83. FE-4 believed that much of what was considered "shrink" included "products that stores never received or lost track of." *Id.* ¶ 84. These inventory issues may have been exacerbated by the fact that Five Below allegedly used third-party companies to handle all its deliveries to stores. *Id.* ¶ 74. Further upstream, FE-7 – who oversaw the operations of one of Five Below's fulfillment centers – reported that there were "inaccuracies" in the dashboard showing incoming and outgoing inventory, his "warehouse was constantly overstocked" and that he was forced to dispose of the inventory either by sending it to a liquidator or shipping it to stores at a loss. *Id.* ¶¶ 91, 94.

At the motion to dismiss stage, I find that this testimony from former employees is reliable and supports Plaintiffs' allegation that inventory issues were also contributing to shrink. District

Managers and in-store workers are best situated to understand what inventory was anticipated versus received. In-store employees also would likely have a sense of where inventory losses are occurring. Similarly, individuals overseeing upstream Five Below warehouses are positioned to understand how inventory is managed and distributed, and would know if there were problems tracking inventory being shipped to stores. The testimony of these various former employees across different regions and roles are corroborative, painting a picture of pervasive inventory issues driving inventory loss. The Amended Complaint thus plausibly alleges that inventory mismanagement was another major cause of shrink.

In sum, Defendants repeatedly blamed shrink for poor financial performance and framed shoplifting as the cause of shrink. And because "'shrink' was in the vast majority of instances used as synonymous with 'theft'" in communications to investors, an investor would reasonably interpret the problem with shrink as a problem with shoplifting. AC ¶ 238. Defendants are plausibly alleged to have omitted a critical fact – that there were also *other* significant internal causes of shrink beyond shoplifting related to company management. And these omissions were material as shrink was repeatedly cited as the "primary" cause of lower-than expected earnings during the class period. *Id.* ¶¶ 99-103. Given the impact shrink was having on profits, there is a substantial likelihood that the disclosure of more information about the causes of shrink would have significantly altered the mix of information considered by reasonable investors.[24] *Basic Inc.*,

---

[24] This is further supported by the numerous investor analyst reports that discussed shrink, as well as questions Defendants received in earnings calls about shrink. *See* AC ¶¶ 115, 231.

485 U.S. at 231-32.  As such, Defendants' statements about the extent and cause of shrink are material to investors, misleading by omission, and thus actionable under the PSLRA.[25]

       5.     *Shrink Was Not the Sole Cause of Five Below's Weak Performance.*

Plaintiffs additionally assert that statements representing that "shrink was the primary issue hampering the Company's financial results" were misleading because declining profits were also caused by "the Company's inability to appropriately stock trend-right inventory for its stores and its inability to manage and track its inventory."  AC ¶ 237.

Defendant Anderson and CFO Chipman made two present statements indicating that shrink was the primary or driving cause of poor earnings.  *Id.* ¶ 233 (a large decrease in gross margin was "primarily driven by" shrink); *id.* ¶ 235 (low earnings per share "can be fully attributed to higher-than planned shrink").  I have already concluded that these two statements are misleading by omission.

As described above, Plaintiffs have plausibly alleged that during the class period Defendants were experiencing significant issues executing on its trend-right strategy and were failing to stock stores with enough trending merchandise, negatively impacting sales.  In fact, in June 2024, Defendant Anderson admitted that some of Five Below's financial issues stemmed from "declining sales and older merchandise trends."  *Id.* ¶ 11.  Thus, shrink was not the sole cause of Five Below's weak financial performance.  Plaintiffs have plausibly alleged that these two

---

[25] Specifically, statements about shoplifting and theft in paragraphs 231, 232, 234, and 236 are actionable, as are Defendants' general statements about shrink in paragraphs 228, 233, and 235.

Defendant Anderson's statement in paragraph 229 is an exception.  There, he purportedly stated that Five Below "trued [up shrink] last year, and it had an impact on our fourth quarter [and] we are accruing at the higher rates this year."  AC ¶ 229.  This is not alleged to be false.

statements attributing all or most of Five Below's poor performance to shrink are adequately pled to be false or misleading.

> ### 6. Statements on Shrink Mitigation Are Not Plausibly Alleged to be False

From June 2023 to March 2024, Defendants made numerous representations that they were considering and implementing measures to mitigate shrink.[26]  Plaintiffs assert that these statements were false and misleading because Five Below was not taking substantial steps to mitigate shrink, and the measures they did implement were ineffective.  *See* AC ¶ 247.  Even if the mitigation measures were not substantial, this does not render Defendants' statements misleading.

According to former employees, the mitigation measures implemented in stores during the class period were insubstantial and ineffective.  FE-1, who was employed as a Five Below District Manager between January 2019 and November 2023, asserted that Five Below's main shrink

---

[26] These statements were:

- ¶ 229: Anderson at the June 2023 earnings call: "we are accruing at the higher rates this year and doing things on our part to mitigate shrink."
- ¶ 240: Defendant Anderson at the June 2023 earnings call: "[W]e are . . . doing things on our part to mitigate shrink."
- ¶ 240: Defendant Bull at the June 2023 earnings call: "[W]e're focusing on preventative measures around shrink."
- ¶ 241: Defendant Bull at the August 2023 earnings call: "I am also leading a team to focus on operational mitigation efforts to counter the elevated shrink trends." "[W]e've dedicated a team to look at all different areas to help with mitigation efforts. And that includes enhanced technology, merchandise presentation, . . . register formats, policies and procedures."
- ¶ 242: Defendant Anderson at the August 2023 earnings call: "We'd already mitigated some of the things from the 30 basis [point] increase from last year. . . . The difference is . . . a year ago, we weren't doing anything about it. . . . So all the mitigation efforts we are putting in just started." "I see nothing but upside as we get past this shrink, put mitigation efforts in for that."
- ¶ 243: Defendant Anderson at a Fox Business interview in November 2023: "[W]e're making some changes to our business model, we've had to really tighten up our self-checkouts, we're putting some more labor in the stores. . . . [W]e will figure out the shrink and theft problem."
- ¶ 244: Defendant Anderson at the March 2024 earnings call: "We have implemented additional shrink mitigation initiatives based on our 2023 learnings."

mitigation measure implemented at stores under their control was limited to instructing store associates to help ring up customers in the self-checkout registers, because these registers enabled theft. AC ¶¶ 120-21. But Five Below kept modifying this checkout policy due to customer complaints. *Id.* FE-2, another District Manager employed from June to October 2023, "reported that the only measure he recalled Five Below taking in response to theft was a policy on the assisted self-checkouts" where employees would oversee the self-checkout and directly check out customers if more than three customers were in line. *Id.* ¶¶ 63, 124. But labor limitations made this difficult to implement. *Id.* ¶ 124. Similarly, District Manager FE-3, who left Five Below in March 2023, noted that the only measure to prevent shrink was having employees assist self-checkout, which also was difficult because of low staffing. *Id.* ¶ 123. Additionally, FE-3 noted that staff were not supposed to intervene if they saw shoplifting occur.[27] *Id.* Of note, none of these former employees worked at Five Below after November 2023. However, FE-4, a Merchandise Manager at a single store from October 2023 until March 2024, also said that employees were not trained or given strategies to prevent theft, and had to sign a contract saying he would not intervene if someone stole inventory. *Id.* ¶ 122.[28]

---

[27] I find this particular allegation irrelevant. This non-intervention policy likely existed to protect the safety and welfare of employees, and as such I will draw no negative inferences from it.

[28] I will credit this former employee testimony as a source of reliable information. Defendants working in or closely managing stores have a sense of what shrink-mitigation measures were actually being implemented, and the level of success these measures had in their stores. Their testimony is nearly identical, lending further credence. But the time frame matters given that none of the District Managers were at Five Below after November 2023, while many shrink statements were made after that time and the mitigation measures were still being tested and rolled out. Consequently, the former employee testimony does not provide strong proof of what occurred after November 2023.

In sum, former employee testimony indicates that Five Below was implementing some measures to combat shoplifting in the former employees' stores, but that these measures were not very effective and did not include an increase in store staffing.

Based on this former employee testimony, Plaintiffs do not plausibly allege that Defendants' statements were false or misleading. During the class period, Defendants were exploring how to deal with shrink across 1,600 stores. *See* Mot. to Dismiss at 1 n1. Defendants never represented that they had implemented extensive shrink mitigation measures at each store, or that these measures were resoundingly successful. Rather, Defendants' statements indicated that Five Below was focusing on shrink, looking at different mitigation measures, and taking some steps to mitigate shrink. AC ¶¶ 240-244. Former employee testimony does not contradict this, and is actually consistent with the notion that Five Below was testing out different shrink mitigation methods in stores and adjusting these methods based on effectiveness and customer satisfaction. *See, e.g., id.* ¶ 120.[29] And this is consistent with a sound management strategy – rather than universally implementing extensive untested policies at 1,600 stores, Five Below first tested out various low-cost changes, such as new checkout policies, at a smaller number of stores. *See, e.g., id.* ¶ 244 (Defendant Anderson telling investors at the March 2024 earnings call that "[w]e have implemented additional shrink mitigation initiatives *based on our 2023 learnings*") (emphasis added). Defendants' statements were thus neither false nor misleading, but reflect reasonable business decisions. And when Five Below realized that the shrink mitigation measures

---

[29] In an analyst report summarizing results from the March 2024 earnings call, Guggenheim actually noted that "FIVE is leaning into associate-assisted, rather than self-checkout, including receipt checking, *which was piloted in 20 stores in the 4Q*", indicating that self-checkout changes made in 2023 were merely limited pilots to determine their effectiveness. *Id.* ¶ 157 (emphasis added). This further indicates that changes made in fall/winter 2023 were smaller scale tests before rolling out broader changes.

they had tested were not producing the desired reduction in shrink, they disclosed this fact to investors at the March 2024 earnings call.  *Id.* ¶¶ 117, 153.

Plaintiffs also appear to fault Five Below for its hesitancy to increase labor in stores to combat shrink.  But the only representation Five Below made about staffing was in a November 2023 interview, where CEO Anderson stated that Five Below was "putting some more labor in the stores."  *Id.* ¶ 243.  None of the former District Managers were employed by Five Below past November 2023 – thus, the only evidence Plaintiffs provide to support that this statement was false is the testimony of a merchandise manager (FE-4) at a *single* store.  Even if more labor wasn't added at the store where FE-4 worked, Plaintiffs fail to plausibly allege that Five Below wasn't increasing labor at some of the 1,600 other stores to mitigate shrink.  Further, Plaintiffs' hesitancy to increase labor across the board appears to have been a reasoned business decision discussed with investors: at the March 2024 earnings call, Defendant Anderson specifically discussed the financial tradeoff between reducing shrink and increasing labor costs.  *Id.* ¶ 125.

Accepting all allegations in the Amended Complaint as true and drawing all inferences in Plaintiffs' favor, I conclude that Plaintiffs have failed to allege that Defendants' statements about implementing shrink mitigation measures were false or misleading.  Plaintiffs' PSLRA claims with respect to these statements are therefore dismissed.

### 7.  *Materiality*

Plaintiffs also adequately allege that the cause and mitigation of shrink were material to investors.  During the class period, Five Below represented that lower-than-expected earnings per share were "fully attributed to higher-than-planned shrink."  AC ¶¶ 7, 103, 153.  To assuage investor concerns, Defendants emphasized external causes of shrink and touted their mitigation efforts, deflecting attention from management issues.  *See, e.g.*, *id.* ¶¶ 7, 98, 101, 154.  A reasonable

investor experiencing lower-than-expected earnings would find the underlying cause of their low earnings – shrink – and related mitigation efforts material. In fact, many analysts specifically commented on shrink. *Id.* ¶¶ 115, 231. And, as discussed below, especially after the July 16, 2024 disclosures, analysts placed great emphasis on the degree to which problems with performance were internal and structural. Thus, the extent and causes of shrink Five Below are adequately alleged to be material to investors.

### C. Statements About Five Below's Triple-Double Strategy

The last category of statements involve Five Below's "triple-double" strategy, which sought to triple Five Below's stores and double its sales and earnings per share. Defendants argue that Plaintiffs have not adequately pled that the triple-double statements are actionable under the PSLRA. I agree.

#### 1. *Factual Background*

In March of 2022, Five Below announced its triple-double expansion plan, which aimed to triple the number of Five Below stores by the year 2030 and more than double Five Below's sales and earnings per share by 2025. AC ¶¶ 33-34. To achieve this, Five Below would need to open 400 stores by 2025 and 1,000 new stores by 2030. *Id.*

Throughout the class period, Five Below executives made optimistic statements about the triple-double expansion during quarterly earnings calls and at conferences – including as late as June 2024. *Id.* ¶¶ 130-38, 264. But some employees on the ground noticed major flaws with the expansion. *Id.* ¶¶ 141-148. FE-8, a District Manager at Five Below for eight years who oversaw 12 stores, stated that when new stores opened, sales at nearby stores would immediately drop off. *Id.* ¶¶ 142-43. Another District Manager, FE-2, reported that new stores would open with entirely empty sections because Five Below did not have a proper inventory system. *Id.* ¶¶ 63, 146. District

Manager FE-1 similarly reported that Five Below's inventory issues made stocking new stores complicated and that many new stores would wait months to receive new product. *Id.* ¶¶ 147-48.[30]

In June 2024, Five Below announced low earnings for the first quarter of 2024. *Id.* ¶ 163. Analysts speculated that the Company's triple-double strategy contributed to the disappointing results, but Anderson attributed the problems to macroeconomic issues. *Id.* ¶¶ 169-71.  On July 16, 2024, Five Below filed an 8-K announcing the resignation of Defendant Anderson. *Id.* ¶ 179. At the same time, Five Below reported in a press release a 5% decline in sales and a 19% decline in income per common share from the June projections. *Id.* ¶ 180.  In August of 2024, after the class period, interim CEO Bull stated that triple-double expansion timeline was "too aggressive and put a tremendous amount of pressure on the organization." *Id.* ¶ 198.  On that same earnings call, Five Below announced that it was slowing down the pace of the triple-double plan. *Id.* ¶ 298.

Plaintiffs assert that numerous statements that Defendants made during the class period about the triple-double plan were false and misleading. *Id.* ¶ 265.[31]  Defendants argue that these statements are inactionable statements of corporate optimism, are not sufficiently alleged to be false, and are forward looking statements covered by the PSLRA's Safe Harbor.

### 2.    *The Safe Harbor Provision and Forward-Looking Statements*

As previously described, the Safe Harbor provision in the PSLRA, 15 U.S.C. § 78u-5(c), immunizes from liability any forward-looking statement that is either (1) identified as forward-looking and accompanied by meaningful cautionary language; or (2) is made without actual knowledge of its falsehood. *Avaya*, 564 F.3d at 254.

---

[30] The inventory-related issues are analyzed in Section II(A).

[31] A table of these statements can be found at Resp. to Mot. to Dismiss, Appendix A. at 21-30, ECF 43.

Five Below Defendants made numerous forward-looking statements about their plans to build new stores. *See, e.g.,* AC ¶ 254 ("We plan to open 200 new stores [in 2023] and expect to end the year with 1,540 stores or unit growth of approximately 15%"); *id.* ¶ 261 ("we plan to open between 225 and 235 new stores in fiscal 2024."). Five statements[32] about the triple-double plan are pure forward-looking statements, and six[33] are mixed present/future statements that are not entitled to the Safe Harbor with respect to the part of the statement that refers to the present. *Avaya*, 564 F.3d at 255 (explaining the differences between pure forward-looking statements and mixed present/future statements).

Eight of these forward-looking statements were made at earnings calls or in a 10-K. AC ¶¶ 253, 254 (both statements), 255, 257, 260, 261, 263. At each earnings call, Five Below informed investors that forward-looking statements made in the call were subject to known and unknown risks, and cross-referenced Five Below's 10-K filings, thereby incorporating them. *See, e.g.*, March 2024 earnings call at 4. In its 10-Ks, Five Below warned that its plans to open new stores was subject to numerous risks. March 2023 10-K at 18; March 2022 10-K at 20; March 2024 10-K at 18. Five Below cautioned that the availability of attractive store locations, delays in the opening of new stores, staffing challenges, and maintaining distribution capacity, among other factors, could negatively impact its growth and operation strategy. *Id.* Five Below specifically discussed the risk that new stores may oversaturate markets and negatively affect sales at existing stores. *Id.* This cautionary language is extensive and specific to the risks at issue, rendering these eight forward-looking statements inactionable.

---

[32] AC ¶¶ 253, 254 (as to Defendant Bull), 255, 260, 261.

[33] AC ¶¶ 254 (as to Defendant Anderson), 257, 258, 263, 264 (both statements).

The remaining three forward-looking statements were made at conferences, and are not alleged to be accompanied by cautionary language. AC ¶¶ 258, 264 (there are two forward-looking statements in paragraph 264). But these statements are still covered by the Safe Harbor provision because Plaintiffs do not adequately allege that they were made with "actual knowledge of [their] falsehood." *Avaya*, 564 F.3d at 254

At the ICR Conference in January 2024, Defendant Anderson expressed continued commitment to the triple-double plan, saying that "[w]e still . . . expect to triple our stores by 2030." AC ¶ 258. And at the Oppenheimer Conference in June 2024, Anderson again expressed commitment to Five Below's store growth. *Id.* ¶ 264 (featuring two forward-looking statements). However, there is no indication that Defendant Anderson made these statements with knowing falsity. Plaintiffs present no evidence that Five Below was planning to pause or slow expansion – rather, Plaintiffs argue that Defendants' focus on opening new stores came at the cost of inventory management and executing their trend-right strategy. *Id.* ¶¶ 265, 267. While their dedication to expansion may have been ill-advised, there is no indication that Five Below was secretly planning to stop expanding while representing otherwise to investors.

The proximity in time between the June statement and Five Below's subsequent August announcement of slowing growth may raise some eyebrows. *See Avaya*, 564 F.3d at 271-72 ("proximity" of the rosy statements "to the . . . release of Avaya's disappointing results" "strengthens the inference of scienter"). But given the context of what was occurring at the time, this proximity alone cannot establish knowledge of falsehood. Between the June statement and Five Below's August announcement, the CEO of the Company left and the stocks plummeted dramatically, reaching their lowest price since 2018. AC ¶ 189. Five Below naturally made strategic adjustments during this moment of crisis. On the record here, I do not infer from the two-

month gap in time that Anderson's statements about commitment to the triple-double plan were false when made.

Because these statements are not plausibly alleged to be false when made, they are covered by the Safe Harbor provision and must be dismissed.

> *3.    Present Statements Not Plausibly Alleged to be False.*

For the present portions of statements regarding the triple-double strategy to be actionable, Plaintiffs must allege that the present statements were false or misleading, and material.  *In re Aetna*, 617 F.3d at 277.

There are eight present statements at issue.[34]  Two of the statements involve representations about streamlining the process for leasing new stores.  AC ¶¶ 254, 260.  Other statements discuss how many stores have opened and how many are in the pipeline.  *Id.* ¶¶ 254, 257, 258.  Several of the statements express confidence in and a commitment to triple-double growth.  *Id.* ¶¶ 256, 257, 263, 264.  Finally, one statement from Defendant Anderson expressed the opinion that recent earnings decline wasn't from internal issues or Five Below "wouldn't be continuing our growth." *Id.* ¶ 264.

Plaintiffs fail to plausibly allege that any of these statements were false.  First, Plaintiffs do not allege that statements regarding the leasing process or store opening goals and projections were inaccurate.  Rather, Plaintiffs primarily assert that the new stores opened with missing inventory, low staffing, and would cannibalize sales at nearby stores.  *See id.* ¶¶ 140-48.

Plaintiffs rely heavily on Five Below's post-class period change of course.  In the August 2024 earnings call, interim CEO Defendant Bull announced that Five Below was going to

---

[34] *See* AC ¶¶ 254 (Anderson's statement), 256, 257, 258, 260, 263, 264 (both).

"evaluat[e] [its] store operating model with the goal of reducing complexity and optimizing our store labor," and "moderat[e] [its] store growth for 2025." *Id.* ¶ 197. He told investors that "the timeline for [the triple-double] goals was too aggressive and put a tremendous amount of pressure on the organization." *Id.* ¶ 198.[35] This moderation would allow Five Below "to focus on execution in the [other] key areas." *Id.* But moderation did not mean halting all growth: Five Below still expected to open 150 to 180 stores in 2025. *Id.* And these post-hoc statements do not render the class period statements false, as "[h]indsight [] is not a cause of action," *City of Cambridge Ret. Sys.*, 908 F.3d at 883, and "liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1330. Five Below's decision to slow growth a month after the class-period ended as part of a Company-wide reset does not render their prior growth plans false or misleading.

In addition, Defendants' statements of confidence in and commitment to triple-double are inactionable puffery and not alleged to be false. While specific details about the triple-double plan – such as the number of stores and profits per store – would be reasonably relied upon by an investor, Defendants' vague and optimistic statements about "confidence" and "commitment" are the types of immeasurable statements that courts routinely find would not be reasonably relied on by an investor. *See, e.g.*, AC ¶ 256 ("We feel extremely confident around the Triple-Double vision"). Further, these statements are not alleged to be false. During the class period, Defendants opened stores at a breakneck pace, and Plaintiffs do not plausibly allege that Five Below was secretly rolling back the triple-double plan while expressing outward commitment to the plan.

---

[35] In their Motion to Dismiss, Defendants astutely point out that the full statement was: "With the benefit of hindsight, the timeline for [the triple-double] goals was too aggressive and put a tremendous amount of pressure on the organization." Mot. to Dismiss at 25 (citing Aug. 2024 earnings call at 5, ECF 42-12).

Defendants' continued investment in new stores may have been a poor management decision in light of the purported difficulties that new stores were experiencing, but poor management is not actionable. Similarly, Five Below's subsequent decision to slow growth may indicate that prior confidence and commitment to triple-double was misguided, but it does not render these statements false or misleading when made.

In sum, Plaintiffs have failed to plausibly allege that any present statement about the triple-double plan was false or misleading.

### 4. *Defendants' Triple-Double Statements Did Not Create a Duty to Disclose.*

Plaintiffs also argue that "[b]y choosing to speak about the Company's triple-double expansion strategy, Defendants had a duty to speak completely and accurately about that strategy, including to disclose material facts necessary to make their statements regarding the strategy not misleading." AC ¶ 265. According to Plaintiffs, Defendants therefore should have disclosed "that the expansion strategy was too aggressive, as the newly opened stores were understaffed, under-stocked, and ultimately hurt Five Below's existing locations." *Id.*

In contrast with Five Below's selective disclosure of the cause of shrink, I conclude that Defendants' disclosures on triple-double did not create a duty to disclose. Here, Defendants made only general statements about the broader triple-double vision and the planned stores in the pipeline. They did not speak about specific successes or challenges these new stores were experiencing, and are not alleged to have made specific misleading comments about the performance at these new stores. Had Defendants selectively disclosed specific facts about their expansion, they may have created a duty to disclose. But the generalized and high-level statements at issue here created no such duty to delve into each challenge and success experienced at new stores.

50

5.    *Conclusion*

Plaintiffs have failed to sufficiently plead that Five Below's statements about their triple-double plan were false or misleading. These statements are therefore inactionable, and must be dismissed.

**D.    Conclusion**

In conclusion, I find that Plaintiffs have plausibly alleged that some statements in two categories are false or misleading and material: (1) Defendants' present statements about Five Below's ability to execute on the trend-right strategy and stock trend-right items in stores, and (2) Defendants' statements relating to the extent and cause of shrink.

**III.    SCIENTER**

The PSLRA requires that "with respect to each act or omission alleged," plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter can be shown by a "'knowing or reckless state of mind,' which in [the] securities context would be demonstrated by pleading 'an extreme departure from the standards of ordinary care.'" *Fan*, 927 F.3d at 718 (quoting *Avaya*, 564 F.3d at 267 n.42); *see also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (defining recklessness in this context as "[e]xtreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.").

The inference required "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs I*, 551 U.S. at 324 (citations omitted). Rather, a strong inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* This can be "established by alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners CDO Fund*, 368 F.3d at 237.

"Scienter is judged holistically, based on all the facts presented." *Energy Transfer*, 532 F.Supp.3d at 227; *see also Avaya*, 564 F.3d at 267-68 ("The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard"); *Tellabs I*, 551 U.S. at 326 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). The scienter analysis "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269; *see also South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[T]he federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.").

I find that Plaintiffs have in part alleged scienter with respect to Mr. Bull, Mr. Anderson, as well as to Five Below. As to Ms. Kristy Chipman, an executive no longer named as a defendant,[36] I cannot attribute scienter to Five Below stemming from her statements.

### 1. *Individual Defendants*

Plaintiffs bring claims against two of Five Below's executives – Joel Anderson, who served as Five Below's President and CEO from 2015 until July 15, 2024, as well as Kenneth Bull, who

---

[36] Five Below CFO Kristy Chipman was named as a Defendant in one of the original complaints, *see City of Orlando Police Officers Pension Fund v. Five Below, Inc*., No. 24-4905, ECF 1, and is the source of one of the statements plausibly alleged to be false in the Amended Complaint. AC ¶ 233. Because she is not named as a Defendant in the Amended Complaint, I will request that the Clerk's office terminate her from this proceeding.

served as the Chief Operating Officer starting in March 2023 and was appointed Interim President and CEO after Anderson's departure.  AC ¶¶ 23-24.

It is not sufficient that a plaintiff alleges that an individual defendant "must have" known something solely by virtue of his or her position with a company.  *In re Advanta*, 180 F.3d at 539. "But plaintiffs can use circumstantial evidence to allege scienter, including the importance of a particular matter to the business, meetings and conversations the individual was alleged to be part of, and the day-to-day responsibilities of that individual."  *Energy Transfer*, 532 F.Supp.3d at 228; *see also GSC Partners CDO Fund*, 368 F.3d at 237 (holding that scienter can be established "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.").

Toward the beginning of the Amended Complaint, Plaintiffs attest that they have reviewed and analyzed regulatory filings made by Five Below with the SEC, press releases, presentations, analyst and media reports, transcripts of Five Below's investor and analyst conference calls, communications with knowledgeable individuals including former employees of Five Below, trading data for Five Below securities, as well as other publicly available information.  AC ¶ 2.

When viewing the entire picture, Plaintiffs have alleged facts leading to a strong inference of scienter on the part of both Mr. Anderson and Mr. Bull.

a)      Joel Anderson (CEO)

Joel Anderson was Five Below's President and CEO from 2015 until July 15, 2024.  AC ¶ 23.  As CEO, Mr. Anderson directed and supervised Five Below's operations and was the primary Five Below spokesperson on quarterly earnings calls.  *Id.* ¶¶ 23-25.  Mr. Anderson is specifically identified in the 10-K and 10-Q filings with the SEC, as he signed and certified those documents. *Id.*; *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (holding that

the maker of a statement is the person with ultimate authority over the statement); *Steamfitters Local 449 Pension Fund v. Alter*, No. 09-4730, 2011 WL 4528385, at *9 (E.D. Pa. Sept. 30, 2011) (Rufe, J.) ("Courts assume that corporate officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for the contents."). The 10-K filings touted the importance of the trend-right strategy and Five Below's ability to execute on it. AC ¶ 215.

Mr. Anderson held himself out to investors as knowledgeable about Five Below's execution of the trend-right strategy and what was occurring on the ground. He spoke frequently to investors about Five Below's ability to bring trending items into stores and even discussed the performance of specific products, but in ways that Plaintiffs argue were misleading. *See, e.g.*, *id.* ¶¶ 211-14. "To adequately plead scienter, it is sufficient for plaintiffs to allege that defendants had knowledge of facts or access to information that contradicts their statements." *In re Cambrex Corp. Sec. Litig.*, No. 03-4896, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005). Plaintiffs assert that, while Anderson was touting Five Below's trend right execution, he was aware that Five Below was experiencing significant issues getting trending items into stores for customers. FE-1, a District Manager overseeing 12-16 stores on the West Coast, said that Anderson visited the stores and observed that they were not stocked with trend-right products. AC ¶¶ 58, 61. Mr. Anderson and FE-1 spoke about the inventory issues. *Id.* ¶ 61. Additionally, FE-1 attended regular group calls with Anderson where other attendees frequently raised inventory issues for trending items. *Id.* ¶ 62.[37] Thus, the Amended Complaint alleges facts establishing that Anderson knew that Five

---

[37] I find FE-1's testimony to be a sufficiently reliable source of information and belief at a Motion to Dismiss stage. He reports having firsthand conversations with Anderson about trend-right inventory issues and witnessed other Five Below employees reporting similar issues to Anderson in calls. According to other former employees, these inventory issues were ubiquitous at Five Below stores nationwide. This supports

Below was struggling to execute on its trend-right strategy, while simultaneously touting that Five Below's "secret sauce" was its success in quickly getting trending items into store.[38]

Mr. Anderson also made numerous statements regarding the extent and cause of shrink. In June 2023, Anderson announced that Five Below was experiencing elevated rates of shrink. *Id.* ¶ 229. Soon thereafter, in the August 2023 earnings call, he announced a decline in operating margin guidance because of increased shrink, and referred to shoplifting when asked about shrink. *Id.* ¶¶ 231-32. In the March 2024 earnings call, he announced low earnings per share and said that the poor performance "can fully be attributed to higher-than-planned shrink." *Id.* ¶ 235. However, the 10-Ks – signed by Anderson – acknowledged that "shrink" covers more than theft but also includes other forms of inventory loss. *See, e.g.*, March 2023 10-K at 24. Given this inconsistency, Anderson's statements repeatedly linking shrink to shoplifting likely misled investors to believe that all shrink was shoplifting. Plaintiffs thus plausibly alleged that Anderson was aware that "shrink" included other forms of retail loss, and that a reasonable person in his position would have known that his statements solely focused on shoplifting might mislead investors. As such, Anderson's statements were "reckless in disregarding the obvious risk of misleading the public," supporting scienter. *Avaya*, 564 F.3d at 272.

---

the notion that FE-1 also experienced these issues and raised them directly with Anderson given the chance, as did other employees on calls with FE-1 and Anderson. Thus, the totality of the allegations compels me to credit FE-1's testimony. *See California Pub. Emps' Ret. Sys.*, 394 F.3d at 147.

[38] Plaintiffs also cite to other former employees who do not have first-hand knowledge, but merely believed that concerns were passed along to higher-level executives. *See, e.g.*, AC ¶¶ 64 (FE-2 "understood" that complaints were passed along to Anderson), 87-88 (FE-5, a Marketing Director, was told be his supervisors that they "talked to Joel" about inventory issues). I find that these former employees are not sufficient to establish scienter in isolation, but contribute to a broader inference of scienter based on FE-1's first-hand testimony.

When Mr. Anderson represented that lower earnings were fully attributable to shrink, Anderson was aware that the company was experiencing issues stocking trend-right items, negatively impacting sales. And two and a half months after saying poor sales were fully attributable to shrink, Five Below announced that sales had decreased 2.3%, which Anderson blamed on both macroeconomic trends and "older merchandise." AC ¶¶ 163-65. Though by itself not sufficient to establish scienter, I find that the short period of time between (1) Anderson telling investors that low earnings were fully attributable to shrink and (2) Anderson disclosing that sales were down in part due to "older merchandise trends" further supports an inference of scienter, because presumably some sales data were available at the time of the first statement. *See Avaya*, 564 F.3d at 271-72 ("proximity" of the rosy statements "to the . . . release of Avaya's disappointing results" "strengthens the inference of scienter"); *Universal Am. Corp v. Partners Healthcare Sols. Holding, L.P.*, 176 F.Supp.3d 387, 395-96 (D. Del. 2016) (four months between misleading statements and disclosure support an inference of scienter).

In sum, Plaintiffs' Amended Complaint paints a picture where Mr. Anderson made statements contradicted by the reality on the ground – shoplifting was not the sole cause of Five Below's shrink, shrink was not the sole cause of Five Below's poor performance, and Five Below was experiencing issues with trend-right inventory. Plaintiffs also plausibly plead that Anderson knew about the struggles Five Below was experiencing. Looking collectively at the facts alleged, I find that there is a sufficiently strong inference that Anderson's misleading trend-right and shrink statements were made with scienter.[39] *See also Tellabs II*, 513 F.3d at 711 ("Is it conceivable that

---

[39] I agree with Defendants that Anderson and Bull's stock sales during the class period as well as Anderson's resignation from Five Below to become CEO of Petco do not support scienter. But looking at the totality of the circumstances, Plaintiffs have asserted scienter.

[the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely.").

> b)    <u>Kenneth Bull (COO)</u>

Kenneth Bull served as the Chief Operating Officer starting in March 2023, and stepped in as Interim President and CEO upon Anderson's departure in July 2024. AC ¶ 24. Bull also signed and certified Five Below's 2022 and 2023 10-Ks,[40] and spoke regularly at quarterly earnings calls. *Id.*

In August 2023, Mr. Bull announced to investors that he was leading a team focused on mitigating shrink. *Id.* ¶ 241. And throughout the class period, Bull made numerous statements about shrink to investors. He commented on the level of shrink and the increase of shrink over time, discussed crime as a cause of shrink, and outlined mitigation efforts Five Below was considering or implementing. *Id.* ¶¶ 228, 231, 240, 241. In making these statements and representing that he was personally leading shrink efforts, Mr. Bull held himself out as knowledgeable about the extent, causes of, and possible solutions to shrink. Given Bull's professed personal involvement and knowledge of the shrink problems, there is a strong inference that his misleading statements on shrink were made with scienter. *See Hall v. Johnson & Johnson*, No. 18-1833, 2019 WL 7207491, at *22 (D.N.J. Dec. 27, 2019) (finding scienter of CEO who had spoken as an expert about the subject at issue); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F.Supp.3d 874, 906 (E.D. Pa. 2018) (Savage, J.) (finding scienter where "officers were speaking as authoritative sources who possessed the information to support their statements.").

---

[40] He signed these in his capacity as CFO. *See* March 2022 10-K at 82; March 2023 10-K at 79.

Mr. Bull also made several statements as to Five Below's ability to stock trend-right items in stores that Plaintiffs plausibly allege to be false.  *See* AC ¶ 211.  I find that Plaintiffs have pled scienter as to these statements.  As COO, Mr. Bull was particularly well-situated to know about Five Below's inventory management and ability to execute on its trend-right strategy.  In the March 2023 earnings call, Mr. Bull discussed his new role at Five Below and what it entailed.  He told investors "I'm now responsible for *the inventory optimization pillar* and have oversight of *merchandise planning and allocation,* data and analytics, strategy, communications and legal teams." March 2023 earnings call at 6 (emphasis added).  His purported personal involvement and knowledge of inventory management and merchandise allocation create a strong inference that he knew that Five Below was struggling to execute on its trend-right strategy, supporting an inference of scienter.

Other factors also support scienter.  In the June 2024 earnings call, Mr. Bull commented on Five Below's double-digit percentage increase in SKUs, commenting that they were planning to reduce SKUs and refocus.  AC ¶ 204.  This demonstrates a close familiarity with Five Below's merchandise, making it likely that he would be aware of other issues affecting Five Below's merchandise – such as an inability to get trending merchandise in stores.  Additionally, FE-7, an Associate Director of Fulfillment Center Operations, claims to have spoken directly with Mr. Bull about issues stocking new Five Beyond sections.[41]  *Id.* ¶ 144.  This further bolsters the inference

---

[41] I find FE-7's testimony to be reliable at a Motion to Dismiss stage.  Other former employees verified that Five Below was experiencing inventory issues, including inventory issues stocking Five Beyond sections. *See, e.g.*, *id.* ¶ 147.  FE 7 worked at Five Below from March 2021 until December 2023, and was therefore employed during the majority of the class period.  *Id.* ¶ 91.  FE-7 was able to remember specific individuals who were on calls when Five Beyond issues were discussed, and had first-hand knowledge of both the inventory issues and of the calls that Mr. Bull was on.  *Id.* ¶ 144.

that Mr. Bull knew that Five Below was experiencing major inventory issues and failing to execute on its trend-right strategy, despite making statements to the contrary.

Plaintiffs also attempt to rely on Defendant Bull's post-class period statements to establish scienter. After the class period, Defendant Bull made numerous trend-right statements that Plaintiffs try to paint as "admissions of prior knowledge" that would establish scienter. *Id.* ¶ 271. For example, at the earnings call on August 28, 2024, Bull – serving as interim CEO – announced a decline of comparable sales of 5.7 %. *Id.* ¶ 192. At the call, Defendant Bull acknowledged that Five Below "got away from . . . the core part of our business around . . . trend product," going so far as to say the Company "lost our way." *Id.* ¶¶ 55, 195. He also commented that Five Below "overexpanded our assortments . . . without the strict editing process of past years and without the key item focus that screamed value and differentiation." *Id.* ¶ 195.

I do not find that these post-class statements raise an inference of scienter. Bull's post-class statements were made over a year after his misleading statements, with the added benefit of hindsight and as the interim CEO of a company in crisis trying to salvage a floundering retail chain. It is unreasonable to infer that these post-class period statements, without more, render Bull's trend-right statements from as early as 2022 fraudulent.

Though the post-class statements do not support scienter, I nonetheless conclude that the combination of Mr. Bull's role, the way he held himself out to investors, and first-hand former employee testimony raise a strong inference of scienter. Given his purported personal involvement, and conversations with employees, it is unlikely that he would have been unaware of the inventory issues and non-theft causes of shrink.

c)     <u>The Core Operations Doctrine Also Supports Scienter.</u>

Plaintiffs also argue that a strong inference of scienter is shown through the core business doctrine. Under this doctrine, "misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives give rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters*, 103 F.Supp.3d 635, 653-54 (E.D. Pa. 2015) (Restrepo, J.) (quoting *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246-47 (3d Cir. 2013)).

As detailed above, Defendants repeatedly represented to investors – both orally and in SEC filings – that executing the trend-right strategy was core to Five Below's business. *See* March 2023 10-K at 13 ("[t]he principal basis upon which we compete is by offering a dynamic, edited assortment of trend-right products."); *id.* at 7 (Five Below's "broad assortment of trend-right, high-quality merchandise" is one of its core "competitive strengths" that "differentiate Five Below from competitors and are the key drivers of our success."); *see also* AC ¶ 285 (Bull explaining to investors at the June 2024 earnings call that "what we got away from was the core part of our business around . . . delivering an edited assortment trend product."). Further, as a discount retailer dependent on a high volume of sales to turn a profit, the ability to stock and sell trending items is core to Five Below's success. AC ¶ 37. Thus, the execution of Five Below's trend-right strategy was of central importance to Five Below, and misleading statements or omissions on this matter from Anderson and Bull give rise to an inference of scienter.

Showing that misstatements touched on core business matters is not sufficient to establish scienter – plaintiffs "must also allege 'some additional allegation of specific information conveyed to management and related to the fraud.'" *Hall*, 2019 WL 7207491, at *21 (quoting *Martin v. GNC Holdings, Inc.*, 757 F.App'x 151, 155 (3d Cir. 2018)). But I have already found that

Defendant Anderson and Bull possessed personal knowledge giving rise to a strong inference of scienter. The core business doctrine thus serves as an additional source of support for the inference of scienter for Anderson and Bull.

### 2.    *Corporate Defendant*

Five Below is also named as a defendant, requiring Plaintiffs to show a strong inference of scienter as to the corporation. "Scienter can be imputed to the corporation through basic agency principles or through the corporate scienter doctrine." *Energy Transfer*, 532 F.Supp.3d at 234.[42] As with the analysis of individual defendants, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs I*, 551 U.S. at 326.

An inference of scienter based upon statements made by Individual Defendants can be imputed to Five Below "because 'a corporation is liable for statements by employees who have apparent authority to make them.'" *Avaya*, 564 F.3d at 252 (quoting *Tellabs II*, 513 F.3d at 708). Although "securities fraud claims are governed by federal law, the issue of imputation is determined by state law." *Belmont v. MB Inv. Partners, Inc*., 708 F.3d 470, 494 (3rd Cir. 2013) (citations omitted). Under Pennsylvania law, plaintiffs must prove that the officers acted with apparent authority for the corporation. *Id.* (quoting *In re Pers. & Bus. Ins. Agency*, 334 F.3d 239, 242-43 (3d Cir. 2003)). The nature and extent of an agent's apparent authority is a question of fact for the fact-finder. *See Gizzi v. Texaco, Inc*., 437 F.2d 308, 310 (3d Cir. 1971). Plaintiffs plausibly plead that Anderson and Bull "possessed the power and authority to control, and did in fact control,

---

[42] The Third Circuit has neither accepted nor rejected corporate scienter in a precedential decision. For the same reasoning set forth at length in *Energy Transfer*, I remain of the opinion that the theory of corporate scienter is appropriate for statements made on behalf of the corporation when high-ranking executives were personally involved. *See Energy Transfer*, 532 F.Supp.3d at 236-238. Here, however, because all of the statements at issue are attributed to individual defendants, it is unnecessary to reach the corporate scienter doctrine.

Five Below's public statements to the market, including in SEC filings, press releases, and presentations to securities analysts, investors, and the media." AC ¶ 25. Defendants appear to concede that corporate scienter can be shown through agency and that the Individual Defendants here would be agents for that purpose. *See* Mot. to Dismiss at 34 n.11 (arguing that a failure to allege fraudulent intent by Anderson and Bull means failure to plead corporate scienter). At this stage, Plaintiffs have plausibly alleged that CEO Anderson and COO Bull spoke with apparent authority and their statements can therefore be attributed to Five Below.

Plaintiffs also assert that statements made by Kristy Chipman were false or misleading. *See* AC ¶¶ 101, 113, 136, 221. Ms. Chipman served as Five Below's Chief Financial Officer starting in July 2023. *Id*. ¶ 29. Ms. Chipman is not a named defendant in this case, but Plaintiffs argue that she "spoke with authority" and that her statement "can thus be attributed to Five Below." Resp. to Mot. to Dismiss at 50 (citing AC ¶ 25). Yet Plaintiffs put forth no allegations that support an inference of scienter and make no arguments that she acted with scienter. For an employee's statement to be imputed onto the corporation, a finding of individual scienter is required. *See Tellabs II*, 513 F.3d at 708 ("To establish corporate liability for a violation of Rule 10b-5 requires looking to the state of mind of the individual corporate official or officials who make or issue the statement . . .") (internal quotations omitted). Plaintiffs do not plead allegations that create an inference of scienter as to CFO Chipman, and therefore fail to establish corporate scienter as to her statements.

## IV.    LOSS CAUSATION

Of the remaining four elements of a PSLRA claim, Defendants challenge only loss causation.[43]

Plaintiffs assert that the economic loss they experienced was caused by a series of partial disclosures issued to correct Defendants' false and misleading statements.   AC ¶¶ 10-13. Specifically, Plaintiffs allege that stock prices dropped after: (1) the announcement in March 2024 that fourth quarter 2023 earnings per share were low; (2) the announcement in June 2024 that first quarter 2024 earnings were poor and that they were struggling with trends; and (3) the announcement in July 2024 that CEO Anderson was stepping down and that sales had continued to decline.

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  There is not a heightened standard of pleading for loss causation.  At the Motion to Dismiss stage, the Supreme Court has been clear that a plaintiff's complaint requires "only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"   *Id.* at 346 (quoting Fed. R. Civ. P. 8(a)(2)).  To plead loss causation, Plaintiffs must "provide[] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation."   *Id.* at 347.  "Although a corrective disclosure must be related to the same

---

[43] As to the other elements, Plaintiffs have certainly pleaded economic loss connected to the sale of securities.  Reliance is presumed where a security "is traded in an open and efficient market" under the fraud-on-the-market theory.  *See Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992)*; see also In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270 n.8 (3d Cir. 2005) ("The fraud-on-the-market theory supposes that 'the price of a company's stock is determined by the available material information regarding the company and its business.'") (quoting *Basic Inc*., 485 U.S. at 241).  AC ¶¶ 327-29.

subject as the misrepresentation, and not some other adverse facts about the company, there is no requirement that the disclosure mirror the earlier misrepresentation." *In re Urban Outfitters*, 103 F.Supp.3d at 655. Rather, the truth may be revealed by a series of partial disclosures through which the truth gradually leaks out. *Dura*, 544 U.S. at 342. As a result, the issue of causation is "usually reserved for the trier of fact." *EP MedSys., Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000).

### 1.    March 20, 2024 Partial Disclosure.

On March 20, 2024, Five Below disclosed in a press release that earnings per share were below the target. AC ¶ 151. According to Defendant Anderson, this was "fully attributed to higher-than-planned shrink." *Id.* ¶ 153. At the call, Defendant Anderson also noted that the new store productivity had declined into the mid-80s.[44] *Id.* ¶ 155. Immediately after, analysts expressed disappointment. JP Morgan downgraded Five Below shares from "Overweight" to "Neutral," and multiple analysts lowered Five Below's price target. *Id.* ¶¶ 156-159. Five Below's share price dropped by $32.18 per share, a decline of more than 15%. *Id.* ¶ 162.

Plaintiffs argue that "[t[he poor performance reflected a deterioration in Five Below's business due to the failure of its trend right strategy, its inventory control issues, and the adverse impact of the Triple-Double expansion." Resp. to Mot. to Dismiss at 8. But a mere announcement of poor performance does not suffice to support loss causation. Two categories of statements at issue were plausibly pled to be false or misleading and material: (1) statements about the execution of Five Below's trend-right strategy and inventory management, and (2) statements about the cause

---

[44] New store productivity is "a figure that measures the sales generation efficiency of a new store in its first year as a percentage of the performance of a pre-existing store." *Id.* ¶ 155.

and extent of shrink.  The March 2024 announcement about low earnings-per-share which were "fully attributed to higher-than-planned shrink"[45] does not *correct* these prior misstatements.  Five Below simply reported results, and did not identify inventory or trend-right issues as a cause.

"[T]he loss causation element requires the plaintiff to prove that it was the very facts about which the defendant lied which caused its injuries."  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006) (citations omitted).  In other words, a plaintiff cannot establish the element of loss causation "unless the relevant truth about that misrepresentation is made known to the public, and the stock price declined as a result."  *In re DVI, Inc. Sec. Litig*., No. 03-5336, 2010 WL 3522090, at *11 (E.D. Pa. Sept. 3, 2010).  Because Plaintiff does not plead that the March 2024 disclosures revealed the truth about the trend-right strategy or the nature of the losses comprising shrink, they fail to adequately plead "what the causal connection might be between that loss and the misrepresentation."  *Dura*, 544 U.S. at 342.  In simple terms, the March 2024 statements do not constitute "corrective" disclosures for purposes of establishing loss causation.

### 2.    June 5, 2024 Partial Disclosure.

On June 5, 2024, Five Below released its earnings for the first quarter of 2024, with "painful" sales results.  AC ¶ 163.  Five Below announced that comparable sales had decreased by 2.3%, and net income had declined 16%.  *Id.* ¶ 164.  As a result, investor diluted income per common share dropped 15%.  *Id*.

On this earnings call, CEO Anderson commented on Five Below's "older merchandise trends," acknowledging for the first time that there were issues executing on trend-right.  *Id*. ¶ 165.

---

[45] In fact, Plaintiffs plead that this statement itself was a misrepresentation to investors, blaming shrink for poor earnings that were also attributable to poor inventory and trend management.

He admitted that it had "proven harder for us to lap some of the big trends from last year" and said that was probably the "biggest difference" for year-to-year performance – thus disclosing that Five Below's ability to execute its trend-right product was largely responsible for the poor financial results, not just shrink.  *Id. ¶* 166.  In a call with Truist, Five Below executives further disclosed that it was a "fair assumption" that "there just isn't a lot of 'new' and 'exciting product' right now in the stores."  *Id*. ¶ 172.  Analysts reported on this, with Truist stating that the "store is currently more 'stale' than it has been in quite some time."  *Id.* ¶ 174. And UBS noted "the lack of newness in the product assortment."  *Id*. ¶ 176.

After this announcement, Five Below stock dropped 10.6%.  *Id.* ¶ 178.

Defendants vaguely argue that Plaintiffs fail to assert how this loss was caused by a corrective disclosure that remedied prior misleading statements.  I disagree.  At the June 5 earning call, CEO Anderson acknowledged that Five Below was experiencing "older merchandise trends" and was having difficulty with trends, labeling that as the "biggest difference" for year-to-year performance.  Defendants' disclosure thus partially corrects both categories of misleading and false statements: it reveals Five Below's issues executing the trend-right strategy, and discloses that the "biggest difference" causing poor performance was not shrink as previously alleged, but failure to execute on trends.

Drawing all inferences in Plaintiffs' favor, they have pled a causal connection between the misrepresentations, June 2024 corrective disclosure, and drop in stock prices.

### 3.  *July 16, 2024 Partial Disclosure.*

Plaintiffs point to Five Below's announcements on July 16, 2024 as corrective disclosures that impacted Five Below's stock price.  On this date, Five Below announced in a press release and SEC Form 8-K that Anderson was stepping down as the CEO and President of Five Below

after leading the Company for nearly a decade.  AC ¶ 179.  Five Below announced that Mr. Bull was taking over as the interim President and CEO.  *Id.*

In the same press release, Five Below also announced that sales had continued to decline. The second quarter-to-date had a decline of comparable sales from 5% over the same period the last year, and Five Below announced it expected a 6-7% decrease in comparable sales for the entire quarter. *Id.* ¶ 180. As a result, the "diluted income per common share" was expected to be between $0.53 and $0.56, which was below the forecast range announced six weeks prior in the June earnings call.  *Id.*

Five Below executives shed light on these poor results in conversations with JP Morgan, who published statements from a conversation with Five Below executives.  *Id.* ¶ 182.  A Five Below executive acknowledged that the Company had strayed from their "historical three-fold playbook" and needed to "get back to trend-right product."  *Id.*  Similarly, JP Morgan reported that Five Below management had identified "the need to improve trend-right product in stores" as an issue.  *Id.* ¶ 183.

Analysts took this news hard, and specifically remarked on how problems *internal* to the company were to blame.  Guggenheim lowered its target price by 24%, from $165 to $125.  *Id.* ¶ 184.  Barclays lowered its rating for Five Below stock from Overweight to Equal Weight, concluding that the issues seemed more "company specific" rather than just caused by macroeconomic trends.  *Id.*  ¶ 185.  William Blair also downgraded Five Below, noting that "[m]anagement highlighted that many of the recent demand pressures are self-inflicted, suggesting the headwinds are more structural in nature." *Id.* ¶ 187.  And Deutsche Bank, after having its own follow-up conversations with Five Below management, said that "[m]anagement indicated that a

significant part of this year's top-line challenges is self-inflicted from less-than-exciting product assortment. . ." *Id.* ¶ 188.

Five Below's stock plummeted after this announcement and conversations with analysts, experiencing a one-day decline of $26.20 – over 25%. *Id.* ¶ 189. It closed at $102.07 on July 17, the lowest closing price since June 2018. *Id.*

Defendants simply argue that the announcement of Anderson's departure does not adequately allege loss causation. Mot. to Dismiss at 38-39. I agree that the announcement of Anderson's departure in no way corrects prior misleading statements about trend right and shrink losses and therefore does not by itself serve to establish loss causation. But Five Below's disclosures on July 16 went beyond the announcement of Anderson's departure. In the press release and in conversations with analysts, Five Below also disclosed disappointing quarter results, reduced guidance, and cast blame on its failure to execute its trend-right strategy. Similar to the June disclosures, the July disclosure revealed underlying issues executing the trend-right strategy as a central factor driving poor performance – not just shrink.

Drawing all inferences in favor of Plaintiffs, I conclude that Plaintiffs have pled a causal connection between the misrepresentation, corrective disclosure, and loss from the July 2024 disclosure.

Because Plaintiffs have "provide[d] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation" as to the June and July 2024 disclosures, their claims as to these dates will survive dismissal. *Dura*, 544 U.S. at 347.

## V.    SECTION 20(a) CLAIM

Under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person."  15 U.S.C. § 78t(a).

Section 20(a) "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)." *Avaya*, 564 F.3d at 252.  "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person."  *Id*.; *see also In re Alpharma Inc. Sec. Litig*., 372 F.3d 137, 153 (3d Cir. 2004) ("Under the plain language of the statute, plaintiffs must prove not only that one person controlled another person, but also that the controlled person is liable under the [Exchange] Act.") (quotations and citations omitted), *abrogated on other grounds by Tellabs I*, 551 U.S. 308 (2007).  Further, "in order for secondary liability to attach under § 20(a), the defendant must have been a culpable participant in the act or acts constituting the violation or cause of action."  *Belmont*, 708 F.3d at 484 (quotations omitted).

"The three elements of a § 20(a), or 'control person' claim, are as follows: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud."  *In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*, No. 05-1151, 2011 WL 3444199, at *36 (D.N.J. Aug. 8, 2011) (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 286 (3d Cir. 2006)).

Plaintiffs allege that Individual Defendants "had the power to control or influence the policies and practices giving rise to the false and misleading statements and omissions alleged herein," "control[led] the contents of the various SEC filings, press releases, and earnings call statements disseminated to the market," and "controlled other personnel who had roles in preparing

69

or disseminating the false and misleading statements." AC ¶¶ 352-53.  In sum, Plaintiffs assert that the Individual Defendants "participated in and controlled the actionable conduct alleged herein, which artificially inflated the market price of Five Below common stock." *Id.* ¶ 357.

For the Individual Defendants whom I have found potentially subject to liability under Section 10(b) of the Exchange Act, Plaintiffs have adequately pled that those defendants were culpable participants in the act constituting the violations.  Plaintiffs' § 20(a) claim therefore survives to the same extent that their § 10(b) claim does.

## VI.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss will be granted in part and denied in part.  An appropriate order follows.


　/s/ Gerald Austin McHugh　
United States District Judge