**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE FIVE BELOW, INC. SECURITIES LITIGATION | Case No. 2:24-cv-03638-GAM<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TROUTMAN PEPPER LOCKE LLP**

Jay A. Dubow (PA Bar No. 41741)
Erica H. Dressler (PA Bar No. 319953)
Katherine R. Hancin (PA Bar No. 335719)
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Telephone: (215) 981-4000
Email: jay.dubow@troutman.com
Email: erica.dressler@troutman.com
Email: katie.hancin@troutman.com

Mary M. Weeks (admitted *pro hac vice*)
Hannah Baskind (admitted *pro hac vice*)
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30062
Telephone: (404) 885-3000
Email: mary.weeks@troutman.com
Email: hannah.baskind@troutman.com

*Counsel for Defendants*

Dated: March 13, 2026.

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ....................................................................................................1

II.   FACTUAL BACKGROUND....................................................................................5

   A.   Five Below's Background as a Leading National Retailer Delivering
        High-Quality Products. .................................................................................5

      1.   Five Below's Business Strategy Includes Stocking Trend-Right
           and Non-Trending Products. ...............................................................5

      2.   Five Below Recognizes Shrink as a Cost/Expense. .............................6

   B.   Five Below Maintains Steady Sales Throughout the Class Period until the
        Fourth Quarter of 2023. ................................................................................7

      1.   The Company Meets (and Beats) Expectations and Sales Remain
           Steady in the Third and Fourth Quarters of 2022. ..............................7

      2.   The Company Continues to Meet Sales Expectations for the First
           Three Quarters of 2023 and Announces in March 2023 That Shrink
           Was Impacting the Business. ...............................................................9

      3.   In March 2024, Five Below Announces that the Company's
           Earnings Per Share for the Fourth Quarter of 2023 Came In at the
           Low End of its Guidance—for the First Time—and Issues
           Disappointing Guidance for Fiscal Year 2024.....................................13

      4.   In June 2024, Five Below Announces Declining Sales Caused by
           Five Below Stores Being "Over SKU-ed."...........................................14

III.   PROCEDURAL HISTORY.......................................................................................16

   A.   Plaintiffs File the Amended Complaint. .........................................................16

   B.   Defendants File a Motion to Dismiss Based on Multiple Grounds for
        Dismissal. .......................................................................................................17

   C.   The Court Partially Grants Defendants' Motion to Dismiss..............................18

   D.   Plaintiffs Move for Class Certification. ..........................................................19

   E.   Defendants Oppose Class Certification and Rely on an Experienced
        Expert. .............................................................................................................20

IV.   LEGAL STANDARD................................................................................................21

   A.   Rule 23(a) Requirements. ...............................................................................22

   B.   Rule 23(b)(3) Requirements. ..........................................................................22

V.   ARGUMENT............................................................................................................22

   A.   Plaintiffs Cannot Satisfy the Demanding Predominance Requirement of
        Rule 23(b)(3)...................................................................................................22

1.      Plaintiffs Have Not Proffered a Model for Calculating Damages on a Class-Wide Basis That Is Consistent with Their Different Theories of Liability. ...............................................................23

      a.      The Incontrovertible Inexperience of Plaintiffs' Expert Removes Any Assurance that Plaintiffs Can Present a Damages Model at All. ....................................................23

      b.      Plaintiffs Fail to Explain How to Calculate Damages Attributed to Their Two Theories of Liability. ..............................28

      c.      Plaintiffs Fail to Explain How to Isolate Inflation Accounting for Confounding Information. ....................................30

2.      Defendants Have Rebutted the *Basic* Presumption of Reliance. ...............35

      a.      Defendants Have Shown Lack of Price Impact for the Alleged Shrink Misstatements. ........................................38

      b.      Defendants Have Shown Lack of Price Impact for the Alleged Trend-Right Misstatements. .............................43

      c.      Plaintiffs Solely Plead an Inflation Maintenance Theory Here. ..................................................47

B.      If the Class Is Certified, the Class Period Must Be Shortened. ...........................48

VI.      CONCLUSION...................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ...................................................................................37, 47

*Basic v. Levinson*,
    485 U.S. 224 (1988)....................................................................................35, 36, 38

*In re BP p.l.c. Sec. Litig.*,
    No. 10-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).........................28, 29, 30

*Brown v. Am. Airlines, Inc.*,
    285 F.R.D. 546 (C.D. Cal. 2011) ......................................................................47

*Butela v. Midland Credit Mgmt. Inc.*,
    341 F.R.D. 581 (W.D. Pa. 2022) .......................................................................48

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ............................................................................23

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    No. 17-01580, 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019)..................................37

*Chudner v. TransUnion Interactive, Inc.*,
    No. 09-433-ER, 2010 WL 5662966 (D. Del. Dec. 15, 2010)..................................24

*City of Cape Coral Mun. Firefighters' Ret. Plan v.
    Emergent Biosolutions, Inc., HQ*,
    322 F. Supp. 3d 676 (D. Md. 2018) ................................................................48

*In re Cmty. Bank of N. Va. & Guaranty Nat'l Bank of
    Tallahassee Second Mortg. Loan Litig.*,
    622 F.3d 275 (3d Cir. 2010)............................................................................ *passim*

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)......................................................................................... *passim*

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014).................................................................24, 26, 28

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015) ....................................................................38

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)..................................................................................................35

*Forrand v. Fed. Exp. Corp.*,
  No. 08-1360, 2013 WL 1793951 (C.D. Cal. Apr. 25, 2010) ...................................23

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ...........................................................................26

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
  594 U.S. 113 (2021)........................................................................................... *passim*

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008)............................................................................31

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).....................................................................................4, 21, 36

*Hoekman v. Educ. Minn.*,
  335 F.R.D. 219 (D. Minn. 2020)..............................................................................28

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)...............................................................................21, 24

*In re Intuitive Surgical Sec. Litig.*,
  No. 13-01920, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016).................................37

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  No. 20-4953, 2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024)................................37, 40, 45, 47

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ...................................................................................23

*Loritz v. Exide Techs.*,
  No. 13-02607, 2015 WL 6790247 (C.D. Cal. July 21, 2015)...........................28, 29

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ...................................................................................23

*In re Montano*,
  No. 7-1026, 2013 WL 2244216 (Bankr. D.N.M. May 21, 2013)............................26

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001).................................................................................22, 24

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015)....................................................................................23, 30

*Pelletier v. Endo Int'l PLC*,
338 F.R.D. 446 (E.D. Pa. 2021)........................................................................................23

*Radiation Dynamics, Inc. v. Goldmuntz*,
323 F. Supp. 1097 (S.D.N.Y. 1971).................................................................................35

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
No. 08-0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)...................................24, 26, 28

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
64 F.4th 731 (6th Cir. 2023) .............................................................................................24

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015)..............................................................................................23

*S.E.C. v. Ballout*,
No. 24-81170, 2025 WL 1627432 (S.D. Fla. Apr. 3, 2025)..........................................27, 32

*S.E.C. v. Cambridge Inv. Rsch. Advisors Inc.*,
No. 22-00071, ECF 213 (S.D. Iowa June 10, 2024)..........................................................26

*San Diego Cty. Emps. Ret. Ass'n v. Johnson & Johnson*,
No. 24-1409, 2025 WL 2176586 (3d Cir. 2025) ...............................................................42

*Shupe v. Rocket Cos.*,
752 F. Supp. 3d 735 (E.D. Mich. 2024).......................................................................37, 41, 46

*Sicav v. Wang*,
No. 12-6682, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...........................................24, 26, 28

*Smith v. LifeVantage Corp.*,
341 F.R.D. 82 (D. Utah 2022) ..........................................................................................28

*In re Vaxart, Inc. Sec. Litig.*,
738 F. Supp. 3d 1259 (N.D. Cal. 2024) ............................................................................31

*Villella v. Chemical & Mining Co. of Chile Inc.*,
No. 15-cv-2106, 2018 WL 2958361 (S.D.N.Y. June 13, 2018) ........................................35

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018)........................................................................................48

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)......................................................................................................21, 22

*In re Williams Sec. Litig.*,
496 F. Supp. 2d 1195 (N.D. Okla. 2007)........................................................................31, 35

**Statutes**

15 U.S.C. § 78u-4(b) ("Private Securities Litigation Reform Act of 1995") ...........................6, 17

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................................................................ *passim*

*Causes, Consequences, and Tips*, MRPEASY,
    https://www.mrpeasy.com/blog/inventory-shrinkage/.............................................................39

*Inventory Shrinkage*, CFI EDUC., INC,
    https://corporatefinanceinstitute.com/resources/accounting/inventory-
    shrinkage/ ............................................................................................................................39

*Inventory Shrinkage: Definition, Causes, Journal Entry*, ACCESS GRP.,
    https://www.unleashedsoftware.com/blog/inventory-shrinkage/ ..........................................39

Five Below, Inc. ("Five Below" or the "Company"), Joel Anderson, and Kenneth Bull (collectively, "Defendants"), submit this Memorandum of Law and accompanying exhibits in opposition to the Motion for Class Certification (the "Certification Motion") filed by Lead Plaintiffs Arkansas Teacher Retirement System ("ATRS") and Arkansas Public Employees' Retirement System ("APERS") (collectively, "Plaintiffs"), ECF 61. Defendants respectfully request that the Court deny Plaintiffs' Certification Motion.

I.    **<u>INTRODUCTION</u>**

Plaintiffs ask this Court to certify a class of purchasers of Five Below stock (the "Class") from December 1, 2022 to July 16, 2024 (the "Class Period") to pursue claims based on alleged misstatements during the period. Reading Plaintiffs' Certification Motion and their expert's report, one would surmise this is a garden-variety securities case. It is anything but. Rather, Plaintiffs have wholly failed to present a class-wide damages model, and there is ample evidence of the lack of price impact of any alleged misstatements. This is a death-knell to their Certification Motion. Class certification is, therefore, improper, and Plaintiffs' Certification Motion should be denied (or, alternatively, the Class Period should be strictly limited to fit the facts of the case, which have largely been ignored by Plaintiffs and their expert).

As set forth in more detail in Defendants' Motion to Dismiss,[1] Five Below is a leading, national retailer of trending products. For over twenty years, it has continuously reported strong sales that are driven by strong-performing trend-right products. Indeed, Five Below is known for capitalizing on viral products, like fidget spinners in 2017, and Squishmallows and Hello Kitty products in 2020. Despite this success, the Company warned investors that its future success could

---

[1] *See generally* ECF 45 ("Mem. Op.").

be impacted by inventory shrink or if it could not accurately predict a product mix to meet customer demand.

It was not until March 20, 2024, that Five Below announced that it came in at the low end of the previously announced earnings guidance for *one* quarter, the fourth quarter of 2023, because of higher-than-expected shrink (which the Company had repeatedly warned investors over the years could happen), and issued disappointing guidance for fiscal year 2024. Following these first-in-time disappointing results and guidance, Defendants evaluated Five Below's stores and preliminarily concluded in June 2024 that the Company may have increased its product mix too much for the fourth quarter of 2023. For instance, to meet customer demand during the COVID-19 pandemic in 2020 and 2021, the Company increased their product assortment (including the expanded stocking of hand sanitizer and home goods). However, as of June 2024, the Company announced it may need to decrease this level of product assortment, which the Company had repeatedly warned investors it might have to do.

Despite these events and disclosures, Plaintiffs still ask this Court to certify a Class for a vast one-and-a-half-year period, relying on alleged "corrective" disclosures that did not correct any previous statements. Likely recognizing their request cannot withstand the rigorous scrutiny required by the Third Circuit and the Supreme Court, Plaintiffs attempt to skate by on vague generalities in their Certification Motion. The Court should deny their Certification Motion because Plaintiffs have not shown that common questions predominate on several grounds.

*First*, Plaintiffs do not present any damages model at all. Rather, the sole expert they rely on, Dr. Evgeny (Eugene) Orlov, merely explains how damages can be calculated in securities cases in general, while conceding that he has ignored the facts of this case. ECF 61-1, Ex. 1 ("Orlov Report") at ¶ 97 n.65 ("I have not yet been asked to determine the level of inflation in Five Below's

stock."); Ex. A, Deposition of Evgeny (Eugene) Orlov, Ph.D., at 270:8–271:2 (Mar. 3, 2026) ("Orlov Dep.") (█████████████████████████████████ ████████████████████████████████████████████████). Not only has Plaintiffs' expert failed to present a damages model, but it is also undisputed that he has ***never before*** prepared a damages model for a securities class action such as this. *See* Orlov Dep. at 218:20 (████████████████████████████████). Plaintiffs, therefore, ask the Court to rely on their expert's unsupported representation that he ***could*** prepare a class-wide damages model consistent with Plaintiffs' theories of liability at trial, with no actual evidence that he can do so. Plaintiffs' request is improper because it is fundamentally at odds with Plaintiffs' obligations under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Class certification should be denied on this basis alone.

*Second*, even if Plaintiffs' "just trust-us" approach could satisfy their *Comcast* burden, Plaintiffs' theories of damages are inconsistent with their theories of liability. Plaintiffs' expert fails to account for Plaintiffs' multiple theories of liability. Properly focusing on the narrow fraud claim that survived Defendants' Motion to Dismiss, ECF 46 (the "Order"), only 19 alleged misstatements remain, including statements regarding Five Below's ability to source and deliver trending products (the "Trend-Right Statements");[2] and statements regarding the cause and extent of shrink (the "Shrink Statements").[3] Neither Plaintiffs nor Dr. Orlov can explain how or whether he would account for Plaintiffs' two theories of liability (based on the Shrink Statements and Trend-Right Statements). This constitutes a clear violation of Plaintiffs' burden following *Comcast*. Moreover, Plaintiffs do not present a damages model that is capable of reliably

---

[2] *See* ECF 40 (the "Amended Complaint" or "AC") ¶¶ 211–17, 219–20, 222–23.

[3] *See id.* ¶¶ 228, 231, 232, 234–36.

controlling for confounding information.  For example, Plaintiffs wholly fail to explain how their damages model will account for and factor out inflation caused by the dismissed misstatements or how their model will account for the fact that Defendants included risk disclosures that address the remaining alleged misstatements.  The failure to do so will inevitably overstate potential damages to the putative class.  Thus, Plaintiffs have wholly failed to present a damages model capable of measuring damages attributable to their theories of liability.

*Third*, Plaintiffs' Certification Motion should be denied as Defendants have rebutted the presumption of reliance by showing a lack of price impact for all the challenged statements.  As the Supreme Court has held, Defendants are entitled at the class certification stage to rebut the class-wide presumption of reliance by proving through any evidence that the stock price was not impacted by the alleged false statements.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*").  Here, price impact is eviscerated because there is a clear mismatch between the alleged misstatements and the alleged corrective disclosures.   The "corrective" disclosures merely announced Five Below's financial results for the first half of 2024 and revised guidance—these cannot correct the Shrink Statements or the Trend-Right Statements which relate to the Company's performance from the fourth quarter of 2022 through the fourth quarter of 2023.  Moreover, Five Below's disappointing sales for the first quarter of 2024 cannot correct any Shrink Statements because the Company, as it should, records shrink as a ***cost/expense*** in its financial statements.  Shrink does not impact sales at all.  These purported "corrective" disclosures also cannot correct the Trend-Right Statements.  That Five Below acknowledged its stores had become seemingly "over SKU-ed"[4] does not support an inference that the Company had not been identifying and delivering trend-right items earlier during the Class Period.

---

[4] "SKU refers to stock keeping unit – the number of unique items for sale."  Mem. Op. at 20 n.14.

Consequently, there is a clear mismatch between the alleged misrepresentations and the corrective disclosures such that any price impact is undermined.

In all, Plaintiffs have not carried their burden of proving—by a preponderance of the admissible evidence—that each of Rule 23's requirements are met.  The Court should, therefore, deny their Certification Motion in its entirety.

And, even in the event that the Court is inclined to grant Plaintiffs' Certification Motion in any respect, the Class Period should be shortened so that it spans from March 20, 2024 to July 16, 2024, as the so-called corrective disclosures, if anything, only related to results for the period after March 20, 2024.

## II.    FACTUAL BACKGROUND

### A.    Five Below's Background as a Leading National Retailer Delivering High-Quality Products.

Five Below is a Pennsylvania corporation that operates over 1,600 stores through which it sells thousands of products that are mostly priced between $1 and $5.  AC ¶¶ 22, 26, 254.  Five Below opened its first stores in 2002 and, since then, it has been expanding throughout the United States.  ECF 42 ("Motion to Dismiss" or "MTD"), Ex. D at 8.  From February 2015 until July 15, 2024, Joel D. Anderson served as Five Below's Chief Executive Officer ("CEO") and President. AC ¶ 23.  Beginning on July 15, 2024 until December 2, 2024, Kenneth R. Bull served as Five Below's interim President and CEO.  *Id*. ¶ 24.  Mr. Bull also served as Five Below's Chief Financial Officer ("CFO") from 2012 until early 2023.  *Id.*  Mr. Bull has since then served as Five Below's Chief Operating Officer ("COO").  MTD, Ex. B at 29.

#### 1.    Five Below's Business Strategy Includes Stocking Trend-Right and Non-Trending Products.

Five Below is a leading, high-growth retailer offering trend-right, high-quality products. MTD, Ex. D at 6.  As explained in the Company's public filings throughout the Class Period, a

core aspect of Five Below's strategy is that it continuously strives to stock its shelves with a dynamic, edited assortment of trend-right products. AC ¶ 215(a) ("[The Company] monitor[s] trends in the ever-changing tween and teen markets and [is] able to quickly identify and respond to trends."). Five Below sells these trend-right products and non-trending, everyday products. *Id.* ¶ 215(b) (aiming "to deliver an edited assortment of trend-right as well as everyday products within each of our category worlds that changes frequently to create a sense of anticipation and freshness"). According to equity analysts who follow Five Below, Five Below's key demographics of customers include lower-income individuals. *See* Ex. B, Telsey Advisory Group Report, at 1 (June 6, 2024); Ex. C, UBS Report, at 2 (July 17, 2024).

### 2.    Five Below Recognizes Shrink as a Cost/Expense.

Because Five Below is a retailer offering products, it accounts for "inventories" on its balance sheet. In accounting for inventories, it considers changes in its inventory as an assert or a liability, which the Company told investors in its Form 10-Ks. MTD, Ex. D at 51; *id.*, Ex. I at 53; *id.*, Ex. Q at 52; *id.*, Ex. V at 51. Inventories recorded on Five Below's balance sheet also include "inventory shrink," and "the company accrues estimates for inventory shrink for the period between the last physical count and the balance sheet date. The shrink estimate can be affected by changes in the merchandise mix and changes in actual shrink trends." *Id.*, Ex. D at 51; *id.*, Ex. I at 53–59; *id.*, Ex. Q at 52–57; *Id.*, Ex. V at 51–56. The Company warned its investors that its "profitability and cash flows from operations may be negatively affected if we are not successful in managing our inventory balances and inventory shrinkage." Ex. I at 26; Ex. Q at 25.[5]

---

[5] In addition, disclosures referencing these risk factors were made at the beginning of each earnings conference call: "certain comments made during this call may constitute forward-looking statements and are made pursuant to and within the meaning of the safe harbor provisions of the [PSLRA] . . . . Such forward-looking statements are subject to both known and unknown risks and

B.    **Five Below Maintains Steady Sales Throughout the Class Period until the Fourth Quarter of 2023.**

1.    **The Company Meets (and Beats) Expectations and Sales Remain Steady in the Third and Fourth Quarters of 2022.**

At the beginning of the Class Period, Five Below announced its sales exceeded expectations in the third quarter of 2022, due to its breadth of trend-right products. *See id.*, Ex. E at 4. On November 30, 2022, one day before the Class Period, Five Below announced that it substantially beat its revenue guidance for the third quarter of 2022, even against a difficult macro environment and a comparison to last year's extremely strong sales. *Id.* In fact, between 2019 and 2021, Five Below's net sales increased from $1.8 billion to $2.8 billion, representing an annual growth rate of 24.2%. *Id.*, Ex. I at 7. Five Below evaluates the current performance of the Company using "comparable sales"—*i.e.*, "comparable sales include net sales from stores that have been open for at least 15 full months from their opening date, and e-commerce sales." *Id.*, Ex. C at 18.[6] Mr. Anderson explained that Five Below connected with its customers through trend-right products like Squishmallows and "[n]ewer trends like Anime, Funko and Hello Kitty grew." *Id.*, Ex. E at 4.

Further, the Company started the Class Period, the fourth quarter of 2022, incredibly strong with a secure, steady supply of trend-right products. *Id.* at 5. Looking towards the start of the fourth quarter of 2022, Mr. Anderson stated that the Company was pleased with its results for the start of the fourth quarter, including Black Friday. *Id.* He explained that Five Below's "stores are

---

uncertainties . . . [which] are described in the press release and our SEC filings." *Id.*, Ex. E at 4; *see, e.g.*, *id.*, Ex. J at 4; *id.*, Ex. K at 4.

[6] Alternatively, "[n]on-comparable sales are comprised of new store sales, sales for stores not open for a full 15 months, and sales from existing store relocation and expansion projects that temporarily closed (or not receiving deliveries) and not included in comparable sales." *Id.*, Ex. C at 19.

stocked and ready with an amazing assortment of value products that promises to delight our customers." *Id.*; AC ¶ 211. For example, the stores had a wide assortment of trending products including branded games, toys, pet beds, holiday decor, licensed t-shirts, and Bluetooth speakers. MTD, Ex. E at 5.

In all, Mr. Bull explained that Five Below had a better-than-expected third quarter and was off to a "good start" for the fourth quarter 2022. *Id.* at 7. The Five Below "teams [thus] continue to move quickly to adjust to changing customer preferences." *Id.*; AC ¶ 211. And Mr. Bull "thank[ed] them for their ongoing commitment and dedication." MTD, Ex. E at 7.

The achievements of 2022 were reiterated when Messrs. Anderson and Bull reported on these good results at the January 9, 2023 ICR Conference, explaining that "[i]t was a very good holiday [in 2022]. Trends were strong, Squishmallows, Slime Lickers, Hello Kitty. And I think that's something that—I've been here eight years now, we've really got a good cadence with those." AC ¶ 212. Reflecting on Five Below's successes, including with the fidget spinner in 2017, Mr. Anderson explained that Five Below is "pretty nimble and quick. There's not a lot of bureaucracy at Five Below. When we identify something, we move really quick to get that in the store, test it and then push it out to the stores." *Id.* ¶ 213.

Even with this continued success throughout 2022 and into 2023, the Company had warned investors that to be successful, it must keep a balanced total product mix of trending and non-trending products—a correct mixture of SKUs—to meet customers' demands, and if its "buying decisions do not accurately predict customer trends or purchasing actions," this will negatively impact the Company's results. MTD, Ex. I, at 26.[7] It also disclosed that "disruptions in [its] ability

---

[7] *See supra* n.5.

to select, obtain, distribute and market merchandise profitably" could impact the Company's financial results. *Id.*, Ex. D at 19.[8]

> **2.    The Company Continues to Meet Sales Expectations for the First Three Quarters of 2023 and Announces in March 2023 That Shrink Was Impacting the Business.**

The fourth quarter of 2022 (the start of the Class Period) was successful for Five Below. *Id.*, Ex. J at 4.  On March 15, 2023, Defendants reported on successful sales for the fourth quarter of 2022, announcing "[they] were pleased with our holiday performance, which was at the high end of our guidance," as they previously indicated at the January ICR conference. *Id.*  However, Mr. Bull explained that the Company experienced "higher-than-expected shrink," and that "[o]n an annual basis, shrink for 2022 was approximately 30 basis points higher than what we experienced in 2021."  AC ¶ 228.

In that March 2023 earnings call, Mr. Anderson also focused on summarizing major accomplishments the Company had met in 2022; Five Below had experienced strong sales that year.  MTD, Ex. J at 4.  He explained that Five Below "successfully lapped" trends by finding "amazing value products" like Hello Kitty, Funko, and Marvel Collectibles, as well as other licensed products such as Kendall and Kylie crossbody bags. *Id.*  "[Five Below] stay[s] on top of hot trends and swiftly move[s] to capitalize on them. . . . The flexibility of our model . . . is unique and enables swift recognition and introduction of trend-right and relevant products to our customers, and we honed our expertise and discipline to effectively manage the constant cycling of these trends."  AC ¶ 214.  In other words, these accomplishments demonstrated that the Company's statements made on November 30, 2022 and January 9, 2023 about trend-right

---

[8] *See supra* n.5.

products were true, as sales and comp sales were and continued to be strong.  *See* MTD, Ex. J at 4.

Following previous quarters, the first quarter of 2023 was a success for Five Below—trend-right products again drove an increase in sales.  *Id.*, Ex. F at 4.  On June 1, 2023, Defendants again announced that Five Below was pleased with its first quarter of 2023 results, which were in line with their guidance, with sales growth of approximately 14% to $726 million, and a transaction-driven 2.7% comparable sales increase.  *Id.*  Mr. Anderson reflected on the current macroeconomic environment, which was an obstacle for customers.  *Id.* ("[i]t continues to be a challenging time for consumers with persistent inflation, lower tax refunds and fewer government-sponsored benefits compared to the stimulus fueled periods of the pandemic").  Even though "customers faced [these] multiple macro headwinds [in the first quarter of 2023], [Five Below] continue[s] to be there for them, flexing our offering to bring them the Wow products they need and want.  Our broad-based sales performance and transaction trends demonstrate that we are gaining trips and customers through our amazing value, trend-right products and Five Beyond prototype[,]" as shown by Five Below's sales growth in 2022 and the beginning of 2023.  AC ¶ 216.

Moreover, in response to the results of the first quarter of 2023, analysts questioned Mr. Anderson about the Company's experience with inventory shrink.  MTD, Ex. F at 10. Mr. Anderson explained that shrink was impacting the retail industry nationwide—including Five Below—and that the Company was accruing shrink at higher rates.  *Id.* ("[S]hrink is [still] definitely something that's impacted retail.  We're no exclusion to it. . . . [W]e are accruing at higher rates [in 2023 compared to 2022].");  *see also* MTD at 6 & n.6 ("It is uncontroversial that the prevalence of higher than historic levels of shrink was mounting on an industry-wide basis, impacting companies throughout the retail industry.");  Ex. D, Expert Report of Jennifer Marietta-

Westberg, Ph.D, ¶ 34 (Mar. 13, 2026) ("Marietta-Westberg Report").  An equity analyst that follows and reports on Five Below, William Blair, reported the next day on shrink within the retail industry, explaining that "[i]n line with many of its peers, Five Below highlighted increased pressures relating to shrink."  AC ¶ 115.

Once again, Five Below met and exceeded its own sales expectations in the second quarter of 2023 (the middle of the Class Period), as the Company demonstrated its ability to adapt and react to trends.  MTD, Ex. G at 4.  On August 30, 2023, Defendants announced again that sales for the second quarter of 2023 were in line with the Company's guidance with sales growth over 13% to $759 million and 2.7% comparable sales increase, which continued to be driven by transactions. *Id.*  In the second quarter of 2023, trend-right products were top performers for the Company.  *Id.* ("Notable performers were Squish, Hello Kitty, Anime, Collectibles and our version of consumables, including candy, snacks and beverages.  Our teams also captured the popular Swifty trend with stylish clothing, jewelry, such as friendship bracelets and beauty products.").  Reflecting on these top performers, Mr. Anderson noted that "we can quickly capitalize on a trend" in the second quarter of 2023.  AC ¶ 217.  As noted in the previous earnings call in June 2023, Mr. Anderson explained that the Company was not changing any sales guidance for 2023 but, rather, was changing its projections of shrink for that year.  MTD, Ex. G at 8 ("with us not changing the top line [*i.e.*, sales], the 20-basis point decline [in operating margin guidance] is really the only change from the last quarter, and that pretty much is all based on the changes we're making with the assumption of shrink").  In other words, while Five Below adjusted its earnings guidance to reflect an anticipated increase in shrink reserves, its sales outlook for 2023 remained unchanged. *Id.*

Further, during the August 2023 earnings call and in response to an analyst question regarding where shrink "is coming from," and noting that there's a lot of "organized crime," and if Five Below has seen "this work[] its way into more traditional customers and to employers," *id.* at 12, Mr. Anderson responded that shrink was coming from multiple avenues in 2023:

> It's coming on all angles.  And you've got several cities now which just simply aren't prosecuting below the $500 level.  Sadly, our hometown here in Philly is a city that's seen some of our highest shrink rates.  And we watched Target and we watched Wawa exit Center City.  And so while I don't think we're yet at that extreme of closing Five Below stores there, these are the type of mitigation strategies that will be included as we consider what to do if we don't see things improve.

*Id.*; AC ¶ 232.  Mr. Anderson further reflected on news regarding shrink in the retail industry stating that, "I think you're all familiar with the recent media and videos that are out there where retailers across the sector are experiencing increased levels of shrink and related crime incidents[,] and we are not immune to this as we're finding out."  MTD, Ex. G at 8; AC ¶ 231.  That same day, an analyst from Credit Suisse, who follows Five Below, also reported that Five Below "joined the long list of retailers embedding significant margin headwinds from shrink in their forward outlooks."  AC ¶ 115.

Beyond any projections, the third quarter of 2023 provided the Company with strong sales, once again demonstrating the Company's grasp on identifying and obtaining trend-right products for that quarter.  MTD, Ex. N at 4.  On November 29, 2023, Mr. Anderson announced that they were pleased with Five Below's financial performance and operational execution for the third quarter of 2023.  *Id.*  The Company exceeded its guidance on sales, comps and earnings, and the comparable sales results were remarkably consistent with the first two quarters of the year.  *Id.* Mr. Anderson noted that "[w]e . . . effectively capitalized on multiple trends" in the third quarter of 2023, and certain trends were "very popular," including "Hello Kitty, squish, anime and collectibles." *Id.*; AC ¶ 220.  Reflecting on these very popular trending items, Mr. Anderson noted

that during that quarter, "[o]ur merchants have sourced . . . fresh and trend-right products at outstanding values." AC ¶ 219.

The next day, Mr. Anderson appeared on Fox Business's "Mornings with Maria" to discuss the earnings report for the third quarter of 2023 and the environment of shrink, and he stated that "what it really means, is theft." *Id.* ¶ 234. As noted in the August 2023 earnings call, Defendant Anderson explained that "[w]e talked about theft in our second quarter call. Theft is real, it's impacting all retailers. . . . This is a real societal problem and we've got to lean together with the politicians to figure this out." *Id.*

> **3.      In March 2024, Five Below Announces that the Company's Earnings Per Share for the Fourth Quarter of 2023 Came In at the Low End of its Guidance—for the First Time—and Issues Disappointing Guidance for Fiscal Year 2024.**

Fifteen months after the start of the Class Period, on March 20, 2024, Defendants announced—for the first time during the Class Period—that the Company missed their internal expectations for their ***earnings per share target*** for ***one*** quarter (the fourth quarter of 2023). AC ¶ 317; MTD, Ex. H at 4. Also for the first time, the Company issued its guidance for fiscal year 2024, which was disappointing. MTD, Ex. H at 4. However, Five Below's sales remained strong with total fourth quarter sales for 2023 of $1.34 billion and growth of over 19%, and comparable sales increased 3.1%, driven by outperformance in the candy, style, sports and seasonal worlds. *Id.* Nevertheless, "[d]espite these strong sales results, earnings per share of $3.65 was at the low end of [Five Below's] internal expectations and can be fully attributed to higher-than-planned shrink." *Id.*; AC ¶ 235. In other words, this was the ***first*** time in the Class Period that Five Below affirmatively stated that any disappointing financial results were because of higher-than-expected shrink. MTD, Ex. H at 4. Mr. Anderson also generally commented that "shrink is industry-wide and a societal problem that accelerated over the last year." *Id.* at 8; AC ¶ 236.

As shown by positive sales results in 2023, Mr. Anderson explained that trend-right products were "strong performers" for the Company in 2023, such as "Hello Kitty, Disney and Harry Potter as well as trends like hydration and collectibles and the continuation of [Squishmallows]." MTD, Ex. H at 5. In addition, the Company announced that non-trending products like candy, food, beverage and beauty continued to outperform throughout 2023. *Id.* Mr. Anderson explained that, as shown by the sales growth in the fourth quarter of 2023, trend-right products were strong performers because the "flexibility of [Five Below's] model with [its] 8 worlds is unique and enables our teams to quickly introduce trend-right relevant products to our customers." *Id.*; AC ¶ 222.

### 4.    In June 2024, Five Below Announces Declining Sales Caused by Five Below Stores Being "Over SKU-ed."

On June 5, 2024, *for the first time* during the Class Period, Defendants disclosed a decline in sales for *one* quarter: the first quarter of 2024. AC ¶ 319. Specifically, comparable sales decreased by 2.3% from the first quarter of fiscal year 2023. *Id.* ¶ 164.

As the Company had regularly warned investors could happen, Five Below explained it had initially evaluated the Company's total product mix and preliminarily determined that the Company may have too many products (*i.e.*, SKUs) of both trending and non-trending products during the first quarter of 2024. *Id.* ¶ 204. The Company had grown its diversity of products to meet customer demand during the COVID-19 pandemic in 2020 and 2021 (*e.g.*, hand sanitizer and home goods); however, post-pandemic, the Company believed it may need to reduce the number of products. *Id.* ("[Five Below had a] double-digit percentage increase in SKUs versus pre-pandemic. And that's us becoming over SKU-ed and over-assorted . . . and we're going to get that back. . . . [W]e're going to . . . renew a focus in terms of reducing those SKUs."). This "over SKU" may have been a result of Five Below holding onto "older merchandise trends." *Id.* ¶ 165.

- 14 -

Defendants explained Five Below may have "got[ten] away from [] the core part of our business around . . . delivering an ***edited*** assortment trend product" for the fourth quarter of 2023. *Id.* ¶ 285 (emphasis added). Five Below's preliminary determination related to macroeconomic pressures on lower-income consumers, who became more price-sensitive and reduced demand for discretionary products. Ex. B at 1–2 ("The company saw the slowdown in all geographies, and it was more pronounced among lower income consumers . . . (partly as tax refunds were exhausted)."); Ex. C at 2 ("[Five Below's] challenging comp is a result [in part] of pressure on lower income consumers (it noted it is seeing lower comps in stores levered to this demographic)").

While the Company was evaluating its product mix, Mr. Anderson explained that Five Below was still performing above level in the first quarter of 2024 when compared to its competitors at sourcing and delivering trending products. *Id.* ¶ 168 (explaining that Five Below's "quarterly research" asked "where do you go when you want fun, trend-right, high-value items," and "we have not seen some of the [competitors] move up the list on that"). He also explained that the Company remained committed to "chasing trends" as this "has always been a strength of ours. And [Five Below] will continue to quickly identify and capitalize on trends, bringing them in-store quickly" in 2024, as it had done in years prior. *Id.* ¶ 223.

As the Company had previously disclosed, the first quarter of 2024 presented struggles not seen in previous quarters. MTD, Ex. A at Item 5.02 & Ex. 99.1. Furthering this disclosure, on July 16, 2024, Defendants released quarter-to-date financial results and guidance for the full quarter for the second quarter of 2024, a decline in comparable sales as compared to July 2023, and the fact that Mr. Anderson "stepped down from his roles of President and CEO, and from the Board of Directors, to pursue other interests." *Id*. ¶ 321; MTD, Ex. A at Item 5.02 & Ex. 99.1.

Specifically, the Company disclosed that comparable sales for the period ended July 16, 2024 had declined 5% compared to the comparable period ended July 15, 2023.  MTD, Ex. A at Item 5.02 & Ex. 99.1.  While the Company had a decline in sales for this one quarter, it also announced the positive results that it had successfully opened 61 stores in the first quarter of 2024, representing an increase in stores of 17.4% from the end of the first quarter of 2023.  *Id.*, Ex. B at 6.

Equity analysts following Five Below observed that a myriad of factors, including increased competition, contributed to the disappointing sales results in the first quarter of 2024.  *See* Ex. B, Telsey Advisory Group Report, at 1 (June 6, 2024); Ex. C, UBS Report, at 2 (July 17, 2024).  For example, Telsey Advisory Group, an investor analyst that follows Five Below, also commented that Five Below's "soft comp trend" was likely due to a combination of factors, including "increased competition from mass merchants, like Walmart [,] and online retailers, like Temu[.]"  Ex. B at 1.  Another equity analyst following Five Below, UBS, remarked on "the prospect that competition could be having some impact," on Five Below's sales, including that competitors had gained attention from Five Below's core customers.  Ex. C at 2 ("While [Five Below's] answer to this unknown is that 'it has long faced competition and performed well,' there could be some differences this time.  Temu and SHEIN have gained more traction and attention from consumers, especially [Five Below's] core customer.").  Even with these factors, Five Below remained "committed to delivering on [its] extreme value promise to [its] customers while driving profitable growth for our shareholders" in 2024.  MTD, Ex. A at Ex. 99.1.

III.    **PROCEDURAL HISTORY**

A.    **Plaintiffs File the Amended Complaint.**

Sixteen days later, on August 1, 2024, Tyler Himes filed an initial complaint, after which the Court appointed two Lead Plaintiffs (two Arkansas retirement funds, consisting of the

Arkansas Public Employees' Retirement System and the Arkansas Teacher Retirement System) and two Lead Counsel (the law firms of Berger Montague PC and Bernstein Litowitz Berger & Grossmann LLP).  ECF 1, 23.  On January 13, 2025, Plaintiffs filed an Amended Complaint, in which Plaintiffs pursued theories of liability concerning, as relevant here, misstatements regarding Five Below's practice of offering an assortment of "trend-right products," or products purchased "in reaction to existing marketplace trends," and the cause and extent of "shrink," on Five Below's financial results.  *See* AC ¶¶ 5–7.[9]

B. **Defendants File a Motion to Dismiss Based on Multiple Grounds for Dismissal.**

On March 14, 2025, Defendants filed a motion to dismiss.  *See generally* MTD. Defendants asserted multiple grounds for dismissal, including that Plaintiffs failed to allege any actionable statement, let alone clear the high pleading hurdles required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as many of the statements challenged by Plaintiffs are inactionable statements of optimism and puffery.  *Id.* at 10–25.  Moreover, Defendants' disclosures repeatedly warned of the very business risks Plaintiffs assert materialized.  *Id.* at 10–16. Defendants also argued that the Amended Complaint should be dismissed for failure to adequately allege scienter as it contains only conclusory, blanket assertions of motive that do not support an inference of scienter and entirely fail to establish conscious misbehavior or recklessness by any Defendant.  *Id.* at 26–39.  Finally, Defendants explained that Plaintiffs' theory of loss causation is

---

[9] Plaintiffs also pursued two other liability theories regarding Five Below's efforts to mitigate shrink, and Five Below's plans for expansion—*i.e.*, its "Triple-Double" initiative—which reflected its plan to triple the number of its locations and double its sales and earnings per share ("EPS") through 2025.  MTD at 3.  The Court dismissed these theories of liability (*i.e.*, allegations regarding shrink mitigation and the Triple-Double initiative) from the case.  Mem. Op. at 40 & n.26, 44.

implausible given that not one of Plaintiffs' alleged corrective disclosures is tethered to allegations of an omission or material misstatement.  *Id.* at 39.

### C.        The Court Partially Grants Defendants' Motion to Dismiss.

On August 25, 2025, the Court partially granted Defendants' Motion to Dismiss in a Memorandum Opinion.  *See generally* Mem. Op.  Only a subset of Plaintiffs' theories survived: statements regarding Five Below's ability to source and deliver trending products—the Trend-Right Statements; and statements regarding the cause and extent of shrink—the Shrink Statements.  *See* Order at 1–2.  The Court also dismissed the theory that Mr. Anderson's departure could be considered in the loss causation analysis as such departure could not, as a matter of law, "correct" any prior alleged misstatements.  Mem. Op. at 68 (finding that "announcement of Anderson's departure in no way corrects prior misleading statements about trend right and shrink losses and therefore does not by itself serve to establish loss causation").

The Court also distilled the Trend-Right Statements to about 14 actionable statements where the Company was describing Five Below's business strategy of sourcing trending products, AC ¶¶ 211–15(a), 217, 220, 222–23 (explaining that Five Below's strength is that the Company is nimble and moves quickly to source and capitalize on trends); and statements concerning the Company's ability to deliver and stock trending products in their stores, *id.* ¶¶ 215(b), 216, 219 (explaining the Company delivers an assortment of trending products sourced from their merchants).[10]  *See* Order at 1–2.  The Shrink Statements were similarly narrowed to only about

---

[10] While not the subject of this Opposition, Defendants believe that these so-called actionable statements are similar to the statements that were dismissed, and as such, will be found to be not actionable for the same reasons that the Court dismissed the other Trend-Right Statements.

five actionable statements regarding the extent of shrink, AC ¶¶ 228, 230, 235, and the cause and extent of shrink in the retail industry, *id.* ¶¶ 232, 234, 236.[11]  Order at 2.

### D.    Plaintiffs Move for Class Certification.

On January 16, 2026, through their Certification Motion, Plaintiffs sought to certify a proposed class of Five Below stockholders.  Plaintiffs solely rely on Dr. Evgeny (Eugene) Orlov as their class certification expert.  Pls.' Cert. Mot. at 25.[12]  Dr. Orlov is a Partner at Econic Partners LLC, an economic consulting firm.  Orlov Report ¶ 1.  While Dr. Orlov has prepared reports and declarations in cases involving the Securities and Exchange Commission ("SEC"), he has never created—or even attempted to create—a class-wide damages model for a private securities class action before.  *See id.*, Appendix A at 41; *see* Orlov Dep. at 218:20 ( ████████████████████ ████████████████████ ).  ████████████████████

████████████████████

████████████████████.  *See* Orlov Dep. at 18:14–18, 62:21–63:12

(████████████████████

████████████████████

████████ ).

Despite Dr. Orlov's lack of experience, Plaintiffs propose to use Dr. Orlov's Report to "demonstrate[] that per-share damages can be determined on a class wide basis" using an event study, estimating inflation, and "mechanically" calculating damages on an individual basis.  Pls.'

---

[11]  While also not the subject of this Opposition, Defendants believe that through discovery, Company documents will prove that the statements did not omit material facts such that the statements will be found to be not actionable.

[12]  While Plaintiffs solely rely on Dr. Orlov, ████████████████████ ████████████████.  *See* Orlov Dep. at 64:7–13 (████████████████ ████████████████████ ████████████████ ).

Cert. Mot. at 25.  In his report, Dr. Orlov asserts that "damages in this matter are *capable* of being calculated on a class-wide basis using well-established economic methods and commonly applied in securities litigation."  Orlov Report ¶ 97 (emphasis added); *see also* Orlov Dep. at 194:5–11

(███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████).  In an over one hundred paragraph report, he spends a mere five paragraphs on a proposed damages model.  Orlov Report ¶¶ 98–102.  In these few paragraphs, Dr. Orlov only generically explains how damages can be calculated in securities cases, noting that he has not taken into account the facts of this case.  *Id.* ¶¶ 98–100 (explaining that "typically" damages are measured using an "out-of-pocket" framework and that "[e]conomists commonly estimate artificial inflation using event study techniques . . . [d]epending on the facts" of the particular case other "tools" can be used); *id.* ¶ 97 n.65 ("I have not yet been asked to determine the level of inflation in Five Below's stock."); Orlov Dep. at 269:7–10 (██████████████████████

███████████████████████████████████████████████████████

█████████████) (emphasis added); *id.* at 219:19–220:12 (██████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████).

### E.    Defendants Oppose Class Certification and Rely on an Experienced Expert.

As noted in the report filed contemporaneously herewith, Defendants' class certification expert is Dr. Jennifer Marietta-Westberg.  *See* Marietta-Westberg Report ¶ 8.  Dr. Marietta-

- 20 -

Westberg is a Vice President at Cornerstone Research, an economic and financial consulting firm. *Id.* ¶ 1. Prior to joining Cornerstone Research, she spent a decade at the SEC, including as Deputy Director and Deputy Chief Economist at the Division of Economic and Risk Analysis. *Id.* ¶ 3. She also served as a member on the SEC Investor Advisory Committee, advising on the effectiveness of disclosure and initiatives to protect investors' interests. *Id.* ¶ 2. She has extensive experience as an expert in private securities class actions, including opining on whether stock price declines constitute economic evidence of price impact of prior alleged misrepresentations, and whether a purported damages model can be used to measure class-wide damages that are attributable to Plaintiffs' theories of liability. *Id.*, Appendix A at 2–3.

## IV.    LEGAL STANDARD

To succeed in certifying their proposed class, Plaintiffs must prove, by a preponderance of the evidence, that the proposed class satisfies all of the Rule 23 requirements. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). Securities class actions must clear the same hurdles as any other would-be class action. *Id.* at 321–22 (holding "it does not follow that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims" come in the context of a securities fraud action).

"[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ." *Halliburton II*, 573 U.S. at 275. Rule 23 "calls for a rigorous analysis," *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 482 (3d Cir. 2018), where the plaintiffs "must be prepared to prove . . . in fact" all of the requirements of Rule 23 are met, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Importantly, this means there is no presumption in favor of class certification. *See Mielo*, 897 F.3d at 483 ("We repeat (hopefully for the last time): the 'relaxed' Rule 23 standard suggested in *Eisenberg* [*v. Gagnon*, 766 F.2d 770 (3d Cir. 1985)] is no longer the law of this circuit. When

- 21 -

courts harbor doubt as to whether a plaintiff has carried her burden under Rule 23, the class should not be certified.").

### A.    Rule 23(a) Requirements.

A party seeking class certification must "affirmatively demonstrate" its compliance with the four requirements for certification within Rule 23(a) of numerosity, commonality, typicality, and adequate representation.  *Dukes*, 564 U.S. at 350.

### B.    Rule 23(b)(3) Requirements.

Plaintiffs must additionally satisfy the requirements of Rule 23(b)(3), by showing that "(i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)."  *In re Cmty. Bank of N. Va. & Guaranty Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 622 F.3d 275, 291 (3d Cir. 2010) (citing Fed. R. Civ. P. 23(b)(3)).  "Predominance measures whether the class is sufficiently cohesive to warrant certification."  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001) (citation omitted).

## V.    ARGUMENT

### A.    Plaintiffs Cannot Satisfy the Demanding Predominance Requirement of Rule 23(b)(3).

Rule 23(b)(3) requires Plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Although governed by the same preponderance-of-the-evidence standard as the other Rule 23 determinations, *see Mielo*, 897 F.3d at 484, the Supreme Court has recognized that, "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)[,]" *Comcast*, 569 U.S. at 34 (requiring a "rigorous analysis" of predominance).

1.    **Plaintiffs Have Not Proffered a Model for Calculating Damages on a Class-Wide Basis That Is Consistent with Their Different Theories of Liability.**

To meet their burden under Rule 23(b)(3), Plaintiffs must proffer a damages model that meets two requirements: (1) it must demonstrate that damages are capable of measurement on a class-wide basis, and (2) it must be consistent with Plaintiffs' theories of liability.  *Id.* at 35–36;[13] *see also Forrand v. Fed. Exp. Corp.*, No. 08-1360, 2013 WL 1793951, at *3 (C.D. Cal. Apr. 25, 2010) ("in order for Rule 23(b)(3)'s predominance requirement to be satisfied, a plaintiff must bring forth a measurement method that can be applied classwide *and* that ties the plaintiff's legal theory to the impact of the defendant's allegedly illegal conduct").  Plaintiffs have failed to meet both requirements.

a.    The Incontrovertible Inexperience of Plaintiffs' Expert Removes Any Assurance that Plaintiffs Can Present a Damages Model at All.

Fatally, Plaintiffs have not presented any damages model whatsoever.  "[T]o pass a rigorous analysis examination a ***Plaintiff must do more than state a formula that could be used***

---

[13] Defendants are aware that this Court has previously suggested *Comcast* applies only to antitrust cases.  *See Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 487 (E.D. Pa. 2021) (citing *Neale v. Volvo Cars of N.A., LLC*, 794 F.3d 353, 374 (3d Cir. 2015)).  That may be true in this Circuit with respect to *Comcast*'s specific analysis as it applied to plaintiffs' antitrust theories and proposed classwide damages model (which is an issue that Defendants expressly preserve for appeal).  Yet, the Third Circuit went on to explain that its "reading of *Comcast* is consistent with decisions by several of our sister courts" and expressly endorsed the First Circuit's decision in *In re Nexium Antitrust Litig.*, 777 F.3d 9, 23 (1st Cir. 2015) for the proposition that "***at class certification, the damages calculation must reflect the liability theory***."  *Id.* (emphasis added); *see, e.g.*, *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) (requiring damages model at class certification stage); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) (same); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (same).  Indeed, the Fifth Circuit has upheld denial of class certification based on *Comcast* in a securities class action.  *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 688 (5th Cir. 2015) (affirming denial of class certification because "[i]f certain corrective events were later determined to be independent of the misrepresentations, but those corrective events could not be disaggregated from the damages model, the plaintiffs would travel to a place forbidden by *Comcast*").

to calculate class-wide damages." *Chudner v. TransUnion Interactive, Inc.*, No. 09-433-ER, 2010 WL 5662966, at *1 n.1 (D. Del. Dec. 15, 2010) (emphasis added); *see, e.g.*, *In re Hydrogen Peroxide Antitrust Litig*, 552 F.3d at 318 ("The evidence and arguments a district court considers in the class certification decision call for rigorous analysis. A party's assurance to the court that it intends or plans to meet the requirements is insufficient."); *Newton*, 259 F.3d at 187–88 (rejecting plaintiffs' attempt "to gloss over" predominance requirement based on their claim that a formula *could* be devised to measure damages). Rather, Plaintiffs must present a damages model that allows "the Court [to] understand, concretely, how plaintiffs propose to reliably establish damages." *Sicav v. Wang*, No. 12-6682, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015).

Plaintiffs that "fail[] to provide the Court any explanation as to how objective values will be calculated," fail the "rigorous [predominance] analysis." *Chudner*, 2010 WL 5662966, at *1 n.1. Thus, "[w]hen a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts . . . . that there are unspecified 'tools' available to measure damages, the model amounts to '*no damages model at all*,' and the class cannot be certified." *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 08-0160, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (emphasis added) (rejecting class certification in securities case because merely referencing "unspecified 'valuation tools'" was insufficient to establish that damages could be measured on a class-wide basis), *reversed on other grounds Ohio Pub. Emps.' Ret. Sys. v. Federal Home Loan Mortg. Corp.*, 64 F.4th 731 (6th Cir. 2023); *see also, e.g.*, *Sicav*, 2015 WL 268855, at *6 (denying class certification in securities case because "plaintiffs have not shown or explained, concretely, how damages would be calculated"); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) (finding "[a]lthough the methodologies he describes may very well be

- 24 -

capable of calculating damages in this action, [plaintiff's expert] has made no showing that this is the case").[14]

Here, Plaintiffs rely exclusively on Dr. Orlov's report to "demonstrate[] that per-share damages can be determined on a class wide basis" using an event study, estimating inflation, and "mechanically" calculating damages on an individual basis. Pls.' Cert. Mot. at 25. Dr. Orlov asserts that "damages in this matter are *capable* of being calculated on a class-wide basis using well-established economic methods commonly applied in securities litigation." Orlov Report ¶ 97 (emphasis added). Dr. Orlov's report provides nothing more than vague gestures towards what damages would typically look like in a generic securities case, thereby completely—and improperly—ignoring the facts of this case. *Id.* ¶¶ 98–100 (explaining that "typically" damages are measured using an "out-of-pocket" framework and that "[e]conomists commonly estimate artificial inflation using event study techniques . . . [d]epending on the facts" of the particular case other "tools" can be used); *id.* ¶ 97 n.65 ("I have not yet been asked to determine the level of inflation in Five Below's stock."). In fact, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. *See* Orlov Dep. at 232:7–233:11 (▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆) (emphasis added); *id.* at 269:7–10; *see also id.* at 194:4–14. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Orlov Dep. at 82:13 ("▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆"). Thus, the mere reference to an event study

---

[14] Damages arising from a Rule 10b-5 violation are calculated as the price inflation caused by the company's alleged misrepresentations at the time an investor purchased shares, less "inflation" remaining in the stock at the time the investor sold those shares, with "inflation" being the price of the stock less what the price of the stock would have been if the company had not misled the market. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

methodology, without showing or explaining, concretely, how it will be tailored to address Plaintiffs' theories of liability and reliably measure damages in this case, falls short of satisfying *Comcast*'s requirements. *See Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141–42 (S.D.N.Y. 2014) (acknowledging that plaintiffs did not need to perform calculations at class certification stage, and concluding that plaintiffs had to present a precise enough "specification of the damages calculation method . . . to assure that the model is in fact linked with the theory of liability"); *Ohio Pub. Emps.' Ret. Sys.*, 2018 WL 3861840, at *19; *see also, e.g.*, *Sicav*, 2015 WL 268855, at *6; *In re ConAgra Foods, Inc.*, 302 F.R.D. at 552.[15]

Further, Dr. Orlov baldly states that for a securities case, "[e]conomists commonly estimate artificial inflation using event study techniques." Orlov Report 1 at ¶ 99. But he admits he has not yet performed any such inflation calculation ***for this action***, undoubtedly for the simple reason Plaintiffs "have not yet [asked him] to determine the level of inflation in Five Below's stock." *Id.* ¶ 97 n.65. That is particularly problematic because it is undisputed Dr. Orlov has not presented a damages model in a securities class action before.[16]  *See* Orlov Report at Appendix A at 41 (listing all of Dr. Orlov's prior reports and declarations); Orlov Dep. at 218:20 (███████████████ s

---

[15] *See also In re Montano*, No. 7-1026, 2013 WL 2244216, at *7 (Bankr. D.N.M. May 21, 2013) ("If in fact . . . damages could be measured class-wide, Plaintiffs had an obligation to come forward with evidence thereof. They did not, and *Comcast* does not allow them the luxury of waiting until trial.").

[16] While Dr. Orlov's *curriculum vitae* filed in this case is devoid of any information (*see* Orlov Report at Appendix A), in at least one other action (non-securities class action), he filed a detailed *curriculum vitae*, showing that none of the his prior experiences involve securities class actions, all of the damages work described was related to ill-gotten gains or disgorgement and ***not*** investor loss, and it does not mention having any experience with calculating investor loss or event studies. *See* Ex. E, Expert Report of Evgeny (Eugene) Orlov, Ph.D., *S.E.C. v. Cambridge Inv. Rsch. Advisors Inc.*, No. 22-00071, ECF 213, Appendix A at 29–30 (S.D. Iowa June 10, 2024) ("Orlov Cambridge Report").

███████████████████████████).[17] Because Dr. Orlov has not presented a damages model here and has never prepared one before, Plaintiffs are asking the Court to solely rely on Dr. Orlov's "say-so" that he could present—for the *first time*—a class-wide damages model at trial.[18] Such request is fundamentally at odds with Plaintiffs' obligations under *Comcast, see* Orlov Dep. at 219:19–220:12 (█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████). *Cf. Ft. Worth*

---

[17] ████████████████████████████████████████████████
████████████████████████████. *Id.* at 269:16–269:22 (████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████); *id.* at
293:19–294:25 (████████████████████████████████████████████████████
███████████████████████). However, these two cases involving the SEC involved completely different analyses than this action. *See* Orlov Cambridge Report; Ex. F, Expert Report of Evgeny (Eugene) Orlov, Ph.D., *S.E.C. v. Ballout*, No. 24-81170, 2025 WL 1627432 (S.D. Fla. Apr. 3, 2025) ("Orlov Ballout Report"). In those two cases, Dr. Orlov analyzed how much investors overpaid in fees because their holdings were allegedly placed into higher-fee share classes despite lower-cost alternatives being available. *See generally* Orlov Cambridge Report; Orlov Ballout Report. He calculated damages by multiplying the value of investor holdings by the difference between actual and but-for expense ratios (the percentage of holdings value paid as a fee). Thus, his damages analyses were not based on an analysis of stock price inflation or changes in the stock price caused by alleged corrective disclosures.

[18] However, in at least one prior case (non-securities class action), Dr. Orlov has taken a completely opposite position than he has here. ███████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████. Orlov Dep. at 235:15–20 (███████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████).
In at least one prior case, he opined that individuals who purchased stock after the first misstatement but who sold prior to the corrective disclosure did ***not*** experience any harm. *See* Orlov Ballout Report ¶ 38 ("Only investors who purchased [the company's] stock between [the first misstatement], and [the corrective disclosure], and still held or sold that stock after [the corrective disclosure], suffered monetary harm as a result of the fraud.").

*Emps. Ret. Fund*, 301 F.R.D at 141–42 (denying class certification in securities case because "without assurance beyond [the plaintiffs' expert's] say-so, the [c]ourt cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis"); *Smith v. LifeVantage Corp.*, 341 F.R.D. 82, 114–15 (D. Utah 2022) (finding court cannot rely on "conceptual punts or rainchecks for another day"); *see also Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 240 (D. Minn. 2020) (finding proposed methodology to be unsupported because the expert has "never performed" such surveys previously).  Consequently, the Court should deny class certification because Plaintiffs have simply failed to present any damages model at all.  *See Ohio Pub. Emps.' Ret. Sys.*, 2018 WL 3861840, at *19; *Sicav*, 2015 WL 268855, at *6; *In re ConAgra Foods, Inc*., 302 F.R.D. at 552.

b.    <u>Plaintiffs Fail to Explain How to Calculate Damages Attributed to Their Two Theories of Liability.</u>

Even if Plaintiffs' bare assertion that class-wide damages ***could*** be calculated is sufficient (and it is not), class certification is still improper because Plaintiffs have not presented a damages model that is consistent with either of their theories of liability.

Plaintiffs have failed to explain how Dr. Orlov will separately calculate damages attributable to their only remaining theories of liability (*i.e.*, Trend-Right Statements and Shrink Statements).  Securities-class-action plaintiffs that allege "multiple alleged misrepresentations," "correct information was allegedly disclosed at multiple times," "correct information regarding different alleged misrepresentations was allegedly disclosed on the same day," and "some of the allegedly concealed facts arose or were made known to the company . . . during the class period," must account for various theories of liability in their damages model.  *Loritz v. Exide Techs.*, No. 13-02607, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015).  Damages models that fail to do so are insufficient to survive class certification in securities cases.  *In re BP p.l.c. Sec. Litig.*,

- 28 -

No. 10-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013); *see also Loritz*, 2015 WL 6790247, at *22 (denying class certification because plaintiff's expert "discusses general techniques for computing damages in securities fraud cases" but "fails to tie these theories to the facts of this case or to each other").

*In re BP p.l.c. Sec. Litig.* is particularly instructive here. There, the plaintiffs presented an event study as the proposed damages methodology for a securities class action. 2013 WL 6388408, at *16. In turn, the defendants identified multiple ways in which the damages model was inconsistent with plaintiffs' theories of liability, including in part that "[t]he model does not disaggregate 'inflation' according to the type of misrepresentation corrected or risk disclosed." *Id.* In further responding, the plaintiffs "claim[ed] that their event study—which . . . has not yet been created—will provide options to the jury to disaggregate inflation by the type of misrepresentation, should the jury agree with [the d]efendants that the misrepresentations were not part of a single, cohesive fraudulent scheme." *Id.* at *17. The court reasoned the plaintiffs' retorts "only crystallize[d] [the d]efendants' point that [the p]laintiffs have failed to meet ***their burden*** of showing that damages can be measured on a class-wide basis consistent with their theories of liability." *Id.* (emphasis in original). The court held that, "[w]ithout a more complete explication of how [the p]laintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability, the [c]ourt cannot certify this litigation for class action treatment." *Id.* Thus, the court denied class certification. *Id.*

Here too, Plaintiffs base their theory of liability on two separate types of alleged misrepresentations and omissions (Shrink Statements and Trend-Right Statements) and attempt to use an event study to calculate damages. *See* Pls.' Cert. Mot. at 3, 25. Yet, Dr. Orlov has not

explained how he can separately calculate damages attributable to either of these types of misrepresentations. *See* Orlov Report ¶ 101 (merely asserting that an event study "is sufficiently flexible" and certain tools can be used to estimate inflation). Dr. Orlov, therefore, entirely fails to explain how his proposed methodology could accommodate alternative liability findings. Nor have Plaintiffs addressed whether the two separate theories they seek to advance on behalf of the class (based on two different types of unrelated alleged misstatements, Shrink Statements and Trend-Right Statements, spanning over an eighteen-month period) can be translated into a single damages model. *See* Pls.' Cert. Mot. at 25. Like the plaintiffs in *In re BP p.l.c. Sec. Litig.*, here Plaintiffs have wholly failed to meet their burden of demonstrating how the event study will incorporate and respond to their two types of alleged misrepresentations, and the Court should deny class certification on this basis.[19]

c.    <u>Plaintiffs Fail to Explain How to Isolate Inflation Accounting for Confounding Information.</u>

Plaintiffs have failed to explain how their damages model will isolate inflation to exclude the effect of confounding information, which is fatal to certification. Under *Comcast*, "a class action is improper unless the theory of liability is limited to the injury caused by the defendants. In other words, the defendants cannot be held liable for damages beyond the injury they caused." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015). Accordingly, damages models fall "far short of establishing that damages are capable of measurement on a classwide basis," when they fail to distinguish between unrelated facts (including dismissed liability theories) and

---

[19] Moreover, "[there is a] possibility that some of [the] alleged misrepresentations may not survive summary judgment, or may not be found meritorious at trial. *Comcast* suggests that a damages model which cannot accommodate variations in the liability findings may be grounds for decertification at a subsequent stage of the case." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 n.16.

potentially actionable liability theories. *See Comcast*, 569 U.S. at 34.  Indeed, at least one court refused to consider an expert's approach in a securities case a methodology at all, when it did "not even purport to differentiate between forces related to the fraud and those not related to the fraud." *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1273 (N.D. Okla. 2007); *see In re Vaxart, Inc. Sec. Litig.*, 738 F. Supp. 3d 1259, 1265–67 (N.D. Cal. 2024) (denying class certification in securities case because proposed damages model did not account for confounding facts); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 490, 494–95 (N.D. Cal. 2008) (same).

The Supreme Court's ruling in *Comcast* dictates this result.  The plaintiffs asserted claims under multiple theories, alleging that each resulted in consumers paying artificially inflated prices. *Comcast*, 569 U.S. at 31.  The district court accepted just one of these theories, dismissed the others, and proceeded to certify a class.  *Id.* at 31–32.  The Supreme Court reversed, holding that the district court erred in certifying the class.  *Id.* at 35.  The Court reasoned that "[i]f [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from" the only remaining liability theory.  *Id.*  "It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.*

Here, Plaintiffs' damages model wholly fails to control for any confounding information. This is dispositive to the certification question for at least four independent reasons.

*First*, Dr. Orlov does not reveal whether or how he would factor out "inflation" caused by the alleged misstatements that the Court dismissed.[20]  He merely states that "[e]conomists

---

[20] While Dr. Orlov lists the Court's Order as material he reviewed (*see* Orlov Report at Appendix B at 43), he solely cites the Amended Complaint in his Report (*see id.* at 61-1, Ex. 1 at 3 nn.1–2). He, thus, totally ignores that the Court's Order significantly reduced Plaintiffs' theories of liability

commonly estimate artificial inflation using event study techniques," and admits that he has not considered "inflation" in Five Below's stock. Orlov Report at ¶¶ 97–99 & n.65; *see also* Orlov Dep. at 270:8–271:2. Like *Comcast*, Plaintiffs' expert's damages "model did not isolate damages resulting from any one theory," instead "assum[ing] the validity of all []theories . . . initially advanced by [plaintiffs] . . . and [did] not attribute damages to any one particular theory." *Comcast*, 569 U.S. at 32, 36–37. This case, therefore, fits precisely within the *Comcast* paradigm, foreclosing class certification.

*Second*, Dr. Orlov also does not reveal whether or how he would factor out any stock price decline caused by the announcement of the departure of Mr. Anderson on July 16, 2024. As noted above, he solely states that it is common for economists to estimate inflation using event study techniques. Orlov Report at ¶¶ 97–99 & n.65; Orlov Dep. at 270:8–271:2 (

); *see also id.* at 266:2–20 (

). 

 Orlov Dep. at 253:5–10. However, Dr. Orlov himself has admitted, in at least one other expert report submitted to a federal court (in a non-securities class action context) that, "if an event occurs at the same time as the market learns other news about the stock, ascribing the stock price reaction to the event at issue ***may not be possible*** or may require additional steps." Orlov Ballout Report ¶ 20 (emphasis

---

to only about 19 alleged actionable misrepresentations and dismissed that Mr. Anderson's departure could be considered a corrective disclosure for loss causation. *See* Order at 1–2; Mem. Op. at 68 (finding that "announcement of Anderson's departure in no way corrects prior misleading statements about trend right and shrink losses and, therefore, does not by itself serve to establish loss causation").

added).  Thus, Dr. Orlov's failure to explain how Plaintiffs plan to disaggregate inflation based on dismissed facts warrants denial of class certification.  *See Comcast*, 569 U.S. at 32, 36–37.

*Third*, Dr. Orlov has not proposed a methodology that is capable of reliably measuring inflation associated with a concealed or understated risk.  Here, the Company warned investors that it must keep a balanced total product mix of trending and non-trending products to be successful.  MTD, Ex. I, at 26 (if its "buying decisions do not accurately predict customer trends or purchasing actions," it will negatively impact the Company's results); *id.*, Ex. D at 19 (Mar. 16, 2023) ("disruptions in [its] ability to select, obtain, distribute and market merchandise profitably [could impact the Company's financial results]").  It also warned investors that shrink could negatively impact the Company's financials.  *Id.*, Ex. I at 26 ("[its] profitability and cash flows from operations may be negatively affected if we are not successful in managing our inventory balances and inventory shrinkage").  Indeed, Plaintiffs admit that the "corrective" disclosures "revealed the materialization of the ***foreseeable risks*.**"  AC ¶ 322 (emphasis added).  "The residual stock price decline on a day when a risk materializes measures the value impact of that realization of risk, not the value impact of a hypothetical earlier disclosure of the concealed risk."  *See* Marietta-Westberg Report ¶ 112.  A reliable damages model here must measure inflation associated ***only*** with the risk that was concealed.  *Id.* ¶ 110.  Because Dr. Orlov fails to explain how his damages model can consider concealed or unstated risks, Plaintiffs' damages model is not consistent with their theory of liability.  Orlov Dep. at 238:13–23 ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)

(emphasis added).  Indeed, ▮▮▮▮▮▮

███████████████████████████. *See* Orlov Dep. at 175:2–178:4 (t████████████████████

██████████████████████████████████████████████████████████████████████████

█████████████████████████████).

*Fourth*, Dr. Orlov does not reveal how or whether he would factor out inflation caused by facts other than the purported misstatements. At the same time as the alleged corrective disclosures, analysts commented that Five Below's disappointing sales results were because of a multitude of factors, including increased competition. *See, e.g.*, Ex C at 1 (explaining "soft comp trend" was likely due to a combination of factors, including "increased competition from mass merchants, like Walmart [. . .] and online retailers, like Temu"); Ex. D at 2 (remarking that "the prospect that competition could be having some impact" on Five Below's sales). Dr. Orlov does not describe how his damages model controls for confounding information and he fails to state how it would isolate only the portion of the stock price decline attributable to the release of allegedly corrective information (and not other factors). *See* Orlov Dep. at 253:7–253:10 ("████████

██████████████████████████████████████████████████████████████████████████

█████████████████████████). Such failure will cause putative class members' damages to be overstated. Indeed, Dr. Orlov merely provides examples of "standard representations" of inflation ribbons: "a constant dollar inflation ribbon or a constant percentage inflation ribbon," Orlov Report ¶ 100; however, he does not articulate which analytical tools he would use to reliably control for confounding information and limit recoverable damages to the portion of the stock price decline attributable to the release of allegedly corrective information, or to reliably measure inflation during the proposed Class Period.

Each of these reasons—both individually and collectively—mandates denial of class certification. *See Comcast*, 569 U.S. at 32, 36–37 (denying class certification where plaintiffs'

damages model did not reliably measure damages based on plaintiffs' theory of liability); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1273.

## 2. Defendants Have Rebutted the *Basic* Presumption of Reliance.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action[,]" which in a private securities-fraud claim includes "reliance upon the misrepresentation or omission." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10 (2011) ("*Halliburton I*").[21]  Plaintiffs in securities fraud class actions can establish a class-wide presumption that investors relied on any misrepresentations reflected in a security's market price. *Basic v. Levinson*, 485 U.S. 224 (1988).[22]

---

[21] As explained above, damages arising from a Rule 10b-5 violation are calculated as the price inflation caused by the company's alleged misrepresentations at the time an investor purchased shares, less "inflation" remaining in the stock at the time the investor sold those shares, with "inflation" being the price of the stock less what the price of the stock would have been if the company had not misled the market.  *See supra* n.14 (quoting *Dura Pharms*, 544 U.S. at 347).

[22] Plaintiffs still have not met their burden to show that the market is efficient such that the presumption applies.  *See* Orlov Dep. at 194:5–14.  "[C]ourts may look to a non-party investment adviser's knowledge in determining reliance, where that investment adviser invests on behalf of institutional plaintiffs." *Villella v. Chemical & Mining Co. of Chile Inc.*, No. 15-cv-2106, 2018 WL 2958361, at *4–5 (S.D.N.Y. June 13, 2018) (granting motion for issuance of letter of request seeking documents relating to investment manager's decisions in a Section 10(b) and Rule 10b-5 class action because "[w]here, as here, a plaintiff wholly outsources their decision making to an investment adviser who acts as their agent, that agent's decision-making calculus is relevant to the reliance inquiry."); *see also Radiation Dynamics, Inc. v. Goldmuntz*, 323 F. Supp. 1097, 1099 (S.D.N.Y. 1971) (finding that, where plaintiff authorized its broker to sell plaintiff's stock, "[t]he plaintiff is chargeable in the transaction with whatever its agent knew in negotiating the sale . . . the knowledge of an agent is the knowledge of his principal, although the information may never have actually been communicated to the principal.").  Here, P ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *See, e.g.*, Ex. G, Deposition Excerpt of Amy Fecher (30(b)(6) Representative of APERS), at 39:19– 25 (Feb. 11, 2026) (████████████████████████████████████ ████████████████████████████████████████████████████). Therefore, any knowledge or views held by Plaintiffs' investment advisors are imputed to Plaintiffs for purposes of reliance, and those views are fatal to the presumption.  ████████ ████████████████████████████████████████████████████ ████████.  *See* Ex. H, Deposition Excerpt of Samuel Chase (30(b)(6) Representative of

Absent that presumption, individual questions of reliance will predominate, making class certification inappropriate. *See Halliburton II*, 573 U.S. at 267–68.

The *Basic* presumption of class-wide reliance is rebuttable. Defendants can rebut the *Basic* presumption by showing that the alleged misstatement "did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'" *Id.* at 263–64. Such a showing eliminates the contention that an investor relied on the misrepresentation in relying on the integrity of the market price, "completely collaps[ing]" the fraud-on-the-market theory. *Id.* at 283. In fact, "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff" is sufficient to rebut the presumption. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) ("*Goldman*") (citation omitted).[23]

Here, Plaintiffs appear to solely plead an inflation-maintenance theory. *See* AC ¶¶ 316, 347 ("[alleged mis]statements and omissions artificially inflated or maintained the artificial inflation of the price of Five Below common stock" and "artificial inflation was removed from the stock price when the true facts became known"); *see infra* Section V.A.2.c. In an inflation-maintenance scenario, "the misrepresentation prevents preexisting inflation in a stock price from dissipating, but does not cause a price uptick. Instead, the back-end price drop—what happens

---

Stephens Investment Management Group), at 142:18–23 (Feb. 18, 2026) ("Chase Dep.") (███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████); Ex. I, Deposition Excerpt of Gregory Baxter (30(b)(6) Representative of CastleArk Management, LLC), at 43:16–24, 93:14–16 (Feb. 20, 2026) (████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████).

[23] Despite *Goldman*'s importance in securities cases, ████████████████████████ *See* Orlov Dep. at 83:3–8 (████████████████████████████████████████ ████).

when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price. Simply put, the theory goes: back-end price drop equals front-end inflation." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023) ("*ATRS*") (citation omitted). However, the "inference . . . that the back-end price drop equals front-end inflation . . . starts to break down when there is a ***mismatch*** between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 594 U.S. at 123 (emphasis added).

But there must be "a close[] fit (even if not precise) between the front- and back-end statement" for a class to be certified. *ATRS*, 77 F.4th at 99 n.11; *see In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-4953, 2024 WL 1342800, at *11 (S.D.N.Y. Mar. 29, 2024) (denying class certification because of "substantive mismatch" between misstatement and corrective disclosures). "[A]s a rule of thumb, a more-general statement will affect a security's price less than a more-specific statement on the same question" such that the price impact will be undermined. *Goldman,* 594 U.S. at 122 (citation omitted); *see Shupe v. Rocket Cos.*, 752 F. Supp. 3d 735, 781–82 (E.D. Mich. 2024) (finding no price impact where alleged misrepresentations were general comments about business).

This analysis must be conducted on a statement-by-statement basis, and courts can reject class certification as to a subset of the challenged statements. *See, e.g.*, *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-01580, 2019 WL 5287980, at *25–39 (S.D.N.Y. Oct. 18, 2019), *report and recommendation adopted in relevant part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) (price impact rebutted as to one of seven alleged corrective disclosure dates); *In re Intuitive Surgical Sec. Litig.*, No. 13-01920, 2016 WL 7425926, at *14–17 (N.D. Cal. Dec. 22, 2016) (separately analyzing price impact rebuttals on five different dates and finding no price impact on two dates);

*Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269–80 (N.D. Tex. 2015) (price impact rebutted as to five of six alleged disclosure dates).

Accordingly, the Court here must separately analyze the Shrink Statements and the Trend-Right Statements. As to each, there is compelling evidence refuting price impact and rebutting the *Basic* presumption of reliance, rendering class certification improper.[24]

> a.    Defendants Have Shown Lack of Price Impact for the Alleged Shrink Misstatements.

There is ample evidence for the lack of price impact as to the Shrink Statements, rebutting the presumption of reliance. Only seven alleged Shrink Statements survived Defendants' motion to dismiss. When grouping these seven statements into two categories, there is a complete and utter mismatch for both groups of misstatements compared to any later purported "corrective disclosures" identified by Plaintiffs' Amended Complaint.

*First,* price impact is eviscerated for the first group of Shrink Statements. This group of alleged misstatements only concern the extent of shrink, explaining that the Company generally experienced higher shrink in 2022 than 2021, and that the Company's earnings per share for the fourth quarter of 2023 was lower than predicted because of higher-than-expected shrink:

- "[Company experienced] higher-than-expected shrink [and that] [o]n an annual basis, shrink for 2022 was approximately 30 basis points higher than what we experienced in 2021," AC ¶ 228;

- "[d]espite these strong sales results, earnings per share of $3.65 was at the low end of our internal expectations and can be fully attributed to higher-than-planned shrink [for the fourth quarter of 2023]," *id.* ¶ 235.[25]

---

[24] Indeed, ███████████████████████████████████████████████
████████████████████████████████████ *See* Orlov Dep. at 193:2–6 (███████████
████████████████████████████████████████████████████████████
████████████████████████████████████).

[25] It is unclear whether the alleged misstatement in AC ¶ 233 remains in the action. *Compare* Mem. Op. at 39 & n.25 ("[s]pecifically, statements about shoplifting and theft in paragraphs 231,

Comparing to the "corrective" disclosures, the most relevant portions solely speak to the Company's sales and net income for the ***first quarter of 2024*** and comparable sales as compared to July 2023. *Id.* ¶ 164 (alleged corrective disclosure on June 5, 2024 when Five Below announced that comparable sales had decreased by 2.3%, net income had declined 16% and, as a result, investor diluted income per common share dropped 15%); *id.* ¶ 180 (alleged corrective disclosure on July 16, 2024 when Five Below also announced that sales had a decline of comparable sales from 5% over the same period the last year, expected a 6-7% decrease in comparable sales for the entire quarter, and as a result, the "diluted income per common share" was expected to be between $0.53 and $0.56, which was below the forecast range announced six weeks prior in the June earnings call).

This is a clear substantive mismatch. *First*, shrink does ***not*** impact the Company's sales because the Company records shrink as a ***cost/expense***, as outlined to investors in the Company's Form 10-Ks. MTD, Ex. V at 51–56 (2020 Form 10-K balance sheet showing "inventories" under "changes in operating assets and liabilities," and explaining "inventories" includes shrink); *id.*, Ex. I at 53–59 (same for 2021 Form 10-K); *id.*, Ex. D at 51–57 (same for 2022 Form 10-K); *id.*, Ex. Q at 52–57 (same for 2023 Form 10-K).[26] *Second*, the alleged misstatements concern the Company's

---

232, 234, and 236 are actionable, as are Defendants' general statements about shrink in paragraphs 228, ***233***, and 235") (emphasis added), *with* Order at 1–2 (dismissing ¶ 233 from the action). Nevertheless, the alleged misstatement in ¶ 233 similarly only concerns the extent of shrink, and there is a clear substantive mismatch to the alleged corrective disclosures. *See infra* 38–39.

[26] It is also widely accepted that shrink is classified as a cost/expense (and, thus, does not impact sales). *See , e.g.*, Madis Kuuse, *Inventory Shrinkage – Causes, Consequences, and Tips*, MRPEASY (Nov. 28, 2023), https://www.mrpeasy.com/blog/inventory-shrinkage/ ("[W]hen shrinkage occurs, it is recognized as a reduction in the value of inventory. This reduction is treated as an expense"); Oliver Munro, *Inventory Shrinkage: Definition, Causes, Journal Entry*, ACCESS GRP. (May 15, 2023), https://www.unleashedsoftware.com/blog/inventory-shrinkage/ ("When you experience inventory shrinkage in your business, you need to account for those losses by raising your shrinkage expense[s] . . . and reducing your inventory credit"); CFI Team, *Inventory Shrinkage*, CFI EDUC., INC, https://corporatefinanceinstitute.com/resources/accounting/inventory-

shrink levels for 2022 and for the fourth quarter of 2023, AC ¶¶ 228, 235, whereas the "corrective" disclosures only discuss the Company's quarter-to-date financial results for the first quarter of 2024 and guidance for the full quarter for the second quarter of 2024, *id.* ¶¶ 164, 180. *Third*, the alleged "corrective" disclosures did not address whether the prior alleged misstatements regarding shrink were true, nor did they blame increased shrink for the decline in sales for the first quarter of 2024, which was announced in June 2024. *See* MTD, Ex. H at 4; *id.*, Ex. A at 6. Thus, there is a "mismatch between the contents of the misrepresentation and the corrective disclosure," as statements regarding sales cannot "correct" statements concerning the extent of shrink, making inappropriate the inference that "the back-end price drop equals front-end inflation." *Goldman*, 295 U.S. at 123; *see In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *11 (finding a "substantive mismatch" between the alleged misstatement, which addressed only "future targets," compared to corrective disclosures, which spoke to "rigid requirements at the time of acquisition").

*Second*, price impact is also eviscerated for the remaining Shrink Statements. This group of Shrink Statements are Defendants' general comments regarding the cause and the extent of shrink in the retail industry:

- "I think you're all familiar with the recent media and videos that are out there where retailers across the sector are experiencing increased levels of shrink and related crime incidents[,] and we are not immune to this as we're finding out." AC ¶ 231;

- explaining that shrink as theft was not being prosecuted and was impacting other retailers, like Target and Wawa, *id.* ¶ 232;

---

shrinkage/ ("[I]nventory shrinkage should be recorded as an expense in the financial period in which it occurred").

- discussing shrink, adding "and what it really means, is theft[,] [t]heft is real, it's impacting all retailers[, and] this is a real societal problem and we've got to lean together with the politicians to figure this out," *id.* ¶ 234; and

- "shrink is industry-wide and a societal problem that accelerated over the last year," *id.* ¶ 236.

There is again a clear substantive mismatch compared to the "corrective" disclosures because the alleged disclosures did not even discuss the cause and extent of shrink. *Cf. id.* ¶¶ 165, 204 (announcing Five Below's sales results for the first quarter of 2024 and need to reduce the amount of products the Company was stocking—*i.e.*, that the Company was over SKU-ed—on June 5, 2024); *id.* ¶¶ 179–80 (announcing updated sales results for the first quarter of 2024 and comparable sales results on July 16, 2024). The corrective disclosures are wholly unrelated to the alleged misrepresentation, thereby totally undercutting any price impact. The price connection between the alleged corrective disclosures and alleged misrepresentations further breaks down because this category of Shrink Statements includes highly generic statements that merely describe shrink's impact on the retail industry. *Goldman*, 594 U.S. at 122–23; *Shupe*, 752 F. Supp. 3d at 781–82 (finding no price impact where alleged misrepresentations were general comments about seeing a "strong consumer demand" in industry).

Moreover, contrary to Plaintiffs' theory, equity analysts that followed Five Below repeatedly recognized that increased shrink was impacting the entire retail industry (including Five Below). *See, e.g.*, AC ¶ 115 (William Blair reporting on June 2, 2023 that "[i]n line with many of its peers, Five Below highlighted increased pressures relating to shrink"); *id.* (Credit Suisse reporting on August 30, 2023 that Five Below "joined the long list of retailers embedding significant margin headwinds from shrink in their forward outlooks").

Finally, further undercutting Plaintiffs' theory, at the same time as the alleged corrective disclosures, there is evidence that Five Below's disappointing sales results were because of a

- 41 -

multitude of factors, including increased competition, inflation, and loss of federal assistance that was provided during COVID-19. *See, e.g.*, Ex B at 1 (explaining "soft comp trend" was likely due to a combination of factors, including "increased competition from mass merchants, like Walmart [. . .] and online retailers, like Temu"); *id.* at 1–2 ("The company saw the slowdown in all geographies, and it was more pronounced among lower income consumers . . . (partly as tax refunds were exhausted)."); Ex. C at 2 (remarking that "the prospect that competition could be having some impact" on Five Below's sales); *id.* at 2 ("[Five Below's] challenging comp is a result [in part] of pressure on lower income consumers (it noted it is seeing lower comps in stores levered to this demographic)."); *see also* MTD, Ex. F at 4 ("[i]t continues to be a challenging time for consumers with persistent inflation, lower tax refunds and fewer government-sponsored benefits compared to the stimulus fueled periods of the pandemic").[27]

Consequently, Defendants have shown a lack of price impact for the Shrink Statements because there is a mismatch compared to the "corrective" disclosures. *See Goldman*, 594 U.S. at 122–23. The Court should reject class certification as to the Shrink Statements.

---

[27] Defendants are aware of the Third Circuit's recent opinion in *San Diego Cty. Emps. Ret. Ass'n v. Johnson & Johnson*, No. 24-1409, 2025 WL 2176586, at *4 (3d Cir. 2025) in which the Third Circuit found that each alleged corrective disclosure could have communicated new information to investors and was followed by a stock price decline for which there was no other explanation than the disclosure itself (which is an issue that Defendants expressly preserve for appeal). However, the Court held that because the defendants did not present any other evidence to suggest that its alleged misrepresentations had no price impact, the defendants failed to sever the link between the alleged misrepresentations and the stock prices. *Id.* Here, Defendants have presented other evidence to suggest that the alleged misrepresentations had no price impact, including that the price impact was because of the release of disappointing financial results (unrelated to alleged misstatement), and the disappointing financial results *were because of a multitude of factors*. *See supra* 40–42.

        b.      <u>Defendants Have Shown Lack of Price Impact for the Alleged Trend-Right Misstatements.</u>

As to the Trend-Right Statements, there is also ample evidence for the lack of price impact, rebutting the presumption of reliance. The Trend-Right Statements that survived Defendants' motion to dismiss simply tout the Company's business plan for sourcing and delivering trending products.

Indeed, certain statements merely explain that from the fourth quarter of 2022 until the third quarter of 2023, Five Below's strength was that the Company is nimble and moved quickly to source and capitalize on trends. AC ¶ 211 ("teams continue to move quickly to adjust to changing customer preferences [in the fourth quarter of 2022]"); *id.* ¶ 212 ("we've got a good cadence with those [trends in the fourth quarter of 2022]"), *id.* ¶ 213 ("we're nimble and quick [with trends in the fourth quarter of 2022]"); *id.* ¶ 214 ("[w]e stay on top of hot trends and swiftly move [in the fiscal year 2022]"); *id.* ¶ 215(a) ("We monitor trends in the ever-changing tween and teen markets and are able to quickly identify and respond to trends."); *id.* ¶ 217 ("we can quickly capitalize on a trend [in the second quarter of 2023]"); *id.* ¶ 220 ("We . . . effectively capitalized on multiple trends."); *id.* ¶ 222 ("[the] flexibility of our model with our 8 worlds is unique and enables our teams to quickly introduce trend-right relevant products to our customers [in the 2022 fiscal year]"); *id.* ¶ 223 ("[In 2022 and 2023], chasing trends has always been a strength of ours. And we will continue to quickly identify and capitalize on trends, bringing them in-store quickly[.]"). The other statements explain that during this period—the fourth quarter of 2022 until the third quarter of 2023—the Company did deliver an assortment of trending products sourced from their merchants. *Id.* ¶ 211 ("stores are stocked and ready with an amazing assortment of value products that promises to delight our customers [for the fourth quarter of 2022 during the holiday season]"); *id.* ¶ 215(b) ("[w]e deliver an edited assortment of trend-right as well as

everyday products within each of our category worlds that changes frequently to create a sense of anticipation and freshness"); *id.* ¶ 216 ("we continue to be there for [customers], flexing our offering to bring them the Wow products they need and want [in the first quarter of 2023]"); *id.* ¶ 219 ("Our merchants have sourced . . . fresh and trend-right products at outstanding values [in the third quarter of 2023].").

In contrast, in the June 5, 2024 "corrective" disclosure, Defendants acknowledged the decrease in sales for the ***first quarter of 2024*** was because Five Below may have become "over SKU-ed" (*i.e.*, an increased product mix) and that it needed to refocus on a smaller number of products for that quarter. *Id.* ¶ 204. Mr. Bull explained to investors that Five Below had increased its product assortment during 2020 and 2021 to meet customer demand (in response to the COVID-19 pandemic) and that it no longer needed to stock such a wide assortment of those products. *Id.* ("[Five Below experienced a] double-digit percentage increase in SKUs versus pre-pandemic. And that's us becoming over SKU-ed and over-assorted . . . and we're going to get that back. . . . [W]e're going to . . . renew a focus in terms of reducing those SKUs.").[28]  Similarly, in the July 16, 2024 disclosure, Five Below did not discuss their trend-right strategy ***at all*** and instead solely reported on quarter-to-date financial results for the first quarter of 2024 and guidance for the full quarter for the second quarter of 2024 and announced Mr. Anderson's departure. AC ¶¶ 179–80; MTD, Ex. A at Ex. 99.1.

There is a clear substantive mismatch for the Trend-Right Statements. *First*, the Trend-Right Statements only discuss the Company's trend-right strategy from the fourth quarter of 2022 until the third quarter of 2023, which was successful as Five Below experienced increased sales

---

[28] *See also id.* ¶ 165 (explaining that because Five Below had too many products it was holding on to "older merchandise trends"); *id.* ¶ 285 (explaining "what we got away from was the core part of our business around . . . delivering an ***edited*** assortment trend product") (emphasis added).

during that period. AC ¶¶ 211–17, 219, 220, 222–23. In contrast, the "corrective" disclosures only discuss Five Below's financial results for the fourth quarter of 2023. *Id.* ¶¶ 165, 179–80. *Second*, as this Court explained in its Memorandum Opinion, that "Five Below was going to reduce SKUs does not necessarily support an inference that the company had lost its focus on identifying trend-right items during the class period. Defendants never stated that they *only* stocked trend-right items—rather, trend-right items helped drive store foot traffic and purchases of regular merchandise." Mem. Op. at 20–21.[29] Thus, that Five Below noted it should reduce the number of SKUs starting in the fourth quarter of 2023 does not correct or obfuscate earlier statements concerning Five Below's business strategy of sourcing and delivering trending products from 2022 until the third quarter of 2023.[30] *Third*, as this Court has held, "a mere announcement of poor performance does not suffice to support loss causation." Mem. Op. at 64. Indeed, "simply report[ing] results," does not correct the prior Trend-Right Statements. *Id.* at 65.

Accordingly, there is a substantive mismatch, as the "corrective" disclosures did not address Five Below's purported inability to execute its trend-right strategy during the fourth quarter 2022 until the third quarter of 2023. *Goldman*, 295 U.S. at 123; *see In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *11 (finding a "substantive mismatch" between the

---

[29] Mr. Anderson noted that it has "proven harder for us to lap some of the big trends from last year," and claimed "that's probably been the biggest difference from last year's outperformance to this year" *in regard to the Squishmallow trend in particular*. MTD, Ex. K at 8 ("Squishmallow's penetration begins to moderate here in the back half of the year. So [] first half of the year was much bigger than the back half of the year last year. And so I think that moderation will start to help as well. But I think that's probably been the biggest difference from last year's outperformance to this year being more in line with those that have discretionary categories.").

[30] Further contrary to Plaintiffs' theory, Mr. Anderson explained that Five Below was performing at the same level when compared to its competitors at sourcing and delivering trending products. AC ¶ 168 (explaining that Five Below's "quarterly research" asked "where do you go when you want fun, trend-right, high-value items," and "we have not seen some of the [competitors] move up the list on that").

alleged misstatement, which addressed only "future targets," compared to corrective disclosures, which spoke to "rigid requirements at the time of acquisition").

Moreover, a lack of price impact is also supported because the Trend-Right Statements were highly generic statements touting the Company's business strategy of sourcing and delivering trends using general descriptions as opposed to specific facts. *See, e.g.*, AC ¶ 213 ("And we're pretty nimble and quick. There's not a lot of bureaucracy at Five Below. When we identify something, we move really quick to get that in the store, test it and then push it out to the stores."); *id.* ¶ 214 ("[w]e stay on top of hot trends and swiftly move to capitalize on them."); *id.* ¶ 217 ("we can quickly capitalize on a trend"). Such generic statements about believing in the Company's business model clearly undercut any price impact. *See Goldman*, 295 U.S. at 123 (explaining price impact is undermined "when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')"); *Shupe*, 752 F. Supp. 3d at 781–82 (finding no price impact where alleged misrepresentations were general comments that the company's networks were "generally 'growing[,]'" and maintaining that "the upcoming 'cycles' would be good" for business).

Finally, like the Shrink Statements, as noted above, Plaintiffs' theory is also undercut because at the same time as the alleged corrective disclosures, there is evidence that Five Below's disappointing sales results were because of a multitude of factors, including increased competition, inflation, and loss of federal assistance that was provided during COVID-19. *See supra* 40–42.

Thus, the evidence supports that there is a lack of price impact for the Trend-Right Statements because there is a mismatch compared to the "corrective" disclosures. *See Goldman,* 594 U.S. at 122–23. The Court should, therefore, deny class certification as to the Trend-Right Statements.

- 46 -

c.        Plaintiffs Solely Plead an Inflation Maintenance Theory Here.

Plaintiffs may attempt to overcome the powerful evidence that there was no back-end price impact by invoking the price inflation theory.  In securities cases, plaintiffs "can either plead a price-inflation theory . . . or an inflation-maintenance theory." *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6.  Under the price inflation theory, "price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.'"  *Goldman*, 594 U.S. at 123. Alternatively, in an inflation-maintenance scenario, "the misrepresentation prevents preexisting inflation in a stock price from dissipating, but does not cause a price uptick[, and] [i]nstead, the back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price." *ATRS*, 77 F.4th at 80.

Plaintiffs appear to solely plead an inflation-maintenance theory here.  *See* AC ¶¶ 316, 347. The AC states that Plaintiffs' loss causation theory is that "[alleged mis]statements and omissions artificially inflated or maintained the artificial inflation of the price of Five Below common stock" and that "[t]he artificial inflation was removed from the stock price when the true facts became known." *Id.*; *see also ATRS*, 77 F.4th at 80 (in an inflation-maintenance theory case a "back-end price drop" occurs).  Indeed, the AC (and Plaintiffs' expert's report) contains no indication whatsoever that Plaintiffs are proceeding on a price inflation theory, and a class cannot be certified on an unpled theory.  *See In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6 (explaining plaintiffs must "***plead***" either price-inflation theory or an inflation-maintenance theory and considering whether plaintiffs' expert made clear which theory it was proceeding under) (emphasis added); *see also Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011)

("Class certification is not a time for asserting new legal theories that were not pleaded in the complaint."). As a result, a price inflation theory is not available to Plaintiffs in this case.

### B.    If the Class Is Certified, the Class Period Must Be Shortened.

In the event that the Court is inclined to grant Plaintiffs' Certification Motion in any respect, the Class Period should be shortened so that it spans from March 20, 2024 to July 16, 2024. "District courts are not bound by the class definition proposed by a plaintiff. Rather, courts have the authority to limit or modify class definitions in order to provide the precision needed for class certification." *Butela v. Midland Credit Mgmt. Inc.*, 341 F.R.D. 581, 591 (W.D. Pa. 2022) (citation omitted); *see, e.g.*, *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 682 (D. Md. 2018) (shortening class period in securities case based on dismissed misstatements); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 291 (D. Minn. 2018) (shortening class period in securities case because defendants rebutted alleged corrective disclosures).

Here, for the first fifteen months of the proposed Class Period (from December 1, 2022 until the earnings call on March 20, 2024), it is undisputed that Five Below had successful sales results, which were driven by strong-performing trend-right products. MTD, Ex. E at 4; *id.*, Ex. F at 4; *id.*, Ex. G at 4; *id.*, J at 4; *id.*, Ex. N at 4; Chase Dep. at 133:22–134:16 (testifying as Plaintiffs' investment advisor that Five Below's "comp sales" and "[t]ransactions" "were good . . . , for sure," for the first few months of the Class Period); *id.* at 106:8–18 (explaining that for the third quarter of 2023, "transactions are higher[, and s]o people are coming into the stores, which is usually a good sign"). Five Below also did not state that shrink had a disappointing impact on any financial results. MTD, Ex. E at 4; *id.*, Ex. F at 4; *id.*, Ex. G at 4; *id.*, J at 4; *id.*, Ex. N at 4. It was not until March 20, 2024 that the Company announced it experienced disappointing financial results and affirmatively stated shrink negatively impacted the Company's financial performance for the

- 48 -

fourth quarter of 2023.  *Id.*, Ex. H at 4 ("[d]espite these strong sales results, earnings per share of $3.65 was at the low end of [Five Below's] internal expectations and can be fully attributed to higher-than-planned shrink").

Accordingly, stockholders from December 1, 2022 to March 20, 2024, did not pay an artificially inflated price because Five Below was in fact delivering on its business strategy of sourcing and stocking trend-right products.  This is evidenced by Five Below's successful sales results.  *See* Marietta-Westberg Report ¶¶ 11–12, 79–81.  Moreover, Five Below did not "blame" shrink for disappointing financial results until March 20, 2024.  MTD, Ex. H at 4.  Consequently, if there is to be any Class Period at all, it should not start until March 20, 2024.  If the Court is not inclined to deny the Plaintiffs' Motion, the Court should shorten the Class Period from March 20, 2024 to July 16, 2024.

## VI.    CONCLUSION

For all of the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification.  Defendants request oral argument on this Motion.

March 13, 2026

Respectfully submitted,

**TROUTMAN PEPPER LOCKE LLP**

Mary M. Weeks (admitted *pro hac vice*)
Hannah Baskind (admitted *pro hac vice*)
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30062
Telephone: (404) 885-3000
Email: mary.weeks@troutman.com
Email: hannah.baskind@troutman.com

*/s/  Jay A. Dubow*
Jay A. Dubow (PA Bar No. 41741)
Erica H. Dressler (PA Bar No. 319953)
Katherine R. Hancin (PA Bar No. 335719)
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Telephone: (215) 981-4000
Email: jay.dubow@troutman.com
Email: erica.dressler@troutman.com
Email: katie.hancin@troutman.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on the 13th day of March 2026, a true and correct copy of the foregoing Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification was filed with the Clerk of Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*/s/  Jay A. Dubow*

Jay A. Dubow (PA Bar No. 41741)