# EXHIBIT F

**2025 WL 1627432 (S.D.Fla.) (Expert Report and Affidavit)**
United States District Court, S.D. Florida.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Benjamin BALLOUT, Mohamed Zayed, and William Fielding, Defendants.

No. 9:24-cv-81170.
April 3, 2025.

**Expert Report of Evgeny (Eugene) Orlov, Ph.D.**

**Name of Expert:** Eugene Orlov, Ph.D.
**Area of Expertise:** Accounting & Economics >> Finance
**Area of Expertise:** Accounting & Economics >> Accounting
**Representing:** Plaintiff
**Jurisdiction:** S.D.Fla.

**Table of Contents**

I. Expert Qualifications .................................................................................................................... 2
II. Case Background, Assignment, and Summary of Opinions ........................................................ 2
A. *Case Background* ....................................................................................................................... 2
B. *Assignment* ............................................................................................................................... 4
C. *Summary of Opinions* ............................................................................................................... 4
III. Background ............................................................................................................................... 5
A. *Enerkon's Corporate History* ................................................................................................... 5
B. *Academic Literature Documents Misconduct by Management Has Negative Effect on Value of* 6
*Companies and Harms Shareholders* ..........................................................................................
IV. Assessing Enerkon's Stock Price Inflation Associated with the Alleged False and Misleading Claims .... 8
*A. Event Study Analysis* ................................................................................................................ 9
Step 1: Determining the relevant event dates .............................................................................. 9
Step 2: Estimating predicted returns ........................................................................................... 11
Step 3: Calculating abnormal returns ......................................................................................... 12
Step 4: Conducting statistical tests ............................................................................................. 12
*B. Enerkon's Stock Price Was Inflated Starting at Least on March 8, 2021, through June 22, 2021* .............. 16
*C. Pecuniary Harm to Investors* ................................................................................................... 17
Appendix A: CV ............................................................................................................................ 19
Appendix B. Materials Relied Upon ............................................................................................. 22
Exhibits ......................................................................................................................................... 25

### I. Expert Qualifications

1. I am a Senior Financial Economist with the Office of Litigation Economics in the Division of Economic and Risk Analysis of the Securities and Exchange Commission ("SEC") at its Los Angeles Regional Office. In this role I provide financial, economic, and statistical analyses to assist the SEC in its investigations and enforcement actions. I joined the SEC in 2018. Prior to joining the SEC, I was employed for approximately thirteen years at Compass Lexecon, where I consulted on matters involving antitrust and financial economics. I have testified as an expert on behalf of the SEC in several litigations.

2. I have a Ph.D. in economics from Northwestern University with specialization in Applied Economics and Industrial Organization and a Master's degree in economics from New Economic School in Moscow, Russia. I have published academic articles in the *Review of Economics and Statistics, American Economic Journal: Micro,* and other journals. I have presented my research at major academic conferences, and I have also served as a referee for top academic journals. I have taught macroeconomics at the undergraduate level at Northwestern University. My curriculum vitae, which is included in this report as Appendix A, lists my publications and litigations, in which I was an expert witness.

3. In the preparation of this report, I have been assisted by SEC economists working under my direction. I receive a salary for my work at the SEC and that compensation depends neither on my participation as an expert in this matter, nor on the outcome of the matter.

## II. Case Background, Assignment, and Summary of Opinions

### A. *Case Background*

4. The complaint the SEC filed in this matter alleges that Benjamin Ballout ("Ballout") together with his associates Mohamed Zayed ("Zayed") and William Fielding ("Fielding") engaged in a fraudulent scheme to inflate the publicly traded stock of Enerkon Solar International, Inc. ("Enerkon").[1] The Complaint further alleges that certain Defendants subsequently profited from the scheme.[2]

5. According to the Complaint, Ballout schemed to inflate Enerkon's stock price through false and misleading statements and omissions in its public statements and disclosures to investors.[3] For instance:

i. In a press release dated March 9, 2021, Enerkon announced the completion of the initial acquisition of Coviklear Holdings International ("Coviklear"),[4] falsely claiming that Coviklear owned distribution rights to a new Covid-19 test device.[5]

ii. On May 3, 2021, Enerkon issued a press release misleadingly stating that it purchased "122 acres of commercial land to establish the planned 20 MW Solar and Hydrogen Plant facility,"[6] even though the land was residential and Enerkon never paid money for it to the landowner.[7]

iii. On May 11, 2021, Enerkon issued a press release misleadingly announcing its "first contingent order for the SARS2 COVID19 15 second 'Insta Test'" valued at $28 million per month,[8] even though the purported order was not legitimate.[9]

6. On June 22, 2021, the SEC suspended trading in Enerkon's stock "due to, among other things, lack of adequate and accurate information in Enerkon's" financials and questions regarding "the accuracy and adequacy of publicly disseminated information in press releases," including the press releases mentioned above.[10]

### B. *Assignment*

7. I was asked by the staff of the SEC's Division of Enforcement to assess whether the fraudulent scheme alleged in the Complaint artificially increased Enerkon's stock price. I was also asked to identify groups of investors who were harmed by the alleged scheme.

8. In forming my opinions, I relied upon facts and data of the type reasonably relied upon by experts in my field, including documents and information provided to me by the SEC staff and information obtained through research. A list of the documents and information that I relied upon in preparing my expert report is attached as Appendix B to this report.

### C. *Summary of Opinions*

9. My conclusions are summarized as follows:

• Using a standard approach to estimate stock price inflation due to the alleged fraudulent scheme described in the Complaint,[11] I have concluded that Enerkon's stock price was artificially inflated as evidenced by the significant stock price decline in response to the partially corrective disclosure on June 22, 2021.

• The inflation in Enerkon's stock price likely started at least on March 8, 2021, and may have started prior to that date.

• Investors who purchased Enerkon's stock at artificially inflated prices starting at least March 8, 2021, and through June 22, 2021, and who still held or sold that stock after June 22, 2021, were harmed because of the artificial inflation.

10. The opinions presented in this report are a result of the information available to me as of the report date. I reserve the right to supplement the opinions and analyses described in this report depending on any materials I may be provided later, including witness testimony, documents from written discovery, and expert reports filed on behalf of the defendants.

### III. Background

### A. *Enerkon's Corporate History*

11. Enerkon was a Nevada corporation;[12] it was formed on October 31, 2017, when Castle Holding Corp. changed its name to Enerkon Solar International, Inc.[13] Ballout became the company's President, Chief Executive Officer, and Chief Financial Officer on February 8, 2018.[14] On the same day, the previous CEO, John Cappello and his company Cappellos Inc., sold 22,250,000 shares of common stock and 100,000 shares of Class B preferred stock of Enerkon to Ballout for $65,000.[15]

12. Enerkon's stock was quoted on the Over-The-Counter (“OTC”) Pink Market maintained by OTC Markets. OTC securities are securities not listed on a national securities exchange.[16] These securities are subject to more limited disclosure requirements than securities listed on national securities exchanges and typically have lower liquidity, lower institutional holdings, and higher volatility.[17] Exhibit 1 shows that Enerkon's stock traded inconsistently in 2019 and most of 2020, as indicated by a high proportion of days with no trading volume for Enerkon's stock in each month during this period.[18] Its liquidity improved towards the end of 2020 when the stock started trading more consistently every day. Exhibit 2 shows that while Enerkon's stock started to be traded daily after November 2020, the number of trades per day varied substantially.

### B. *Academic Literature Documents Misconduct by Management Has Negative Effect on Value of Companies and Harms Shareholders*

13. Academic literature documents that stock prices react to new, unexpected, and value-relevant company-specific information. Such information may include earnings surprises, announcements of operational changes such as mergers and acquisitions, joint ventures, announcements about large product orders, share buybacks, as well as announcements disclosing company's wrongdoing.[19]

14. Specifically with respect to misconduct by insiders (management and controlling shareholders), academic research shows that such misconduct causes significant harm to companies and their shareholders through immediate financial losses, reduced future profits and growth,[20] and increased costs (legal, compliance, reputational, etc.),[21] all of which result in erosion of

company value.[22] When the misconduct or the company's deteriorated financial position resulting from the misconduct is made public, this disclosure can lead to a decline in the company's stock price, causing harm to shareholders.[23]

15. For example, one of the seminal studies on this topic shows, based on a sample of 585 U.S. firms, that on average, companies experience a 38 percent stock price decline when the news of corporate theft, fraud, or misconduct by insiders is reported, *i.e.*, for every $100 investment, investors incurred a loss of $38 due to the misconduct.[24] The study attributes one quarter of this price decline (approximately $9.30 out of the $38 loss on a $100 investment) to the market adjusting to a more accurate representation of the companies' financial situation, *i.e.,* reflecting the impact of the shortfall in funds and immediate financial losses resulting from the misconduct. An additional two thirds of the price decline (approximately $25 out of the $38 loss on a $100 investment) is attributed to the decrease in the present value of the expected future cash flows and growth opportunities, needs for more financing, and higher financing and contracting costs that result from the corporate misconduct. The remaining price decline (approximately $3.30 out of the $38 loss on a $100 investment) is attributed to investors' expectations of legal penalties, including fines and class-action lawsuits related to the misconduct. Notably, for more than one third of the companies in the sample, the stock price loss was nearly 100 percent because these companies filed for bankruptcy after the misconduct investigation.

### IV. Assessing Enerkon's Stock Price Inflation Associated with the Alleged False and Misleading Claims

16. I use the term "price inflation" to refer to the difference between the actual stock price and the stock price that would have been observed absent Ballout's false and misleading claims. I follow the standard approach used by economists to evaluate inflation in Enerkon's stock price due to the alleged false and misleading claims.

17. To identify whether the alleged false and misleading claims described above had an impact on Enerkon's stock price, I use an event study. An event study is a widely accepted methodology used in academic research to measure the impact of corporate events such as announcements of financial results, mergers and acquisitions, product development updates as well as disclosures of misconduct by insiders on the price of a security; this method has been accepted in U.S. Courts.[25]

18. I apply the standard event study methodology to individually assess the change in Enerkon's stock price following each of the alleged false and misleading statements and the SEC's announcement of the misconduct and the suspension of trading in Enerkon's stock. If my analyses were to show that Enerkon's stock price change was significant in reaction to either any of the misleading press releases or to the partially corrective disclosure (*i.e.*, the SEC's announcement), I would conclude that the misinformation artificially inflated Enerkon's stock price.[26]

### A. *Event Study Analysis*

19. Conducting an event study includes four steps: determining the relevant event dates, estimating predicted returns, calculating abnormal returns, and conducting statistical tests. I discuss each of these four steps below.

### Step 1: Determining the relevant event dates

20. The first step of an event study is to determine when the event or information was made public so that it could be incorporated into the stock price. It is at this stage that financial economists typically assess whether it will be feasible to estimate the impact of an event on the stock price. For example, if an event occurs at the same time as the market learns other news about the stock, ascribing the stock price reaction to the event at issue may not be possible or may require additional steps. As another example, the precise timing of the public release of the news may be unclear.

21. I define the effective day to be the first day when the information could have first affected Enerkon's stock price by the close of trading on that day. The Complaint identifies three Enerkon press releases issued on March 9, 2021, May 3, 2021, and May 11, 2021, that contained the alleged false and misleading claims as well as the SEC's announcement of trading suspension in Enerkon's stock. Each of the three Enerkon press releases was published during trading hours, hence, I view the effective day for each of the news events to be the same day of its release.

22. In addition to these three press releases, I identified another Enerkon press release preceding and directly related to its March 9, 2021, announcement of the completion of its acquisition of Coviklear. On March 5, 2021, Enerkon disclosed it was in final talks to purchase Coviklear with the acquisition to be signed "next week."[27] The press release was published after the close of trading on that day. Therefore, I view the following trading day, March 8, 2021, as the effective day when this information was made public and consider that date in my event study analysis.

23. As for the trading suspension by the SEC, the information was made public prior to trading at 9:30 am on June 23, 2021, and went into immediate effect.[28] The first day of trading after the two-week trading halt was July 8, 2021. Therefore, I view July 8, 2021, as the effective day when the information of the suspension and allegations of the alleged misconduct could have first affected the stock price.

24. As is standard for event study analysis, I also considered whether it took more than one day for the stock price to fully incorporate the information.

25. Finally, as is customary for event study analysis, I verify whether any concurrent or confounding news or events could have affected Enerkon's stock price on all the relevant event dates or on the trading days following these press releases.[29]

### Step 2: Estimating predicted returns

26. On any particular day, a stock's price and stock return can be affected by many factors, including news that has market-wide relevance, such as unexpected changes in the economic and market environment, and company-specific news such as the at-issue disclosures. The predicted return measures the portion of the stock's return on the announcement day that is expected based on that day's industry and overall market movement and is therefore unlikely to be related to the at-issue disclosure or other company-specific news.

27. I calculate Enerkon's predicted return by estimating the relation between Enerkon's stock return and the return on a diversified market index of U.S. companies that are eligible to trade on the OTC market (ticker OTCQX.US).[30] I estimate this relation using daily stock price returns and market returns between March 5, 2020 and March 4, 2021.[31] I then use the estimated model parameters to calculate the predicted return for each effective day.[32]

### Step 3: Calculating abnormal returns

28. The difference between the actual and predicted return is called an abnormal return. It represents the portion of the stock's price change on the disclosure day that is related to company-specific factors such as the at-issue disclosure, and other daily random variation in the stock's price, and not due to overall market movements. To calculate the abnormal return for each day, I subtract the predicted return, according to the model estimated in Step 2 from the actual return.

### Step 4: Conducting statistical tests

29. I perform t-tests to test the hypothesis that a given day's abnormal return is large enough in magnitude, relative to historical daily price fluctuations, to be deemed unusual or "statistically different from zero"-*i.e.,* statistically significant. The test involves calculating a t-statistic for the estimated abnormal return.[33] An abnormal return with a t-statistic greater than 1.96 in absolute value is considered statistically significant at the conventional 95 percent confidence level and considered as unlikely to be due to daily random variation in the stock's price.

30. Exhibit 3 summarizes the results of my event study analysis and Exhibit 4 plots Enerkon's stock price and traded volume as well as the market performance between March 5, 2020, and December 31, 2021. I separately consider Enerkon's stock price reaction to each of Enerkon's four press releases and its reaction to the SEC's announcement of suspected misconduct by the company and suspension of trading in Enerkon's stock.

31. With regards to Enerkon's press releases, I find the following:

i. March 5, 2021 (Friday, after the close of trading): Since the disclosure that Enerkon was in final talks to acquire Coviklear was made after the close of trading on Friday, March 5, 2021, the first time market could trade on the news was on Monday, March 8, 2021. On that day, Enerkon's stock price increased by 50 percent, from $0.58 per share to $0.87 per share. After controlling for movements in the market index, the abnormal return in Enerkon's stock price on that date was an increase of 40.2 percent. The corresponding t-statistic for this return is 1.48, which is below the 1.96 threshold for statistical significance at the 95 percent level. On March 9, 2021, the next trading day after March 8, 2021, the abnormal return is not statistically significant. (Note that this is also the date of Enerkon's announcement of completion of the initial acquisition of Coviklear, which I discuss in more detail below). Finally, the March 5, 2021, press release contained additional information discussing Enerkon's activity in Ukraine and, therefore, the stock price increase on March 8, 2021, cannot be solely attributed to the news of final talks to acquire Coviklear.[34]

ii. March 9, 2021: The day of the announcement of completion of the acquisition of Coviklear, Enerkon's stock price increased by 6.9 percent, from $0.87 per share to $0.93 per share. The corresponding abnormal return and the abnormal return on the following trading day, March 10, 2021, were not statistically significant at the 95 percent confidence level. Enerkon's stock price change. This is consistent with the fact that a portion of the news was previously disclosed on March 5, 2021, when the company announced that the Coviklear acquisition was near completion. Since Enerkon's stock price increased by 50 percent on March 8, 2021, it may have already reflected the market's reaction to the news. Based on my review of relevant news and press coverage, other than the press release about the completion of initial acquisition there was no other Enerkon-related news on either March 9, 2021, or March 10, 2021.

iii. May 3, 2021: The day of the Enerkon announcement of the purchase of commercial land to establish the planned solar and hydrogen plant facility, Enerkon's stock price increased by 6.0 percent, from $0.383 per share to $0.406 per share. The corresponding abnormal return and the abnormal return on the following trading day, May 4, 2021, were not statistically significant at the 95 percent confidence level. There was no other Enerkon-related news on these two dates.

iv. May 11, 2021: The day of the Enerkon announcement of a large order for its Covid-19 "Insta Test," Enerkon's stock price increased by 6.0 percent, from $0.32 per share to $0.34 per share. The corresponding abnormal return and the abnormal return on the following trading day, May 12, 2021, were not statistically significant at the 95 percent confidence level. There was no other Enerkon-related news on these two dates.

32. The fact that a large abnormal return of more than 40 percent on March 8, 2021, is not statistically significant is consistent with high volatility in Enerkon's stock price. Importantly, this price increase is economically meaningful. For instance, a 40 percent price increase in reaction to acquisition news is considerably higher than a typical stock price reaction to such news. A seminal academic paper shows that, on average, an acquiring company experiences a statistically significant stock price increase of ten or less than ten percent following the announcement of an acquisition.[35] Furthermore, as explained above, the fact

that Enerkon's stock price reaction to any of the misleading announcements is not statistically significant does not necessarily indicate that the stock price was not artificially inflated. To determine whether Enerkon's stock price was artificially inflated, I also consider Enerkon's stock price reaction to the partially corrective disclosure made public on June 23, 2021.

33. With regards to the SEC's announcement of a trading suspension in Enerkon's stock, I find that on the day when the trading resumed after the suspension (July 8, 2021), Enerkon's stock price decreased by 70.2 percent, from $0.6045 per share to $0.18 per share.[36] After controlling for movements in the market index, the abnormal return in Enerkon's stock price on that date was a decline of 75.2 percent. The corresponding t-statistic for this return is 5.49, which exceeds the 1.96 threshold for statistical significance at the 95 percent level. Enerkon's stock price change on the following trading day, July 9, 2021, was not statistically significant.

34. There was one Enerkon-related news between June 22, 2021, and July 8, 2021: on June 24, 2021, Enerkon announced its cooperation with the SEC and asked for an earlier end of trading suspension.[37] While this announcement may have confounded the effect of SEC's trading suspension on Enerkon's stock price, it is likely that its effect on Enerkon's stock price would be positive because the announcement contained information that the company was cooperating with the SEC and was attempting to have its stock resume trading sooner, *i.e.,* it would mute the negative impact of SEC's trading suspension.

35. Therefore, I conclude that the June 22, 2021, SEC's trading suspension disclosure caused a statistically significant decline in Enerkon's stock price on July 8, 2021. Because the SEC's announcement put the market on notice regarding prior misleading statements made by Ballout and is a partially corrective disclosure, the stock price decline on this day reflects the artificial fraud inflation partially leaving Enerkon's stock price.

### B. Enerkon's Stock Price Was Inflated Starting at Least on March 8, 2021, through June 22, 2021

36. The results of the event study analysis indicate that while Enerkon's positive stock price reactions to the alleged false and misleading claims were not statistically significant, its negative reaction to the SEC's suspension of trading in Enerkon's stock was unlikely due to chance. Importantly, as Exhibit 4 shows, Enerkon's stock price never recovered back to the pre-suspension levels, which provides additional evidence that the SEC's press release was a disclosure that corrected the artificial inflation in Enerkon's stock price.[38] Therefore, I conclude that the alleged false and misleading claims cumulatively caused the stock price to be inflated and the stock price decline on July 8, 2021, measures the value impact of the fraud on that day.

37. There are three factors that lead me to conclude that Enerkon's stock price was inflated due to the alleged fraud. First, there were no other public news between June 22, 2021, and July 8, 2021, that may have negatively affected Enerkon's stock price. Second, the fact that Enerkon's stock price did not recover following the partially corrective disclosure on June 22, 2021, indicates that the reaction to the SEC's trading suspension was not a temporary reflection of lower liquidity but a revaluation of the stock in light of the SEC's revelations of the company's misconduct. Finally, there is substantial academic research showing that managerial misconduct would be expected to influence the stock price. Therefore, I conclude that Enerkon's stock price was inflated at the time of disclosure. Given that the first allegedly misleading information was made public on March 5, 2021 (with the effective price impact date of March 8, 2021), I also conclude that the inflationary period started at least around early March 2021 and may have started prior to that date.

### C. Pecuniary Harm to Investors

38. Generally, investors suffer pecuniary harm as a result of a fraud when they (i) purchase a security at prices artificially inflated by the fraud and (ii) hold or sell the security after the inflation has dissipated from its price after the fraud is revealed. I determined that the misleading information made public by Enerkon starting in early March 2021 caused artificial inflation in Enerkon's stock price. Based on my event study analysis, I determined that the artificial inflation at least partially dissipated from Enerkon's stock price on July 8, 2021, following the SEC's trading suspension and fraud revelations. Therefore, investors who

purchased Enerkon stock after the misleading announcements at least starting March 8, 2021, and through June 22, 2021 (the last trading day before July 8, 2021), paid an artificially inflated price resulting from the fraud. However, not all investors who purchased Enerkon stock during this period suffered monetary harm due to the fraud: some investors who purchased Enerkon stock at inflated prices may also have sold it at inflated prices prior to the trading suspension. Only investors who purchased Enerkon stock between March 8, 2021, and June 22, 2021, and still held or sold that stock after June 22, 2021, suffered monetary harm as a result of the fraud.

Footnotes

1    Complaint, *Securities and Exchange Commission vs. Benjamin Bailout, Mohamed Zayed, and William Fielding, Defendants*, In the United States District Court, Southern District of Florida, Civil Action No. 9:24-cv-81170. ("Complaint"), ¶1.

2    *See* Complaint, ¶1.

3    *See* Complaint, ¶1. At the time of the alleged false and misleading statements, Ballout was Enerkon's President, Chief Executive Officer, and Chief Financial Officer. Consequently, in this report, I use "Ballout," "Enerkon," and "the company" interchangeably when referring to the alleged false and misleading statements.

4    *See Newsfile Corp,* "Enerkon Solar International (ENKS) Closes Acquisition Stake in Coviklear Holdings International," dated March 9, 2021. Enerkon acquired a 40 percent stake in Coviklear on March 9, 2021, and an additional 60 percent was expected to be acquired "in the coming week."

5    *See* Complaint, ¶¶23-25.

6    *See Newsfile Corp,* "Enerkon Solar International Inc. (ENKS) Announces the Purchase of 122 Acres of Commercial Land to Establish the Planned 20 MW Solar and Hydrogen Plant Facility," dated May 3, 2021.

7    *See* Complaint, ¶¶34-36.

8    *See Newsfile Corp,* "Enerkon Solar International Inc. (ENKS) Announces its First Contingent Order for the SARS2 COVID19 15 Second 'Insta Test'," dated May 11, 2021.

9    *See* Complaint, ¶¶28-32.

10    *See SEC,* release No. 92232, dated June 22, 2021.

11    In this report, I use the term "price inflation" to refer to the difference between the actual stock price and the price that would have been observed absent the alleged fraudulent scheme.

12    *See* Enerkon's Form 10-Q for quarter ended December 31, 2017, filed January 26, 2018, p. 7.

13    *See* Enerkon's Form 8-K, filed November 8, 2017, p. 2.

14    *See* Enerkon's Form 8-K, filed February 12, 2018, p. 4.

15    *See* Enerkon's Form 8-K, filed February 12, 2018, p. 3. Each share of the Class B preferred stock is entitled to 100 votes per share but has no conversion, liquidation, or dividend rights. *See* Enerkon's Form 10-Q for quarter ended December 31, 2017, filed January 26, 2018, p. 11.

16    *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/over-counter-otc-securities (accessed on January 12, 2025).

17    *See* Ang, A., Shtauber, A.A., and Tetlock, P.C. (2013), "Asset Pricing in the Dark: The Cross-Section of OTC Stocks," *The Review of Financial Studies*, 26(12), pp. 2985, 2996. Volatility is a statistical measure of stock returns and is often associated with large stock price fluctuations. *See* https://www.investopedia.com/terms/v/volatility.asp (accessed on January 12, 2025). I define stock return on

a given day as the difference between the stock's closing price on a given day and its closing price on the previous day, divided by the previous day's closing price.

The proportion of days with no trading volume is a common illiquidity measure where higher proportion indicates higher illiquidity. This indicator measures an investor's ability to trade a stock at all. See Ang, A., Shtauber, A.A., and Tetlock, P.C. (2013), "Asset Pricing in the Dark: The Cross-Section of OTC Stocks," *The Review of Financial Studies*, 26(12), pp. 2986, 2995-2996.

Consistent with these academic findings, Enerkon's stock price also reacted to information and news about Enerkon. For instance, when Enerkon announced stock buybacks and a new joint venture on May 20, 2021, and another stock buyback on June 7, 2021, its stock price increased by 64 percent and 106 percent, respectively. See *Newsfile Corp*, "Enerkon Solar International Inc. (ENKS) Announced a Major Stock Buy Back Today, Significantly Reducing the Company's Outstanding Common Stock, 'Raising Shareholder Book Value per Share'," dated May 20, 2021 at 8:30 am, *MarketLine Financial Deals Tracker* "Enerkon Solar International Plans to Form Joint Venture," dated May 20, 2021, and *Newsfile Corp,* "Enerkon Solar International Inc. (ENKS) Announced Second Phase - Stock Buy Back Today, Which Will Significantly Reduce the Company's Outstanding Common Stock, Raising ENKS Book Value per Share," dated June 7, 2021 at 2:15 pm. Based on the event study analysis I describe below, price increases on both days were statistically significant.

*See, e.g.*, Murphy, D.L., Shrieves R.E., and Tibbs S.L. (2009), "Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk," *Journal of Financial and Quantitative Analysis*, 44(1), pp. 55-83. (The study finds that firms experience significant decreases in reported earnings and increases in risk following allegations of misconduct.)

*See, e.g.*, Alexander, C.R. (1999), "On the Nature of the Reputational Penalty for Corporate Crime: Evidence," *Journal of Law and Economics*, 42(S1), pp. 489-526.

*See* Karpoff, J.M., Lee D.S., and Martin G.S. (2008), "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis,* 43(3), pp. 581-611.

*See, e.g.*, Griffin, P.A., Grundfest J.A., and Perino M.A. (2004), "Stock Price Response to News of Securities Fraud Litigation: An Analysis of Sequential and Conditional Information," *ABACUS: A Journal of Accounting, Finance and Business Studies*, 40(1), pp. 21-48.

*See* Karpoff, J., Lee S., and Martin G. (2008), "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis*, 43(3), pp. 581-612. (The study also finds that corporate misconduct causes significant harm to the company, estimating that "[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08. Of this additional loss, $0.36 is due to expected legal penalties and $2.71 is due to lost reputation. In firms that survive the enforcement process, lost reputation is even greater at $3.83.")

*See, e.g.,* Campbell, J.Y., Lo, A.W., and MacKinlay, A.C. (1997), *The Econometrics of Financial Markets.* Princeton University Press, NJ, pp. 149-180; Brown, S.J., and Warner, J.B., (1985), "Using Daily Stock Returns: The Case of Event Studies," *Journal of Financial Economics*, 14(1), pp. 3-31; Mitchell, M.L., and Netter, J.M. (1994), "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, 49, pp: 545-572; MacKinlay, A.C. (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), pp. 13-39; and Tabak, D.I., and Dunbar, F.C. (2001), "*Materiality and Magnitude: Event Studies in the Courtroom,*" Chapter 19 in Litigation Service Handbook: The Role of the Financial Expert, 3rd ed., Wiley, edited by Weil, R.L., Wagner, M.J., and Frank, P.B.

I explain the concept of statistical significance below.

*See Newsfile Corp,* "Enerkon Solar International (ENKS) Chairman Files with USG FARA Office in Support of Large National Projects," dated March 5, 2021.

*See* SEC Internet Publishing Log_Redacted.pdf.

To identify potentially confounding events, I considered press coverage of Enerkon using two widely used news aggregators, Factiva and Bloomberg. I also reviewed Enerkon's other press releases and disclosures filed through OTC Markets and the SEC's EDGAR filing system. Finally, I searched for analyst reports for the company in Refinitiv and determined that only BuySellSignals Research published any reports on Enerkon. However, the reports merely summarized stock price trends and did not contain any analyst

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

commentary. *See, e.g., BuySellSignals Research*, "Research Report: ENKS," dated January 8, 2021. Further, BuySellSignals Research did not publish any reports on Enerkon between January 9, 2021, and September 3, 2021. See *BuySellSignals Research*, "Research Report: ENKS," dated September 3, 2021.

I also considered including various industry indices in my regression model, *e.g.,* Invesco Solar ETF (symbol TAN) and iShares Global Clean Energy ETF (symbol ICLN). Ultimately, I do not include the industry index in my model because it did not improve the predictive capability of the regression as measured by the adjusted $R^2$.

I obtained the Enerkon stock price information and data on the market index from Bloomberg. The market index returns are calculated using the trading days for Enerkon's stock. The time period of estimation, between March 5, 2020 and March 4, 2021, precedes all of the press releases described in the Complaint. I confirmed that my regression result is robust to using alternative market indices and alternative time periods.

The model of predicted returns is: log(Enerkon's stock price return) = 0.00630 + 0.67218 * log(OTCQX.US return). For a particular day of interest, to calculate Enerkon's predicted return, I use the above estimates and the OTCQX.US return on the same day.

A t-statistic represents a statistical measure that gives a sense of how likely it is to observe the estimated abnormal return, compared to the normal variation of historical abnormal returns during the estimation period.

Enerkon issued press releases about its activity in Ukraine at least since November 2020. *See, e.g., Newsfile Corp,* "Enerkon Solar International (ENKS) Opens Talks with JSC 'Ukrainian Capital Bank' On a Major Solar Project," dated November 12, 2021. Based on my review of press coverage, that activity may have also been misleading. *See Big News Network,* "Chernobyl, SpaceX, A Ukraine Lobbyist, And A Skyrocketing Stock Price," dated March 25, 2021.

*See* Netter J., Stegemoller M., and Wintoki M.B. (2011), "Implications of Data Screens on Merger and Acquisition Analysis: A Large Sample Study of Mergers and Acquisitions from 1992 to 2009," *The Review of Financial Studies*, 24(7), p. 2350, Table 13.

The SEC's suspension of trading was made public at 9:30 am on June 23, 2021, with immediate suspension of trading in Enerkon's stock price. Therefore, I evaluate changes in Enerkon's stock price between the following trading day, July 8, 2021, and June 22, 2021.

*See iCrowdNewswire,* "Enerkon Issues Public statement on Temp Trading Suspend notice from the SEC," dated June 24, 2021.

It is possible that a trading suspension would adversely affect stock liquidity after the suspension is lifted, due to regulatory requirements for brokers. *See, e.g.*, information available at https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/investor-5 (accessed on January 12, 2025). However, Enerkon's stock was actively traded immediately following the trading suspension, with over one million shares traded during the first ten trading days following the lifting of the suspension.

**End of Document**     © 2026 Thomson Reuters. No claim to original U.S. Government Works.