**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TYLER HIMES, *et al.*** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 24-3638** |
| | : | |
| **FIVE BELOW, INC., *et al.*** | : | |

**McHUGH, J.** **August 3, 2026**

**MEMORANDUM**

This is a securities fraud case rooted in a "fraud on the market" theory. Plaintiff institutional investors brought this action for themselves and on behalf of a class of shareholders in Five Below, Inc. ("Five Below") against Defendants Five Below and two individual company executives. Having survived a motion to dismiss, Plaintiffs now seek class certification of their claims against Defendants for making public statements that omitted material information and made material misrepresentations in violation of the Securities Exchange Act.

The principal dispute here concerns Rule 23(b)(3)'s predominance element in the securities litigation context. Plaintiffs have successfully invoked the rebuttable presumption of reliance under *Basic v. Levinson*, meaning that I can presume putative class members relied on material public misrepresentations that Defendants made. To rebut this presumption, Defendants must prove by a preponderance of the evidence that the alleged misrepresentations did not actually affect Five Below's stock price.

Defendants seek to disprove price impact by claiming a mismatch exists between the alleged misrepresentations and the corrective disclosures, but their arguments do not withstand close scrutiny. After considering all the relevant quantitative and qualitative evidence, I conclude

that they have failed to meet their burden to rebut the presumption, and Plaintiffs have satisfied the predominance requirement. I will therefore grant Plaintiffs' Motion for Class Certification.

## I. Background

Plaintiffs' allegations concern several allegedly false or misleading statements made with respect to (1) Defendants' "trend-right" strategy and its execution and (2) the cause and extent of inventory loss that Five Below was experiencing, *i.e.*, "shrink,"[1] during the class period. These statements related to Five Below's core business strategy of identifying and offering trending items to customers; the company's ability to execute this strategy and stock these items in its stores; the amount and nature of inventory loss the company was facing; and its efforts to mitigate that problem. I granted in part and denied in part Defendants' motion to dismiss, issuing a memorandum that scrutinized the various alleged misrepresentations and omissions to determine whether they were actionable under the Private Securities Litigation Reform Act. In doing so, I dismissed several paragraphs of the Amended Complaint for various reasons, while finding the remaining twenty statements were actionable. *In re Five Below, Inc. Sec. Litig.*, No. 24-3638, 2025 WL 2447794, at *14 (E.D. Pa. Aug. 25, 2025); Mot. to Dismiss Ord., ECF 46. In partially denying Defendants' motion, I rejected their contention that the trend-right statements were inactionable "puffery." I also rejected the argument that the corrective disclosures in June and July 2024 regarding Five Below's operational issues failed to sufficiently plead a causal connection to establish loss causation vis-à-vis the alleged misrepresentations.

The issue now is whether Plaintiffs can sustain a class.

[1] As I explained in my ruling on the motion to dismiss, shrink includes losses due to various causes, including theft, operational or administrative errors, damage, waste, and spoilage, among others. ECF 45.

## II. Legal Standard

To be certified, a class must satisfy Rule 23(a)'s four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). The parties seeking class certification must establish all four elements by a preponderance of the evidence. *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 184 (3d Cir. 2019). This burden requires them to "affirmatively demonstrate" their compliance with the Rule, that is, by showing "there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The parties must also meet "the requirements for a particular type of class set forth in Rule 23(b)." *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 481 (E.D. Pa. 2022) (McHugh, J.).

Here, Plaintiffs seek certification under Rule 23(b)(3), which "requires a court to consider whether common questions of law or fact predominate (predominance) and whether the class action mechanism is the superior method for adjudicating the case (superiority)." *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 392 (3d Cir. 2015). The Third Circuit has recognized that ascertainability is also a requirement for certification under Rule 23(b)(3), that is, "the class must be currently and readily ascertainable based on objective criteria." *Id.* (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 305 (3d Cir. 2013)).

The court "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). This extends to expert testimony. *Id.* "A rigorous analysis requires that factual determinations be made by a preponderance of the evidence." *Ferreras*, 946 F.3d at 183. The court should only certify a class

if it "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *Hydrogen Peroxide*, 552 F.3d at 309 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

**III. Discussion**

**A. The Proposed Class satisfies Rule 23(b)(3)'s predominance requirement.**

The parties primarily dispute whether Plaintiffs satisfy Rule 23(b)'s predominance requirement. To certify the class, Rule 23(b)(3) explicitly requires "common questions" to "predominate over any questions affecting only individual members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks omitted) (quoting *Amchem*, 521 U.S. at 623). "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). Plaintiffs typically satisfy the predominance element in securities fraud class actions. *See Hydrogen Peroxide*, 552 F.3d at 321–22.

As I have previously explained, "the analysis entails (a) first examining each element of the plaintiff's legal claim to see if it involves common issues of law or fact and then (b) determining whether issues common to the class overwhelm issues subject to individualized proof." *Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98, 139 (E.D. Pa. 2020) (McHugh, J.) (citing *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 370–71 (3d Cir. 2015)). This inquiry's first step "incorporates the Rule 23(a) commonality requirement." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004); *see Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008) ("[W]here an action is to proceed under Rule 23(b)(3), the commonality requirement is subsumed by the predominance requirement.") (internal quotation marks and citation omitted). The second

step examines whether those questions "predominate over those affecting only individual class members." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (internal quotation marks omitted) ("Halliburton I"). In securities class actions where, as here, the plaintiffs allege a fraud-on-the-market theory, the analysis "often turns on the element of reliance,"[2] *Energy Transfer*, 623 F. Supp. 3d at 481 (quoting *Halliburton I*, 563 U.S. at 810), which "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury," *Amgen*, 568 U.S. at 461 (citation omitted).

*1. Basic's Rebuttable Presumption of Reliance*

Recognizing that it would be difficult for plaintiffs to establish this causal connection via direct, individualized proof of reliance from each class member, the Supreme Court held that plaintiffs may also invoke a rebuttable presumption of indirect reliance based on the fraud-on-the-market theory. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–47 (1988). Under this theory, "the court presumes (1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178–79 (3d Cir. 2000). The theory's

---

[2] A successful claim under Section 10(b) and Rule 10b-5 also requires proving (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) economic loss; and (5) loss causation. *See Amgen*, 568 U.S. at 460–61; 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. Plaintiffs need not prove loss causation—whether a statement caused price impact *and* subsequent economic loss—at the class-certification stage, *Halliburton I*, 563 U.S. at 807, 812–13, and the court cannot determine whether the challenged statements were false or misleading until the merits stage, *Basic*, 485 U.S. at 242.

core premise is that a reasonable investor "presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (quoting *Halliburton I*, 563 U.S. at 813). The *Basic* presumption is two-fold, positing that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations," *Basic*, 485 U.S. at 246, and that an "investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price," *id.* at 247.

To invoke the presumption, a plaintiff must prove that (1) the alleged misrepresentation was made publicly; (2) the stock traded in an informationally efficient market; and (3) the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed. *Id.* These prerequisites "are directed at price impact—whether the alleged misrepresentations affected the market price in the first place." *Id.* at 278.[3] Here, the parties do not dispute that the alleged misrepresentations were made publicly, and Plaintiffs allege, with evidentiary support, that the class members held Five Below stock during the class period. Therefore, to properly invoke the presumption, Plaintiffs must establish the remaining *Basic* prerequisite: market efficiency. *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 633 (3d Cir. 2011) ("[T]o invoke the fraud-on-the-market presumption of reliance, plaintiffs must show they traded securities in an efficient market.").

---

[3] In *Amgen*, 568 U.S. at 468, the Supreme Court clarified that at the class-certification stage, a plaintiff need not prove materiality because this factor is subject to classwide proof and should be addressed later on the merits, *see Goldman Sachs*, 594 U.S. at 119 ("The remaining *Basic* prerequisites—publicity, market efficiency, and market timing—must be satisfied by plaintiffs before class certification.") (internal quotation marks omitted) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("Halliburton II")).

In an efficient market, "information important to reasonable investors . . . is immediately incorporated into stock prices." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) (citation omitted). Five Below trades on a major stock exchange, the NASDAQ, which courts in this Circuit consider to be a factor that weighs in favor of market efficiency. *See DVI*, 639 F.3d at 634 ("[T]he listing of a security on a major exchange such as . . . the NASDAQ weighs in favor of a finding of market efficiency."); *e.g., Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 481 (E.D. Pa. 2021) (Baylson, J.) ("Endo trades on major stock exchanges, including NASDAQ, which is frequently held to be a standalone basis for finding market efficiency.").

The Third Circuit has identified the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), as an instructive but not exhaustive guideline for assessing market efficiency. *DVI*, 639 F.3d at 634 n.16 (listing several circuit courts that also approved of the *Cammer* factors).[4] Those factors include: (1) the security's average weekly trading volume; (2) significant reporting on the stock by securities analysts; (3) the existence of market makers for the security; (4) the company's eligibility to file S–3 registration statements with the SEC; and (5) a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the market. *Cammer*, 711 F. Supp. at 1285–87. The first four factors examine indirect indicia of market efficiency, while the fifth factor, often the most significant (but not determinative) factor in the analysis, calls for direct empirical evidence. *See In re Petrobras Sec.*, 862 F.3d 250, 276 (2d Cir. 2017); *DVI*, 639 F.3d at 634 (stating the fifth factor is normally the most important "because an efficient market is one in which information important to reasonable investors . . . is

[4] Other factors like the type of security (stocks, bonds, convertibles, derivatives, etc.), the company's industry, and the security's price, may also be relevant. *DVI*, 639 F.3d at 634.

immediately incorporated into stock prices") (cleaned up); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016) ("Courts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency.").

To establish this direct evidence, parties typically rely on event studies, which are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280. "When conducting an event study, an economist measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry." *Energy Transfer*, 623 F. Supp. 3d at 484 (cleaned up). These regression analyses attempt "to disprove the assumption that an event did not have an impact on the security price, such that a stock's return should be the expected return [based on market conditions], together with normal variation. . . . Statistical significance testing focuses on whether this deviation—the actual excess return on the event date—is highly unusual." *Id.* at 484–85. "Significance is calculated as the excess return divided by the standard error of the regression over the sample period." *Id.* at 485.

Plaintiffs' expert, Eugene Orlov, Ph.D., evaluated these factors and found that under the *Cammer* framework, Five Below stock traded in an efficient market. *See* Orlov Initial Rep. ¶¶ 22–63, ECF 61-3. Notably, Defendants' expert, Jennifer Marietta-Westberg, Ph.D., did not contest Dr. Orlov's evaluation and did not discuss market efficiency in her opposition report nor conduct her own event study. *See* Marietta-Westberg Dep. at 62:19–63:3, 65:8–22, ECF 70-2; *see generally* Marietta-Westberg Opp'n Rep., ECF 62-6 (not discussing market efficiency). Having comprehensively reviewed Dr. Orlov's empirical analysis with respect to the *Cammer* factors, I

conclude that Plaintiffs have met their initial burden under *Basic* to prove market efficiency, and that they have therefore successfully invoked the rebuttable presumption of reliance.[5]

2. *Defendants' Burden to Rebut the Presumption*

The *Basic* presumption is rebuttable, however, so the defendant can overcome it through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Goldman Sachs*, 594 U.S. at 118 (quoting *Basic*, 485 U.S. at 248). The Supreme Court has repeatedly instructed that the defendant must "*show* that the misrepresentation *in fact* did not lead to a distortion of price." *Id.* at 125 (quoting *Basic*, 485 U.S. at 248); *see Halliburton II*, 573 U.S. at 279 ("[The *Basic* presumption] affords defendants an opportunity to rebut the presumption by showing, among other things, that the particular misrepresentation at issue did not affect the stock's market price."). If an alleged misrepresentation did not impact the stock's price, "then *Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Goldman Sachs*, 594 U.S. at 119 (quoting *Halliburton II*, 573 U.S. at 283). Merely producing "some evidence relevant to price impact" does not suffice to meet the defendant's burden of persuasion, which it "must carry . . . by a preponderance of the evidence." *Id.* at 126.

"Defendants typically attempt to rebut through either front-end evidence—showing that the alleged misrepresentations did not affect the stock price—or back-end evidence—focusing on the allegedly curative effects of disclosures." *Pelletier*, 338 F.R.D. at 469. Here, Defendants seek

[5] Dr. Orlov also reviewed three factors commonly evaluated in addition to the *Cammer* factors: (1) market capitalization; (2) bid-ask spread for stock sales; and (3) public float, *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), as well as two other factors, autocorrelation and short interest. I conclude that these factors, as analyzed by Dr. Orlov, *see* Orlov Initial Rep. ¶¶ 64–94, also support finding Five Below's stock traded in an efficient market.

to sever the link by showing a mismatch exists between the alleged misrepresentations and corrective disclosures in both substance and in specificity, which, if true, would undermine any causal relationship.

*3. Plaintiffs' Price Impact Theories: Price Inflation and Inflation Maintenance*

Defendants question which theory of price impact Plaintiffs advance, arguing that the Amended Complaint pleads only an inflation-maintenance theory. Before analyzing whether Defendants rebutted the *Basic* presumption, it is necessary to clarify the theories under which Plaintiffs seek to prove price impact. *See In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-4953, 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024) ("A threshold question for the Court is determining Plaintiff's theory of price impact."). Plaintiffs in securities fraud cases can plead price impact through either of two theories: (1) price-inflation, *i.e.*, the misstatements artificially inflated the stock price, or (2) inflation-maintenance, *i.e.*, the misstatements kept the stock price artificially inflated. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023) ("ATRS"). The latter theory defines "price impact [as] the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement." *Goldman Sachs*, 594 U.S. at 123; *ATRS*, 77 F.4th at 80 (explaining that under the inflation-maintenance theory, "the misrepresentation prevents preexisting inflation in a stock price from dissipating, but does not cause a price uptick," and that the back-end price drop after the truth is revealed serves as indirect evidence of front-end inflation).

Here, Plaintiffs specifically alleged that Defendants "artificially inflated *and* maintained the market price of Five Below common stock" during the class period, Am. Compl. ¶ 340, (emphasis added), and further pled that the price dropped following each alleged corrective disclosure thereby causing Plaintiffs to suffer significant economic losses, *see, e.g.*, *id.* ¶¶ 323,

347; *see also id.* ¶ 316 ("These statements and omissions artificially inflated or maintained the artificial inflation of the price of Five Below common stock."). Plaintiffs thus principally rely on the inflation-maintenance theory for most of the alleged misrepresentations but pinpoint two subsets as being subject to the price-inflation theory, claiming these statements inflated Five Below's stock price at the outset. Pls.' Reply, ECF 69 at 42–43.

The first price inflation alleged involves the company's earnings call on November 30, 2022, during which Defendant Joel Anderson stated that, "[o]ur stores are stocked and ready with an amazing assortment of value products that promises to delight our customers," and Defendant Kenneth Bull represented that, "[o]ur teams continue to move quickly to adjust to changing customer preferences." *Id.* at 43 (quoting Am. Compl. ¶ 211). Dr. Orlov calculated that on the next day, Five Below's stock price increased by 17.42%, which he opined is an abnormal return that is statistically significant at the 99% confidence level. Orlov Initial Rep. ¶¶ 55–56.

The second price inflation alleged involves the company's June 1, 2023 earnings release, which quoted Defendant Anderson saying, "[w]hile our customers face multiple macro headwinds, we continue to be there for them, flexing our offering to bring them the Wow products they need and want. Our broad-based sales performance and transaction trends demonstrate that we are gaining trips and customers through our amazing value, trend-right products and Five Beyond prototype." Pls.' Reply at 43 (quoting Am. Compl. ¶ 216). Like the first subset's calculation, Dr. Orlov found that Five Below's stock saw an abnormal and statistically significant price increase of 5.08% the next day. Orlov Initial Rep. ¶ 56. Plaintiffs claim these abnormal returns reflect front-end inflation, so I will analyze these two alleged misstatements under the price-inflation framework and the remaining alleged misrepresentations via the inflation-maintenance inquiry.

### 4. *Evidence of Price Impact*

To undercut Plaintiffs' liability theory here, Defendants "must establish by a preponderance of the evidence that the disclosure of the truth did not cause a price drop." *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 754 (S.D.N.Y. 2025). Defendants attempt to disprove back-end price impact by showing a material discrepancy exists between the alleged misrepresentations and corrective disclosures based on both substance and genericness. In addressing the inflation-maintenance theory, the Supreme Court recently observed that the "inference . . . that the back-end price drop equals front-end inflation . . . starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman Sachs*, 594 U.S. at 123. As an example, the Court noted that where a misrepresentation is generic in nature, but the correction alleged is narrowly focused, it makes it "less likely that the specific disclosure actually corrected the generic misrepresentation," weakening any inference that front-end price inflation can be proven by the back-end price drop. *Id.*

In light of the Supreme Court's decision in *Goldman Sachs*, the Second Circuit has instructed district courts in inflation-maintenance cases to inquire "whether there is a basis to infer that the back-end price equals front-end inflation." *ATRS*, 77 F.4th at 99 n.11. If the Second Circuit's approach is valid, proving a mismatch requires "a closer fit (even if not precise) between the front- and back-end statements" than courts have required when analyzing the loss causation element of a securities fraud claim. *Id.* Therefore, in determining whether the alleged misstatement maintained artificial inflation, a court asks whether a "truthful substitute" for the misstatement would have affected the stock's price. *See id.* at 100; *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("[O]nce a company chooses to speak, the proper

question for purposes of our inquiry into price impact is not what might have happened had a company remained silent, but what would have happened if it had spoken *truthfully*.").

A substantive mismatch, which Defendants also argue exists here, "can also sever the link between the challenged statement and the purported corrective disclosure." *In re Nvidia Corp. Sec. Litig.*, No. 18-7669, 2026 WL 821418, at *14 (N.D. Cal. Mar. 25, 2026). Importantly, however, at the class-certification stage, "the Court should determine only whether the disclosure contains new information 'that need only relate to, concern, or be linked to a specific alleged misrepresentation.'" *Pelletier*, 338 F.R.D. at 483 (quoting *Pearlstein v. BlackBerry Ltd.*, No. 13-7060, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021)). This is because the disclosure need not "take a particular form or be of a particular quality, such that it be a mirror image tantamount to a confession of fraud." *Pearlstein*, 2021 WL 253453, at *18; *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) ("[A] disclosure need not precisely mirror the earlier misrepresentation. It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading.") (citations omitted)).

Furthermore, the timeframe within which to assess price impact is also a relevant, case-specific inquiry. *Energy Transfer*, 623 F. Supp. 3d at 485, 490. This is so because neither the Supreme Court nor the Third Circuit has adopted a bright-line rule to delineate the proper window. *See Halliburton II*, 573 U.S. at 271 ("To recognize the presumption of reliance . . . was not 'conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.'") (quoting *Basic*, 485 U.S. at 246–47); *DVI*, 639 F.3d at 635 (noting that "[w]e have addressed the speed with which information is incorporated into market price and explained that because a perfectly efficient market is not attainable, we do not require that public information be absorbed instantaneously.") (cleaned up). As I have previously

explained, this flexible approach makes sense given the variability in how an imperfect market responds to new, value-relevant information in the real world. *See Energy Transfer*, 623 F. Supp. 3d at 486 (citing *Peil v. Speiser*, 806 F.2d 1154, 1161 n.10 (3d Cir. 1986)). Indeed, courts in this Circuit and in others have allowed plaintiffs to show price impact over periods ranging from the same day of the disclosures to three days thereafter. *See, e.g., In re EQT Corp. Sec. Litig.*, No. 19-754, 2022 WL 3293518, at *18 (W.D. Pa. Aug. 11, 2022) (two-day window); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019) (one- and two-day windows); *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (three-day window).

Also relevant to the price-impact assessment is the statistical significance attributed to an event study. Here, Dr. Orlov found statistical significance at the 99% confidence level in the one-day window following the June 5 disclosure. Orlov Initial Rep. ¶ 56. As to the July 16 disclosure, although he excluded the one-day price reaction from his original analysis of price behavior focusing on "disclosure versus non-disclosure days," Dr. Orlov opined that if he had included it, that price reaction would have reflected statistical significance at the 99% confidence level. *Id.* ¶ 54 n.52. And in his rebuttal report, Dr. Orlov concluded that, after controlling for market and industry factors, the abnormal returns on the day after the July 16 disclosure were indeed statistically significant at the 99% confidence level. Orlov Rebuttal Rep. ¶ 61 n.49, ECF 70-1. Notably, Defendants' expert, Dr. Marietta-Westberg, who did not conduct her own event study, *see* Marietta-Westberg Dep. at 65:25–66:6, 68:5–8, does not contest Dr. Orlov's conclusions as to the statistical significance of these price reactions, *see* Marietta-Westberg Rep. at nn. 47, 51.

But even if Dr. Orlov's regression analysis did not show statistical significance—which it did—many courts have recognized that an event study's failure to disprove a null value to the requisite degree of statistical confidence does not on its own show a lack of price impact. *See,*

*e.g., Monroe Cnty.*, 332 F.R.D. at 394 ("In recognition of this basic truism of statistics, courts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact."); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275, 2015 WL 5097883, at *13 n.8 (D.N.J. Aug. 31, 2015) ("[I]t also does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact."). This is because "[e]vent studies have an inherent rate of error, and where the statistical evidence does not disprove a null value to the requisite confidence level, numerous courts have recognized that as a matter of logic such absence of proof is not proof of absence." *Energy Transfer*, 623 F. Supp. 3d at 487.

5. *The Availability of a Viable Damages Model*

Separately, relying on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), Defendants challenge Plaintiffs' proposed damages model, contending that it does not show damages can be calculated on a class-wide basis consistent with their "two liability theories." Opp'n Br., ECF 62 at 35–37. As an initial matter, Defendants' attempt to split Plaintiffs' liability theory in two is unpersuasive. This is because both interrelated categories of misrepresentations—as to the trend-right strategy and the cause and extent of shrink—logically support the same liability theory alleged, which is that Defendants' misrepresentations and omissions artificially inflated or maintained Five Below's stock price, which dropped when the truth was disclosed, causing financial loss to Plaintiffs and the class. *See Forsythe v. Teva Pharm. Indus. Ltd*, 102 F.4th 152, 159 n.12 (3d Cir. 2024) ("We reject petitioner's attempt to recast the asserted categories of misstatements as distinct theories of liability. The District Court properly determined that even though it dismissed one of three categories of misstatements which 'reach[ed] the same theory' of liability, 'those misstatements [were] part of the same, single theory of liability' and said theory

remained viable."); *see also* Pls.' Reply at 34 (explaining that Plaintiffs' liability theory alleges Defendants misled investors "first by falsely representing that executing on Five Below's trend-right strategy was an unqualified strength of the Company when in reality it experienced myriad execution issues, and second by blaming Five Below's issues on shrink, which they defined narrowly as external theft.").

Defendants further argue that Dr. Orlov's proposed methodology is deficient because it fails to account for the need to disaggregate confounding information. To consider this argument would require the Court to wade prematurely into questions of loss causation, *i.e.*, economic loss from drops in the stock price unrelated to Plaintiffs' liability theory, an issue the Supreme Court expressly reserved for a later determination at the merits stage. *See Amgen*, 568 U.S. at 475 ("[T]his Court has held that loss causation . . . [is a] common question[] that need not be adjudicated before a class is certified."); *see Forsythe*, 102 F.4th at 159 (agreeing with the district court's conclusion that "any questions of 'loss causation' or the 'disaggregati[on of] confounding factors to prove economic loss' need not be determined at the class certification stage."); *see also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-6728, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) ("[W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate.").

Defendants' argument that Dr. Orlov's proposed damages model is overly vague also lacks merit. Dr. Orlov proposes using a model that measures "out-of-pocket" loss to calculate damages on a class-wide basis. Orlov Rep. ¶¶ 98–100; Orlov Rebuttal Rep. ¶¶ 108–28. He identified the following three standard tools that economists use to assess price impact and, where appropriate, disaggregate any contemporaneous information on a class-wide basis: (1) conducting event studies

that control for market and industry effects; (2) reviewing analyst reports to discern what information investors viewed as new and value-relevant; and (3) implementing valuation analyses to estimate the effect of certain information on expected future cash flows or risk. *See id.* Courts routinely accept this proposed methodology in securities fraud class actions like this one. *See, e.g., Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, No. 20-4660, 2023 WL 7285167, at *24 (E.D. Pa. Nov. 3, 2023) (rejecting identical argument and collecting cases accepting identical methodology); *Utesch v. Lannett Co.*, No. 16-5932, 2021 WL 3560949, at *19 (E.D. Pa. Aug. 12, 2021) ("[C]alculating damages using the out-of-pocket method is standard in securities fraud class actions, and Defendants have not contended to the contrary.").

As the Third Circuit has recently acknowledged, "*Comcast* poses a low bar to class certification," *Forsythe*, 102 F.4th at 159, and at the class-certification stage, particularly because I have already concluded that common issues predominate here, Plaintiffs need not produce a detailed or precise damages model to satisfy Rule 23, *see Modafinil*, 837 F.3d at 261 (explaining that "the damages model does not need to be exact"); *EQT*, 2022 WL 3293518, at *28; *see also Sterling Heights*, 2015 WL 5097883, at *13 ("Because common issues predominate on all other issues of law and fact presented to the Court, the Court need not assess the validity of Plaintiffs' damages model at this stage.").

At argument, the defense faulted Dr. Orlov for averring that he can "estimate" inflation rather than "calculate" it. *See* Class Cert. Hr'g Transcript at 43:10–23, ECF 78. In his reports, however, Dr. Orlov uses the terms "estimate" or "estimation" interchangeably with variations of the terms "measure" and "calculate" when discussing his proposed out-of-pocket methodology. No material distinction exists between those terms in this context, given that the Supreme Court and the Third Circuit use variations of the terms "measure" and "calculate" to explain the

plaintiff's burden at the class-certification stage. *See, e.g., Forsythe*, 102 F.4th at 158 ("Under Rule 23(b)(3), damages must be 'susceptible of measurement across the entire class.'") (quoting *Comcast*, 569 U.S. at 35)); *Neale*, 794 F.3d at 375 (clarifying that "it is a misreading of *Comcast* to interpret it as preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement.") (cleaned up); *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 485 (3d Cir. 2015) ("[I]t is important for the District Court to remember that an inability to calculate damages on a classwide basis will not, on its own, bar certification."). Plaintiffs have thus met their burden to show "a reliable method is available to prove damages on a class-wide basis." *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 144 (E.D. Pa. 2011).

Moving from the general to the specific, I next address Defendants' efforts to rebut the *Basic* presumption by disproving price impact as to twenty alleged inflationary front-end misrepresentations and two alleged corrective disclosures. I do so through a practical lens given the Supreme Court's direction that "[i]n assessing price impact at class certification, courts should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman Sachs*, 594 U.S. at 122 (cleaned up).

**B. Price Impact of the Misrepresentations and Corrective Disclosures**[6]

Plaintiffs argue that two sets of misrepresentations artificially inflated Five Below's stock price. Pls.' Reply at 43–44; Am. Compl ¶¶ 211, 216. They allege that on a November 30, 2022 earnings call, Defendants Anderson and Bull spoke to investors about the company's ability to

[6] Although paragraph 233 of the Amended Complaint does not appear on the list of actionable statements in the Court's order, ECF 46, this was an inadvertent omission. As stated in the accompanying memorandum, ECF 45 at 39 & n.25, the statements about shrink alleged in that paragraph are actionable.

stock trending items in stores and meet changing customer preferences. Am. Compl. ¶ 211. The record shows that analysts reacted to these statements in real time. On the same day after that call, BofA Securities issued a report titled "Trend-right assortment drives beat and strong Black Friday weekend," in which analysts highlighted Five Below's ability to source and stock trending items as a key reason for its strong earnings-per-share performance. BofA Securities Rep. (Nov. 30, 2022), ECF 70-26 at 1. Another report from Telsey Advisory Group (TAG) issued the next day attributed Five Below's success to, among other things, "trend-right product newness (e.g., Five Beyond items), enhancements to its supply chain network, and solid execution." Telsey Advisory Group Rep. (Dec. 1, 2022), ECF 70-27 at 2. In addition, the TAG report noted that Five Below's earnings-per-share guidance for the fourth quarter of 2022 reflected "gains from the company's value focused assortment, newness in merchandising, including Five Beyond, and higher in-stock levels." *Id.* Dr. Orlov found a statistically significant price increase occurred the next day, Orlov Initial Rep. ¶¶ 55–56, which Defendants have not contested.

Plaintiffs allege that approximately six months later, Five Below made additional front-end misrepresentations during the company's June 1, 2023 earnings release, which quoted Defendant Anderson emphasizing the company's core strategy and competitive advantage in identifying, marketing, and quickly stocking trending items, which sell well, attract new customers, drive store foot traffic, and simultaneously increase sales of non-trending items. Pls.' Reply at 43 (quoting Am. Compl. ¶ 216). Analysts reacted to these statements shortly thereafter, with a report from Craig-Hallum issued on June 2 opining that Five Below's first quarter success "suggests the company's product assortment and value offerings continue to resonate with [its] core customers despite a weakening retail environment." Craig-Hallum Rep. (June 2, 2023), ECF 70-28 at 2. Deutsche Bank reported that Five Below's "strong traffic gains" reflected its "value

proposition [wa]s increasingly resonating with customers," and noted the company's "compelling value offering, nimble and scaling business model, ample white space opportunity, and upside from merchandising and product newness" as key performance drivers. Deutsche Bank Rep. (June 1, 2023), ECF 70-29 at 2. Dr. Orlov found that Five Below's stock price saw a statistically significant abnormal price increase of 5.08% the next day following the earnings release. Orlov Initial Rep. ¶ 56. Defendants have also not contested these alleged misrepresentations' impact on the company's stock price, and the analysts' reports, along with Dr. Orlov's unchallenged calculations, establish that Five Below's statements mattered to the market. I therefore conclude that Defendants have failed to meet their burden to rebut the *Basic* presumption as to the alleged front-end misrepresentations on November 30, 2022, and June 1, 2023.

*1. June 5, 2024 Corrective Disclosure*

Turning to the corrective disclosures, Plaintiffs allege that Five Below disclosed "painful" sales results on a June 5, 2024 earnings call, when it released its earnings for the first quarter of 2024, and announced that comparable store sales decreased by 2.3%, and net income declined by 16%. Am. Compl. ¶¶ 163–64. As a result, diluted income per common share dropped 15%. *Id.* at 164. On that call, Defendant Anderson commented on the company's "older merchandise trends," acknowledging for the first time that there were internal issues executing on the trend-right strategy. Earnings Call Transcript (June 5, 2024), ECF 70-9 at 3. In response to a question from a Barclays analyst, who asked whether Five Below's poor performance could be attributed to "anything self-inflicted," Defendant Anderson admitted that it had "proven harder for us to lap some of the big trends from last year" and said that was probably the "biggest difference" for year-to-year performance—thus revealing the company's inability to execute its trend-right strategy was largely responsible for the poor financial results, not just shrink. *Id.* at 8; Am. Compl. ¶ 166.

Also on that call, a Truist analyst inquired, among other things, whether the company's poor performance was because "maybe your product has gotten a little bit stale?" Earnings Call Transcript at 9. And in a follow-up call with Truist, company executives further disclosed that it was a "fair assumption" that "there just isn't a lot of 'new' and 'exciting products' right now in the stores to drive customer traffic." Truist Securities Rep. (June 5, 2024), ECF 70-10 at 2–3. Moreover, in subsequent reports, analysts doubted Five Below's explanation for the "painful" news and indicated that the company's issues may be self-inflicted. *Id.* at 3 ("[W]e think the store is currently more 'stale' than it has been in quite some time[.]"); Craig-Hallum Rep. (June 6, 2024), ECF 70-11 at 2 (stating that, contrary to Five Below's claim that issues were primarily attributable to macroeconomic factors, a peer company had reported success that same day and "[w]e fear there could be a lack of trends near-term that is the real culprit behind softer comps."); UBS Rep. (June 6, 2024), ECF 70-12 at 2 (explaining that, "[w]hile FIVE attributed the weakness to the macro, the market will likely be skeptical of this explanation," and that at least some investors will point to "the lack of newness in the product assortment" as one of the reasons for the poor financial results).

The day after the disclosure, Five Below's stock price dropped 10.6%, Am. Compl. ¶ 178; Orlov Initial Rep. ¶ 56, which Dr. Orlov found was a statistically significant price reaction at the 99% confidence level. Defendants did not contest the statistical significance. *See* Marietta-Westberg Rep. at nn. 47, 51. However, they seek to sever the link between the June 5 disclosure and the stock price by arguing the disclosure did not convey new information about executing the trend-right strategy, *id.* ¶¶ 72–73, 77, nor the cause and extent of shrink, *id.* ¶¶ 85–87, Opp'n Br. at 48, and that the company's poor results were attributed to various factors, Opp'n Br. at 48–49.

I disagree. The analyst reports issued after the company's June 5 earnings call show that analysts viewed its internal operations as important to investors and did not accept the company's

explanation that the weak financial performance was primarily due to external factors. *See Energy Transfer*, 623 F. Supp. 3d at 508 ("[t]he existence of a price decline and analyst commentary highlighting the negative news is, 'of course . . . evidence of price impact") (quoting *Monroe Cnty.*, 332 F.R.D. at 396); *see also ATRS*, 77 F.4th at 104 ("[M]arket commentary can provide insight into the kind of information investors would rely upon in making investment decisions—and therefore can serve as indirect evidence of price impact—[but] commentary touching upon only the same subject matter . . . cannot be enough."). Moreover, analysts expressed their surprise at the disappointing news, reflecting that this information was previously unknown to investors. *See* Orlov Rebuttal Rep. ¶ 36.

During the class period, while Defendants were experiencing significant issues executing its trend-right strategy and failing to stock stores with sufficient trending items, they attributed these pitfalls to forces beyond their control and touted their trend-right strategy as the company's "secret sauce." *Id.* ¶ 29; Am. Compl. ¶ 213. Thus, the June 5 disclosure corrected both categories of misrepresentations: it revealed the company's execution issues and disclosed the "biggest difference" causing poor performance was not shrink as previously alleged, but its failure to execute on trends. *See* ECF 45 at 66; Orlov Rebuttal Rep. ¶ 60 ("The disclosures are relevant to both categories of alleged misstatements because they corrected the market's understanding of the source of Five Below's performance problems."). Therefore, the true cause of the company's struggles was an important consideration to the market at the same time the stock price decreased at a statistically significant rate. Orlov Initial Rep. ¶ 56; *see Energy Transfer*, 623 F. Supp. 3d at 493. Whether other factors may have contributed to Five Below's weak results goes towards loss causation, an inquiry immaterial to class certification, *see Forsythe*, 102 F.4th at 159, and, in any event, does not change the disclosure's impact on the stock price. Looking at all the evidence

surrounding the June 5 disclosure, I conclude that Defendants have not rebutted the presumption of reliance.

2. *July 16, 2024 Corrective Disclosure*

Plaintiffs allege another corrective disclosure occurred after the market closed on July 16, 2024, when Five Below announced in a press release and SEC Form 8-K that Defendant Anderson was resigning as the company's CEO after nearly a decade at the helm. Am. Compl. ¶ 179. In the same press release, Five Below also announced that sales had continued to decline: the second quarter-to-date had a decline of comparable sales from 5% over the same period the previous year, and the company announced it expected a 6–7% decrease in comparable sales for the entire quarter. *Id.* ¶ 180. As a result, the diluted income per common share was expected to be between $0.53 and $0.56, which was below the forecast range announced six weeks before on the June call. *Id.*

Five Below executives discussed these poor results in conversations with J.P. Morgan, which published statements from one such conversation in a report on July 17. *Id.* ¶ 182. The report described Defendant Bull as acknowledging that the company had "'strayed' from the historical three-fold playbook during and exiting the pandemic" and needed to "[g]et back to trend-right product." J.P. Morgan Rep. (July 17, 2024), ECF 70-16 at 2, 4; Am. Compl. ¶ 182. Similarly, J.P. Morgan also reported that Five Below management cited "the need to improve trend-right product in stores," which it characterized as "stale," as an issue. J.P. Morgan Rep. at 4; Am. Compl. ¶ 183.

Analysts took this sudden, unexpected news hard and commented on how internal problems within the company were to blame, rather than just issues affecting the entire retail industry. In lowering Five Below's stock rate, Evercore ISI explained that "FIVE has lost sight of its north star – i.e. delivering trend right product at a disruptive value in a fun store atmosphere,"

and specifically opined that "[w]e believe recent merchandising and store execution issues are the main driver of Five's comp/margin woes." Evercore ISI Rep. (July 17, 2024), ECF 70-14 at 2. William Blair also downgraded Five Below, noting that "[m]anagement highlighted that many of the recent demand pressures are self-inflicted, suggesting the headwinds are more structural in nature." William Blair Rep. (July 17, 2024), ECF 70-15 at 2. Guggenheim lowered its target price by 24%, from $165 to $125, Am. Compl. ¶ 184, and reported that the "seemingly sudden, significant comp deterioration . . . is puzzling and concerned with both macro and company-specific factors at work; with management calling out product, value, and experience self-infliction," Guggenheim Rep. (July 17, 2024), ECF 70-19 at 2.

Other analysts also raised concerns. Deutsche Bank, after having its own follow-up conversations with Five Below executives, recounted that "[m]anagement indicated that a significant part of this year's top-line challenges is self-inflicted from less-than-exciting product assortment," Deutsche Bank Rep. (July 17, 2024), ECF 70-17 at 2, and that "the company must get back to selling trend right merchandise while delivering extreme value," *id.* at 3. Following a call with Five Below executives, UBS reported that "[t]he Company believes it has strayed a bit from its core competencies: compelling values, on-trend merchandise, and a fun shopping experience," and that as to product, "it needs to get back to finding on-trend merchandise which has driven traffic over the years," UBS Rep. (July 17, 2024), ECF 70-23 at 3.

Five Below's stock price fell after this announcement and conversations with analysts, declining the next day by over 25%. Am. Compl. ¶ 189. Dr. Orlov concluded that the abnormal returns were statistically significant at the 99% confidence level. Orlov Rebuttal Rep. ¶ 61 n.49. Notably, Defendants' expert, who did not conduct her own event study, *see* Marietta-Westberg Dep. at 65:25–66:6, 68:5–8, does not contest Dr. Orlov's conclusions as to this price reaction's

statistical significance, *see* Marietta-Westberg Opp'n Rep. at n.51. Defendants claim the link is severed, however, because "Five Below did not discuss their trend-right strategy at all and instead solely reported on quarter-to-date financial results for the first quarter of 2024 and guidance for the full quarter for the second quarter of 2024 and announced Mr. Anderson's departure." Opp'n Br. at 51. They argue the disclosure did not offer any new information regarding the company's ability to execute its trend-right strategy, Marietta-Westberg Opp'n Rep. ¶¶ 73, 75, or the cause and extent of shrink, *id.* ¶¶ 88–89; Opp'n Br. at 49.

But as noted in my previous memorandum, the July 16 disclosure "revealed underlying issues executing the trend-right strategy as a central factor driving poor performance – not just shrink." ECF 45 at 68. Although Defendant Anderson's departure did not correct prior misleading statements about trend-right and shrink losses, Five Below's July 16 disclosure went beyond announcing his resignation. *Id.* In the company's press release, and in conversations with analysts, Five Below also disclosed disappointing quarter results, reduced guidance, and cast blame on its failure to execute its trend-right strategy. As in its June disclosure, Five Below revealed underlying issues executing its core trend-right strategy as a key factor driving poor financial results—not just shrink (which it defined only as theft). *See* Orlov Rebuttal Rep. ¶ 92 (concluding that the disclosures revealed to investors that, contrary to claims that Five Below could "quickly execute" on trends to bring trending product into stores, the company's weak performance was self-inflicted and driven by execution failures rather than macroeconomic factors). And the analysts' reports reflect that the market connected Five Below's "self-inflicted" execution issues to its earlier misrepresentations which blamed its poor performance only on external issues like shrink. The July 16 disclosure, therefore, contained "new information 'that need only relate to, concern, or be linked to a specific alleged misrepresentation,'" *Pelletier*, 338 F.R.D. at 483 (quoting *Pearlstein*,

2021 WL 253453, at *18), and Defendants have failed to rebut the presumption of reliance as to the July 16 disclosure.

The remaining misrepresentations cited by Plaintiffs as having artificially maintained the stock price are thematically similar, either touting Five Below's proficiency in identifying trending products and executing its trend-right strategy or blaming macroeconomic and market-wide factors external to the company. As to the trend-right statements, an example is paragraph 214 of the Amended Complaint: "We stay on top of hot trends and swiftly move to capitalize on them. . . . The flexibility of our model . . . is unique and enables swift recognition and introduction of trend-right and relevant products to our customers, and we honed our expertise and discipline to effectively manage the constant cycling of these trends." As to shrink, I have previously described paragraphs 231 to 234 of the Amended Complaint as repeatedly connecting the shrink discussed to "shoplifting, an outside force," without mentioning "any other potential causes inside the company." ECF 41 at 31. The market's immediate reaction, and both the inquiries and the statements from analysts after the June 5 and July 16 corrective disclosures in 2024, demonstrate the relevance and value of such statements to investors. Given this throughline, there is no need to parse each misrepresentation individually. Plaintiffs have sufficiently shown common issues of law and fact, particularly as to reliance.

**C. The Proposed Class satisfies Rule 23(b)(3)'s remaining requirements.**

*1. Ascertainability*

Although not explicitly stated in Rule 23(b)(3)'s text, the Third Circuit has instructed that a plaintiff must also meet an ascertainability standard by showing "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's*

*Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Carrera*, 727 F.3d at 306). This "does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'" *Id.* (quoting *Carrera*, 727 F.3d at 308 n.2). Here, the proposed class is currently and readily ascertainable. The class definition includes all persons and entities who purchased or acquired Five Below common stock during the class period. Class members can be readily ascertained by referencing shareholder records. *See Utesch*, 2021 WL 3560949, at *11 ("Plaintiffs explain and Defendants do not dispute that class members can be identified using records of shareholder acquisitions. Thus, the ascertainability requirement is met."). I therefore conclude that the ascertainability requirement is satisfied.

*2. Superiority*

Rule 23(b)(3) also requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). This superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Warfarin*, 391 F.3d at 533–34 (citation omitted). In doing so, the court considers "the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 434–35 (3d Cir. 2016); Fed. R. Civ. P. 23(b)(3)(A)–(D).

Here, all factors favor class certification for the same reasons they did in *Energy Transfer*. In this multi-million-dollar securities class action with potentially thousands of class members nationwide, and Defendants' headquarters being located in this judicial district, "the complexity and costs of the litigation outweigh the possible recoveries of individual plaintiffs, there are no

known parallel suits by individual plaintiffs, judicial and administrative efficiency favor centralization, and the case presents no untoward difficulties in management in the form of a class action." *Energy Transfer*, 623 F. Supp. 3d at 512. The superiority requirement is satisfied here.

**D. The Proposed Class satisfies Rule 23(a)'s requirements.**

*1. Numerosity*

Rule 23(a)(1) requires the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no minimum number of members to meet this requirement, however, classes greater than 40 generally suffice. *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001); *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018). The named plaintiffs need not "offer direct evidence of the exact number and identities of the class members," but can show numerosity by presenting "sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to" enable the court to "rely on 'common sense' to forgo precise calculations and exact numbers." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012).

Importantly, "the number of class members is [just] the starting point," *Modanil*, 837 F.3d at 250, therefore courts should also consider whether joinder is impracticable by weighing relevant factors, "including judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages," *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 900 (3d Cir. 2022) (quoting *Modafinil*, 837 F.3d at 250, 253). "[J]udicial economy and the ability to litigate as joined parties are of primary importance." *Modafinil*, 837 F.3d at 250.

Here, the proposed class includes "[a]ll persons and entities that purchased or otherwise acquired the common stock of Five Below, Inc. from December 1, 2022 through July 16, 2024." Pls.' Mot. ¶ 1, ECF 61. Over the course of those nineteen-and-a-half months, Five Below's stock was traded on the NASDAQ Stock Market. More than 769 institutional investors purchased or acquired shares during the class period. On average, 4.5 million shares of stock were traded every week, representing approximately eight percent of Five Below's outstanding shares. These factors suggest that there are at least several thousand, if not tens of thousands, of prospective class members. Therefore, joinder of all the individual members would be impractical in this case, and I conclude that the numerosity element is met.

*2. Commonality*

Rule 23(a)(2) requires named plaintiffs to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To meet this requirement, they must "demonstrate that the class members have suffered the same injury," *Wal-Mart*, 564 U.S. at 349–50 (cleaned up), by showing that the class members' claims "depend upon a common contention . . . [that is] capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *id.* at 350. "Commonality is satisfied when there are classwide answers." *Reyes*, 802 F.3d at 482; *see Wal-Mart*, 564 U.S. at 350 ("What matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.").

Here, the legal and factual issues all concern a common course of conduct by Defendants as to public representations made to class member shareholders about Five Below's "trend-right" strategy and execution, and the cause and extent of the inventory loss, *i.e.*, "shrink," that the

company was experiencing during the class period. In a similar securities class action, I concluded that the commonality element was satisfied because

> [t]he factual and legal questions as to whether such representations were false or misleading, Defendants' state of mind in making such representations, and whether such representations violated the securities laws are all common to the putative class. And, further, questions of the impact these representations had on Defendants' securities and alleged damages caused to class members as holders of these securities are also susceptible to common resolution.

*Energy Transfer LP*, 623 F. Supp. 3d at 510. Similarly, here, the answers to questions about Defendants' alleged misconduct and the harm it caused would be common to all class members, reflecting precisely the classwide resolution that the commonalty requirement intended. I therefore conclude that commonality is satisfied here.

*3. Typicality*

Rule 23(a)(3) requires named plaintiffs to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality, much like commonality, serves as a guidepost to ascertain "whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Marcus*, 687 F.3d at 597–98. Typicality "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Id.* at 598 (quoting 7A Wright & Miller's Federal Practice & Procedure § 1764 (4th ed. 2008)).

Typicality requires the court to address "three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both

(a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009). "Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Nat'l Football League*, 821 F.3d at 428 (cleaned up). Here, Lead Plaintiffs and the class members assert virtually identical claims, all of which arise out of the same alleged unlawful conduct by Defendants that artificially inflated the stock held by class members. Therefore, typicality is satisfied.

*4. Adequacy*

Rule 23(a)(4) requires named plaintiffs to establish that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement primarily examines two matters: the interests and incentives of the class representatives, and the experience and performance of class counsel." *Cmty. Bank*, 795 F.3d at 392. The requirement's principal aim "is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *Id.* at 393. It also aims to "ferret out" conflicts of interest "and to ensure that the putative named plaintiff has the . . . incentive to represent the claims of the class vigorously." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) (citations omitted).

Here, Lead Plaintiffs are two retirement systems for certain public employees in Arkansas. Their agents submitted declarations attesting to their diligent commitment to this case and to their

understanding of their duties as lead plaintiffs to provide fair and adequate representation for the class. ECF 61-4, 61-5. Lead Plaintiffs have a financial interest in this case that is representative of class members, having alleged a combined loss of more than $5 million due to Defendants' alleged course of conduct during the class period. *See* ECF 17-1 at 9, 17-5. I therefore conclude that Lead Plaintiffs' interests and incentives are adequate and representative of the class.

I also conclude that class counsel can adequately represent the class. Both Berger Montague PC and Bernstein Litowitz Berger & Grossman LLP have significant experience litigating securities class actions and have competently briefed, argued, and survived the motion to dismiss in this litigation, providing competent advocacy during the class certification briefing.

**E. Class Period**

Defendants seek to shorten the class period so that it spans only from March 21 to July 16, 2024, arguing that Five Below had positive sales results driven by a successful trend-right strategy from December 1, 2022, until March 20, 2024, and that the company did not affirmatively "blame" shrink for its disappointing financial results until the March 20 earnings call. Opp'n Br. at 55–56. While Defendants correctly note that courts are not bound by the plaintiff's proposed class definition and may modify it "to provide the precision needed for class certification," *Chedwick v. UPMC*, 263 F.R.D. 269, 272 (W.D. Pa. 2009), "[c]lass action plaintiffs are entitled to define the class period as broadly as their evidence supports," *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 88 (D.N.J. 2019) (internal quotation marks and citation omitted). More importantly, at the class-certification stage, courts do not inquire into the merits to determine the class period's adequacy; rather, they look only to the pleadings to determine whether sufficient evidence exists to support the chosen start date. *See id.* at 88–89; *accord Deluca v. Instadose Pharma Corp.*, No.

21-675, 2023 WL 5489032, at *3 (E.D. Va. Aug. 24, 2023); *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 135 (S.D.N.Y. 2019).

Plaintiff disputes Five Below's narrative of sustained success. It notes that Five Below's gross profit margin, a key metric that analysts and investors use to assess a company's financial health and efficiency, fluctuated throughout the disputed timeframe, and that various factors other than the trend-right strategy contributed to the company's positive sales results. *See* Form 10-K Fiscal Year 2022, ECF 42-4 at 42–43 (showing decrease of approximately 60 basis points for fiscal year ended January 28, 2023); Form 10-Q, ECF 42-3 at 21 (showing no change from comparator period for quarter ended April 29, 2023); Form 10-Q, ECF 70-33 at 23 (showing increase of approximately 70 basis points from comparator period for quarter ended July 29, 2023); Form 10-Q, ECF 70-34 at 23 (showing decrease of approximately 190 basis points from comparator period for quarter ended October 28, 2023); Form 10-K, Fiscal Year 2023, ECF 42-17 at 43 (showing increase of approximately 20 basis points for fiscal year ended February 3, 2024); Form 10-Q, ECF 70-35 at 22 (showing increase of approximately 20 basis points from comparator period for quarter ended May 4, 2024). Plaintiff characterizes these fluctuations as evidence of an uncertain and eroding financial picture, which Defendants sought to obscure during the March 2023 earnings call and on subsequent calls in August and November of that same year, with an artificially narrow definition of shrink intended to divert attention from internal operational issues. Am. Compl. ¶¶ 228, 230–33.

In the final analysis, this is an issue of loss causation Defendants can revisit at summary judgment. At this stage, based on the pleadings, the proposed start date for the class period is justified, without prejudice to Defendants renewing this argument later. *See Pelletier*, 338 F.R.D. at 477 (citation omitted).

## IV. Conclusion

For the reasons set forth above, I conclude that Plaintiffs have proven that class certification is appropriate here. They have established all the Rule 23(a) elements, as well as the necessary elements of Rules 23(b)(3) and 23(g). Accordingly, Plaintiffs' Motion for Class Certification will be granted. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge